**No. 23-5600**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

———————————————————

L.W., by and through her parents and next friends, Samantha Williams
and Brian Williams, et al, *Plaintiffs-Appellees*,

and

UNITED STATES OF AMERICA, *Intervenor-Appellee*,

v.

JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney
General and Reporter, et al., *Defendants-Appellants*.

———————————————————

On Appeal from the United States District Court for the
Middle District of Tennessee (No. 3:23-cv-00376) (Richardson, J.)

———————————————————

**PLAINTIFFS-APPELLEES' RESPONSE TO
DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY OF
PRELIMINARY INJUNCTION PENDING APPEAL**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION……………………………….......................................................1

STANDARD OF REVIEW……………………………………………………....2

ARGUMENT……………………………………………………………………3

I.   Defendants Are Unlikely to Succeed on Appeal of Plaintiffs' Equal Protection Claims…………………………………………....3

   A.   The District Court Correctly Found That the Ban Is Subject to Heightened Scrutiny………………………………..3

   B.   The District Court Correctly Found That the Ban Likely Cannot Survive Heightened Scrutiny………………………...10

II.   Defendants Are Unlikely to Succeed on Appeal of Plaintiffs' Due Process Claims……………………………………………………14

III.   Defendants Fail to Satisfy the Remaining Stay Factors……………17

   A.   Defendants Fail to Show They Will Suffer Irreparable Harm…………………………………………………………17

   B.   The Balance of Harms Weighs Strongly Against a Stay……..18

   C.   A Stay Would Be Contrary to the Public Interest……………20

IV.   Defendants Are Unlikely to Succeed on Their Challenge to the Injunction's Scope…………………………………………………...21

CONCLUSION…………………………………………………………………...22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985)................................................................10, 11, 12

*Bassett v. Snyder*,
951 F. Supp. 2d 939 (E.D. Mich. 2013) ...........................................21

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) ...................................................................5, 7

*Brandt v. Rutledge*,
2023 WL 4073727 (E.D. Ark. June 20, 2023) ........................2, 13, 14

*Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) ....................................................2, 4, 21

*Bristol Reg'l Women's Ctr., P.C. v. Slatery*,
7 F.4th 478 (6th Cir. 2021) (en banc) ...............................................10

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) .............................................................19

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)...........................................................................14

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023) ..............................................................21

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022).................................................................6, 16

*Doe 1 v. Thornbury*,
2023 WL 4230481 (W.D. Ky. June 28, 2023) ...........................2, 5, 7

*Doe v. Ladapo*,
2023 WL 3833848 (N.D. Fla. June 6, 2023) .............................*passim*

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982)...........................................................................19

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
   884 F.3d 560 (6th Cir. 2018) ..................................................................9

*Eknes-Tucker v. Marshall*,
   603 F. Supp. 3d 1131 (M.D. Ala. 2022)................................2, 7, 13, 17

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)...............................................................................7

*Geduldig v. Aiello*,
   417 U.S. 484 (1974)...............................................................................8

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994)...............................................................................6

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
   2023 WL 4054086 (S.D. Ind. June 16, 2023).............................*passim*

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
   927 F.3d 396 (6th Cir. 2019) ...............................................................15

*Memphis A. Philip Randolph Institute v. Hargett*,
   977 F.3d 566 (6th Cir. 2020) .................................................................3

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) .................................................................6

*Miller v. Johnson*,
   515 U.S. 900 (1995)...............................................................................6

*Nken v. Holder*,
   556 U.S. 418 (2009)...............................................................................3

*Ondo v. City of Cleveland*,
   795 F.3d 597 (6th Cir. 2015) .................................................................9

*Parham v. J. R.*,
   442 U.S. 584 (1979)...............................................................15, 16, 17

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) .................................................................6

*Reno v. Flores*,
  507 U.S. 292 (1993)...........................................................................................16

*Rice v. Cayetano*,
  528 U.S. 495 (2000)...........................................................................................8

*Romer v. Evans*,
  517 U.S. 620 (1996).........................................................................................14

*Santosky v. Kramer*,
  455 U.S. 745 (1982).........................................................................................15

*Schall v. Martin*,
  467 U.S. 253 (1984).........................................................................................15

*Silvester v. Becerra*,
  138 S. Ct. 945 (2018).......................................................................................10

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) ..........................................................................4, 6

*U.S. Student Ass'n Found. v. Land*,
  546 F.3d 373 (6th Cir. 2008) ..............................................................................3

