No. 23-5600

In the United States Court of Appeals for the Sixth Circuit

L. W., by and through parents and next friends, Samantha Williams and Brian Williams; SAMANTHA WILLIAMS; BRIAN WILLIAMS; JOHN DOE, by and through parents and next friends, Jane Doe and James Doe; JANE DOE; JAMES DOE; REBECCA ROE; SUSAN N. LACY, on behalf of self and patients; RYAN ROE, by and through parent and next friend, Rebecca Roe,
*Plaintiffs – Appellees*

v.

JONATHAN THOMAS SKRMETTI, in his official capacity as the Tennessee Attorney General and Reporter, et al.,
*Defendants – Appellants*

_____

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville
No. 3:23-cv-00376

_____

### *AMICUS CURIAE* BRIEF OF
### WOMEN'S DECLARATION INTERNATIONAL USA
### IN SUPPORT OF APPELLANTS AND REVERSAL

Kara Dansky
WOMEN'S DECLARATION INTERNATIONAL USA
P.O. Box 21160
Washington, D.C., 20009
800-939-6636
president@womensdeclarationusa.com
*Counsel for Amicus Curiae*
*Women's Declaration International USA*

No. 23-5600
*L.W., et al. v. Skrmetti, et al.*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Under Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

***Amicus Curiae*:**
Women's Declaration International USA

**Counsel for *Amicus Curiae*:**
Kara Dansky

*/s/ Kara Dansky*_____
Attorney of record for *Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

INTEREST OF AMICUS CURIAE ........................................................... 1

SUMMARY OF ARGUMENT .................................................................. 4

ARGUMENT ............................................................................................. 8

    I.    Sex is grounded in material reality, whereas "gender" (including linguistic derivatives like "gender identity," "transgender" and "cisgender") is grounded in regressive sexist stereotypes. ................... 9

    II.    The word "transgender" is a linguistic sleight of hand that cannot be protected legally as a quasi-suspect class under Equal Protection analysis because it has no coherent meaning. ..................................... 15

        A.    If "transgender people," at least those with a diagnosis of "gender dysphoria, have a disability, then "transgender" cannot be a quasi-suspect classification. .............................................. 17

        B.    "Transgender people," even with no diagnosis of "gender dysphoria," do not constitute a coherent category of people, by their own definitions. .............................................................. 20

    III.    Children have an international human right to grow into adulthood and to be protected from the physical and psychological harms that result from blocking puberty and/or administering opposite-sex hormones. ........................................................................................... 22

CONCLUSION ........................................................................................ 29

CERTIFICATE OF COMPLIANCE ....................................................... 31

CERTIFICATE OF SERVICE ................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona Governing Committee v. Norris*
    463 U.S. 1073 (1983) ...........................................................................21

*Bostock v. Clayton Cty.*
    140 S.Ct. 1731 (2020) ...................................................................16, 22

*City of Cleburne v. Cleburne Living Center, Inc.*
    473 U.S. 432 (1985) ................................................................... *passim*

*City of Los Angeles Department of Water and Power v. Manhart*
    435 U.S. 702 (1978) ...........................................................................21

*Doe v. Boyertown Area Sch. Dist.*
    No. 17-3113 (3rd Cir. 2018) ..................................................................4

*Frontiero v. Richardson*
    411 U.S. 677 (1973) ...........................................................................21

*L.W., et al., v. Skrmetti, et al.*
    6th Cir. July 8, 2023 (No. 23-5600) ...........................................7, 8, 15

*Meriwether v. Hartop*
    992 F.3d 492 (6th Cir. 2021) ...............................................................11

*Price Waterhouse v. Hopkins*
    490 U.S. 228 (1989) ...........................................................................12

*Reed v. Reed*
    404 U.S. 71 (1971) .............................................................................21

*United States v. Virginia*
    518 U.S. 515 (1996) ...........................................................................21

*Weinberger v. Wiesenfeld*
    420 U.S. 636 (1975) ...........................................................................21

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*
    858 F.3d 1034 (7th Cir. 2017 ...............................................................14

*Williams v. Kincaid*
    45 F.4th 759 (4th Cir. 2022) ...........................................................7, 18


**Statutes**

Tenn. S.B. 1.


**International authorities**

Decl. Women's Sex-Based Rts. (January 2019).....................................1, 2, 28

U.N. Convention Rts. Child, G.A. Res. 44/25 (Nov. 20, 1989) ........25, 26, 27


**Other materials**

American Psychiatric Association (2013), Intellectual disability
    DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed.)18

Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of Women's Issues and the Legal Danger of "Brain-Sex" Language*
    17 NEV. L.J. 670, 693 (2017) ...............................................................9

Angus Thompson, *'What's the real risk?' Gender transition insurance cover cut for GPs*
    THE SYDNEY MORNING HERALD (May 29, 2023)...............................23

Azeen Ghorayshi, *England Limits Use of Puberty-Blocking Drugs to Research Only*
    THE NEW YORK TIMES (June 9, 2023) .................................................24

Colin Wright, *A Biologist Explains Why Sex Is Binary*
    THE WALL STREET JOURNAL (Apr. 9, 2023)........................................10

Colin Wright, *The Transgender Umbrella Casts Its Shadow Over Gender Nonconformity: Why are we pretending we don't know why kids think they're trans?*"
    REALITY'S LAST STAND (August 31, 2022).........................................14

E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*
    INTERNATIONAL JOURNAL FOR TRANSGENDER HEALTH (Sept. 15, 2022)5, 6

George Orwell, *Nineteen Eighty-Four*
    Plume/Harcourt Brace 2003 ed. ...........................................................10

