Nos. 23-5600, 23-5609

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

◆

L.W., et al., *Plaintiffs-Appellees*,
&
UNITED STATES OF AMERICA, *Plaintiff/Intervenor-Appellee*,
v.
JONATHAN SKRMETTI, et al., *Defendants/Appellants.*

―――

On Appeal from the U.S. District Court for the Middle District of Tennessee
No. 3:23-cv-376, Hon. Eli J. Richardson

◆

JANE DOE 1, et al., *Plaintiffs-Appellees*,
v.
WILLIAM C. THORNBURY, JR., et al., *Defendants*,
&
COMMONWEALTH OF KENTUCKY, ex rel. Attorney General Daniel Cameron,
*Defendant/Intervenor-Appellant.*

―――

On Appeal from the U.S. District Court for the Western District of Kentucky
No. 3:23-cv-230, Hon. David J. Hale

### BRIEF OF ALABAMA, ARKANSAS, AND 19 OTHER STATES AS *AMICI CURIAE* SUPPORTING APPELLANTS AND REVERSAL

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*

OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Additional Counsel Listed on Signature Page*

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici are not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF CONTENTS...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION AND INTERESTS OF AMICI CURIAE ................................1

ARGUMENT ......................................................................................................4

    I.    Laws Prohibiting Pediatric Sex-Modification Procedures Do Not Trigger Heightened Scrutiny .................................................................4

        A.    Laws Prohibiting Pediatric Sex-Modification Procedures Do Not Discriminate Based on Sex ........................5

        B.    *Bostock* Does Not Control ......................................................11

        C.    Transgender Individuals Are Not a Suspect Class ..................14

    II.    Even If Heightened Scrutiny Applied, Kentucky's And Tennessee's Laws Survive ................................................................17

        A.    Laws Prohibiting Pediatric Sex-Modification Procedures Are Based in Biology, Not Stereotype.................17

        B.    Sex-Modification Procedures Are Experimental......................20

        C.    The District Courts Erroneously Relied on American Medical Interest Groups that are Biased Advocates, Not Neutral Experts ................................................................24

CONCLUSION..................................................................................................29

CERTIFICATE OF COMPLIANCE..................................................................32

CERTIFICATE OF SERVICE ..........................................................................33

# TABLE OF AUTHORITIES

## CASES

*Abigail All. For Better Access to Development Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) (en banc)...............................................1

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) (en banc).........................................15, 18, 19, 20

*B.P.J. v. W.V. State Bd. of Educ.*,
  2023 WL 111875 (S.D.W.V. Jan. 5, 2023) ...............................................18, 20

*Ballard v. United States*,
  329 U.S. 187 (1946)...................................................................18

*Boe v. Marshall*,
  No. 2:22-cv-184-LCB (N.D. Ala.)......................................................27

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020)........................................... 11, 12, 13, 14, 16

*Brandt v. Rutledge*,
  47 F.4th 661 (8th Cir. 2022) ..........................................................5

*Brandt v. Rutledge*,
  No. 21-2875, 2022 WL 16957734 (8th Cir. Nov. 16, 2022)..............................12

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)............................................................13, 15, 17

*Craig v. Boren*,
  429 U.S. 190 (1976)...................................................................18

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)...........................................................*passim*

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
  920 F.3d 421 (6th Cir. 2019) ..........................................................28

*Frontiero v. Richardson*,
411 U.S. 677 (1973)......................................................................16, 20

*Geduldig v. Aiello*,
417 U.S. 484 (1974)................................................................................5

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) ...............................................................29

*Gonzales v. Carhart*,
550 U.S. 124 (2007)...............................................................................1

*Kirchberg v. Feenstra*,
450 U.S. 455 (1981) .............................................................................18

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014)...................................................................29

*Lyng v. Castillo*,
477 U.S. 635 (1986)..............................................................................15

*Mass. Bd. of Retirement v. Murgia*,
427 U.S. 307 (1976)........................................................................15, 16

*McMain v. Peters*,
2018 WL 3732660 (D. Or. Aug. 2, 2018) .............................................8

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ...............................................................11

*Michael M. v. Superior Court*,
450 U.S. 464 (1981)..............................................................................19

*Nguyen v. INS*,
533 U.S. 53 (2001)..........................................................................18, 19

*Pelcha v. MW Bancorp, Inc.*,
988 F.3d 318 (6th Cir. 2021) ...............................................................11

iv

*Reed v. Reed*,
   404 U.S. 71 (1971).........................................................................18

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973)...........................................................................15

*Stanton v. Stanton*,
   421 U.S. 7 (1975)...........................................................................18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   143 S. Ct. 2141 (2023) ..................................................................12

*Titus v. Aranas*,
   2020 WL 4248678 (D. Nev. June 29, 2020).....................................8

*United States v. Virginia*,
   518 U.S. 515 (1996)..................................................................18, 19

*Vacco v. Quill*,
   521 U.S. 793 (1997).......................................................................14

*Washington v. Davis*,
   426 U.S. 229 (1976).......................................................................12

*Washington v. Glucksberg*,
   521 U.S. 702 (1997).....................................................................2, 3

## STATUTES

18 U.S.C. § 116................................................................................6

Miss. Code Ann. § 41-41-191(3)(f) ...............................................10

## OTHER AUTHORITIES

Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*,
   102 AMERICAN SCIENTIST 460  (2014) .............................................26