*United States v. Salerno*,
  481 U.S. 739 (1987).........................................................................................21

*United States v. Virginia*,
  518 U.S. 515 (1996) ...........................................................................................8

*Utah v. Evans*,
  536 U.S. 452 (2002).........................................................................................20

*Vitolo v. Guzman*,
  999 F.3d 353 (6th Cir. 2021) .....................................................................17, 20

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ..........................................................................21

## Statutes

Tenn. Code Ann. § 68-33-102 .........................................................................4, 5

Tenn. Code Ann. § 68-33-103 ..................................................................4, 5, 7, 8

Tenn. Code. Ann. § 68-33-105 .................................................................20

**Other Authorities**

Fed. R. Civ. P. 52(a) advisory committee's note.....................................11

Michael T. Morley, *Erroneous Injunctions*, 71 Emory L.J. 1137
   (2022)..................................................................................................19

## **INTRODUCTION**

Three transgender teenagers, their parents, and a medical provider who treats transgender youth brought this action to prevent imminent irreparable harm from Tennessee's new categorical ban on providing gender-affirming care to minors (the "Ban"). If the Ban goes into effect and the Minor Plaintiffs are cut off from the critical gender-affirming medical care they rely on to treat gender dysphoria, they will experience anxiety, distress, and potentially permanent physiological changes. L.W. Decl., R.22, PageID#201; John Doe Decl., R.24, PageID#212–13; Ryan Roe Decl., R.26, PageID#229. The Parent Plaintiffs will have their parental judgment and decision-making authority usurped by the State, and they will either have to disrupt their lives at great costs to enable their children to receive critical medical care out of state, or else endure witnessing their children suffer without the medical treatment they need. Samantha Williams Decl., R.23, PageID#208–09; Williams Reply Decl., R.137, PageID#2371–72; Jane Doe. Decl., R.25, PageID#220–22; Doe Reply Decl., R.138, PageID#2376; Rebecca Roe Decl., R.27, PageID#236–37; Roe Reply Decl., R.139, PageID#2381. The Provider Plaintiff will have to choose between abandoning her patients or losing her medical license and livelihood. Lacy Decl., R.28, PageID#242–43.

In a meticulous opinion examining hundreds of pages of testimony, the district court determined that Plaintiffs are likely to prevail and entered a preliminary

injunction to prevent irreparable harm and preserve the status quo until a trial can be held on the merits. The court's factual findings and legal conclusions are consistent with the decisions of every other court to examine laws that attempt to categorically ban gender-affirming care for minors.[1]

Defendants ask this court to reverse that decision on an emergency basis without full briefing. But they will experience no harm in maintaining the status quo, and the district court's factual findings that Plaintiffs will experience immediate, irreparable harm are amply supported by the record. The district court also properly found that a statewide injunction was necessary to provide complete relief to the Plaintiffs. Because Defendants can establish none of the factors necessary to justify the extraordinary relief they seek, this Court should deny the motion.

## <u>STANDARD OF REVIEW</u>

Four factors govern whether Defendants are entitled to a stay of the district court's decision: "(1) whether [Defendants have] made a strong showing that [they are] likely to succeed on the merits; (2) whether [Defendants] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

---

[1] *See Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022); *Doe 1 v. Thornbury*, 2023 WL 4230481 (W.D. Ky. June 28, 2023); *Brandt v. Rutledge*, 2023 WL 4073727 (E.D. Ark. June 20, 2023); *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 2023 WL 4054086 (S.D. Ind. June 16, 2023); *Doe v. Ladapo*, 2023 WL 3833848 (N.D. Fla. June 6, 2023); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022).

*Memphis A. Philip Randolph Institute v. Hargett*, 977 F.3d 566, 568 (6th Cir. 2020).

Although no single factor is determinative, the first two factors are the "most critical."

*Nken v. Holder*, 556 U.S. 418, 434 (2009).

When assessing whether an appeal of a preliminary injunction is likely to succeed, this Court "review[s] de novo the legal conclusions made by the district court, and [it] review[s] its factual findings for clear error." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008). This Court's "review of the district court's ultimate decision regarding injunctive relief is reviewed under the highly deferential abuse-of-discretion standard." *Id.*

## ARGUMENT

### I. Defendants Are Unlikely to Succeed on Appeal of Plaintiffs' Equal Protection Claims.

The district court determined that heightened scrutiny applied to Plaintiffs' claims and, based on detailed factual findings, concluded that Defendants could not satisfy that standard. Defendants fall woefully short of showing that the district court's legal conclusions were wrong or that its factual findings were clearly erroneous.