Gerald Posner, *The Truth About Puberty Blockers*
    THE WALL STREET JOURNAL (June 7, 2023) .................................22, 23

Human Rights Campaign, *Glossary of Terms* ...............................................16

Jessica Clarke, *Sex Assigned at Birth*
    122 COLUM. L. REV. 1821, 1834-36 (2022)........................................10

Kara Dansky, *The Abolition of Sex: How the 'Transgender' Agenda Harms Women and Girls*
    (Bombardier Books 2021)....................................................................12

Kathleen Stock, *Changing the concept of "woman" will cause unintended harms*
    THE ECONOMIST (Jul. 6, 2018) ......................................................9, 11

Leor Sapir, *Why Europe and America are going in opposite directions on youth transgender medicine*
    THE HILL (June 28, 2023),........................................................ 24, 25

Ludvigsson, *et al., A systematic review of hormone treatment for children with gender dysphoria and recommendations for research*
    ACTA PAEDIATRICA (Jan. 20, 2023) ...................................................24

Michael Cook, *Policy shift in Finland for gender dysphoria treatment*
    BIOEDGE (July 25, 2021) ....................................................................23

National Research Council (US) Committee on Disability Determination for Mental Retardation, *Mental Retardation: Determining Eligibility for Social Security Benefits*
    NATIONAL LIBRARY OF MEDICINE (2002) ...........................................18

Risa Ara Schnebly, *Sex Determination in Humans*
    THE EMBRYO PROJECT ENCYCLOPEDIA (July 16, 2021).......................10

Sandra Lee Bartky, "Shame and Gender," in *Femininity and Domination*
    (Routledge 1990)....................................................................................11

Sheila Jeffreys, *Gender Hurts: A Feminist Analysis of the Politics of Transgenderism*
    (Routledge 2014).........................................................................11, 13

Statement, Campaign for US Ratification of the of the Convention on the Rights of the Child .........................................................................................25

Stonewall, *List of List of LGBTQ+ terms* ...............................................16, 17

*Sweden puts brakes on treatments for trans minors*
    FRANCE24 (Feb. 8, 2023)..................................................................23

Transgender Trend, *Is 'affirmation' gay conversion therapy for children and young people?*
    (April 1, 2021).....................................................................................28

Women's Declaration International USA, *Lesbian Bill of Rights*
    (Sept. 4, 2022)....................................................................................28

**INTEREST OF AMICUS CURIAE**

Women's Declaration International (WDI, of which WDI USA is one chapter) is made up of women from every walk of life – from law and government, to the hard sciences, the culture-shaping professions, and the nation-building trades. We are more than 36,000 individual women and 507 organizations from 160 nations. But from our diversity we have a single message: Never again will we return to a world where women are defined by the patronizing, regressive, and oppressive stereotypes of gender. "Gender identity" ideology supplants the objectively definable category of sex and deprives us all of the definition of women woven into thousands of sex discrimination cases that acknowledge sex as binary, objective, and immutable. This appeal presents the questions, critical to the continued progress of women and girls and to the health and safety of young people, as to what the words sex and gender mean and how the nebulous concept of "gender identity" is being weaponized to harm children and young adults physically and psychologically.

WDI's founders authored the Declaration on Women's Sex-Based Rights (the Declaration), which affirms the sex-based rights of women and girls and challenges the discrimination they experience when the category of "sex" is replaced by the category of "gender identity."[1] The Declaration is rooted in the idea that the right of

---

[1]     Decl.     Women's     Sex-Based     Rts.     (January     2019), https://www.womensdeclaration.com/en/.

1

women and girls to live free from discrimination, recognized under international human rights law, derives from being of the female "sex," not from "gender identity." Relevant in this case involving the obligations of government bodies to protect young people, the Declaration provides that "[s]tates should recognize that medical interventions aimed at the 'gender reassignment' of children by the use of puberty-suppressing drugs, cross-sex hormones and surgery" should be prohibited. The Tennessee law at issue here, SB 1,[2] is in alignment with the Declaration.

WDI USA is interested in this appeal first because, as an organization, we can hardly protect the sex-based rights of women and girls if sex is judicially redefined to mean an amorphous continuum of subjectively felt "genders" that may not be related to sex at all. Second, this case deals directly with the authority of a government entity, in this case the state of Tennessee, to protect children from the harms of what is colloquially referred to as "gender affirming care" (i.e., the use of hormones that cause irreversible damage to young peoples' natural physical and psychological growth and development). Third, the linguistic destabilization caused by use of words like "transgender" and "cisgender" is producing massive confusion

---

[2]      Tenn. S.B. 1, AN ACT to amend Tennessee Code Annotated, Title 28; Title 29; Title 33; Title 34; Title 36; Title 37; Title 39; Title 40; Title 49; Title 56; Title 63; Title 68 and Title 71, relative to medical care of the young.

throughout society as well as in law, and ought to be avoided at all costs. In view of its work on these issues, WDI USA has a meaningful perspective to offer the Court.

No counsel for a party authored this brief in whole or in part. No party or counsel for a party contributed money that was intended to fund preparing or submitting this brief. No person—other than WDI USA, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. WDI USA is authorized to file this amicus brief because Appellants and Appellees have consented to its timely filing.

## SUMMARY OF ARGUMENT

This panel was right to stay the District Court's preliminary injunction and WDI urges the panel to reverse the District Court's decision and remand accordingly.