Anna Smith Haghighi, *What To Know About Estrogen in Men*,
MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW ............10

Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research
Only*, N.Y. TIMES (June 9, 2023), https://perma.cc/Z74M-ED6R......................22

Azeen Ghorayshi, *More Trans Teens Are Choosing "Top Surgery,"*
N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8..............................11

Claire Sissions, *Typical Testosterone Levels in Males and Females*,
MEDICAL NEWS TODAY (Jan. 6, 2023), https://perma.cc/M98N-4WG4 ............10

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender &
Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH
(Sept. 15, 2022)............................................................................................2

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE
(June 15, 2022), https://perma.cc/ZMT2-W6DX ...............................................28

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration,
Child Abuse Fetishists*, REDUXX (May 17, 2022),
 https://perma.cc/5DWF-MLRU ...........................................................................3

Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022),
https://perma.cc/KS4N-V2GX..............................................................................22

Hilary Cass, *The Cass Review: Interim Report* (Feb. 2022),
https://perma.cc/RJU2-VLHT...............................................................................22

Jayne Leonard, *What Causes High Testosterone in Women?*,
MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.............10

Jennifer Block, *Gender dysphoria in young people is rising—and so is
professional disagreement*, THE BMJ (Feb. 23, 2023),
https://perma.cc/QKB6-5QCR...............................................................................27

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe,
Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.............24

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022) ...............................26

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 460 (2019), https://perma.cc/WU36-5889..................................10

Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. JOURNAL (June 9, 2023), https://www.wsj.com/articles/medical-journals-false-consensus-on-gender-affirming-care-sex-change-procedure-transgender-f10cd52b ...........................28

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021) .............14, 16

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1 (2021), https://perma.cc/E3ZQ-4PZV ...................................10

Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited May 12, 2023) ................................................................7, 9

Nat'l Inst. for Health & Care Excellence, *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ..................................................................................21

Nat'l Inst. for Health & Care Excellence, *Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/93NB-BGAN............................................9, 21

NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited May 12, 2023)...................9

NHS England, *Interim Service Specification* (June 9, 2023), https://perma.cc/YE3E-AE3H ...........................................................22

Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT...................................................23

Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. JOURNAL (Jul. 14, 2023) ...................................................................29

Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. JOURNAL (June 28, 2023) ...........................................27

Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022), https://perma.cc/FDS5-BDF3 ..........................................22, 23

Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7 .....................................................7

Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X ...........................................................................27

Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020) .......................................................................................................26

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Amici curiae are the States of Alabama, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and West Virginia.

Amici regulate healthcare. They have done so for as long as they have existed. Since the Founding, States have exercised their authority to enact health and safety measures—regulating the medical profession, restricting access to potentially dangerous medicines, banning treatments that are unsafe or unproven. *See Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-05 (D.C. Cir. 2007) (en banc). State legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

The district courts forgot this. Rather than accord Kentucky and Tennessee's "health and welfare laws" a "strong presumption of validity," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted), the courts treated certain medical interest groups as the *real* regulators, authoring standards that no mere State could contradict. The "major medical organization[s] in the United States" endorse the Standards of Care promulgated by the World Professional Association for Transgender Health (WPATH), the courts reasoned, so it is *those*

standards the Constitution purportedly mandates. KY.Op., R.61, PageID#2309; *see* TN.Op., R.167, PageID#2693-94, 2707-08.

One could scarcely dream up a more radical organization to outsource the regulation of medicine to than WPATH. As "Americans are engaged in an earnest and profound debate about" how best to help children suffering from gender dysphoria, *cf. Washington v. Glucksberg*, 521 U.S. 702, 735 (1997), WPATH has taken its gender ideology to the extreme and included in its latest Standards of Care an entire chapter on self-identified "eunuchs"—individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[1] Because eunuchs "wish for a body that is compatible with their eunuch identity," the Standards say, some will need "castration to better align their bodies with their gender identity."[2] WPATH thus deems castration "medically necessary gender-affirming care" for eunuchs to "gain comfort with their gendered self."[3]

And how did WPATH learn that castration constitutes "medically necessary gender-affirming care"? From the Internet of course—specifically from a "large online peer-support community" called the "Eunuch Archive," which WPATH says

---

[1] E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022), S88 ("SOC 8").
[2] *Id.* at S88-89.
[3] *Id.* at S88-89.

hosts "the greatest wealth of information about contemporary eunuch-identified peo-ple."[4] Later reporting revealed that the Eunuch Archive also hosts thousands of sto-ries that "focus on the eroticization of child castration" and "involve the sadistic sexual abuse of children,"[5] though curiously WPATH did not include that fact in its Standards of Care.

This is the stuff of nightmares or farce, not constitutional law. Yet these are the same Standards of Care the district courts, Plaintiffs, and a number of American medical interest groups claim the Fourteenth Amendment requires States to adopt. And just as with eunuchs, WPATH's Standards consider sterilizing sex-modification procedures to be medically necessary "gender-affirming care" for *minors* suffering from gender dysphoria.[6]

Thankfully, the Constitution does not put WPATH in charge of regulating medicine in Kentucky, Tennessee, or anywhere else. While a "legislative commit-tee" is free to consider WPATH's position, the organization's say-so does not "shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267. The govern-ment regulates the medical profession, not the other way around. *See Glucksberg*, 521 U.S. at 731. Amici write in support of the well-established authority that States

---

[4] *Id.* at S88.
[5] Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://perma.cc/5DWF-MLRU.
[6] *See* SOC 8, *supra*, at S43-S66.

have to enact health and welfare laws—even ones that conflict with WPATH's hor-rifying standards.