#### A. The District Court Correctly Found That the Ban Is Subject to Heightened Scrutiny.

1. As the district court properly recognized, the Ban draws an explicit classification based on sex designated at birth. Op., R.167, PageID#2680–83. The

Ban prohibits medically necessary care if—and only if—the care is provided in a manner Defendants deem "inconsistent with the minor's sex," which the Ban defines as "a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth." Tenn. Code Ann. §§ 68-33-103(a)(1)(A), 68-33-102(9). "Whether a medical procedure is banned by SB1 . . . therefore requires . . . the ascertainment of whether the minor's sex at birth is consistent with that minor's (gender) identity." Op., R.167, PageID#2681–82.

Accordingly, Tennessee's Ban "creates a sex-based classification on its face" and "imposes disparate treatment on the basis of sex." *Id*; *see Brandt*, 47 F.4th at 669 ("Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [the law] discriminates on the basis of sex."); *K.C.*, 2023 WL 4054086, at *8 ("[W]ithout sex-based classifications, it would be impossible for [Indiana's ban] to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted)."); *accord Ladapo*, 2023 WL 3833848, at *8.

2. Under this Court's binding precedent, sex discrimination under the Equal Protection Clause also includes discrimination based on a person's "fail[ure] to act and/or identify with his or her" sex designated at birth—in other words, being transgender. *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004). The Ban

engages in precisely such sex discrimination by targeting health care for exclusion if the purpose of the care is to alleviate "distress from a discordance between the minor's sex [designated at birth] and asserted identity," or to "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth]." Tenn. Code Ann. § 68-33-103(a)(1)(A)-(B); *see* Op., R.167, PageID#2684–90; *Doe 1*, 2023 WL 4230481, at *4; *accord Ladapo*, 2023 WL 3833848, at *8. Conversely, the Ban contains an exception allowing for irreversible (and widely criticized) surgical interventions on infants with differences of sex development if the purpose of the surgery is to make the infant's body conform to their sex designated at birth. Tenn. Code Ann. § 68-33-102(1). As the Supreme Court explained in *Bostock v. Clayton County*, when the government "penalizes a person identified as male at birth for traits or actions that it tolerates in" people "identified as female at birth,"—such as receiving medical treatment to live in accordance with a female gender identity—the person's "sex plays an unmistakable and impermissible role." 140 S. Ct. 1731, 1741–42 (2020).

Seeking to evade the force of *Bostock*, Defendants contend (at 9–10) that its reasoning does not apply because, unlike Title VII, the Equal Protection Clause allegedly tolerates sex discrimination so long as men as a group are treated the same as women as a group. Not so. "The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals,

not groups." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy J., concurring). "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat [persons] as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up).

Defendants (at 9–10) also latch onto dicta in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), and *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), but neither case suggested that a sex classification could be facially discriminatory under Title VII and facially neutral under the Equal Protection Clause. *Meriwether* noted that Title VII and Title IX may differ with respect to whether certain sex classifications are *permissible*—not whether they exist at all. 992 F.3d at 510 n.4. And *Pelcha* held that *Bostock* did not change Circuit precedent for claims under the ADEA. 988 F.3d at 324. Circuit precedent before *Bostock* already held that discrimination based on transgender status is sex discrimination under *both* Title VII *and* the Equal Protection Clause. *Smith*, 378 F.3d at 575. *Pelcha* did not (and could not) affect that precedent.

Despite Defendants' insistence (at 9), *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), does not mandate rational basis review. *Dobbs* stated that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny." *Id.* at 2245–46. But, unlike facially

neutral laws involving pregnancy or abortion, the Ban *explicitly* imposes differential treatment based on sex. *See* Op., R.167, PageID#2681–82; *Doe 1*, 2023 WL 4230481, at *4; *K.C.*, 2023 WL 4054086, at *8; *Ladapo*, 2023 WL 3833848, at *10. The law is thus subject to heightened scrutiny, "not because [it] relate[s] to sex in some vague sense or because [it] has some disparate impact on one sex or another, but because" it requires government officials and healthcare providers "to intentionally treat individual[s] differently because of their sex" designated at birth. *Bostock*, 140 S. Ct. at 1742.[2]