Gender identity advocates and the lower court are confusing the public by conflating the words sex and gender, and this Court should correct that. Sex and gender are different things; sex is grounded in the material reality of biology and gender is the set of stereotypes imposed on people on the basis of sex, i.e., on the basis of being male or female. "Gender identity" is directly grounded in sexist and regressive stereotypes. For example, in the matter of *Doe v. Boyertown Area School District*, the National PTA submitted an *amicus* brief quoting a self-described "trans[gender] girl" as saying, "When I was little I loved to play with dolls and play dress up. I loved painting my nails too. Wearing my mom's high heels was my favorite!"[3] Stories like these peddle the offensive stereotype that a child who is a girl necessarily likes playing with dolls, dressing up, painting nails, and wearing heels; or, according to "gender identity" ideology, that a child who likes playing with dolls, dressing up, painting nails, and wearing heels is necessarily a girl. The child in question, the "transgender girl," was just a boy who liked to play dress-up, not a girl

---

[3]    *Amicus* Brief of the National PTA, *et al.* in Support of Appellees at 22, *Doe v. Boyertown Area Sch. Dist., No. 17-3113* (3rd Cir. 2018).

at all. Furthermore, adding a prefix like "trans" or "cis" to the word "gender" does not cure any of this. The stereotypes remain.

The word "transgender" does not, as a factual matter, denote a coherent category of people and therefore cannot constitute a quasi-suspect class for Equal Protection purposes. Individuals and organizations that advocate for "rights for transgender people" cannot *themselves* agree on a coherent definition. For example, in 2022, the World Professional Association for Transgender Health (WPATH) published its "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8," containing a glossary whose definitions are simply baffling and not capable of being organized in any manner that would make the creation of a quasi-suspect class possible.[4] It states:

> GENDER: Depending on the context, gender may reference gender identity, gender expression, and/or social gender role, including understandings and expectations culturally tied to people who were assigned male or female at birth. Gender identities other than those of men and women (who can be either cisgender or transgender) include transgender, nonbinary, genderqueer, gender neutral, agender, gender fluid, and "third" gender, among others; many other genders are recognized around the world.

---

[4]     E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, INTERNATIONAL JOURNAL FOR TRANSGENDER HEALTH (Sept. 15, 2022), https://www.wpath.org/soc8.

TRANSGENDER or trans are umbrella terms used to describe people whose gender identities and/or gender expressions are not what is typically expected for the sex to which they were assigned at birth. These words should always be used as adjectives (as in "trans people") and never as nouns (as in "transgenders") and never as verbs (as in "transgendered").

GENDER EXPRESSION refers to how a person enacts or expresses their gender in everyday life and within the context of their culture and society. Expression of gender through physical appearance may include dress, hairstyle, accessories, cosmetics, hormonal and surgical interventions as well as mannerisms, speech, behavioral patterns, and names. A person's gender expression may or may not conform to a person's gender identity.

GENDER IDENTITY refers to a person's deeply felt, in-ternal, intrinsic sense of their own gender.[5]

 None of this is sufficiently coherent to establish a quasi-suspect category of people and in the end it doesn't matter, because one hundred percent of human beings are either female or male; there is no third sex class.

If this court were to create a quasi-suspect class called "transgender people" for Equal Protection purposes, it would create a legal nightmare for the judiciary, because in today's cultural climate anyone can simply state that he or she "is

---

[5]     *Id*. Appendix B: Glossary.

transgender" and be given the benefit of the doubt as to the truth of that statement. To the extent that there is any coherent category of people called "transgender," that category *might* more accurately be called "people with a diagnosis of gender dysphoria." This is the category of people that the 4th Circuit recently ruled have the right to protection under the Americans with Disabilities Act (ADA), having determined that a diagnosis of "gender dysphoria" constitutes a disability.[6] But the Supreme Court has already rejected the far more clearly defined disability category of "mental retardation" as not being a quasi-suspect class.[7] And the amorphous, tautological, and infinitely subjective "transgender" category scarcely qualifies as a class at all, let alone a quasi-suspect class capable of being protected under intermediate scrutiny.

As this panel recognized in its July 8, 2023, decision to stay the District Court's imposition of a preliminary injunction, the administration of puberty blockers and opposite-sex hormones is both experimental and irreversible.[8] And yet it is happening all over our country. While other countries have examined the evidence and taken steps to protect children from these harmful practices, the U.S.

---

[6]    *Williams v. Kincaid*, 45 F.4[th] 759 (4th Cir. 2022), *cert. denied*, 600 U.S. ___ (U.S. June 30, 2023) (No. 22-633).

[7]    *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

[8]    *L.W., et al., v. Skrmetti, et al.,* Op. at 8, 11 (6th Cir. July 8, 2023) (No. 23-5600).

continues in its zeal to halt the natural puberty of healthy minors and to administer hormones known to have long-term harmful consequences, including sterility and loss of sexual function. Many of the children who are being subjected to these so-called "treatments" are on the autism spectrum; many others, if permitted to mature into their sexuality without being hindered by puberty blockers or hostile sex hormones, will discover that they are lesbian or gay.

This panel has an opportunity to put an end to all of this chaos and damage by reversing the District Court's decision in a ruling that uses accurate language, rejects the idea that "transgender" can be defined coherently, and allows Tennessee to enforce the law its legislature sensibly enacted to protect minors (many of whom are lesbian or gay) from irreversible physical and psychological damage.

## ARGUMENT

WDI USA agrees with this panel's July 8, 2023 decision to stay the District Court's preliminary injunction because the plaintiff-appellees are unlikely to succeed on the merits of their claims.[9] Plaintiffs have not demonstrated, and indeed cannot demonstrate, that children have a "fundamental right" to access experimental and irreversible medical "treatments" or that parents have a "fundamental right" to consent to such for Due Process purposes. Plaintiffs also cannot demonstrate that the

---

[9]     *Id.* at 2.

word "transgender" connotes a coherent category of human beings entitled to elevated scrutiny for Equal Protection purposes or that prohibiting the administration of hormones to children of both sexes constitutes sex discrimination. The Panel was also right to find that under both Due Process and Equal Protection analysis, the Tennessee law in question likely satisfies rational basis review. The panel was correct as to all three legal issues for the reasons stated in its July 8 opinion, and the District Court's decision should be reversed.