## ARGUMENT

The courts below committed two main errors. First, they assumed that height-ened scrutiny applies whenever a "minor's sex at birth determines whether or not the minor can receive certain types of medical care." KY.Op., R.61, PageID#2303 (citation omitted); TN.Op., R.167, PageID#2682 (same). Second, they relied on the WPATH Standards of Care and the imprimatur of American medical interest groups to find that laws prohibiting sex-modification procedures for children fail heightened scrutiny. KY.Op., R.61, PageID#2309; TN.Op., R.167, Page ID#2692-2694, 2707-08. But the Constitution does not cast a skeptical eye on health and welfare laws, even if they regulate sex-modification procedures. And States do not need to seek approval from WPATH before banning experimental procedures that leave children sterilized. The Court should reverse.

## I.    Laws Prohibiting Pediatric Sex-Modification Procedures Do Not Trigger Heightened Scrutiny.

Though worded slightly differently from one another, Kentucky's SB 150 and Tennessee's SB 1 do the same thing: prohibit healthcare providers from performing sex-modification surgeries on and administering sex-modification hormones to mi-nors. Both district courts concluded that such laws are subject to heightened scrutiny under the Equal Protection Clause because they purportedly discriminate on the

basis of sex and subject transgender individuals to disparate treatment on the basis of sex. The Tennesee Court also ruled that such laws discriminate against transgender individuals, who constitute a quasi-suspect class. In fact, as with "other health and welfare laws," rational-basis review applies. *Dobbs*, 142 S. Ct. at 2284.

### A.  Laws Prohibiting Pediatric Sex-Modification Procedures Do Not Discriminate Based on Sex.

Following the erroneous reasoning of an Eighth Circuit preliminary injunction panel, the courts below held that SB 150 and SB 1 trigger heightened scrutiny because a "minor's sex at birth determines whether or not the minor can receive certain types of medical care." KY.Op., R.61, PageID#2303 (quoting *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022)); TN.Op., R.167, PageID#2682 (same). But if this were enough to warrant heightened review, the Constitution would look askance at any public hospital offering testicular exams only to men or c-sections only to women. It would also mean that a law restricting abortions would face heightened scrutiny. The Supreme Court rejected this reasoning, holding that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretext designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245-46 (cleaned up) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). It could hardly be otherwise: Plaintiffs have produced no evidence that the Fourteenth Amendment was originally understood to be suspicious of any

5

recognition that males and females are biologically different. No special blessing from a court is needed before a government enforces a ban on female genital mutilation, for instance. *See, e.g.*, 18 U.S.C. §116.

The district courts tried to get around this truth by asserting that, unlike with abortions, both boys and girls can take hormones to transition, yet the laws at issue "demarcate[]" their bans "based on a minor's sex." TN.Op., R.167, PageID#2682. So the Tennessee Court reasoned that "if a minor's sex is female at birth and that minor wants to access hormone therapies to enable her to conform her gender identity to her sex," "SB1 would allow this minor to access such care"; but "if a minor's sex at birth is male and that minor wanted access [to] the same treatment," "SB1 would deny that minor access." TN.Op., R.167, PageID#2682 (footnote omitted). The Kentucky Court reasoned similarly. KY.Op., R.61, PageID#2305.

This pathway doesn't get around *Dobbs*, either. It appears to work only because it lumps the treatments at issue into one overarching category: "hormone therapies," TN.Op., R.167, PageID#2682, or transitioning "treatments," KY.Op., R.61, PageID#2306. But this is like subjecting an abortion regulation to heightened scrutiny because men can access "reproductive healthcare," while only women are prohibited from receiving abortions. It defines the procedure at too high a level of generality (though there would be no asymmetry here because neither boys *nor* girls

can be prescribed sex-modification procedures). What matters are the individual procedures at issue.

Here, there are three. The first is puberty blocker transitioning treatment. Puberty blockers work the same way in males and females. Sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for transitioning.[7] So banning their use in sex-modification procedures does not draw any line based on sex. Girls and boys are treated identically: both may receive puberty blockers to treat precocious puberty, but not to transition. Rational-basis review applies.

The second treatment is testosterone transitioning treatment. Unlike puberty blockers, testosterone transitioning treatments can be used *only* in females. That is, giving testosterone to a female can be a transitioning treatment because it will lead to male characteristics, while giving testosterone to a male *cannot* be a transitioning treatment because it will *not* lead to female characteristics. While the same drug may be used in *other* treatments for males (like treating a testosterone deficiency), no amount of testosterone can cause a male to develop female characteristics. If a male wants to transition, he must use estrogen, not testosterone.

The third treatment is estrogen transitioning treatment, which works the inverse as testosterone transitioning treatment. It can be given only to males to

---

[7] *See* Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7; Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited May 12, 2023).

transition. Giving estrogen to a female won't lead to transitioning; testosterone is needed to do that.