3.a. The Ban is also subject to heightened scrutiny because it facially discriminates against a quasi-suspect class—transgender individuals. A transgender person is, by definition, someone whose sex designated at birth is different from their gender identity. Op., R.167, PageID#2657 n.3. By prohibiting medical treatments based on whether they alleviate "distress from a discordance between the minor's sex [designated at birth] and asserted identity," or "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth]," Tenn. Code Ann. § 68-33-103(a)(1)(A)-(B), the Ban expressly and exclusively targets transgender people. *See Eknes-Tucker*, 603 F. Supp. 3d at

---

[2] It is equally irrelevant that laws prohibiting "cross dressing" were commonplace when the Fourteen Amendment was ratified. Mot. 10. The Supreme Court long ago rejected the historical approach to sex discrimination claims. Op., R.167, PageID#2688. (citing *Frontiero v. Richardson*, 411 U.S. 677 (1973)).

1147 (similar law "places a special burden on transgender minors because their gender identity does not match their birth sex").

Defendants (at 12) resist this straightforward conclusion with a strained analogy to *Geduldig v. Aiello*, 417 U.S. 484 (1974), asserting that, because not all transgender individuals need the medical procedures banned by SB1, there is a "lack of identity" between transgender status and the prohibited treatments. As the district court recognized, that is like saying a law prohibiting Black students from graduate school does not discriminate based on race because not all Black individuals wish to enroll. Op., R.167, PageID#2674. That obviously (and thankfully) is not the law. *See Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice to make the classification race neutral."); *U.S. Virginia*, 518 U.S. 515, 550 (1996) (explaining that "some women, at least, would want to attend [VMI] if they had the opportunity" even if others would not). A law allowing treatment for cisgender individuals but not transgender individuals discriminates based on transgender status, even if some transgender individuals do not seek the prohibited treatments.[3]

---

[3] Defendants wrongly assert that the Ban does not discriminate based on transgender status because the Legislature banned "treatment for gender dysphoria even when it is *not* 'to identify with, or live as, a purported identity inconsistent with the minor's sex.'" Mot. 12. But that provision prohibits treatments to alleviate "distress from a discordance between the minor's sex [designated at birth] and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1)(B). Because cisgender minors do not have a

3.b. As the district court recognized, "[t]he overwhelming majority of courts to consider the question . . . have found that transgender individuals constitute a quasi-suspect class for the purposes of the Equal Protection Clause," triggering heightened scrutiny. Op., R.167, PageID#2677–78 (collecting cases). Transgender people (i) "have historically been subject to discrimination including in education, employment, housing, and access to healthcare," (ii) "are also no less capable of contributing value to society than non-transgender individuals," (iii) "have obvious immutable, or distinguishing characteristics that define them as a discrete group," and (iv) "are both a minority and lack political power." *Id.* PageID#2678–79.

The district court also properly rejected Defendants' argument that *Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015), forecloses application of heightened scrutiny. Op., R.167, PageID#2677 n.21. *Ondo* was about sexual orientation—not transgender status—and the question was whether any intervening Supreme Court decisions required modification of prior Circuit precedent applying rational basis review to such classifications. By contrast, no Circuit precedent impedes holding that classifications based on transgender status trigger heightened scrutiny. *Cf. EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 579–80 (6th Cir. 2018) (whether Title VII prohibits sexual-orientation discrimination is a

"discordance between" their identity and their sex designated at birth, both prohibitions exclusively target transgender minors.

9

"substantially different legal issue[]" from whether it prohibits transgender-status discrimination).

### B. The District Court Correctly Found That the Ban Likely Cannot Survive Heightened Scrutiny.

1. The district court correctly held that Defendants failed to meet their burden to show that the law's disparate treatment on the basis of sex and transgender status was "substantially related to an important government interest." Op., R.167, PageID#2670, 2713. Although Defendants (at 7, 14) fault the district court for "second-guess[ing] the legislature's judgments" and engaging in "courtroom fact-finding," they rely exclusively on cases applying rational basis review. *See e.g., Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 483 (6th Cir. 2021) (en banc). Unlike in the rational basis cases they cite, intermediate scrutiny is "subject to courtroom factfinding." *Silvester v. Becerra*, 138 S. Ct. 945, 950 (2018) (Thomas, J., dissenting from denial of certiorari) (citation omitted).

Moreover, to show likelihood of success, Defendants must establish that the district court's factfinding was not only wrong, but clearly erroneous. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985). The "clear error" standard

applies to all findings of fact including "documentary evidence or inferences from other facts." *Id.* at 574; *see also* Fed. R. Civ. P. 52(a) advisory committee notes.