## I.    Sex is grounded in material reality, whereas "gender" (including linguistic derivatives like "gender identity," "transgender" and "cisgender") is grounded in regressive sexist stereotypes.

Sex and "gender" are not synonyms. The term sex refers to the observable fact of the distinction between female and male—based on genetic characteristics and reproductive biology—not a mutable status that everyone, as if by accident, is "assigned at birth."[10] Women and girls are the female sex.[11] Sex is established at

---

[10]    *See* Kathleen Stock, *Changing the concept of "woman" will cause unintended harms*, THE ECONOMIST (Jul. 6, 2018), https://www.economist.com/open-future/2018/07/06/changing-the-concept-of-woman-will-cause-unintended-harms

[11]    *See* Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of Women's Issues and the Legal Danger of "Brain-Sex" Language*, 17 NEV. L.J. 670, 693 (2017) ("There are undeniable legal consequences of living in a female body. . . . Thus, woman specific language must be used in legal discussions of sex-based discrimination. . . .").

conception, when an X sperm or a Y sperm fertilizes an egg.[12] It is easily identifiable and recorded with nearly 100% accuracy.[13] In contrast, the expression "assigned at birth" was developed to indicate that medical professionals had "assigned" a sex to members of a tiny class of babies whose sex could not easily be determined because they had both male and female reproductive characteristics, but who were all nonetheless genetically either female or male.[14] That objectively diagnosed condition is not related to the subjective feelings at the root of "gender identity" ideology; but "gender identity" advocates intentionally repurpose the phrase to imply that sex is not binary, but rather a continuum. Their use of the term is not aimed at scientific accuracy, but rather ideological advocacy.

Repurposing this limited medical description to imply that *every* human is arbitrarily "assigned" a sex that might not be his or her "real" sex exemplifies Orwell's Newspeak: It denies women and girls the language necessary to oppose "gender identity" ideology and establish that they are unchangeably different from

---

[12]    *See* Risa Aria Schnebly, *Sex Determination in Humans*, THE EMBRYO PROJECT ENCYCLOPEDIA (Jul. 16, 2021), https://embryo.asu.edu/pages/sex-determination-humans.

[13]    *See* Colin Wright, *A Biologist Explains Why Sex Is Binary*, THE WALL STREET JOURNAL (Apr. 9, 2023) (refuting arguments that the existence of intersex people renders "sex" indeterminate).

[14]    *See* Jessica A. Clarke, *Sex Assigned at Birth*, 122 COLUM. L. REV. 1821, 1834-36 (2022).

men and boys in ways that sometimes matter—especially in being subjected to sex-based discrimination.[15] But just as two plus two equals four, every person is a member of either the female or male sex.

In contrast to sex, "gender" refers to a set of stereotypes imposed on women (and girls) and men (and boys) on the basis of sex.[16] It is, in the words of feminist scholar Sheila Jeffreys, the "foundation of the political system of male domination."[17] For feminists, gender is purely a social construction loaded with various patriarchal roles, values, and expectations. For example, women in our society are expected to wear high heels in order to comply with the rules of womanhood and to attract the attention of men, even though it has been shown time and again that wearing high heels impairs mobility and causes lower back pain, sore

---

[15]   George Orwell, *Nineteen Eighty-Four* 309-10 (Plume/Harcourt Brace 2003 ed.); *see also* Stock, *supra* (discussing "conceptual engineering").

[16]   *See, e.g., Amicus Curiae* brief of Women's Liberation Front in support of Plaintiff-Appellant at 7-9, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) (No. 20-3289).

[17]   Sheila Jeffreys, *Gender Hurts: A Feminist Analysis of the Politics of Transgenderism* (Routledge 2014), 1; *see also* Sandra Lee Bartky, "Shame and Gender," in *Femininity and Domination* (Routledge 1990), 84 ("What patterns of mood or feeling, then, tend to characterize women more than men? Here are some candidates: shame; guilt; the peculiar dialectic of shame and pride in embodiment consequent upon a narcissistic assumption of the body as spectacle; the blissful loss of self in the sense of merger with another; the pervasive apprehension consequent upon physical vulnerability, especially the fear of rape and assault.").

calves, foot pain, angle sprains, constricted blood vessels, crooked feet, and weakened ligaments. Women are also expected to be sweet, docile, and subservient to men.[18] This is all still true, notwithstanding the gains that feminists have made over the years. Feminists call for the abolition of gender because gender is a prison that keeps women in a position of subservience to men. For feminists, in other words, gender is the problem, not the solution.[19]

The concept of "gender identity" manipulates offensive, regressive, sexist stereotypes for a particularly harmful purpose – to deny women the coherent, objective legal taxonomy that anchors the jurisprudence of women's rights. On its face, "gender identity" refers to a person's subjective *identity*, not to his or her *sex*, defined by whatever feeling the person has of what it means to "be of the gender with which he or she identifies" and whatever expression the person gives that feeling. When men and boys claim to "identify as" women or girls, "gender identity" reduces to regressive stereotypes about what it means to be female, deprives women

---

[18]    The Supreme Court has rightly ruled that discrimination on the basis of nonconformity with such stereotypes in the employment context constitutes unlawful sex discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

[19]    *See, e.g.,* Kara Dansky, *The Abolition of Sex: How the 'Transgender' Agenda Harms Women and Girls* (Bombardier Books 2021).

of agency to define their role in the world for themselves, and subjects women to sex-based discrimination. As Jeffreys notes:

> Transgenderism depends for its very existence on the idea that there is an 'essence' of gender, a psychology and pattern of behavior, which is suited to persons with particular bodies and identities. This is the opposite of the feminist view, which is that the idea of gender is the foundation of the political system of male domination."[20]

How can a man or boy "feel" or "sense" that he is a woman and "express" that feeling by wearing dresses, earrings, and makeup, except by having lived in a society where that is demanded and expected of women?