Because biology dictates that only males can take estrogen *to transition*, and only females can take testosterone *to transition*, testosterone transitioning treatments and estrogen transitioning treatments are "medical procedure[s] that only one sex can undergo." *Dobbs*, 142 S. Ct. at 2245-46. Rational-basis review thus applies to laws regulating the procedures. *Id.*

It does not matter that Kentucky and Tennessee allow these same drugs— puberty blockers, testosterone, and estrogen—to be used for some purposes but not for transitioning. The distinctions the States drew make sense because the different uses of the drugs have different diagnoses, different goals, and different risks. That makes them different treatments. This distinction is normal. States routinely allow drugs to be used for some treatments (morphine to treat a patient's pain) but not others (morphine to assist a patient's suicide). *E.g.*, *McMain v. Peters*, 2018 WL 3732660, at *4 (D. Or. Aug. 2, 2018) (prisoner seeking testosterone for PTSD not similarly situated to prisoner with Klinefelter Syndrome); *Titus v. Aranas*, 2020 WL 4248678, at *6 (D. Nev. June 29, 2020) (prisoner seeking testosterone to treat low levels not similarly situated to female prisoner taking testosterone to transition). In-deed, distinguishing between treatments that use the same drug is not just rational,

but necessary. To the diabetic patient, injecting insulin is lifesaving. To the hypo-glycemic patient, it can be life ending. Same drug, different treatments.

Consider puberty blockers again. Puberty blockers are ordinarily prescribed to treat precocious puberty, in which a child begins puberty at an unusually early age.[8] Unlike gender dysphoria, precocious puberty is a physical abnormality that can be diagnosed through medical tests.[9] And the goal of using puberty blockers to treat precocious puberty is to ensure children develop at "the normal age of puberty"[10]—the exact opposite goal as when doctors use them to treat gender dysphoria by *halting* normal puberty. This distinction alters the risk calculus as well: because doctors prescribe blockers to dysphoric children well beyond the normal age, using puberty blockers to treat gender dysphoria may risk diminished bone growth and social development.[11]

The same distinctions hold for the hormones barred by Kentucky and Tennesee. Males and females normally have very different amounts of naturally

---

[8] Mayo Clinic, *Precocious Puberty*, *supra*.

[9] *See* NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited May 12, 2023).

[10] Mayo Clinic, *Precocious Puberty*, *supra*.

[11] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/93NB-BGAN, at 26-32 ("NICE Puberty Blocker Evidence Review").

occurring testosterone and estrogen.[12] And these hormones serve very different purposes in the different sexes. In females, excess testosterone can *cause* infertility[13]; in males, testosterone is prescribed to *alleviate* fertility problems.[14] The inverse is true of estrogen. When prescribed at an excess level to males, estrogen can *cause* infertility and sexual dysfunction[15]; for females, estrogen is usually prescribed to *treat* problems with sexual development.[16] This makes the use of the same hormones in the different sexes different treatments.

The Tennessee Court's even more general rule for applying tiers of scrutiny fails as well. That court reasoned that "a policy that uses racial or gendered terms" automatically "falls into an inherently suspect or quasi-suspect category, even if it creates classifications that are not obviously pernicious." TN.Op., R.167, PageID#2681 (cleaned up and citation omitted). *Dobbs* says otherwise. *See* Miss. Code Ann. §41-41-191(3)(f) ("the pregnant woman"). Or say that plastic surgeons started using TikTok to market to minors an experimental surgery that uses skin

---

[12] *E.g.*, Claire Sissions, *Typical Testosterone Levels in Males and Females*, MEDICAL NEWS TODAY (Jan. 6, 2023), https://perma.cc/M98N-4WG4.

[13] Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.

[14] Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1, 2 (2021), https://perma.cc/E3ZQ-4PZV.

[15] Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW.

[16] Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 460 (2019), https://perma.cc/WU36-5889.

grafts to change one's racial appearance. (Disturbingly, not a far cry from current trends like #NipRevealFriday and "Yeet the Teet" that some surgeons use to sell sex-modification mastectomies to children.[17]) If Tennessee enacted a law prohibiting doctors from providing skin grafts to minors for the purpose of changing their racial appearance, would strict scrutiny apply simply because the statute uses "racial … terms"? Of course not. Such a law would not impose a suspect race-based classification under the Equal Protection Clause. So here: States can ban experimental pediatric sex-modification procedures without triggering heightened scrutiny because such laws do not impose a sex-based classification.

### B.    *Bostock* Does Not Control.

Nor does *Bostock* say otherwise, as the district courts thought. KY.Op., R.61, PageID#2303-04 (citing *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)); TN.Op., R.167, PageID#2684-85 (same). First, *Bostock* concerned Title VII's prohibition on sex-based employment discrimination, and both the Supreme Court and this Court have explained that *Bostock*'s reasoning cannot be exported beyond that context. *See Bostock*, 140 S. Ct. at 1753; *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). That is particularly true when it comes to the Equal Protection Clause, which "predates Title

---

[17] *See* Azeen Ghorayshi, *More Trans Teens Are Choosing "Top Surgery,"* N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8.

VII by nearly a century, so there is reason to be skeptical that [their] protections" are coextensive. *Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., joined by Gruender, Erickson, Grasz, & Kobes, JJ., dissenting from denial of rehearing en banc); *accord Washington v. Davis*, 426 U.S. 229, 239 (1976) (declining to hold that Title VII's race discrimination standards are "identical" to the Fourteenth Amendment's). The author of *Bostock* recently reiterated this conclusion, explaining why interpretations the Civil Rights Act of 1964 cannot be applied to the Equal Protection Clause. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2200 (2023) (Gorsuch, J., concurring).