2a. That the district court's review of the evidence in this case is "plausible" is beyond serious dispute. With respect to whether the Ban served an "important" state interest, the district court noted that: "[A]s with virtually all medical procedures, treatment for gender dysphoria carries with it the risk of negative side effects." Op., R.167, PageID#2703. But the court found based on the record "that there is at best conflicting evidence as to whether the relevant procedures increase a person's likelihood of experiencing certain illnesses, and that even if there is an increased risk, that it can be mitigated." *Id.* PageID#2704. In reaching that conclusion, the district court evaluated each of the risks Defendants' experts raised and found (based on testimony from Plaintiffs' experts), that the concerns were overblown or unfounded. *Id.* PageID#2696–704.

The court also explained that any risks from the medical procedures had to be weighed against "the evidence suggesting that [those treatments] confer certain benefits on the recipients"—specifically, "lower[] rates of depression, suicide, and additional mental health issues faced by transgender individuals." Op., R.167, PageID#2704, 2706. Citing testimony from Plaintiffs' expert witnesses who have treated over a thousand adolescents with gender dysphoria across two decades, the

court found that the benefits of banned therapies "are well-established by the existing record." *Id.* PageID#2706.

2b. Turning next to the "substantial relation" prong of the heightened-scrutiny test, the court explained that "the difference in treatment under SB1 between gender dysphoria and other conditions is not 'reasonable,'" but "in all likelihood arbitrary." *Id.* PageID#2710. If the mere fact of risk were enough to ban care, the district court concluded, that would leave "several pediatric treatments targeting something other than gender dysphoria vulnerable to severe limitations on access." *Id.* PageID#2707. The court also noted that the Ban allowed virtually the same procedures to occur when done for a purpose other than gender-affirming care. *Id.* PageID#2709–10. Accordingly, the court concluded that the Ban is "not proportionate to the state's interest of protecting children from allegedly dangerous medical treatments"—it is "severely underinclusive in terms of the minors it protects from the alleged medical risks of the banned procedures." *Id.* PageID#2712–13

3. Defendants' only response to the district court's thorough review (and rejection) of the State's justifications for the Ban is to quarrel with the way the court weighed the evidence. In other words, Defendants invite this Court to do precisely what the clear error standard disallows. *Anderson*, 470 U.S. at 573–74. But the district court's determinations were not only "plausible," they were correct and consistent with the way other courts have viewed similar evidence.

12

The district court found Defendants' experts to be "minimally persuasive," either because they never "diagnosed or treated a minor with gender dysphoria" or because their testimony was riddled with "inconsistencies and illogical inferences." Op., R.167, PageID#2690, 2700. It is hardly radical for a court evaluating expert opinions to consider the person's experience and the logic and consistency of their testimony.[4] Not surprisingly, other courts have used similar rationales in crediting Plaintiffs' experts over Defendants'. *See id.* PageID#2691 n.40 (noting courts' skepticism of Levine and Laidlaw); *Ladapo*, 2023 WL 3833848, at *2, *5 (crediting Janssen and Antommaria; not crediting Hruz); *Brandt*, 2023 WL 4073727, at *27, *30 (crediting Turban, Antommaria, and Adkins; not crediting Hruz); *Eknes-Tucker*, 603 F. Supp. 3d at 1142–43 (giving "very little weight" to Cantor).

Likewise, the district court correctly rejected Defendants' criticism of the WPATH Standards and Endocrine Society Guideline. Although Defendants "tr[ied] to make hay" out of the fact that the conclusions in the Standards and Guideline are supported by "low-quality" evidence, the district court properly recognized, based on the testimony of Plaintiffs' expert, that reliance on such evidence is not unique to

---

[4] Notably, one of Defendants' experts, Dr. Levine, *has* treated many patients with gender dysphoria, including by recommending treatment with the banned care. He even testified at trial in Arkansas that "the psychological impact of cutting off gender-affirming medical care for those currently receiving it [would be] 'shocking' and 'devastating.'" And that "he would expect doctors to 'find a way' to help those patients, even providing treatment in violation of the law." *Brandt*, 2023 WL 4073727, at *24.

the treatment of gender dysphoria, and is particularly common in pediatric medicine. Op., R.167, PageID#2693.