None of this is resolved by adding a prefix like "trans" or "cis" to the word "gender."[21] A person is said to be "transgender" if said person prefers the sex

---

[20]    Jeffreys, *supra* n.17 at 1.

[21]    We are speaking of the binary categories of "transgender" and "cisgender" here because that is what is at issue in this case. However, the Court should be mindful that proponents of "gender identity" frequently insist that gender is divorced from sex, which further undercuts the appellees' suspect class argument. Although the concept of "gender identity" relies on intentionally adopting sex stereotypes to manifest the "gender identity" in question when it comes to the made-up concepts of "transgender" and "cisgender," there is no agreement as to what an "agender," "non-binary," (or any other made-up "gender identity") stereotype is or might be.

stereotypes that are typically associated with the opposite sex.[22] A person is said to be "cisgender" if the person prefers the sex stereotypes typically associated with his or her own sex. None of this does anything to abolish sex stereotypes themselves, and in any event, very few human beings categorically prefer one set of sex stereotypes over the other; in that sense, all of us could be said to "be transgender" in one way or another.

Furthermore, for feminists, to describe women as "cisgender" is patently offensive because it suggests that we somehow "identify with" a set of stereotypes designed to keep us in a state of subservience to men; and because it suggests that there is a category of women who are not female, which is not true. Furthermore, and most relevant to this appeal, if a "transgender" person is simply someone who prefers the sex stereotypes imposed on the opposite sex, there should be no need for doctors to intervene with medical treatment, especially on children and young people.[23]

---

[22]    *See Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017) ("By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth.")

[23]    *See, e.g.,* Colin Wright, *The Transgender Umbrella Casts Its Shadow Over Gender Nonconformity: Why are we pretending we don't know why kids think they're trans?*" REALITY'S LAST STAND (August 31, 2022) ("The definition of "transgender" currently used and embraced by our largest and most prestigious scientific, medical, and human rights organizations is literally synonymous with common gender

By using words like "transgender" and "cisgender," and by using the word gender to mean sex, the District Court obscured all of this in a manner that materially harms women and girls by pretending that women and girls are not a coherent category of human beings. This Court should resolve that by reversing the decision below and, in so doing, by using the words sex and gender accurately and without reference to confusing words like "transgender" and "cisgender," which do nothing but further cement damaging sex stereotypes. These words have no business being enshrined in the law.

## II.    The word "transgender" is a linguistic sleight of hand that cannot be protected legally as a quasi-suspect class under Equal Protection analysis because it has no coherent meaning.

This panel accurately noted in its July 8 decision staying the District Court's injunction that "neither the Supreme Court nor this court has recognized transgender status as a quasi-suspect class."[24] WDI USA would argue strongly against creating such a class, because, as the panel correctly noted, the "bar for recognizing a new quasi-suspect class" is "a high one."[25] In addition, we maintain that the word

---

nonconformity.")        https://www.realityslaststand.com/p/the-transgender-umbrella-casts-its

[24]    *L.W., et al., v. Skrmetti, et al.*, Op. at 12.

[25]    *Id*.

"transgender" simply does not describe a coherent category of human beings that the law *even can* consider as a quasi-suspect class.

As this panel noted in its July 8 decision, in *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), the Supreme Court ruled that Title VII's prohibition on employment discrimination "because of … sex" includes discrimination against people who "are gay or transgender." 140 S.Ct. 1731, 1743 (2020). That Court did not, however, define the word "transgender" anywhere in its ruling. It simply assumed that the word "transgender" has a coherent meaning on which all of society agrees. We think that this is not the case.

The Human Rights Campaign (HRC) defines the word "transgender" to mean an "umbrella term for people whose gender identity and/or expression is different from cultural expectations based on the sex they were assigned at birth."[26] It continues to state that "[b]eing transgender does not imply any specific sexual orientation. Therefore, transgender people may identify as straight, gay, lesbian, bisexual, etc."[27] In a similar vein, the U.K. organization Stonewall defines the word "trans" to mean an "umbrella term to describe people whose gender is not the same

_____

[26]    Human Rights Campaign, *Glossary of Terms* (last updated May 31, 2023), https://www.hrc.org/resources/glossary-of-terms.

[27]    *Id*.

as, or does not sit comfortably with, the sex they were assigned at birth."[28] Stonewall's definition continues: "Trans people may describe themselves using one or more of a wide variety of terms, including (but not limited to) transgender, transsexual, gender-queer (GQ), gender-fluid, non-binary, gender-variant, crossdresser, genderless, agender, nongender, third gender, bi-gender, trans man, trans woman, trans masculine, trans feminine and neutrois."[29]

But if the word "transgender" is an "umbrella term" that encompasses all of these various categories of people (and it is, according to both the Human Rights Campaign and Stonewall, two of the most vocal organizations in the world championing the "rights of transgender people," as well as WPATH), it cannot possibly denote a coherent singular category of people who make up a "quasi-suspect class" that the law can protect under the Equal Protection Clause.