Second, even if *Bostock*'s reasoning applied to the Equal Protection Clause, Plaintiffs' claims still would fail. In *Bostock*, the Supreme Court held that an employer that "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" discriminates based on sex under Title VII. 140 S. Ct. at 1740-41. At the core of the Court's reasoning was a "simple test": "if changing the employee's sex would have yielded a different choice by the employer," the employer has treated the employee differently "because of sex." *Id.* at 1741.

*Bostock* applied this test to workplace gender stereotypes. It makes no sense to apply it to medicine, where males and females are *not* similarly situated. *See*

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause … is essentially a direction that all persons similarly situated should be treated alike."). Take in vitro fertilization. A fertility clinic would not discriminate on the basis of sex by deciding to implant fertilized eggs only in females, even though "changing the [patient's] sex would have yielded a different choice by the [clinic]." There is no equal protection problem because there is no stereotype or inequality in the clinic's policy; implanting the egg in a male would be a different procedure altogether.

The same is true for sex-modification procedures, which also depend on biology, not stereotype. Administering testosterone to bring a boy's levels into a normal range is not the same treatment as ramping up a young girl's testosterone levels to that of a healthy boy—or, for that matter, as providing the hormone to a Tour de France cyclist seeking a yellow jersey. The laws at issue use sex only to determine who would benefit from certain drugs and who would not. And States may regulate testosterone wherever it is administered, be it a pediatrician's office, a gender clinic, or a cyclist training center. To put it in *Bostock*'s terms, it is *not* true that but for a child's sex he or she could be given sex-modification hormones to transition, because *no one* is allowed to receive the drug that transitions *them*. More particularly, because puberty blockers work the same for boys and girls, changing the child's sex changes nothing. Testosterone transitioning treatments and estrogen transitioning

treatments, on the other hand, are "medical procedure[s] that only one sex can undergo," *Dobbs*, 142 S. Ct. at 2245-46—unlike Aimee Stephens's desire to wear a dress, which anyone of either sex can do, *see Bostock*, 140 S. Ct. at 1738. *Bostock* does not apply.

## C.    Transgender Individuals Are Not a Suspect Class.

The Tennessee Court held that targeting sex-modification procedures effectively targets transgender people because only transgender people seek such procedures. TN.Op., R.167, PageID#2673. But this notion is refuted by the growing ranks of detransitioners—individuals who identify as transgender, receive sex-modification procedures, and later re-identify with their natal sex and seek to "detransition."[18] If detransitioners are not transgender, then the court was wrong to assume that only transgender people seek the procedures. And if detransitioners *were* transgender but no longer are, then being transgender is not an immutable characteristic.

Regardless, heightened scrutiny doesn't apply simply because people seeking a procedure are disproportionately (or even uniformly) members of a suspect class. *Vacco v. Quill*, 521 U.S. 793, 800 (1997). For instance, classifications based on sex receive intermediate scrutiny, but a classification of "people seeking abortions" does not, even though only women seek abortions. *Dobbs*, 142 S. Ct. at 2245-46.

---

[18] *E.g.*, Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021).

And in any event, individuals who identify as transgender do not constitute a suspect class to begin with. Aside from the obvious—race, sex, national origin, religion, etc.—the Supreme Court rarely designates suspect or quasi-suspect classes. *See, e.g.*, *Cleburne*, 473 U.S. at 442-46. Indeed, the Court has rejected suspect classification for disability, age, and poverty. *Id.*; *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). The fact that so few classifications rise to the level of "suspect" itself casts "grave doubt" on the assertion that transgender identity does. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc).

Precedent explains why. Classifications are suspect when they single out "distinguishing characteristics" that have historically been divorced from "the interests the State has the authority to implement." *Cleburne*, 473 U.S. at 441. Sex classifications, for example, are suspect because they often "reflect outmoded notions of the relative capabilities of men and women," rather than real differences. *Id.* at 441. Same for racial classifications. *Murgia*, 427 U.S. at 313-14. Thus, to be "suspect," a classification must single out a so-called "immutable characteristic" that has historically been the basis for deep discrimination. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (looking for (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness).

Transgender identity does not check these boxes. For one, it is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). To the contrary, according to Plaintiffs, individuals identify as transgender when their internal perception of who they are departs from the "immutable characteristic" of their biological sex. That necessarily takes place sometime *after* birth. And many individuals who identify as transgender alternate between gender identifications, whether it's non-binary, gender fluid, third gender, or their natal gender.[19] If a child can hop in and out of the category based on her "fluid" identity, it makes no sense to use the category for Equal Protection purposes.

Transgender identity falls short on the other suspect-classification factors too. Individuals identifying as transgender as a class look quite "unlike" those individuals who were long denied equal protection because of their race, national origin, or gender. *Murgia*, 427 U.S. at 313-14 (rejecting age as a suspect class because the elderly have not faced discrimination "akin to [suspect] classifications"). States enshrined purposeful race and sex discrimination into their laws for decades; conversely, as the Supreme Court has explained, transgender individuals have been protected by a "major piece" of federal civil rights legislation" for nearly a half-century. *Bostock*, 140 S. Ct. at 1753. And the laws (wrongly) described as discriminating against

---

[19] *See* Littman, *Individuals Treated for Gender Dysphoria*, *supra*.

transgender individuals are recent enactments grappling with tough policy questions about how to protect children from significant harms arising from the recent spike in transgender identification. To the extent that regulating to prevent those harms requires zeroing in on those individuals most likely to be at risk from them, such a classification is a "sensible ground for differential treatment," not the sort of irrelevant grouping that warrants heightened review. *Cleburne*, 473 U.S. at 441.