Finally, Defendants contend (at 17) that the district court's opinion is "missing" an answer to its European expert's commentary on practices in Europe. But the court did offer an answer: "the practices of European nations is not an apt analogy where none of these countries have gone so far as to ban hormone therapy entirely." *Id.* PageID#2704 n.53; *accord K.C.*, 2023 WL 4054086, at *11; *Ladapo*, 2023 WL 3833848, at *14.

4. Even if Defendants were correct about the district court's scrutiny analysis, they would still not be entitled to relief because the Ban fails rational basis review. The record is devoid of evidence explaining how gender-affirming medical care "would threaten legitimate interests of [Tennessee] in a way that" other permitted types of medical care "would not." *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). And the Ban's prohibition on all types of gender-affirming medical care is "so far removed from [the asserted] justifications that . . . it [is] impossible to credit" those interests as the true motivation for the law. *Romer v. Evans*, 517 U.S. 620, 635 (1996).

## II. Defendants Are Unlikely to Succeed on Appeal of Plaintiffs' Due Process Claims.

Defendants are also unlikely to prevail on the Parent Plaintiffs' due process claims. As the district court correctly found, Op., R.167, PageID#2665–70,

controlling precedent recognizes that parents' fundamental rights under the Due Process Clause include "the right, coupled with the high duty . . . to recognize symptoms of illness and to seek and follow medical advice." *Parham v. J. R.*, 442 U.S. 584, 602 (1979); *see Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019). Where, as here, the parent's and child's liberty interests in pursuing a course of medical care align, the strength of those interests is at its apex against state interference. *Cf. Santosky v. Kramer*, 455 U.S. 745, 760–61 (1982). Moreover, despite Defendants' assertions to the contrary (at 13), the fundamental rights of parents to seek and follow medical advice is not "derivative from" a minor's right to receive treatment because "due process rights related to directing the medical care of children devolve upon the parents . . . rather than the children themselves." *Kanuszewski*, 927 F.3d at 415 (finding due process violation for parents but not their children).[5]

In finding that the Parent Plaintiffs were likely to prevail, the district court properly recognized that Plaintiffs have articulated the fundamental right of parental autonomy "at the same level of generality as" under binding circuit precedent. Op.,

---

[5] To be sure, in some instances, "the juvenile's liberty interest may . . . be subordinated to the State's 'parens patriae interest in preserving and promoting the welfare of the child.'" *Schall v. Martin*, 467 U.S. 253, 265 (1984) (citation omitted). But the question whether a governmental restriction satisfies strict scrutiny is distinct from the question whether the restriction is subject to strict scrutiny in the first place. *See Kanuszewski*, 927 F.3d at 419–20.

R.167, PageID#2668. Pursuant to that precedent, "parents have a fundamental right to direct the medical care of their children, which naturally includes the right of parents to request certain medical treatments on behalf of their children." *Id.* PageID#2669. Defendants' objection (at 13) that the care at issue in this case was not available when the Fourteenth Amendment was ratified is irrelevant. Antibiotics (and most other forms of modern medicine) were not available in the 19th century either. The fundamental right applies to decisions about seeking medical care, not to the particular medical procedures in existence at a given time. *See Parham*, 442 U.S. at 599 (discussing parental autonomy regarding psychological care while noting that "medical knowledge about" mental health has "expanded" over time).

*Dobbs* did not change these principles or overrule these precedents. The Supreme Court in *Dobbs* "emphasize[d] that [its] decision concerns the constitutional right to abortion and no other right. Nothing in [the] opinion should be understood to cast doubt on precedents that do not concern abortion." 142 S. Ct. at 2277–78.

Finally, Defendants come nowhere close to demonstrating that their infringement of fundamental rights is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). As just described, banning treatment shown to improve the health of adolescents who need it does not protect them. And the existence of risk—common to nearly all medical treatment—"does

not automatically transfer the power to make [healthcare] decision[s] from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Indeed, Defendants' focus on the practices of "European countries [that] all chose less-restrictive means of regulation" proves that less restrictive alternatives are available, *see K.C.*, 2023 WL 4054086, at *12, and Tennessee's ban cannot survive strict scrutiny. *See Eknes-Tucker*, 603 F. Supp. 3d at 1146.

### III.   Defendants Fail to Satisfy the Remaining Stay Factors.

Defendants fail to show that any other factor weighs in their favor.