A.  **If "transgender people," at least those with a diagnosis of "gender dysphoria, have a disability, then "transgender" cannot be a quasi-suspect classification.**

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985), cited in this panel's July 8 opinion, is instructive here. In that case, the Supreme Court had

---

[28]    Stonewall, *List of List of LGBTQ+ terms*, https://www.stonewall.org.uk/list-lgbtq-terms.

[29]    *Id.*

to decide whether "mental retardation" is a quasi-suspect classification.[30] It concluded that "mental retardation" is not a quasi-suspect class for several reasons, the first of which is particularly relevant here: "it is undeniable, and it is not argued otherwise here, that those who are mentally retarded have a reduced ability to cope with and function in the everyday world. Nor are they all cut from the same pattern: as the testimony in this record indicates, they range from those whose disability is not immediately evident to those who must be constantly cared for."[31]

The Court of Appeals for the 4th Circuit recently held that people with a diagnosis of "gender dysphoria" are entitled to protection under the Americans with Disabilities Act (ADA).[32] In so doing, the court observed that the ADA "defines the

---

[30]    Of course, language like "mental retardation" would be considered offensive today. Previous editions of the Diagnostic and Statistical Manual of Mental Disorders (DSM) defined "mental retardation" as "significantly subaverage intellectual functioning (i.e., IQ no higher than approximately two standard deviations below the mean), which is accompanied by significant limitations in adaptive functioning in at least two of [various listed] areas." The current edition, DSM-5, does away with the phrase "mental retardation" and its definition and instead contains a diagnosis of "intellectual disability (intellectual developmental disorder)," which involves "impairments of general mental abilities that impact adaptive functioning in three domains, or areas." *See, e.g.,* National Research Council (US) Committee on Disability Determination for Mental Retardation, *Mental Retardation: Determining Eligibility for Social Security Benefits*, NATIONAL LIBRARY OF MEDICINE (2002); American Psychiatric Association (2013), Intellectual disability, in DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed.).

[31]    473 U.S. at 442.

[32]    *See Williams v.* Kincaid, *supra*, n.6.

term 'disability' broadly to include 'a physical or mental impairment that substantially limits one or more major life activities.'"[33] Crucial to the court's reasoning was that a diagnosis of "gender dysphoria" involves "clinically significant distress," which "can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide."[34] This strongly suggests that, like the category of people at issue in *Cleburne* ("the mentally retarded"), the category of people here ("transgender people," at least those with a diagnosis of "gender dysphoria") "have a reduced ability to cope with and function in the everyday world." If that's true, that would render the category "transgender people," at least those with a diagnosis of "gender dysphoria," an inappropriate category for quasi-class protection under the Equal Protection Clause. If disability is not a quasi-suspect class for Equal Protection purposes, and if "transgender people," at least those with a diagnosis of "gender dysphoria," have a disability, then "transgender" is not a quasi-suspect class for Equal Protection purposes either. But whether or not "gender dysphoria" is a disability, it refers to a class whose definition is even less precise than the class disallowed in *Cleburne* for Equal Protection Clause purposes.

---

[33]    *Id*. at 766, quoting 42 U.S.C. § 12102(1)(A).

[34]    *Id*. at 768.

19

### B.    "Transgender people," even with no diagnosis of "gender dysphoria," do not constitute a coherent category of people, by their own definitions.

Still, it could be argued, the phrase "transgender people" includes people who do not have a diagnosis of "gender dysphoria," and that may very well be true. Indeed, as referenced, HRC defines "transgender" as an "umbrella term for people whose gender identity and/or expression is different from cultural expectations based on the sex they were assigned at birth." Stonewall defines "trans" to mean an "umbrella term to describe people whose gender is not the same as, or does not sit comfortably with, the sex they were assigned at birth" and to include people who describe themselves using terms like (but not limited to) "transgender, transsexual, gender-queer (GQ), gender-fluid, non-binary, gender-variant, crossdresser, genderless, agender, nongender, third gender, bi-gender, trans man, trans woman, trans masculine, trans feminine and neutrois." Neither organization even mentions "gender dysphoria" in its definitions. Returning again to *Cleburne*, if that's the case, then "transgender people" are not "all cut from the same pattern."[35] The phrase describes an extremely broad category of people who use a variety of terms (whose meanings themselves are not obvious and often appear to be internally inconsistent) to describe themselves. It defies reason that this category of people should be, or

---

[35]    473 U.S. at 442.

even *could* be, thought of as a quasi-suspect classification for Equal Protection purposes.

The U.S. judiciary has a long and venerable history of applying intermediate scrutiny to claims of sex-based discrimination under the Equal Protection Clause for the purpose of protecting women and girls from unfair treatment under the law. *See, e.g., United States v. Virginia*, 518 U.S. 515 (1996); *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975); *City of Los Angeles Department of Water and Power v. Manhart*, 435 U.S. 702 (1978); *Arizona Governing Committee v. Norris*, 463 U.S. 1073 (1983); *Frontiero v. Richardson*, 411 U.S. 677 (1973).

All of this caselaw stems from the landmark case of *Reed v. Reed*, 404 U.S. 71 (1971), where the Supreme Court held for the first time that the promise of equal protection under the Constitution applies to women equally as it does to men. In her briefing in *Reed*, then lawyer Ruth Bader Ginsburg argued, with her ACLU co-author Melvin Wulf, that "it is presumptively impermissible to distinguish on the basis of an unalterable identifying trait over which the individual has no control and for which he or she should not be disadvantaged by the law."[36] She was, of course, talking about sex, i.e., the difference between men and women, and the "unalterable identifying trait" to which she referred was the fact of her client Sally Reed being female. In contrast, the word "transgender" is anything but an "unalterable

---

[36]    Appellant Br. at 5, *Reed v. Reed*, 404 U.S. 71 (1971).

identifying trait over which [an] individual has no control." To equate it with the discrimination and other ill-treatment that women receive on account of being of the female sex would be a mistake of the highest proportions. It would be a grave insult to women (i.e., adult human females) and it would effectively gut the entire line of cases that established women's sex-based rights.