## II.    Even If Heightened Scrutiny Applied, Kentucky's And Tennessee's Laws Survive.

Even if the district courts were right to apply heightened scrutiny, they were wrong to find that the laws at issue fail such review. First, the laws are based in biology, not stereotype. Second, pediatric sex-modification procedures are experimental, and States have every reason to wait for the results of the experiments to come in before allowing children to be sterilized. Third, the medical interest groups the courts relied on are biased participants, not neutral arbiters of science.

### A.    Laws Prohibiting Pediatric Sex-Modification Procedures Are Based in Biology, Not Stereotype.

The Equal Protection Clause commands that "all persons *similarly situated* … be treated alike." *Cleburne*, 473 U.S. at 439 (emphasis added). But males and females are not similarly situated with respect to receiving sex hormones or obtaining certain surgeries. *See supra* Section I. So a law targeting the unique problems inherent in providing cross-sex hormones can't ignore those biological realities. *Dobbs*,

142 S. Ct. at 2245-46. Nor does the Constitution require it to. To the contrary, "fail[ing] to acknowledge ... basic biological differences ... risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001); *see Ballard v. United States*, 329 U.S. 187, 193 (1946). And a transgender identity doesn't obviate sex-based harms. *Accord Adams*, 57 F.4th at 809-10 (upholding single-sex bathroom policy); *B.P.J. v. W.V. State Bd. of Educ.*, 2023 WL 111875, at *7 (S.D.W.V. Jan. 5, 2023) (upholding single-sex sports policy), *enjoined pending appeal*, 2023 WL 2803113 (4th Cir. 2023).

Biological differences are "the driving force behind the Supreme Court's sex-discrimination jurisprudence." *Adams*, 57 F.4th at 803 n.6. Indeed, "the biological differences between males and females are the reasons intermediate scrutiny," not strict, "applies in sex-discrimination cases in the first place." *Id.* at 809. Intermediate scrutiny prevents States from legislating based on "overbroad generalizations about the different talents, capacities, or preferences of males or females"—generalizations that have no basis in biology. *United States v. Virginia*, 518 U.S. 515, 533 (1996). States cannot presume that women don't like competition, that they have less skill in managing or distributing property, or that they mature faster. *See, e.g.*, *id.* at 541; *Kirchberg v. Feenstra*, 450 U.S. 455, 459-60 (1981); *Reed v. Reed*, 404 U.S. 71, 74 (1971); *Craig v. Boren*, 429 U.S. 190, 192 (1976); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975).

But applying intermediate scrutiny, rather than strict, ensures that distinctions based on "enduring" and "[i]nherent differences" between the sexes survive. *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Such distinctions are, by their nature, substantially related to the relevant governmental interest and have thus been upheld time and again. Consider *Michael M. v. Superior Court*, which upheld a statutory-rape statute that prohibited sex with a minor female only. 450 U.S. 464, 466 (1981). The Court explained that the classification was permissible because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse. Only women may become pregnant." *Id.* at 471; *accord Nguyen*, 533 U.S. at 58.

In short, biology matters, and legislatures aren't required to ignore differences rooted in biology. When preventing harms unique to one sex, legislatures can and should take sexual differences into account.

Two recent decisions demonstrate that classifications grounded in biological reality survive intermediate scrutiny. In *Adams*, the Eleventh Circuit, sitting en banc, upheld a school's policy separating bathrooms by biological sex. 57 F.4th at 796.[20] That court acknowledged that schools have a legitimate interest in "protecting the privacy interests of students" in "shielding one's body from the opposite sex." *Id.* at

---

[20] *See id.* at 803 n.3 (explaining that analysis about sex-based intermediate scrutiny would be the same if transgender individuals were a suspect class).

803 n.6 & 805. Because that interest was grounded in real, physical differences between the sexes, the court concluded that the sex classification satisfied intermediate scrutiny. *Id.* at 807. And the school's interest didn't change even though one student identified as a member of the opposite sex because that student's self-identification could not change the "immutable characteristic[s] of biological sex" that underpinned the school's privacy interests. *Id.* at 803 n.6, 809 (citing *Frontiero*, 411 U.S. at 686). "[S]ex-specific interests … justif[ied] a sex-specific policy." *Id.* at 806.

Similarly, in *B.P.J. v. West Virginia Board of Education*, a district court upheld West Virginia's law prohibiting biological males from playing girls' sports, even if they identify as transgender. 2023 WL 111875, at *7. That's because "[w]hether a person has male or female sex chromosomes," not what gender he or she identifies as, "determines many of the physical characteristics relevant to athletic performance." *Id.* And "males [generally] outperform females because of inherent physical differences between the sexes." *Id.* To further its "interest in providing equal athletic opportunities for females," the State could "legislate sports rules" based on biological sex. *Id.* at *7-8. So too, States can legislate based on sex to prevent sex-based harms.

## B. Sex-Modification Procedures Are Experimental.

While Plaintiffs and their preferred medical interest groups convinced the district courts that pediatric sex-modification procedures are well-supported by the

evidence, that is far from the case. In recent years, medical authorities in the United Kingdom, Finland, Sweden, and Norway have all looked at the evidence and determined that such procedures are in fact experimental.