### A. Defendants Fail to Show They Will Suffer Irreparable Harm.

Defendants have not (and will not) suffer any harm absent a stay. Although Defendants make the generic claim that the preliminary injunction thwarts the will of the Legislature, it is well established that the State suffers no harm when an unconstitutional law is enjoined. *See Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

In the same vein, Defendants complain (at 23) that they are prevented from "protecting" the children of Tennessee. As described above, the district court considered and rejected this claim, explaining at length how Defendants failed to prove that gender-affirming care harms children. Op., R.167, PageID#2696–704. And, as the district court noted, multiple courts have found that it is the banning of

gender-affirming care that harms minors. *Id*. PageID#2706. Defendants fail to meet the high bar of showing those findings were clearly erroneous.[6]

### B. The Balance of Harms Weighs Strongly Against a Stay.

While Defendants can show no cognizable harm without a stay, Plaintiffs will suffer imminent, irreparable harm if the Ban takes effect. *Id.* PageID#2713–17. Testimony from Plaintiffs' medical experts and the Minor Plaintiffs themselves established that the Ban going into effect would result in potentially severe psychological and emotional harm, including anxiety, depression, self-harm, and suicidal ideation. *Id.* The district court correctly recognized that the Minor Plaintiffs would be irreparably harmed by permanent "unwanted physical changes" caused by the Ban prohibiting the use of their currently prescribed treatment. *Id* PageID#2714. The court's findings of fact were amply supported by the record, and were certainly not clearly erroneous. Indeed, multiple other courts have reached the same conclusions. *See id.* PageID#2715.

The district court also properly rejected Defendants' claim that Plaintiffs could avoid harm under the "continuing care exception" of the law, because (i) that provision does not permit medical providers to prescribe any new or alternative form of gender-affirming care, (ii) the provision effectively requires medical providers to

---

[6] Defendants state (at 24) they submitted declarations from a small number of people who regret having received gender-affirming care. None of these declarations came from people who received care in Tennessee.

titrate down existing care in anticipation of the complete ban going into effect, and (iii) Minor Plaintiffs' existing provider is ceasing care altogether as of July 1 unless the law is enjoined, regardless of the "continuing care exception." *Id.* PageID#2715–17.[7]

While Defendants assert that Plaintiffs' medical providers at Vanderbilt University Medical Center ("VUMC") may not resume care even with a preliminary injunction, the district court found that those assertions "stand[] in direct contradiction to the record." Op., R.167, PageID#2717. As the court noted, a VUMC witness testified that the clinic would resume gender-affirming care if the Ban were enjoined. *Id.*[8]

Defendants' only response is to speculate—without evidence—that VUMC did not mean exactly what it said.[9] Defendants misleadingly assert (at 22) that

---

[7] Despite Defendants' assertion (at 21 n.2), CHOICES does not treat people under 16. Roe Reply Decl., R.139, PageID#2380–81.

[8] Defendants' alarming contention (at 21) that Tennessee could enforce the Ban for treatments provided while the preliminary injunction was in place is based on the concurrence of a single Justice, which was not—and never has been—adopted by the Court. *See Edgar v. MITE Corp.,* 457 U.S. 624, 630 (1982); *see also* Michael T. Morley, *Erroneous Injunctions*, 71 Emory L.J. 1137, 1195 (2022) (explaining that Defendants' argument is "inconsistent with the traditional equitable principles that govern injunctions").

[9] Defendants' bare speculation is insufficient to create a genuine disputed question of fact—much less a "bitterly contested" one requiring a hearing. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007).

Plaintiffs' physician might not resume treatment because she expressed concern about "punitive consequences" from "non-medical third parties, and the Ban's private right of action remains in effect. But those lawsuits can be brought only by minor patients or their next of kin—not by "third parties." Tenn. Code. Ann. § 68-33-105(a). Thus, the physician's statement plainly refers to punitive consequences by governmental officials. Moreover, the plain text of the declaration indicates that the physician was expressing her concern about potential liability for providing care under the "Continued Care Exception" in the event the Ban is not enjoined. Brady Decl. R.113-1, PageID#1070–71. The district court's findings regarding VUMC were not clearly erroneous.

In any event, even if an injunction did not reopen VUMC's doors, it would still make it possible for other medical providers in Tennessee to begin or resume providing care. As such, an injunction "significant[ly] increase[s] . . . the likelihood that the plaintiff[s] would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). No more is required.

### C. A Stay Would Be Contrary to the Public Interest.

Because Plaintiffs have demonstrated an overwhelming likelihood of success on the merits of their constitutional claims, the public interest weighs heavily against a stay since "'it is always in the public interest to prevent violation of a party's constitutional rights.'" Op., R.167, PageID#2718 (quoting *Vitolo*, 999 F.3d at 360).