This court (or any court) cannot evaluate a claim of discrimination brought by a group of people who claim membership in a category that is not capable of definition. "Transgender status," whatever the Supreme Court may have thought it meant in *Bostock*, cannot be considered a quasi-suspect classification for Equal Protection purposes. This panel was right to suggest as much in its July 8 decision staying the District Court's injunction, and it should not now create such a class.

## III. Children have an international human right to grow into adulthood and to be protected from the physical and psychological harms that result from blocking puberty and/or administering opposite-sex hormones.

So-called "gender affirming care" has been called "a human experiment on children and teens" by Gerald Posner, one of the most respected investigative journalists in the country.[37] Posner states that "[i]gnoring the long-term dangers

---

[37]    Gerald Posner, *The Truth About Puberty Blockers,* THE WALL STREET JOURNAL (June 7, 2023), https://www.wsj.com/articles/the-truth-about-puberty-blockers-overdiagnosis-gender-dysphoria-children-933cd8fb.

posed by unrestricted off-label dispensing of powerful puberty blockers and cross-sex hormones, combined with the large overdiagnosis of minors as gender dysphoric, borders on child abuse."[38]

Several countries outside of the U.S. are moving toward banning so-called "gender affirming care" for minors. In 2020, the Finnish Health Authority, after conducting a systematic review of the evidence that found the evidence for "gender affirming care" to be "inconclusive," issued guidelines backing psychotherapy instead of puberty blockers and cross-sex hormones as the first line of treatment.[39] Sweden decided in February 2022 to halt hormone therapy for minors except in "very rare cases."[40] In 2023, one of Australia's biggest medical insurers decided to stop covering private practitioners prescribing puberty blockers and cross-sex hormones to adolescents.[41] Also in 2023, NHS England confirmed that it would only

---

[38]    *Id*.

[39]    Michael Cook, *Policy shift in Finland for gender dysphoria treatment*, BIOEDGE (July 25, 2021), https://bioedge.org/uncategorized/policy-shift-in-finland-for-gender-dysphoria-treatment/#:~:text=Although%20pediatric%20medical%20transition%20is,co%2Doccurring%20mental%20health%20conditions.

[40]    *Sweden puts brakes on treatments for trans minors*, FRANCE24 (Feb. 8, 2023), https://www.france24.com/en/live-news/20230208-sweden-puts-brakes-on-treatments-for-trans-minors.

[41]    Angus Thompson, *'What's the real risk?' Gender transition insurance cover cut for GPs*, THE SYDNEY MORNING HERALD (May 29, 2023),

give puberty blockers to minors "as part of clinical research."[42] Additionally, a 2023 Swedish study concluded: "This systematic review of almost 10,000 screened abstracts suggests that long-term effects of hormone therapy on psychosocial and somatic health are unknown except that GnRHa treatment seems to delay bone maturation and gain in bone mineral density."[43] Surely the state of Tennessee may lawfully join these countries in protecting the children in the state from these practices.

Why is the U.S. going in a different direction from these other countries? One reason, put forth by political scientist Leor Sapir, is that the other countries are following the principles of evidence-based medicine, while the U.S. is not.[44] Systematic reviews are the highest quality of evidence that medical associations

---

https://www.smh.com.au/healthcare/what-s-the-real-risk-gender-transition-insurance-cover-cut-for-gps-20230523-p5damx.html.

[42]    Azeen Ghorayshi, *England Limits Use of Puberty-Blocking Drugs to Research Only*, THE NEW YORK TIMES (June 9, 2023), https://www.nytimes.com/2023/06/09/health/puberty-blockers-transgender-children-britain-nhs.html.

[43]    Ludvigsson, *et al., A systematic review of hormone treatment for children with gender dysphoria and recommendations for research*, ACTA PAEDIATRICA (Jan. 20, 2023), https://onlinelibrary.wiley.com/doi/epdf/10.1111/apa.16791.

[44]    Leor Sapir, *Why Europe and America are going in opposite directions on youth transgender medicine*, THE HILL (June 28, 2023), https://thehill.com/opinion/healthcare/4070174-why-europe-and-america-are-going-in-opposite-directions-on-youth-transgender-medicine/.

ought to be relying on when developing policies, practices, and guidelines. WPATH, the American Academy of Pediatrics (AAP), and the Endocrine Society have all issued guidelines encouraging the provision of "gender affirming care" for minors that do not rely on *any* systematic reviews. They don't even claim that their policies and statements rely on systematic reviews. England has broken from WPATH, and the director of Belgium's Center for Evidence-Based Medicine has said he would "toss [WPATH's guidelines] in the bin."[45] Yet other U.S. medical groups routinely cite WPATH, the AAP, and the Endocrine Society when assuring the public about "gender-affirming care." That's how they get away with creating an illusion around "settled science" where it does not in fact exist.

The U.S. has signed, but not ratified, the U.N. Convention on the Rights of the Child (UNCRC), which, according to the Campaign for US Ratification of the of the Convention on the Rights of the Child, "recognizes all children's rights to develop physically, mentally, and socially to their fullest potential, to express their opinions freely, and to participate in decisions affecting their future."[46] Although the

---

[45]    *Id*.