*1. United Kingdom.* In 2020, Britain's National Health Service (NHS) commissioned Dr. Hilary Cass, the former president of the Royal College of Paediatrics and Child Health, to chair an independent commission examining the use of puberty blockers and cross-sex hormones to treat gender dysphoria in minors. As part of the review, the National Institute for Care and Excellence (NICE) conducted two systematic reviews of the published scientific literature concerning the safety and efficacy of using sex-modification procedures to treat children and adolescents with gender dysphoria.[21] The results are striking. The literature reviews concluded that there are no "reliable comparative studies" on the "effectiveness and safety of [puberty blockers],"[22] and that the safety of testosterone transitioning treatment and estrogen transitioning treatment was similarly unknown.[23] Dr. Cass determined that

---

[21] *See Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ("NICE Cross-Sex Hormone Evidence Review"); NICE Puberty Blocker Evidence Review, *supra*.

[22] NICE Puberty Blocker Evidence Review at 12.

[23] NICE Cross-Sex Hormone Evidence Review 14.

"the available evidence was not strong enough to form the basis of a policy position,"[24] and thus called for experiments to *start* being conducted.[25]

On June 9, 2023, NHS published an interim service specification officially adopting many of Dr. Cass's recommendations. Unlike American medical interest groups, NHS now prioritizes psychological—not hormonal or surgical—care for the treatment of gender dysphoria in youth and will consider prescribing puberty blockers to minors *only* as part of a formal research protocol. Recruitment for that research study is expected to *begin* in 2024. Until then, puberty blockers will ordinarily not be prescribed by NHS physicians as a treatment for gender dysphoria.[26]

*2. Sweden.* In February 2022, following an extensive literature review, Sweden's National Board of Health and Welfare concluded that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits."[27] Concerned that there is no "reliable scientific evidence concerning the efficacy and the safety of both treatments," that

---

[24] Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022), https://perma.cc/RJU2-VLHT.

[25] Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022), https://perma.cc/KS4N-V2GX.

[26] *See* Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only*, N.Y. Times (June 9, 2023), https://perma.cc/Z74M-ED6R; NHS England, *Interim Service Specification* (June 9, 2023), https://perma.cc/YE3E-AE3H.

[27] Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.

"detransition occurs among young adults," and that there has been an "unexplained increase" in minors identifying as transgender, the National Board restricted the use of puberty blockers and cross-sex hormones to strictly controlled research settings or "exceptional cases."[28]

*3. Finland.* In June 2020, Finland's Council for Choices in Healthcare in Finland also suggested changes to its treatment protocols.[29] Though allowing for some hormonal interventions under certain conditions, the Council lamented the lack of evidence and urged caution in light of severe risks associated with medical intervention. "As far as minors are concerned," the Council found, "there are no medical treatment[s] [for gender dysphoria] that can be considered evidence-based," and "it is critical to obtain information on the benefits and risks of these treatments in rigorous research settings."[30] The Council concluded: "[N]o decisions should be made that can permanently alter a still-maturing minor's mental and physical development."

*4. Norway.* In March 2023, the Norwegian Healthcare Investigation Board (Ukom) released a report finding that its national guidelines for treating gender

[28] *Id.* at 3-4.
[29] *See* Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT.
[30] *Id.*

23

dysphoria were inadequate.[31] The existing 2020 guidelines had not been based on a literature review, and the new report found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people, especially for teenagers who are increasingly seeking health services."[32] Ukom "recommended that updated guidelines should be based on a new commissioned review or existing international up-to-date systematic reviews, such as those conducted in 2021 by the UK's National Institute for Health and Care Excellence."[33] At present, "Ukom defines such treatments as utprøvende behandling, or 'treatments under trial,'"[34]—that is, experimental.

### C.   The District Courts Erroneously Relied on American Medical Interest Groups that are Biased Advocates, Not Neutral Experts.

The Tennessee Court discounted the European experience because "none of these countries have gone so far as to ban hormone therapy entirely." TN.Op., R.167, PageID#2704 n.53. But if the treatments are experimental, what does it matter if England chooses to conduct the experiments? The Constitution does not require Tennessee (or Kentucky, or any other State) to offer children as guinea pigs rather than waiting on the results of the ongoing experiments.

---

[31] Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.
[32] *Id.*
[33] *Id.*
[34] *Id.*

Instead, both courts below simply relied on the imprimatur of medical interest groups to find that the procedures have *already* been proven safe and effective—even though the systematic reviews of the evidence say just the opposite. KY.Op., R.61, PageID#2309; TN.Op., R.167, Page ID#2692-2694, 2707-08. While healthcare authorities in Europe have curbed access to pediatric sex-modification procedures, American medical organizations have run in the opposite direction: advocating unfettered access to transitioning treatments while quashing members' calls to review the evidence.

In some ways, it is unsurprising that courts defer to these organizations. One would think that medical societies like the American Academy of Pediatrics (AAP), the Endocrine Society, and WPATH would be honest brokers, reviewing the evidence as Europe has done and responding accordingly. And one would hope that organizations like the American Medical Association—which has not published guidelines on this topic but supports the WPATH Standards of Care—would use their institutional goodwill, built up over time, to be the voice of reason and put the safety of children first.

Sadly, this has not happened. As with other institutions, American medical organizations have become increasingly "performative," treated by their leaders as

platforms for advancing the current moment's cause célèbre.[35] Add to this a replication crisis in scientific literature and the ability of researchers to use statistics to make findings appear significant when they are not,[36] and it is no wonder that medical organizations find it easier to just go with the zeitgeist. (Not to mention that the interest groups that endorse gender-transition procedures are just that—interest groups, with a strong financial interest in promoting the procedures their members make a living by providing.) Science is *hard*, and there is no reward in the current climate for any organization that questions the safety and efficacy of using sterilizing sex-modification procedures on children.