## IV.    Defendants Are Unlikely to Succeed on Their Challenge to the Injunction's Scope.

Defendants' challenge to the scope of the injunction is meritless. *See Brandt*, 47 F.4th at 672 (affirming state-wide preliminary injunction).

In finding that the Ban was facially unconstitutional in all its applications, the district court did not disregard *United States v. Salerno*, 481 U.S. 739 (1987), despite Defendants' assertions (at 20) to the contrary. The court stated it is "incumbent on Plaintiffs to show why they have succeeded under *Salerno*'s standard," and found that the Ban is unconstitutional in all its applications. Op., R.167, PageID#2721.

Moreover, the state-wide injunction extends no further "than necessary to provide complete relief to the plaintiffs." *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023). As the district court recognized, "it is far-fetched that healthcare providers in Tennessee would continue care specifically for Minor Plaintiffs when they cannot do so for any other individual to whom [the Ban] applies." Op., R.167, PageID#2719; *cf. Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) (injunctions that permit enforcement against other targets provide "illusory" relief); *Bassett v. Snyder*, 951 F. Supp. 2d 939, 972 (E.D. Mich. 2013) (an injunction regarding an act that was "not enforced against individual plaintiffs . . . will necessarily bar the defendant from enforcing the [a]ct against" all those who might be the target of enforcement). Defendants fail to show that the district court's finding—which was based on the court's thorough understanding of the record in

this case, as well as the relevant facts and circumstances in Tennessee—was erroneous, much less "clearly" so.

In the alternative, if this Court determines that the record is likely insufficient to support a facial injunction, it should not issue an immediate stay. This Court should instead remand for the district court to either hold an evidentiary hearing on the necessary scope of relief or consider whether additional injunctive relief is appropriate for the Provider Plaintiff (whose standing the district court did not consider) or for the United States as Intervenor.

## <u>CONCLUSION</u>

The Court should deny the motion.

Dated: July 6, 2023                          Respectfully submitted,

s/ *Joshua A. Block*

  Stella Yarbrough                         Joseph L. Sorkin
  Lucas Cameron-Vaughn                     Dean L. Chapman, Jr.
  Jeff Preptit                             Kristen W. Chin
  ACLU Foundation of Tennessee             Theodore James Salwen
  P.O. Box 120160                          Richard J. D'Amato
  Nashville, TN 37212                      Akin Gump Strauss Hauer & Feld LLP
  Tel.: 615-320-7142                       One Bryant Park
  syarbrough@aclu-tn.org                   New York, NY 10036
  lucas@aclu-tn.org                        Tel.: 212-872-1000
  jpreptit@aclu-tn.org                     jsorkin@akingump.com
                                         dchapman@akingump.com
  Joshua A. Block                          kristen.chin@akingump.com
  Chase Strangio                           jsalwen@akingump.com
  American Civil Liberties Union           rdamato@akingump.com
  Foundation
  125 Broad Street, Floor 18               Elizabeth D. Scott
  New York, NY 10004                       Akin Gump Strauss Hauer & Feld LLP
  Tel.: 212-549-2593                       2300 N. Field Street, Suite 1800
  jblock@aclu.org                          Dallas, TX 75201
  cstrangio@aclu.org                       Tel.: 214-969-2800
                                         edscott@akingump.com
  Sruti J. Swaminathan
  Lambda Legal Defense and Education       Martine E. Cicconi
  Fund, Inc.                               Christopher J. Gessner
  120 Wall Street, 19th Floor              David Bethea
  New York, NY 10005                       Akin Gump Strauss Hauer & Feld LLP
  Tel.: 212-809-8585                       Robert S. Strauss Tower
  sswaminathan@lambdalegal.org             2001 K Street N.W.
                                         Washington, DC 20006
  Tara Borelli                             Tel.: 202-887-4000
  Lambda Legal Defense and Education       mcicconi@akingump.com
  Fund, Inc.                               cgessner@akingump.com
  1 West Court Square, Ste. 105            dbethea@akingump.com
  Decatur, GA 30030
  Tel.: 404-897-1880
  tborelli@lambdalegal.org                 *Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

The foregoing response is in 14-point Times New Roman proportional font and contains 5,193 words, and thus complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)-(2).

*/s/ Joshua A. Block*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2023, I served the foregoing response upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

*/s/ Joshua A. Block*