[46]    Archived                                                                            at
https://web.archive.org/web/20200509140102/http://www.childrightscampaign.org/what-is-the-crc/.

U.S. has not ratified it (it is one of only two nations not to do so), many of the principles laid out in it are pertinent to this appeal.

The UNCRC[47] provides, in relevant part, that:

- In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration. Art. 3¶1.

- States should "ensure that the institutions, services and facilities responsible for the care or protection of children shall conform with the standards established by competent authorities, particularly in the areas of safety and health." Art. 3¶3.

- States should "respect the responsibilities, rights and duties of parents or, where applicable, legal guardians or other persons legally responsible for the child, to provide, in a manner consistent with the evolving capacities of the child, appropriate direction and guidance in the exercise by the child of the rights recognized in the present Convention." Art. 5.

---

[47]    U.N. Convention Rts. Child, G.A. Res. 44/25 (Nov. 20, 1989).

- States should "recognize the right of the child to the enjoyment of the highest attainable standard of health and to facilities for the treatment of illness and rehabilitation of health." Art. 24.

- States should "recognize the right of the child to education, with a view to achieving this right progressively and on the basis of equal opportunity." Art. 28.

- States "agree that the education of the child shall be directed to [t]he preparation of the child for responsible life in a free society, in the spirit of understanding, peace, tolerance, and equality of sexes." Art. 29.

- States "shall protect the child against all forms of exploitation prejudicial to any aspects of the child's welfare." Art. 36.

Medical interventions aimed at "gender reassignment," also known as "gender affirming care," of children through the use of puberty-suppressing drugs, cross-sex hormones, and surgery do not serve the best interests of these children. Children are not developmentally competent to give full, free, and informed consent to such medical interventions, which carry a high risk of long-term adverse consequences to their physical and psychological health, and which may result in permanent adverse consequences, including sterility and permanent loss of sexual function. By prohibiting such practices, Tennessee is in alignment with international law and human rights principles.

27

This is a matter of particular urgency for young people who are lesbian or gay.[48] It has long been understood that harmful practices that fall under the category of "gay conversion therapy" are a form of torture and abuse. Unfortunately, in many cases that is exactly what is happening with "gender affirming care." Young people who are exploring their sexuality sometimes find themselves attracted to members of the same sex. Often, such young people are today being told that this fact makes them "the opposite gender" and persuaded to undergo "gender affirming care." This is no different from the gay conversion therapy of the past, and it's barbaric. Many lesbian and gay activists all over the world argue that "gender affirming care" *is* gay conversion therapy and that our society is trying to "trans the gay away."[49]

---

[48]   *See* Decl. Women's Sex-Based Rts., 2 ("Sexual orientation rights are necessary in eliminating discrimination against those who are sexually attracted to persons of the same sex. Rights relating to sexual orientation are compatible with women's sex-based rights, and are necessary to enable lesbians, whose sexual orientation is towards other women, to fully exercise their sex-based rights."); Women's Declaration International USA, *Lesbian Bill of Rights* (Sept. 4, 2022), https://womensdeclarationusa.com/lesbian-bill-of-rights/ ("WHEREAS, lesbians are females sexually attracted exclusively to other females, consistent with Article 1 of the Declaration on Women's Sex-Based Rights.").

[49]   *See*, *e.g.*, Transgender Trend, *Is 'affirmation' gay conversion therapy for children and young people?* (April 1, 2021), https://www.transgendertrend.com/affirmation-gay-conversion-therapy-children-young-people/ ("The evidence shows that the majority of adolescents and young people now identifying as transgender are lesbian, gay or bisexual, and that homophobic bullying is indicated as a possible reason. This is cause for serious concern that 'affirmation' is a way of 'transing away the gay.'").

There is simply no valid reason to suppress a child's healthy, natural puberty for the purpose of "affirming" a child's "gender." WDI USA understands that puberty blockers are approved for medical conditions like precocious puberty and takes no issue with the administration of puberty blockers to treat such medical conditions. However, it is completely appropriate for government entities, including Tennessee, to take legal measures such as SB 1 to protect children and adolescents from adults who would enforce sex role stereotypes on girls and boys by diagnosing and treating children as having been "born in the wrong body" when they do not conform to traditional, culturally imposed sex role stereotypes; identifying young people who are same-sex attracted as suffering from "gender dysphoria"; and using medical interventions on children that may result in their sterilization, loss of sexual function, and other permanent harms.

## CONCLUSION

The District Court's imposition of a preliminary injunction obscured the meanings of the words sex and gender, mistook the word "transgender" as establishing a coherent category of human beings who should be treated in law as the opposite sex and as a quasi-suspect class even though it has no coherent definition, and blocked Tennessee from enforcing an important and democratically-enacted state law designed to protect children, consistent with international law and

human rights principles. For all of these reasons, the District Court's ruling should be reversed and remanded.

Dated: July 24, 2023          Respectfully Submitted,

                              */s/ Kara Dansky*
                              Kara Dansky
                              WOMEN'S DECLARATION INTERNATIONAL USA
                              P.O. Box 21160
                              Washington, D.C.  20009
                              (800) 939-6636
                              president@womensdeclarationusa.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that:

1. This brief complies with the type-volume limitation, as provided in Circuit Rule 32.2 and Fed. R. App. P. 29(a)(5), because, exclusive of the exempted portions of the brief as provided by Fed. R. App. P. 32(f), the brief contains 6,447 words.

2. This brief complies with the type-face and type-style requirements, as provided in Fed. R. App. P. 32(a) and Circuit Rule 32 because the brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

3. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: July 24, 2023            */s/ Kara Dansky*
                                     Kara Dansky

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Kara Dansky*
Kara Dansky