Take AAP, for instance, which has "decried" "as transphobic" a resolution by its members discussing "the growing international skepticism of pediatric gender transition" and calling for a literature review.[37] As AAP member Dr. Julia Mason concluded, "AAP has stifled debate" and "put its thumb on the scale … in favor of a shoddy but politically correct research agenda."[38] Similar concerns have been

---

[35] *See generally* Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020).

[36] *E.g.*, Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460, 460-65 (2014) (noting "statistical significance" can "be obtained even from pure noise" by various tricks of the trade).

[37] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022).

[38] *Id.*

raised about the Endocrine Society,[39] whose guidelines for treating gender dysphoria the *British Medical Journal* recently exposed as having "serious problems" be-cause—remarkably—the "systematic reviews" the guidelines were based on "didn't look at the effect of the interventions on gender dysphoria itself."[40]

Then there is WPATH, which at least confesses to being "an advocacy organ-ization[]." *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. Ample evidence shows just how true that is. In addition to advocating castration as "medi-cally necessary gender-affirming care" for males whose "gender identity" is "eu-nuch," WPATH recently removed most minimum-age requirements for sex-modification procedures from its Standards of Care.[41] According to the lead author of the chapter on children, WPATH dropped the age requirements to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held liable for malpractice if they deviated from the stand-ards.[42]

WPATH has also suppressed dissent, including canceling the presentation of a prominent researcher who dared to question the safety of transitioning young

---

[39] *E.g.*, Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. JOURNAL (June 28, 2023).

[40] Jennifer Block, *Gender dysphoria in young people is rising—and so is profes-sional disagreement*, THE BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.

[41] *See* SOC 8, *supra*, at S43-79.

[42] Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

children and censuring a board member who went public with concerns that medical providers in America are transitioning minors without proper safeguards.[43]

And just recently, WPATH's leaders were successful in having a major scientific publishing house, Springer, retract a published paper that dared to examine the growing phenomenon of groups of adolescents suddenly "declar[ing] a transgender identity after extensive exposure to social media and peer influence."[44] Indeed, WPATH has tried to cancel nearly every researcher that has looked at "Rapid Onset Gender Dysphoria," for the simple reason that, "[e]ven mentioning the possibility that trans identity is socially influenced or a phase threatens [its] claims that children can know early in life they have a permanent transgender identity and therefore that they should have broad access to permanent body-modifying and sterilizing procedures."[45] More examples abound. *E.g.*, Amicus Br. of Family Research Council at 7-26.

There is thus good reason for this Court's recognition that the "official positions" of medical interest groups do not establish the constitutional standard. *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 438 (6th Cir. 2019). The

---

[43] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX.
[44] Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. JOURNAL (June 9, 2023), https://www.wsj.com/articles/medical-journals-false-consensus-on-gender-affirming-care-sex-change-procedure-transgender-f10cd52b.
[45] *Id.*

First and Fifth Circuits had it right when they found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014). While medical organizations are certainly capable of establishing true, evidence-based standards of care, they have utterly failed to act responsibly when it comes to pediatric sex-modification procedures. As a group of respected gender clinicians and researchers from Finland, the UK, Sweden, Norway, Belgium, France, Switzerland, and South Africa recently opined, "medical societies" in the United States should "align their recommendations with the best available evidence—rather than exaggerating the benefits and minimizing the risks."[46] Until they do so, States like Kentucky and Tennessee are forced to step in to protect children.

## CONCLUSION

The Court should reverse.

---

[46] Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. JOURNAL (Jul. 14, 2023).

Dated: July 24, 2023

Respectfully submitted,

Steve Marshall
  *Attorney General*
<u>s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*

OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Amici Curiae*

30

## ADDITIONAL COUNSEL

ASHLEY MOODY
Attorney General
State of Florida

MICHAEL T. HILGERS
Attorney General
State of Nebraska

CHRIS CARR
Attorney General
State of Georgia

DREW H. WRIGLEY
Attorney General
State of North Dakota

RAÚL R. LABRADOR
Attorney General
State of Idaho

DAVE YOST
Attorney General
State of Ohio

THEODORE E. ROKITA
Attorney General
State of Indiana

GENTNER DRUMMOND
Attorney General
State of Oklahoma

BRENNA BIRD
Attorney General
State of Iowa

ALAN WILSON
Attorney General
State of South Carolina

KRIS W. KOBACH
Attorney General
State of Kansas

MARTY JACKLEY
Attorney General
State of South Dakota

JEFF LANDRY
Attorney General
State of Louisiana

ANGELA COLMENERO
Provisional Attorney General
State of Texas

LYNN FITCH
Attorney General
State of Mississippi

SEAN D. REYES
Attorney General
State of Utah

ANDREW BAILEY
Attorney General
State of Missouri

PATRICK MORRISEY
Attorney General
State of West Virginia

AUSTIN KNUDSEN
Attorney General
State of Montana

## CERTIFICATE OF COMPLIANCE

1. I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,499 words.

2. In addition, pursuant to Fed. R. App. P. 32(g)(1), this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated:  July 24, 2023

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 24, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to any CM/ECF participants.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*
