No. 23-5600

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

————————

L.W., by and through parents and next friends, Samantha Williams
and Bryan Williams, et al., *Plaintiffs-Appellees*,

and

UNITED STATES OF AMERICA, *Intervenor-Appellee*,

v.

JONATHAN THOMAS SKRMETTI, in his official capacity as the
Tennessee Attorney General and Reporter, et al., *Defendants-Appellants.*

————————

On Appeal from the United States District Court for the
Middle District of Tennessee (No. 3:23-cv-00376) (Richardson, J.)

## BRIEF OF DEFENDANTS-APPELLANTS

JONATHAN SKRMETTI
  Attorney General & Reporter
CLARK L. HILDABRAND
  Deputy Chief of Staff & Senior Counsel
STEVEN J. GRIFFIN
RYAN N. HENRY
BROOKE A. HUPPENTHAL
  Assistant Attorneys General
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, Tennessee 37202
(615) 253-5642
clark.hildabrand@ag.tn.gov

ADAM K. MORTARA
LAWFAIR LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

CAMERON T. NORRIS
TIFFANY H. BATES
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

STATEMENT OF JURISDICTION.....................................................................2

STATEMENT OF THE ISSUE...........................................................................3

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE............................................................................9

    A.  Tennessee Acts to Protect Children from Unproven Treatments...... 9

    B.  District Court Grants Preliminary Injunction .................................. 16

    C.  Proceedings in this Court and New Information Disclosed ........... 19

SUMMARY OF ARGUMENT ..........................................................................20

STANDARD OF REVIEW ...............................................................................22

ARGUMENT .....................................................................................................22

  I.  Plaintiffs Are Not Likely to Succeed on the Merits ................................. 23

    A. Parents lack a fundamental right to subject their children
       to such risky treatments ................................................................. 23

    B. The Act equally protects minors of both sexes .............................. 31

    C. Transgender individuals are not a quasi-suspect class .................. 38

    D. The Act survives any level of review ............................................. 43

  II.  Plaintiffs Failed to Demonstrate Standing Sufficient to Seek
     a Preliminary Injunction Even for Themselves ........................................ 48

  III.  Tennessee Wins the Balance of Equities and Public Interest................... 53

  IV.  The District Court Could Not Enjoin Enforcement Statewide................. 56

CONCLUSION ...................................................................................................60

ADDENDUM ................................................................................................ A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&R Engineering & Testing, Inc. v. Scott*,
  2023 WL 4417252 (5th Cir. July 10)...........................................................50, 51

*Abigail All. for Better Access to Developmental Drugs v.*
  *von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) (en banc)......................................................25, 26

*Adams v. Barrett*,
  5 Ga. 404 (1848) ...............................................................................................30, 33

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) (en banc) .....................................................38, 41

*Arizona v. Biden*,
  31 F.4th 469 (6th Cir. 2022) ...............................................................................57

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997)...............................................................................................50

*Ass'n of Am. Physicians & Surgeons v. U.S. FDA*,
  13 F.4th 531 (6th Cir. 2021) ..........................................................................25, 28

*Boe v. Marshall*,
  No. 2:22-cv-184-LCB (M.D. Ala. 2022)..............................................................47

*Bostock v. Clayton Cnty.*,
  140 S.Ct. 1731 (2020)....................................................................32, 33, 40, 42

*Brandt v. Rutledge*,
  2022 WL 16957734 (8th Cir. Nov. 16) (en banc) .............................................33

*Bristol Reg'l Women's Ctr., P.C. v. Slatery*,
  7 F.4th 478 (6th Cir. 2021) (en banc) ...............................................................43

*California v. Texas*,
　　141 S.Ct. 2104 (2021)..........................................................................57

*Cape v. TSSAA*,
　　563 F.2d 793 (6th Cir. 1977) ............................................................35

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
　　511 F.3d 535 (6th Cir. 2007) ............................................................51

*City of Cleburne v. Cleburne Living Ctr.*,
　　473 U.S. 432 (1985)....................................................................38, 39

*Clark v. Jackson*,
　　2023 WL 2787325 (6th Cir. Apr. 5) ...............................................6, 24

*Collins v. City of Harker Heights*,
　　503 U.S. 115 (1992)..........................................................................24

*Collins v. Texas*,
　　223 U.S. 288 (1912)..........................................................................23

*Craig v. Boren*,
　　429 U.S. 190 (1976)..........................................................................35

*Dobbs v. Jackson Women's Health Org.*,
　　142 S.Ct. 2228 (2022).................................................................*passim*

*Doe v. Ladapo*,
　　2023 WL 3833848 (N.D. Fla. June 6) ...............................................28

*Doe v. Pub. Health Tr. of Dade Cnty.*,
　　696 F.2d 901 (11th Cir. 1983) ..........................................................28

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*,
　　958 F.3d 532 (6th Cir. 2020) ............................................................22

*Farnsworth v. Nationstar Mortg., LLC*,
　　569 F. App'x 421 (6th Cir. 2014).......................................................51

iv

*Foster v. People,*
     50 N.Y. 598 (1872) ........................................................................30, 33

*Geduldig v. Aiello,*
     417 U.S. 484 (1974)........................................................................8, 32, 42

*Gibson v. Collier,*
     920 F.3d 212 (5th Cir. 2019) ................................................................47

*Gonzales v. Carhart,*
     550 U.S. 124 (2007)........................................................................26, 43

*Hearring v. Sliwowski,*
     806 F.3d 864 (6th Cir. 2015) ................................................................49

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
     927 F.3d 396 (6th Cir. 2019) ................................................................28, 31

*Kentucky v. Biden,*
     57 F.4th 545 (6th Cir. 2023) ................................................................53, 57

*Kentucky v. Yellen,*
     54 F.4th 325 (6th Cir. 2022) ................................................................58

*Kosilek v. Spencer,*
     774 F.3d 63 (1st Cir. 2014) (en banc)..............................................47

*Kowalski v. Tesmer,*
     543 U.S. 125 (2004)........................................................................53

*In re MCP No. 165,*
     20 F.4th 264 (6th Cir. 2021) (en banc) ............................................23

*Meriwether v. Hartop,*
     992 F.3d 492 (6th Cir. 2021) ................................................................32

*Miss. Univ. for Women v. Hogan,*
     458 U.S. 718 (1982)........................................................................35

*Morrissey v. United States*,
871 F.3d 1260 (11th Cir. 2017) ..........................................................25

*Nguyen v. INS*,
533 U.S. 53 (2001).............................................................................34

*Norris v. Stanley*,
2023 WL 4530251 (6th Cir. July 13)..................................................26

*Ohio Citizen Action v. City of Englewood*,
671 F.3d 564 (6th Cir. 2012) ..............................................................57

*Ohio v. Yellen*,
539 F. Supp. 3d 802 (S.D. Ohio 2021) ...............................................49

*Ondo v. City of Cleveland*,
795 F.3d 597 (6th Cir. 2015) ..........................................................8, 38

*Parham v. J.R.*,
442 U.S. 584 (1979)...........................................................................29

*Pelcha v. MW Bancorp, Inc.*,
988 F.3d 318 (6th Cir. 2021) ..............................................................33

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
52 F.3d 1373 (6th Cir. 1995) ..............................................................22

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979)...........................................................................42

*Planned Parenthood Cincinnati Region v. Taft*,
444 F.3d 502 (6th Cir. 2006) .......................................................27, 28

*Planned Parenthood of Greater Ohio v. Hodges*,
917 F.3d 908 (6th Cir. 2019) (en banc) ........................................52, 53

*Preterm-Cleveland v. McCloud*,
994 F.3d 512 (6th Cir. 2021) (en banc) ........................................44, 48

*Prince v. Massachusetts*,
321 U.S. 158 (1944).......................................................................28, 29

*Raich v. Gonzales*,
500 F.3d 850 (9th Cir. 2007) ...............................................25

*Reed v. Reed*,
404 U.S. 71 (1971)...............................................................31

*Resendiz v. Exxon Mobil Corp.*,
2023 WL 4410524 (4th Cir. July 10).....................................42

*Rutherford v. United States*,
616 F.2d 455 (10th Cir. 1980) ...............................................25

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017)...............................................................31

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004) ...............................................30

*State v. Wilson*,
25 S.C.L. 163 (1840) ..............................................................30

*Students for Fair Admissions, Inc. v.*
*President & Fellows of Harv. Coll.*,
143 S.Ct. 2141 (2023)...........................................................33

*Tennessee v. Dep't of Educ.*,
615 F. Supp. 3d 807 (E.D. Tenn. 2022)..................................40

*Thompson v. DeWine*,
976 F.3d 610 (6th Cir. 2020) ...............................................54

*U.S. Citizens Ass'n v. Sebelius*,
705 F.3d 588 (6th Cir. 2013) ...............................................25

*United States v. Hansen*,
143 S.Ct. 1932 (2023)...........................................................59

*United States v. Salerno*,
   481 U.S. 739 (1987) .............................................................................58

*United States v. Texas*,
   143 S.Ct. 1964 (2023) .........................................................................58

*United States v. Virginia*,
   518 U.S. 515 (1996) ...............................................................31, 34, 44

*Warshak v. United States*,
   532 F.3d 521 (6th Cir. 2008) (en banc) ............................................59

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ...............................................................6, 24, 25, 31

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
   900 F.3d 250 (6th Cir. 2018) .............................................................49

*Watson v. Maryland*,
   218 U.S. 173 (1910) ...........................................................................26

*Whalen v. Roe*,
   429 U.S. 589 (1977) ...........................................................................28

*Williams-Yulee v. Florida Bar*,
   575 U.S. 433 (2015) ...........................................................................44

*Worley v. State*,
   30 Tenn. 172 (1850) ...........................................................................30

**Statutes**

18 U.S.C. §116 ............................................................................................29, 37

42 U.S.C. §2000h-2 ...........................................................................................52

Tenn. Code Ann. §39-13-110 ...........................................................................29

Tenn. Code Ann. §39-15-213 ......................................................................29, 32

Tenn. Code Ann. §49-6-310 .............................................................................35

Tenn. Code Ann. §62-38-211 ...........................................................................29

Tenn. Code Ann. §68-33-101 ............................................... 9, 10, 11, 13, 16, 27, 42

Tenn. Code Ann. §68-33-102 ...........................................................................10

Tenn. Code Ann. §68-33-103 ...........................................................10, 32, 41, 55

Tenn. Code Ann. §68-33-105 .........................................................................10,16

Tenn. Code Ann. §68-33-106 ...........................................................................10

Tenn. Code Ann. §68-33-107 ...........................................................................10

Tenn. Code Ann. §68-34-108 ...........................................................................29

**Other Authorities**

AAP Policy Statement, *Ritual Genital Cutting of Female Minors*,
125 Pediatrics 1088 (2010) ...................................................29

Aaron, *Opioid Accountability*, 89 Tenn. L. Rev. 611 (2022) ..................................26

*American Heritage Dictionary of the English Language*
(5th ed. 2022 online update) .........................................................34, 35

*Benefit-Risk Assessment in Drug Regulatory Decision-Making*, FDA
(Mar. 30, 2018), www.fda.gov/media/112570/download ..................................7

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021)..................................39

Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*,
Wall St. J. (July 14, 2023), perma.cc/P9GM-MHF7 .........................................15

Kamran Abbasi, *Caring for young people with gender dysphoria*,
BMJ 2023;380:553 (Mar. 9, 2023), dx.doi.org/10.1136/bmj.p553 ....................4

Kruesi, *Social media posts spark calls to investigate Tenn.'s VUMC*,
AP News (Sept. 21, 2022) ....................................................................5

Landén, et al., *A systematic review of hormone treatment for children
with gender dysphoria and recommendations for research*,
Acta Paediatrica, 2023;00:1 (April 18, 2023).........................................4

*Nondiscrimination in Health & Health Educ. Programs or Activities,
Delegation of Authority*,
85 Fed. Reg. 37160, 37198 (June 19, 2020).........................................47

Sands et al., *Top Energy Department official no longer employed after
luggage theft accusations*,
CNN (Dec. 13, 2022), perma.cc/MJF7-5JPL ....................................................40

Sears, *Arresting Dress* (2013)...............................................................33

U.S. Dep't of Health & Hum. Servs., Admiral Rachel Levine
(Oct. 31, 2022), perma.cc/ET5Z-GHFK...........................................................40

Webster, *An American Dictionary of the English Language* (1865)................34, 35

*Whipping & Castration as Punishments for Crime*,
    8 Yale L.J. 371, 382 (1899) ...................................................................37

White House, *A Proclamation on Transgender Day of Visibility*
    (Mar. 30, 2023), perma.cc/VZN6-4ATC...........................................40

Worcester*, A Dictionary of the English Language* (1860) ...............................34, 35

## STATEMENT REGARDING ORAL ARGUMENT

Tennessee agrees with the panel that oral argument is warranted and, therefore, requests oral argument. Order, Doc.45, at 2. This appeal involves important issues of constitutional law. The district court preliminarily enjoined Defendants-Appellants from enforcing Tenn. Code Ann. §68-33-101, *et seq.*—a bipartisan Act that protects Tennessee children from unproven medical practices likely to reduce bone density, stunt mental development, and result in sterilization.

In its erroneous decision, the district court broadly defined a new fundamental right for parents to subject their children to any medical treatment; improperly expanded the scope of sex discrimination under the Equal Protection Clause; and declared that transgender individuals constitute a quasi-suspect class, which neither the Supreme Court nor this Court has ever done. The district court expressly rejected Supreme Court precedent to justify issuing a statewide injunction. The district court denied Tennessee's request for an evidentiary hearing to support its contention that the minor Plaintiffs' sole in-state provider would not restart treatment even if a preliminary injunction issued. Plaintiffs knew but neglected to inform Tennessee or this Court that their provider refused to reinitiate treatment *while the preliminary injunction was in place*.

Oral argument will likely aid the Court's review and should not prevent resolution of the appeal by September 30, 2023. Stay Op., Doc.44-2, at 15.

1

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§1331, 1343, 1367. Compl., R.1, PageID#6-7. The district court issued its order granting Plaintiffs' preliminary injunction motion on June 28, 2023. Order, R.168, PageID#2726. The district court ruled that Plaintiffs, other than Dr. Lacy, had Article III standing to challenge the hormone and puberty-blocker prohibitions. *Id.* PageID#2725-26; Op., R.167, PageID#2663-65. The district court also ruled that the Act would cause Plaintiffs, again other than Dr. Lacy, to experience irreparable harm that the preliminary injunction would redress. *Id.* PageID#2713-17, 2719-22. Defendants continue to assert that all Plaintiffs failed to prove that a preliminary injunction was necessary to prevent their alleged harms and that Dr. Lacy lacks third-party standing.

Defendants timely appealed on June 28, 2023. Notice of Appeal, R.169, PageID#2728-32. This Court has statutory jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion by preliminarily enjoining the Defendants from implementing statewide, against parties and nonparties alike, the Act's prohibitions against administering hormones or puberty blockers to minors.

## INTRODUCTION

The Western world is seeing an astonishing increase in young people presenting with gender dysphoria. As of yet, there is no consensus. American establishment medicine, co-opted by pharmaceutical companies and activists, sponsors a virtually unmonitored on-ramp of "affirmation," first through social transition and pharmaceuticals. Next comes "sex-reassignment surgery," including double mastectomies for girls and castration of boys. By contrast, the national health services of Sweden, the United Kingdom, Finland, and Norway have abandoned this approach for children, deeming the evidence of benefit scant and the risks significant.

As just one example, Sweden once was the world leader in advancing these "therapies." Astonished by the exponential increase in the number of children and young adults diagnosed with gender dysphoria, Sweden's most renowned researchers conducted a comprehensive review of all the evidence and determined that the "long-term effects of hormone therapy on psychosocial and somatic health are unknown, except that [puberty blockers] seem[] to delay bone maturation and

gain in bone mineral density." Landén, et al., *A systematic review of hormone treatment for children with gender dysphoria and recommendations for research*, Acta Paediatrica, 2023;00:1,12 (April 18, 2023); R.113-2, PageID#1086. That review "has resulted in essentially a ban on puberty blockers, cross-sex hormones, and surgeries" for gender-dysphoric children in Sweden. Román Decl. ¶33, R.113-6, PageID#1529.

A week after Governor Lee signed the Act into law, the editor-in-chief of the *British Medical Journal*, among the most prestigious in the world, summed up the state of play: American medical societies are monolithic in their support of these treatments, but "closer inspection" shows that "the strength of clinical recommendations is not in line with the strength of evidence." Kamran Abbasi, *Caring for young people with gender dysphoria*, BMJ 2023;380:553 (Mar. 9, 2023), dx.doi.org/10.1136/bmj.p553. In other words, the "risk of overtreatment of gender dysphoria is real." *Id.*

Legislatures in this country face an important policy choice with regard to these therapies—the choice between deference to the consensus of American medical societies or the more sober evidence-based conclusions of Western Europe. In our Federal system, the States retain primacy over that question. The people of this country did not agree in their Constitution "to remove debates of this sort— about the use of new drug treatments on minors—from the conventional place for

dealing with new norms, new drugs, and new technologies: the democratic process." Stay Op.6. Not today, and certainly not in 1868. As this Court has already observed, state laboratories of democracy are testing a wide variety of solutions to this problem, ranging from strong endorsement of the affirmation model to laws like Tennessee's and Kentucky's. Stay Op.6-7.

Tennessee acted after its people and its General Assembly were shocked by public reporting about Vanderbilt University Medical Center. In September 2022, the Tennessee public learned that Vanderbilt was engaged in a widespread and profit-motivated practice of prescribing hormones and conducting surgeries on children for the asserted purpose of treating gender dysphoria. *See* Kruesi, *Social media posts spark calls to investigate Tenn.'s VUMC*, AP News (Sept. 21, 2022), Ex.1-A to PI Resp., R.113-1, PageID#962. "We have some individuals who have started gender-affirming hormones at 13 or 14" years-old, declared the Vanderbilt doctor who treats all the minor patients in this case. Ex.1-B, R.113-1, PageID#963 (video at 45:41-45:45 (Dr. Brady speaking)). Vanderbilt performed "[t]op surgery" (i.e., double mastectomy) on gender-dysphoric minors as young as 16. Ex.1-C, R.113-1, PageID#979. The founder of Vanderbilt's Transgender Health Clinic boasted that "top surgeries" would "make a lot of money" for Vanderbilt, as would "routine hormone treatment." Ex.1-D, R.113-1, PageID#987 (video at 0:11-0:47 (Dr. Taylor speaking)). And she admitted that "[w]e have very, very little data to

guide our treatment." Ex.1-G, R.113-1, PageID#1048 (video at 37:29-37:32). Faced with this medical recklessness by one of the State's premier medical institutions and heeding the growing concerns of the unbiased medical community in Western Europe, the General Assembly deliberated and acted.

***

Plaintiffs wish to convert their understandable frustration with the result of the policy-making process into a court-ordered frustration of the will of the people of Tennessee. The district court issued the requested preliminary injunction. It gravely erred.

There is no substantive-due-process right for parents to override state law and obtain puberty blockers or hormones for a child suffering from gender dysphoria. Fundamental rights "must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2242 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). To "validly assert a substantive due process claim, a petitioner must provide a 'careful description of' the claimed liberty interest." *Clark v. Jackson*, 2023 WL 2787325, at *5 (6th Cir. Apr. 5). The district court failed to obey that limit on its power to pronounce an unenumerated right in our practically unamendable Constitution. The right that Plaintiffs seek—a parent's supposed "fundamental right to direct the medical care of his or her child," Op., R.167,

6

PageID#2666—is stated at such a high level of abstraction that it would logically imply a right for a parent to obtain an abortion for a pregnant 17-year-old in a state where elective abortion is prohibited, a result flatly inconsistent with *Dobbs*.

Plaintiffs' equal-protection claims are similarly flawed. Their theory of sex discrimination ignores that the Act treats minors of both sexes equally. Perhaps more importantly, while hiding behind the aegis of the American medical establishment, Plaintiffs' arguments about what constitutes the same "treatment" fly in the face of bedrock pharmaceutical medicine. Plaintiffs say that giving puberty blockers for the physical condition of "precocious puberty" is the same treatment as giving them for the mental condition of "gender dysphoria." That is true only in a mechanistic sense—the drugs are delivered the same way. But pharmaceutical intervention is measured by a benefit-risk analysis: Do the benefits to the patient outweigh the risks associated with the treatment? *E.g.*, *Benefit-Risk Assessment in Drug Regulatory Decision-Making*, FDA (Mar. 30, 2018), www.fda.gov/media/112570/download (FDA uses a "benefit-risk" analysis to decide whether to approve new drugs and new uses of old drugs.). That assessment cannot be isolated from the condition being treated because the benefits of treatment (or the risks of non-treatment) differ.

This is why a regulation of a medical procedure that only one sex can undergo is not sex discrimination. The same acts performed on the opposite sex would not

be the same treatment. *Geduldig v. Aiello*, 417 U.S. 484, 496 (1974). Plaintiffs' contrary view is that the Equal Protection Clause requires obsessing over the mechanics while ignoring medical and biological realities. This is an impressive pirouette for the people who proclaim that science is on their side. Plaintiffs would have a court hold that implanting an embryo into a woman (high benefit, low risk) is the same treatment when performed on a man (zero benefit, unacceptable risk). To state the proposition is to refute it.

The district court's alternative holding that transgender persons constitute a quasi-suspect class flies in the face of this Court's precedents. Gay persons are not a quasi-suspect class because, unlike "race or biological gender," sexual orientation is not "definitively ascertainable at the moment of birth." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). Transgender status, like sexual orientation, is not "definitively ascertainable at the moment of birth." *Id*. Until the Supreme Court says otherwise, rational-basis review applies to transgender-based classifications.

Plaintiffs fare no better as to the scope of relief and their obligation to demonstrate standing sufficient to justify the preliminary injunction. Despite Tennessee's repeated warnings that the precedents of the Supreme Court and this Court foreclosed statewide "facial" relief, Plaintiffs persuaded the District Court to enter an overbroad injunction. A preliminary injunction did not even solve the problem Plaintiffs sought to remedy. Plaintiffs brazenly told this Court on July 6

that Tennessee had "misleadingly assert[ed] . . . that [minor] Plaintiffs' physician might not resume treatment" under the preliminary injunction. Stay Resp., Doc.37, at 25-26. But Vanderbilt had already confirmed one week earlier in a private communication with one of the Plaintiffs that it would not reinitiate treatment. Astonishingly, Plaintiffs did not inform this Court or Tennessee during the stay-motion proceedings that Tennessee's long-standing prediction of the lack of efficacy of a preliminary injunction had proven true. Dr. Lacy's presence in this case fixes nothing for Plaintiffs because she lacks third-party standing for her equal protection claim—her only asserted basis for a preliminary injunction.

In short, this Court was right to stay the preliminary injunction. It should now reverse it.

## STATEMENT OF THE CASE

### A. Tennessee Acts to Protect Children from Unproven Treatments

Seeking to "protect the health and welfare of minors" in Tennessee, state legislators introduced the Act in November 2022. *See* S.B.1, 113th Gen. Assem. (2023), codified at Tenn. Code Ann. § 68-33-101, *et seq*., R.33-1, PageID#444-50. It took effect July 1, 2023.

The Act prohibits certain medical procedures on a minor "for the purpose of" either (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or (2) "[t]reating purported discomfort or distress

9

from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §68-33-103(a)(1). Prohibited procedures include surgery and the use of puberty blockers and hormones. *Id*. §68-33-102(5). The Act includes a grace period that, with some limitations, allows minors currently receiving treatment to continue to do so until March 31, 2024. *Id*. §68-33-103(b). It expressly allows healthcare providers to perform procedures to treat congenital defects, the physical condition known as precocious puberty, diseases, and physical injuries. *Id*.

The Act authorizes the Tennessee Attorney General to enforce its prohibitions. *Id*. §68-33-106. It permits state regulatory authorities to initiate disciplinary proceedings against providers who violate the Act. *Id*. §68-33-107. And it creates a private right of action, enabling minors and non-consenting parents to sue offending providers—which Plaintiffs concede, and the district court has held, is not at issue in this case. *Id*. §68-33-105. Section 68-33-105 is possibly the reason that Vanderbilt did not reinitiate treatment while the preliminary injunction was in place.

In adopting the Act, the General Assembly was concerned that the prohibited procedures can lead to minors "becoming irreversibly sterile, having increased risk of disease and illness, or suffering from adverse and sometimes fatal psychological consequences." *Id*. §68-33-101(b). It also determined that the harms of these treatments when performed on a minor "are not yet fully known" and, in any case,

10

outweigh any potential near-term benefits because they "are experimental in nature and not supported by high-quality, long-term medical studies." *Id*.

These concerns are well-founded, as demonstrated by the declarations that Tennessee produced from experts in the fields of endocrinology, psychiatry, and clinical psychology.

Start with puberty blockers, the on-ramp for many minors. Giving puberty blockers to a physically healthy adolescent going through normal pubertal development induces the diseased state of hypogonadotropic hypogonadism, causing diminished bone density, as well as infertility and sexual dysfunction due to undeveloped sex organs. Laidlaw Decl. ¶¶63-108, R.113-7, PageID#1558-66. Even the Endocrine Society acknowledges that the "primary risks of pubertal suppression" to treat gender dysphoria are "adverse effects on bone mineralization," "compromised fertility if the person subsequently is treated with sex hormones," and "unknown effects on brain development." ES Guidelines, R.113-10, PageID#2009. The FDA has approved puberty blockers to rectify a hormonal imbalance in young children caused by precocious puberty but has *not* approved their use to treat gender dysphoria. Levine Decl. ¶175, R.113-5, PageID#1455; Laidlaw Decl. ¶¶74-77, 94-96, R.113-7, PageID#1559-60,1563.

While some proponents say puberty blockers are merely a "pause button," research shows that is not the case. Nearly *all* minors who start puberty blockers

progress to sterilizing cross-sex hormones, and the majority go on to have sex-reassignment surgery. *See* Levine Decl. ¶¶128-29, R.113-5, PageID#1441 (UK study found 98% of adolescents who used puberty blockers progressed to cross-sex hormones); Laidlaw Decl. ¶92, R.113-7, PageID#1562 (Dutch study found 100% of adolescents who took puberty blockers progressed to cross-sex hormones; follow-up study found most went on to have sex-reassignment surgery). This is alarming because, without hormonal intervention, the vast majority of children exhibiting gender dysphoria align their gender identity with their sex by the time they reach adulthood, and desistence is increasingly observed among teens and young adults who first manifest gender dysphoria during or after adolescence. Levine Decl. ¶¶93, 105-118, PageID#1430,1434-37; Hruz Decl. ¶62, PageID#1305 (peer-reviewed literature reported desistence in approximately 85% of children before the adoption of the "affirming" model).

The long-term harms of cross-sex hormones also outweigh any purported benefits. Giving girls high doses of testosterone induces the diseased state of severe hyperandrogenism, causing clitoromegaly, atrophy of the lining of the uterus and vagina, irreversible vocal cord changes, hirsutism, a "[v]ery high risk of" erythrocytosis, and increased risk of myocardial infarction, severe liver dysfunction, coronary artery disease, cerebrovascular disease, hypertension, and breast or uterine cancer. Laidlaw Decl. ¶¶117-144, R.113-7, PageID#1568-74; *see* ES Guidelines,

12

R.113-10, PageID#2013.   And giving boys high doses of estrogen induces the diseased state of hyperestrogenemia, causing sexual dysfunction and leading to a "[v]ery high risk of" thromboembolic disease and increased risk of macroprolactinoma, breast cancer, coronary artery disease, cerebrovascular disease, cholelithiasis, and hypertriglyceridemia.   Laidlaw Decl. ¶¶145-54, R.113-7, PageID#1575-76; *see* ES Guidelines, R.113-10, PageID#2013.   Like puberty blockers, the FDA also has not approved the use of cross-sex hormones to treat gender dysphoria.  Laidlaw Decl. ¶¶119, R.113-7, PageID#1568.

Both puberty blockers and cross-sex hormones threaten a child's fertility and, if successful in blocking puberty, will render the child infertile.  Hruz Decl. ¶¶52, 89, R.113-4, PageID#1302,1320.

The General Assembly also found that "minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures and that many individuals have expressed regret for medical procedures that were performed or administered on them for such purposes when they were minors."  Tenn. Code Ann. §68-33-101(h); *see also* Nangia Decl. ¶¶154-58, R.113-8, PageID#1709-11.

With increasing frequency, detransitioners have come forward lamenting the harmful effects of these treatments.   Levine Decl. ¶¶110-18, R.113-5, PageID# 1435-37; Cole Decl., R.113-11, PageID#2032-37; Kerschner Decl., R.113-12, PageID#2039-42; Mosely Decl., R.113-13, PageID#2044-45.  Parents—including a

Tennessee father whose daughter saw the same Vanderbilt doctor as minor
Plaintiffs—have voiced concern over healthcare providers pressuring them to place
their children on the "conveyor belt" of medical transition without first treating
psychological comorbidities or explaining the long-term harms.  Parent Decls.,
R.113-14—113-19, PageID#2046-78.

No reliable studies demonstrate that medical transition lowers suicide rates,
nor is there reliable evidence that medical transition improves long-term mental
health relative to other treatments lacking medical risk.  Cantor Decl., ¶¶147-153,
177-200, R.113-3, PageID#1158-61, 1177-82; Laidlaw Dec., ¶207-11, R.113-7,
PageID#1588-89 (long-term study showed suicide rate for sex-reassigned group was
19 times higher than for the general population); Nangia Decl. ¶¶145-47, R.113-8,
PageID#1698 (describing benefits of psychodynamic therapy).  And the protocols
adopted by WPATH and the Endocrine Society promoting medical transition for
minors are based on "very low quality" evidence under established research
evaluation standards.  Cantor Decl. ¶¶82, 88-104, R.113-3, PageID#1131-40; Levine
Decl. ¶¶134-37, 173-74, 187, R.113-5, PageID#1443, 1454-55, 1459; Laidlaw Decl.
¶¶173-182, R.113-7, PageID#1580-82.   Studies cited by proponents of these
treatments lacked control groups, were short-term, and failed to consider other
factors that prevent finding causation, as opposed to mere correlation.  Cantor Decl.
¶¶45-69, 277-80, 285, 293-95, 298-311, R.113-3, PageID#1116-24, 1207-20.

Systematic reviews by national health authorities in Sweden, the United Kingdom, Finland, and Norway have all concluded that the harms associated with these treatments are significant, and the long-term benefits are unproven. Román Decl. ¶¶14-38, R.113-6, PageID#1521-31; Cantor Decl. ¶¶16-35, 70-87, R.113-3, PageID#1102-11, 1125-34. Those countries have banned these treatments outside controlled research settings. Cantor Decl. ¶¶16-35, R.113-3, PageID#1102-11; Román Decl. ¶33, R.113-6, PageID#1529. They and others regard these treatments as experimental. Cantor Decl. ¶¶167-71, 302, R.113-3, PageID#1168-70, 1215.

This month, twenty-one medical professionals from nine countries (including Tennessee's experts Dr. Román and Dr. Levine) published a letter in the *Wall Street Journal* reiterating how every systematic review to date "has found the evidence for mental-health benefits of hormonal interventions for minors to be of low or very low quality" and how there is "no reliable evidence to suggest that hormonal transition is an effective suicide-prevention measure." Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, Wall St. J. (July 14, 2023), perma.cc/P9GM-MHF7. Noting "the risks are significant" and highlighting the growing international consensus that psychotherapy should be the "first line of treatment for gender-dysphoric youth," they urged American medical societies "to align their recommendations with the best available evidence—rather than exaggerating the benefits and minimizing the risks." *Id.*

15

Finally, per the legislature, "many of the same pharmaceutical companies that contributed to the opioid epidemic have sought to profit from the administration of drugs" to minors "or have paid consulting fees to physicians who then advocate for administration of drugs" for the prohibited purposes. §68-33-101(*i*). Tennessee chose not to blindly obey the preferences of biased interest groups and instead took the side of caution in protecting the children within its borders.

## B.   District Court Grants Preliminary Injunction

A month-and-a-half after the law's enactment, three minors currently on cross-sex hormones or puberty blockers, their parents, and Dr. Lacy (a Memphis physician) brought this action against multiple Tennessee officials for declaratory and injunctive relief, claiming the Act violates due process and equal protection. Compl., R.1, PageID#1-43.  Plaintiffs do not challenge the Act's private right of action under §68-33-105.  Op., R.167, PageID#2662.  They moved for a statewide preliminary injunction to restrain the Defendants from enforcing the rest of the Act. PI Mot., R.21, PageID#191-95; PI Mem., R.33, PageID#411-43.  (The United States intervened in support of Plaintiffs and also sought a statewide preliminary injunction.  U.S. PI Mot., R.40, PageID#501-06.  The district court has not ruled on the United States' preliminary-injunction motion.)

The district court denied Tennessee's request for a consolidated preliminary injunction hearing and trial on the merits in early 2024, before the Act's grace period

expires. Order, R. 89, PageID#806-12. Tennessee had explained that the only relief the district court could order would run to the individual parties; that Dr. Lacy lacked standing; and that the availability of the continuing-care exception for the minor Plaintiffs meant no emergency was, in fact, present. Mot. to Reset Briefing Schedule, R.74, PageID#667-77; Reply in Support of Mot. to Reset Briefing Schedule, R.84, PageID#739-49.

Tennessee opposed Plaintiffs' motion for a preliminary injunction with thorough evidentiary support, including expert- and fact-witness testimony. PI Opp., R.112, PageID#919-52.

As Plaintiffs' Complaint alleged and declarations explained, Vanderbilt was the sole institution providing the minor Plaintiffs with hormones or puberty blockers for treatment of gender dysphoria; but Vanderbilt had announced it would stop providing these treatments by July 1, 2023, despite the Act allowing the provision of care to continue until March 31, 2024. Compl. ¶¶97-103, 113-21, 128-32; Samantha Williams Decl. ¶¶16-26, R.23, PageID#206-09; Jane Doe Decl. ¶¶15-26, R.25, PageID#219-21; Rebecca Roe Decl. ¶¶18-31, R.27, PageID#234-37. The only other providers in Tennessee identified in this litigation—Dr. Lacy herself and CHOICES in Memphis—do not provide these treatments to minors under 16, so "[w]ith care being cut-off at Vanderbilt on July 1st," Plaintiffs asserted "there are no in-state options for treatment" of the minor Plaintiffs. Rebecca Roe Reply Decl.

¶¶4-5, R.139, PageID#2380-81; *see* Lacy Decl. ¶12, R.28, PageID#241.  Tennessee argued that it was at best unclear whether Vanderbilt would reinitiate care for the minor Plaintiffs if there was a preliminary injunction.  Tennessee thus sought to compel testimony from Vanderbilt officers on the subject.  However, the district court ultimately denied Tennessee's request for an evidentiary hearing on whether a preliminary injunction would actually redress Plaintiffs' alleged harm.  Order, R.122, PageID#2206; Order, R.148, PageID#2534.

On June 28, three days before the Act's effective date, the district court partially granted Plaintiffs' motion and facially enjoined the State's enforcement of the Act statewide as to puberty blockers and cross-sex hormones.  Op., R.167, PageID#2656-724; Order, R.168, PageID#2725-27.  The court held that these portions of the Act likely violate both due process and equal protection and that an injunction would likely prevent irreparable harm to the minor Plaintiffs and their parents.  *Id.*  The district court justified the injunction's statewide scope by asserting "it is far-fetched that healthcare providers in Tennessee would continue care specifically for Minor Plaintiffs when they cannot do so for any other" minor, even though the Act allows providers to continue care for minors through March 2024 and does not stop treatment of adults.  Op., R.167, PageID#2719.  The injunction did not extend to the Act's surgery prohibition, which the court found Plaintiffs lack standing to challenge.  Order, R.168, PageID#2725-26.

Within hours of the district court's preliminary injunction ruling, Tennessee appealed and asked the district court for an emergency stay of the injunction pending appeal. Notice of Appeal, R.169, PageID#2728-32; Stay Mot., R.170, PageID#2733-42. On June 30, the district court denied the stay. Order, R.172, PageID#2747-50.

### C.    Proceedings in this Court and New Information Disclosed

On the evening of that same day, Tennessee asked this Court to issue an emergency stay pending appeal. Stay Mot., Doc.8-1. On July 8, this Court granted Tennessee's emergency motion and stayed the preliminary injunction. Stay Op., Doc.44-2. This Court then consolidated Tennessee's appeal with one subsequently filed by Kentucky. Order, Doc.45.

Plaintiffs promptly asked Defendants to agree to a stay of discovery in the district court. In response to Plaintiffs' request, Tennessee stressed its prior request for documents regarding communications between Plaintiffs and Vanderbilt and sought confirmation that Plaintiffs had fully supplemented their production. On July 17, Plaintiffs produced communications with Vanderbilt confirming that *on the morning of June 30*—before Tennessee filed its emergency motion in this Court and nearly a week before Plaintiffs filed their response—Vanderbilt advised one of the Plaintiffs that it had chosen not to resume treatment despite the injunction being

entered.[1]  Until July 17, Plaintiffs never disclosed that information to Tennessee, this Court, or the district court, despite their repeated (and unfounded) argument that an injunction would cause Vanderbilt to resume treatment and that Tennessee's arguments to the contrary were "misleading[]."  Stay Resp.25-26.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's preliminary injunction order for the same reasons that this Court stayed it.  The district court abused its discretion by contorting Fourteenth Amendment jurisprudence and exceeding its remedial powers.

The Act is constitutional.  The purported fundamental right at stake—the right of parents to subject their children to hormones and puberty blockers as treatment for gender dysphoria—is *neither* deeply rooted in history and tradition nor implicit in the concept of ordered liberty.  These treatments did not exist in 1868.  They are novel.  States historically retained power to regulate the closest approximations of these treatments under rational-basis review.

Plaintiffs' equal-protection arguments are similarly misplaced.  The act protects boys and girls equally.  The recognition of biological sex is not sex stereotyping, at least by the standards of 1868.  And the district court, in its quest to

---

[1] If the Court would like to see this document, Defendants would be glad to file it under seal.  This communication occurred after the district court's decision and was not disclosed to Defendants until July 17.  Accordingly, it is not in the record.

declare transgender status a quasi-suspect classification, was wrong to cast aside relevant precedents from this Circuit.

Rational-basis review is the appropriate standard.  There is no need for second-guessing the General Assembly's fact-finding.  But if the Court did, it would find that the Act survives any level of review.  The prohibited treatments are unproven, and the risks likely outweigh the benefits, as many countries in Western Europe agree.

Plaintiffs also failed to carry their burden of demonstrating a substantial likelihood of standing, a prerequisite for a preliminary injunction.  At Plaintiffs' prompting, the district court denied Tennessee's request for an evidentiary hearing, resulting in an injunction based on speculation about Vanderbilt that Plaintiffs knew was wrong even before Tennessee sought an emergency stay at this Court.

The district court was wrong to enjoin Defendants' enforcement statewide.  It lacked authority to do so.  Even if the district court's mistaken speculation about Vanderbilt's reaction to the preliminary injunction had been correct, a statewide injunction was more burdensome than necessary to remedy the harms of the minor Plaintiffs and their parents.  The district court placed too much stock in labeling this a facial challenge and then called the Supreme Court's canonical test for facial challenges a dead letter.

The preliminary injunction irreparably harmed Tennessee every day it was in effect by preventing Defendants from enforcing the Act and protecting minors. It should be reversed.

## STANDARD OF REVIEW

A "preliminary injunction is an extraordinary and drastic remedy" that courts should not grant "unless the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). Though its entry is reviewed for abuse of discretion, a district court "abuses its discretion" when it "relies on clearly erroneous findings of fact" or "improperly applies the law." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). And, "in a case such as this, where the district court's decision was made on the basis of a paper record, without a[n] evidentiary hearing," this Court is in "as good a position as the district judge to determine the propriety of granting a preliminary injunction." *Id.* (quotation omitted).

## ARGUMENT

As the moving party, Plaintiffs had to establish (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without preliminary relief; (3) a balance of equities tipping in their favor; and (4) that an injunction is in the public interest. *Glowco*, 958 F.3d at 535-36. They failed on all four requirements

(the last two of which merge). And a statewide injunction was, in all events, overbroad.

## I.   Plaintiffs Are Not Likely to Succeed on the Merits.

Plaintiffs will not prevail on their Fourteenth Amendment claims. The Act is squarely within the State's police power "over safety, health, and public welfare." *In re MCP No. 165*, 20 F.4th 264, 273 (6th Cir. 2021) (en banc) (Sutton, J., dissental). Parents do not have a fundamental right to subject their children to medical treatments prohibited by state law—especially when those treatments have significant risks, unproven benefits, and are "medical matters concerning which there is difference of opinion and dispute." *Collins v. Texas*, 223 U.S. 288, 297-98 (1912). The Act equally protects minors of both sexes, and Plaintiffs failed to clear the high bar for establishing transgender status as a new quasi-suspect class. Rational-basis review—"the same standard of review as other health and safety measures"—applies. *Dobbs*, 142 S.Ct. at 2244-46. The Act satisfies that standard or any other this Court might apply.

### A.   Parents lack a fundamental right to subject their children to such risky treatments.

The district court subjected the Act to strict scrutiny because it "infringes on a parent's" supposed "fundamental right to direct the medical care of that parent's child." Op., R.167, PageID#2670. *Dobbs* should have laid to rest the idea that parents can do whatever they want to their children. Rational-basis review applies

when the State regulates doctors from taking affirmative acts against children, born or unborn, at their parents' request. *Dobbs*, 142 S.Ct. at 2244-46. The Supreme Court has "been reluctant to expand the concept of due process" and itself "exercise[s] the utmost care whenever" a litigant asks it to set aside rational-basis review and instead "to break new ground in" the field of substantive due process. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Lower courts should exercise all the more caution.

The district court ignored this Court's instruction that, to "validly assert a substantive due process claim, a petitioner must provide a 'careful description' of the claimed liberty interest." *Clark*, 2023 WL 2787325, at *5. That right "must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs*, 142 S.Ct. at 2242 (quoting *Glucksberg*, 521 U.S. at 721). Plaintiffs made no effort to prove that parents had a fundamental right in 1868—the time of the Fourteenth Amendment's ratification—to subject their children to *these* treatments. They conceded there is, at best, "nearly two decades of research" supporting them. PI Mem., R.33, PageID#433. That should end the discussion.

"Judicial deference is especially appropriate" here. Stay Op.9. Start by considering that Plaintiffs claim an affirmative right to subject their children to puberty blockers and hormones, not simply a negative right to refuse treatment. "Although individuals sometimes have a constitutional right to refuse treatment, the

24

Supreme Court has not handled affirmative requests for treatment in the same way." *Id.* at 10 (citing *Glucksberg*, 521 U.S. at 725-26). Accordingly, "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) (quoting *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993)); *see, e.g.*, *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 711 (D.C. Cir. 2007) (en banc) (no "right to procure and use experimental drugs"); *Raich v. Gonzales*, 500 F.3d 850, 864-66 (9th Cir. 2007) (no right to "medical marijuana"); *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) (no right for mentally ill patients "to take whatever treatment they wished"); *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017) (rejecting fundamental right to IVF surrogacy treatment, not in use "until the mid to late 1980s").

In the wake of the Fourteenth Amendment's ratification, the Supreme Court continued to "leave[] the regulation of doctors to the states." *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 534-35 (6th Cir. 2021) (citing *Dent v. West Virginia*, 129 U.S. 114, 121-24 (1889) (explaining how this was a power of States "from time immemorial")). "There is perhaps no profession more properly open to such regulation" because the practice of medicine deals "with the

25

lives and health of the people." *Watson v. Maryland*, 218 U.S. 173, 176 (1910).

Even faced with a Massachusetts regulation *requiring* inhabitants to take a smallpox

vaccine, the Supreme Court applied the rough equivalent of rational-basis review

and upheld the law. *Norris v. Stanley*, 2023 WL 4530251, at *3-5 (6th Cir. July 13)

(applying *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)).

That the proscribed treatments are ones where "medical and scientific

uncertainty" exists further weakens Plaintiffs' assertion of a fundamental right.

*Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). "Our Nation's history and traditions

have consistently demonstrated that the democratic branches are better suited to

decide the proper balance between the uncertain risks and benefits of medical

technology, and are entitled to deference in doing so." *von Eschenbach*, 495 F.3d at

713. Many of the drugs that were considered cutting edge treatment "for all sorts of

ailments" in the late 1800s—including morphine, opioids, and heroin—are now

strictly regulated or banned by state and federal law. Aaron, *Opioid Accountability*,

89 Tenn. L. Rev. 611, 617-18 (2022). States need the flexibility to adapt their laws

to new research.

Tennessee is rightly skeptical of the off-label prescription of drugs for gender

dysphoria because gender dysphoria, a mental disorder, is not remotely similar to

the physical conditions, such as precocious puberty, that pharmaceutical companies

sought and obtained FDA approval for. "Absent state regulation"—such as the

26

Act—"once a drug has been approved by the FDA, doctors may prescribe it for indications and in dosages other than those expressly approved by the FDA." *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006). Pharmaceutical companies have *not* conducted the rigorous studies necessary to determine whether puberty blockers and hormones are effective or safe in treating gender dysphoria. The benefit-risk analysis is not the same.

Taking a faster and cheaper approach than costly clinical development, and one more likely to succeed than an actual submission to the FDA, "many of the same pharmaceutical companies that contributed to the opioid epidemic" partnered with the Endocrine Society and "paid consulting fees to physicians who then advocate for administration of drugs" for treatment of gender dysphoria. Tenn. Code Ann. §68-33-101(*i*). That business decision is particularly worrisome because, if the drugs really were effective at treating gender dysphoria, then conducting such studies and obtaining FDA approval for the treatment of gender dysphoria would help dispel concerns of European regulators that have restricted their prescription to gender-dysphoric minors.

Plaintiffs are mistaken if they believe that FDA approval of a drug for one indication grants them a constitutional right to it for an unapproved use. That is not how federal drug approval works. The "FDA regulates the marketing and distribution of drugs in the United States, not the practice of medicine, which is the

exclusive realm of individual states," regardless of whether the FDA has approved a drug for one form of treatment.  *Taft*, 444 F.3d at 505.  Take one example from the recent pandemic:  The FDA long ago approved hydroxychloroquine for distribution to treat various conditions, such as malaria, lupus, and arthritis, and initially "conclude[d] that the drug might help treat" COVID-19.  *Ass'n of Am. Physicians*, 13 F.4th at 535.  But this Court ruled States retain authority to regulate their doctors' prescription of hydroxychloroquine, especially for off-label treatments.  *Id.* at 534-35.  Per this Court, the Fourteenth Amendment did not create an end-run around the regulation of hydroxychloroquine whenever a parent wants it to treat a child sick with COVID-19.  So too with dangerous puberty blockers and cross-sex hormones for gender dysphoria, whether they are FDA-approved for something else or not.

Parents of course decide their children's treatment when laws do not say otherwise.  But that "does not mean that parents' control over their children is without limit."  *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396 419 (6th Cir. 2019).  Their "claim is derivative from, and therefore no stronger than," the child's right to treatment.  *Whalen v. Roe*, 429 U.S. 589, 604 (1977); *cf. Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983) (A father's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself.").  If anything, the "state's authority over children's activities is broader than over like actions of adults," not narrower.  *Prince v. Massachusetts*,

321 U.S. 158, 168 (1944). A "state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

These parents assert a fundamental right to subject their children to treatments with lifelong effects, including likely sterilization. But Tennessee has an obligation to "safeguard[]" children from medical abuses and give them "opportunities for growth into free and independent well-developed men" and women. *Prince*, 321 U.S. at 165. Fulfilling that obligation, Tennessee has enacted a wide range of regulations protecting children from their parents' decisions. *E.g.*, Tenn. Code Ann. §39-13-110 (prohibiting female genital mutilation); *id.* §39-15-213 (prohibiting elective abortions of unborn children); *id.* §62-38-211(a) (banning tattooing a minor even with parental consent); *id.* §68-34-108 (1971 prohibition of parents surgically sterilizing minors).

Some doctors regrettably tend to overindulge parents' desires or push their own. For example, the American Academy of Pediatricians, with Plaintiffs' "ethicist" expert Dr. Antommaria on the authoring committee, shockingly encouraged doctors' participation in female genital mutilation by offering a "ritual nick" of girls' clitoral skin in contravention of federal law. AAP Policy Statement, *Ritual Genital Cutting of Female Minors*, 125 Pediatrics 1088, 1092 (2010); 18 U.S.C. §116. Thankfully, parents do not have a fundamental right to have doctors

perform on their child any medical procedure that a medical interest group approves. Endocrine Society and WPATH documents from the past decade simply do not "shed light on the meaning of the Constitution." *Dobbs*, 142 S.Ct. at 2267 (rejecting reliance on the positions of medical associations).

Nineteenth-century Americans detested castration, the surgical analog to the hormone treatments at issue here. Under common law, castrating a male was a felony. *See Foster v. People*, 50 N.Y. 598, 604-06 (1872); *Adams v. Barrett*, 5 Ga. 404, 412-13 (1848). Americans found castration so abhorrent that, despite embracing countless evil acts in promotion of slavery, slave States prohibited slaveowners from castrating their slaves. *E.g.*, *Worley v. State*, 30 Tenn. 172, 175-76 (1850); *State v. Wilson*, 25 S.C.L. 163, 164 (1840). Nothing in the historical record suggests that Americans in 1868 believed parents had a fundamental right to castrate their children, surgically or chemically. Plaintiffs did not even try to make such a showing.

Instead, Plaintiffs fudge the *Glucksberg* test and define the contested right "at a high level of generality," exactly as the Supreme Court says not to. *Dobbs*, 142 S.Ct. at 2258. Parents do not have an unfettered "fundamental right to make decisions concerning the care of their children." Compl. ¶168, R.1, PageID#38. Such a broad-sweeping right would stand in direct conflict with the Supreme Court's instruction in *Dobbs* that mere rational-basis review applies to regulation of abortion.

At a minimum, Plaintiffs' approach would subject to strict scrutiny the prohibition of abortions performed on pregnant minors at the behest of their parents. That cannot be. Cases like *Kanuszewski* asked whether parents could *refuse* the drawing and long-term storage of their children's blood. 927 F.3d at 408, 418-20. The "right to refuse unwanted medical treatment" of that sort cannot "be some-how transmuted into a right to" every sort of medical treatment. *Glucksberg*, 521 U.S. at 725-26. That at least one parent consents makes no difference.

### B.    The Act equally protects minors of both sexes.

The district court ruled that the Act discriminates based on sex, subjecting the Act to intermediate scrutiny because (1) it "creates a sex-based classification on its face"; and (2) "discrimination based on transgender status necessarily constitutes discrimination on the basis of sex." Op., R.167, PageID#2682, 2685. But sex discrimination under the Equal Protection Clause means "giv[ing] a mandatory preference to members of either sex over members of the other." *Reed v. Reed*, 404 U.S. 71, 76 (1971); *accord United States v. Virginia*, 518 U.S. 515, 541-42 (1996) (applying heightened scrutiny to such sex-based preferences).

The Act's prohibitions apply equally to both sexes, with no preference for members of one sex over members of the other. The Act does not "[p]rescrib[e] one rule for" girls, "another for" boys. *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). A physician cannot administer a hormone or puberty blocker to a child of

either sex "for the purpose of" (1) "enabling a minor to identify with, or live as, a purported identity inconsistent with the minors' sex," or (2) "treating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §68-33-103(a)(1). These prohibitions are sex-neutral.

A State's medical regulation "is not a sex-based classification and is thus not subject to the heightened scrutiny that applies to such classifications" by mentioning sex. *Dobbs*, 142 S.Ct. at 2245 (citing *Geduldig*, 417 U.S. at 496). The district court tried to distinguish *Dobbs* by positing that "laws regulating pregnancy generally do not make explicit sex-based classifications." Op., R.167, PageID#2683. But abortion laws almost always mention sex. *See, e.g.*, *Dobbs*, 142 S.Ct. at 2243 & n.14 (Miss. Code Ann. §41-41-191 calculates gestational age "from the first day of the last menstrual period of the pregnant woman"); Tenn. Code Ann. §39-15-213 (repeatedly using "woman" and "female"). That this Act applies to procedures *both* sexes can undergo puts it on even sounder footing.

The district court was also wrong to extend *Bostock v. Clayton County*'s Title VII reasoning to the Equal Protection Clause. *Bostock* expressly did "not prejudge" the meaning of other laws governing sex discrimination. 140 S.Ct. 1731, 1753 (2020). Heeding that warning, this Court has ruled "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). *Bostock* does not even

apply to other antidiscrimination laws with the "because of" language central to *Bostock*'s reasoning. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). *Bostock* is "limited only to Title VII itself." *Id.*; *see* Stay Op.13.

Indeed, the morning after the district court declared that *Bostock*'s hiring-and-firing "rationale is applicable to Plaintiffs' equal protection claim," Op., R.167, PageID#2685, *Bostock*'s author called such a move "implausible on its face," *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S.Ct. 2141, 2220 (2023) (Gorsuch, J., concurring). Title VII, "enacted at the same time by the same Congress" as Title VI, *id.* at 2216, goes "beyond the Equal Protection Clause," *id.* at 2221.

The Equal Protection Clause uses different words and "predates Title VII by nearly a century, so there is reason to be skeptical that its protections reach so far." *Brandt v. Rutledge*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16) (en banc) (Stras, J., joined by Gruender, Erickson, Grasz, Kobes, JJ., dissental). "Between 1848 and 1900," laws against cross-dressing "were a central component of urban life." Sears, *Arresting Dress* 3-4 (2013). And castrating a male was a felony under the common law. *See Foster*, 50 N.Y. at 604-06; *Adams*, 5 Ga. at 412-13. The original public meaning of the Fourteenth Amendment cannot possibly protect a constitutional right to take these drugs or give them to one's children for treatment of gender dysphoria.

Plaintiffs' stay response resurrected an argument from below that not even the

district court adopted.  Stay Resp.4-5.  Channeling *Smith v. City of Salem*, Plaintiffs assert that Tennessee is discriminating based on a person's "fail[ure] to act and/or identify with his or her" sex—what *Smith* called "sex stereotyping"—by propagating a stereotype that males and females are different.  378 F.3d 566, 574-75 (6th Cir. 2004).  This Court has not applied this stereotyping idea to medicine, and for good reason.  Sex stereotypes concern whether someone "wear[s] dresses or makeup," not whether someone's body is male or female.  *Id.* at 574.

Recognizing physical differences between the sexes "is not a stereotype." *Nguyen v. INS*, 533 U.S. 53, 68 (2001).  Those differences are "enduring." *Virginia*, 518 U.S. at 533.  They define sex itself.  At the Fourteenth Amendment's ratification, "sex" meant the "physical difference between male and female."  Webster, *An American Dictionary of the English Language* (1865).  A female is an "individual of the sex among animals which conceives and brings forth young," while a male is of the "sex that begets or procreates young, as distinguished from the female." *Id.*; *see also* Worcester, *A Dictionary of the English Language* (1860) (providing similar definitions for female, male, and sex).  Such biologically focused definitions remain the common understanding of those terms today.  *See, e.g.*, *The American Heritage Dictionary of the English Language* (5th ed. 2022 online update) (defining "sex" as "[e]ither of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions").

In 1868, the term "gender identity" did not exist. Americans understood "gender," when used outside of a grammatical context, as a synonym for "sex." *See, e.g.*, Webster, *An American Dictionary of the English Language* (1865) (defining the noun "gender" as "Sex, male or female"); Worcester, *A Dictionary of the English Language* (1860) (same). Although nowadays "[s]ome people maintain that the word *sex* should be reserved for reference to the biological aspects of being male or female or to sexual activity, and that the word *gender* should be used only to refer to sociocultural roles," the most common nongrammatical definition of gender remains synonymous with (biological) sex. *The American Heritage Dictionary of the English Language* (5th ed. 2022 online update) ("sex" as gender's primary nongrammatical definition); *cf.* Tenn. Code Ann. §49-6-310(a) (defining "gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event" as "the student's sex at the time of the student's birth").

That definitional equivalence is why, when the Supreme Court began subjecting sex-based classifications to heightened scrutiny, it treated "sex" and "gender" as synonymous. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 202-04 (1976); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728-31 (1982). There are "distinct differences in physical characteristics and capabilities between the sexes." *Cape v. TSSAA*, 563 F.2d 793, 796 (6th Cir. 1977). No amount of puberty blockers, hormones, or surgeries will ever transform a male into a female. It is biologically

impossible.  And neither Tennessee nor any other State has to mouth scientific falsehoods just because activists repeat them like a mantra.

The district court wrongly embraced the fallacy that a procedure provided to one sex to treat gender dysphoria is always "the same procedure" when provided to the other or when provided to treat physical disorders.  Op., R.167, PageID#2683.  Both sexes use the same puberty blockers, so prohibiting them for treatment of gender dysphoria does not even consider sex.  The benefit-risk calculation of giving puberty blockers to minors for treatment of gender dysphoria is not the same as giving them to treat precocious puberty.  Giving puberty blockers to a 12-year-old with healthy pituitary glands and sex organs *causes* the diseased state of hypogonadotropic hypogonadism; giving those same drugs to a 4-year-old undergoing precocious puberty is not the same treatment because doing so *restores* normal sex-gland functioning.  Laidlaw Decl., R.113-7, PageID#1558-66.

Plaintiffs similarly err in assuming that administering cross-sex hormones to physically healthy children is the same as surgically treating a congenital defect or providing hormones to children with physical disorders of sex development.  Stay Resp.5.  Boys and girls are physically distinct.  For normal pubertal development, boys need higher testosterone than girls.  Giving testosterone to a 15-year-old boy to rectify his testosterone deficiency is much different from giving a physically healthy girl such high doses that her testosterone levels match a healthy boy, *creating*

in girls the diseased state of hyperandrogenism.    Laidlaw Decl., R.113-7, PageID#1568-74.    Conversely, giving excess estrogen to physically healthy boys *creates* the diseased state of hyperestrogenemia.    *Id.* PageID#1575-76.    The benefit-risk assessments are again different.

Providing appropriate treatment to each sex is not sex discrimination. Plaintiffs' logic means it would be sex discrimination for Tennessee to prohibit implanting fertilized eggs within men based on the "stereotype" that only women have wombs and can become pregnant.    The federal ban on "female genital mutilation" of minors would also qualify as sex discrimination.    18 U.S.C. §116. Under Plaintiffs' living Constitution, if parents sign off on castrating a son so that he can sing with an unnaturally high vocal range as an adult, Tennessee would be powerless to stop it—especially if the boy asserts the WPATH-approved gender identity of "eunuch."    WPATH Standards, R.113-9, PageID#1824-28 ("Chapter 9-Eunuchs"); *cf. Whipping & Castration as Punishments for Crime*, 8 Yale L.J. 371, 382 (1899) (citing the existence of *castrati* in the 1800s in Italy, not in the United States, to justify eugenic sterilization).    The Fourteenth Amendment did not smuggle such a broad understanding of sex discrimination under the words "equal protection of the laws."

### C.    Transgender individuals are not a quasi-suspect class.

Plaintiffs could not establish a clear right to relief because "neither the Supreme Court nor this court has recognized transgender status as a quasi-suspect class." Stay Op.12. "Until that changes, rational basis review applies to transgender-based classifications." *Id.* That result is consistent with *Ondo*'s holding that gay persons are not in a quasi-suspect class. *Ondo*, 795 F.3d at 609. Unlike "race or biological gender," sexual orientation is not "definitively ascertainable at the moment of birth." *Id.* Same if not more so for transgender status. Laidlaw Decl. ¶¶16-18, R.113-7, PageID#1549.

The district court "querie[d] whether the Sixth Circuit's reasoning in *Ondo* rests on solid grounds" and rejected it in a footnote. Op., R.167, PageID#2677. Charitably, the district court got ahead of itself in implicitly overruling *Ondo*. Even if *Ondo* were not binding, Plaintiffs completely failed to engage with the other requirements for a quasi-suspect class. *Cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-47 (1985). Some courts have rightly expressed "grave 'doubt' that transgender persons constitute a quasi-suspect class" under *City of Cleburne*. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc).

On a record even the district court acknowledged was "not fulsome," it simply borrowed the rulings of nonprecedential opinions to find transgender individuals

have historically been subject to discrimination. Op., R.167, PageID#2679. The district court then ruled that transgender individuals can equally contribute to society, defining the class at a higher level of generality than individuals suffering from gender dysphoria. *Id.* PageID#2686. Finally, the district court ruled transgender individuals lack political power even if they have "a substantial voice in the media, substantial support in the non-profit and public-interest sector, and the support of a substantial number of elected representatives or executive-branch officials." *Id.* PageID#2680. They even have the full resources of the U.S. government, which intervened in Plaintiffs' favor. If Plaintiffs had bothered to engage with the *City of Cleburne* requirements instead of summarily citing three nonprecedential decisions, *see* PI Mem., R.33, PageID#428, Tennessee would have explained even further how Plaintiffs failed to satisfy the "high" bar "for recognizing a new quasi-suspect class," Stay Op.12.

For example, as Tennessee argued below in response to the United States' preliminary-injunction motion, *see* U.S. PI. Opp., R.135, PageID#2310-11, the actions of the Biden Administration are inconsistent with Plaintiffs' contention that transgender individuals "are politically powerless." *City of Cleburne*, 473 U.S. at 445. From his first day in office, President Biden has prioritized "Preventing and Combating Discrimination on the Basis of Gender Identity." Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021). His agencies have attempted to impose

new gender-identity obligations on the States.  *See, e.g.*, *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 838-39 (E.D. Tenn. 2022) (rejecting agency attempts to "go[] beyond the holding of *Bostock*"), *appeal argued* No. 22-5807 (6th Cir. Apr. 26, 2023).  President Biden has "appointed a record number of openly LGBTQI+ leaders," including a Senate-confirmed transgender admiral[2] and a nonbinary Deputy Assistant Secretary for the Office of Nuclear Energy.[3]  White House, *A Proclamation on Transgender Day of Visibility* (Mar. 30, 2023), perma.cc/VZN6-4ATC.  Just three days after a transgender individual murdered six Tennesseans at The Covenant School, President Biden lamented an "epidemic of violence against transgender" individuals.  *Id.*

The mere fact that a group constitutes a minority of officeholders or of the nation's total population does not mean it is politically powerless.  In many States, transgender and gender-dysphoric individuals have flexed their political muscle and convinced legislatures to take the unprecedented step of prohibiting recognition of child custody orders when a custodial parent does not want these treatments performed on a gender-dysphoric child.  *See* Stay Op.6-7 (citing Cal. Penal Code §819 and Minn. Stat. §260.925 as two such examples).  The district court was wrong

---

[2] U.S. Dep't of Health & Hum. Servs., Admiral Rachel Levine (Oct. 31, 2022), perma.cc/ET5Z-GHFK.

[3] Sands et al., *Top Energy Department official no longer employed after luggage theft accusations*, CNN (Dec. 13, 2022), perma.cc/MJF7-5JPL.

to recognize transgender individuals as a new quasi-suspect class, especially on such a flimsy record.  That immodest decision granted one side of the political debate a judicial veto the Fourteenth Amendment never contemplated.

Even assuming transgender individuals qualify as a quasi-suspect class, the district court erred again by ruling that the Act discriminates based on transgender status.  Op., R.167, PageID#2686.  Everyone agrees not all transgender individuals use puberty blockers or hormones "to identify with, or live as, a purported identity inconsistent with [their] sex" or to "[t]reat[] purported discomfort or distress from a discordance between" sex and identity.  Tenn. Code Ann. §68-33-103(a)(1).  Transgender minors are in "both" the group of individuals not receiving such treatments and the group receiving such treatments.  *Adams*, 57 F.4th at 809.

Non-transgender individuals also receive the treatments, as was obvious to the legislature in separately prohibiting such treatment for gender dysphoria even when it is *not* "to identify with, or live as, a purported identity inconsistent with the minor's sex."  Tenn. Code Ann. §68-33-103(a)(1).  For example, a girl who has a strong desire to have the chest of a boy and thinks she has the typical feelings and reactions of boys could be diagnosed with gender dysphoria under the relevant diagnostic protocols.  *See* Nangia Decl. ¶13, R.113-8, PageID#1634-35.  The Endocrine Society Guidelines would then allow the administration of puberty blockers to "giv[e] the subject more time to explore options."  ES Guidelines, R.113-10, PageID#2007.

Accordingly, there is a "lack of identity" between transgender status and the prohibited treatments. *Geduldig*, 417 U.S. at 496 n.20; *see id.* (finding no sex discrimination because, though everyone pregnant is a woman, "members of both sexes" are in the nonpregnant group).

Even if there were "uneven effects upon particular groups within a class," that does not violate the Fourteenth Amendment. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). Even circuits that have taken a more expansive approach to *Bostock* agree that "discriminatory impact alone does not suffice. The discrimination must be intentional." *Resendiz v. Exxon Mobil Corp.*, 2023 WL 4410524, at *6 (4th Cir. July 10). After scouring the legislative record, Plaintiffs could not identify "malice or hostile animus," insisting instead that the General Assembly displayed too much "insensitivity," PI Mem., R.33, PageID#435 (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring)). But there is no Insensitivity Clause in the Constitution. The Supreme Court "has long disfavored arguments based on alleged legislative motives" and requires "invidiously discriminatory animus." *Dobbs*, 142 S.Ct. at 2246, 2255. In any event, the General Assembly was trying "to protect the health and welfare of" *all* "minors" from specific treatments where it thought the risks outweighed the benefits. Tenn. Code Ann. §68-33-101(a). The legislature, acting with a tremendous depth of concern for all children in Tennessee, displayed no animus toward either

42

sex or toward transgender individuals.

**D.     The Act survives any level of review.**

The Act, "like other health and welfare laws, is entitled to a strong presumption of validity." *Dobbs*, 142 S.Ct. at 2284. "It must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Id.* Under this "highly deferential" standard, courts "may not second-guess a state's medical and scientific judgments," and the State's rationales are not "subject to courtroom fact-finding." *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 483 (6th Cir. 2021) (en banc). Judicial deference is especially appropriate where—as here—"medical and scientific uncertainty" exists. *Carhart*, 550 U.S. at 163.

The Act easily satisfies rational-basis review. This Court correctly observed that Tennessee "plainly has authority, in truth a responsibility, to look after the health and safety of its children," particularly in this "area of unfolding medical and policy debate." Stay Op.11. "Tennessee could rationally take the side of caution before permitting irreversible medical treatments of its children." *Id.* The district court wrongly "departed from the normal rule that courts defer to the judgments of legislatures," especially "in areas fraught with medical and scientific uncertainties." *Dobbs*, 142 S.Ct. at 2268.

But even if the strictest scrutiny applied, the Act would still pass constitutional

muster. *Cf. Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (dispelling the notion that strict scrutiny is "fatal in fact"). Tennessee has a compelling interest in protecting minors from unproven treatments with permanent negative consequences. A "prohibition on" these treatments for minors was "the least restrictive way to further" Tennessee's "compelling interest in preventing" these identified harms. *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 548 (6th Cir. 2021) (en banc) (Bush, J., concurring). By necessity, then, the Act also survives intermediate scrutiny. *See Virginia*, 518 U.S. at 533.

As discussed above, Tennessee submitted declarations from experts in various fields describing the life-altering harms of these experimental treatments and the lack of quality evidence regarding their long-term safety and efficacy. Expert Decls., R.113-3–113-8, PageID#1089-1733. Tennessee also produced testimony from detransitioners lamenting the physical and psychological consequences of these treatments; parents voicing concern over healthcare providers pressuring them to approve such treatment; and a whistleblower revealing that pediatric clinics often fail to follow even the lax "standards of care" endorsed by American medical-interest groups. Decls., R.113-11–113-20, PageID#2031-91.

The district court improperly second-guessed the legislature's judgments, discounting several of Tennessee's experts and ignoring others. It found the testimony of Dr. Hruz (a pediatric endocrinologist and professor at Washington

University School of Medicine) and Dr. Cantor (a clinical psychologist and neuroscientist with expertise in the assessment of scientific studies) "minimally persuasive" because they shy away from treating minors' gender dysphoria, a field dominated by the very American medical establishment that they testified against. Op., R.167, PageID#2690-91. The district court further cast aside declarations from Dr. Levine (who chaired the 1998 WPATH Standards committee) and Dr. Laidlaw (another board-certified endocrinologist) because they have not "administered the medical procedures banned by" the Act. *Id*. PageID#2691. Respectfully, that reasoning is nonsensical. It is the same as saying the only doctors who can opine on the harms of lethal injection are those who perform such executions without hesitation.

The district court ignored declarations from Dr. Nangia (a child and adolescent psychiatrist who has seen hundreds of patients with active gender dysphoria or a history of the same) and Dr. Román (a Swedish child and adolescent psychiatrist with first-hand knowledge of the developments in Europe). It failed to consider Dr. Nangia's testimony that, due to minors' lack of maturation, most of them cannot comprehend and appreciate the long-term risks of medical transition or the low-quality data underlying WPATH and Endocrine Society documents. Nangia Decl. ¶¶154-58, R.113-8, PageID#1709-11. The lower court also failed to grapple with Dr. Román's explanation of how European doctors who previously treated

gender-dysphoric minors with hormonal treatment now deeply disagree with the American medical establishment and have taken steps to essentially ban these treatments in gender-dysphoric youth.   Román Decl. ¶¶2,14-21,33-38, R.113-6, PageID#1517-31.

The district court also ignored how Vanderbilt doctors describe the flaws of their practice.  The founder of Vanderbilt's Transgender Health Clinic admitted that they "haven't been doing this particularly long enough to know the long-term effects of hormone replacement therapy, and this is particularly true in our pediatric population."   Ex.1-G, R.113-1, PageID#1048 (video at 38:08-38:20 (Dr. Taylor speaking)).  She "had no fellowship training in this.  Everything I have learned, I have learned from my patients, and I've learned from the Internet." *Id.* 44:30-44:36. In a "primer" on transgender medicine, Dr. Taylor explained there is "[n]o real consensus" about estradiol levels for boys identifying as girls.  Ex.1-F, R.113-1, PageID#1029.  Her own practice is "still figuring it out!" *Id*.  The title of two of Dr. Taylor's presentations perhaps sums it up best: "Caring for the Transgender Patient: With little evidence, but a lot of love."  Ex.1-H, R.113-1, PageID#1060.

The district court failed to acknowledge the admitted shortcomings of the 2017 Endocrine Society Guidelines and 2022 WPATH Standards.  "The Endocrine Society makes no warranty, express or implied, regarding the guidelines," "nor do they establish a standard of care."  ES Guidelines, R.113-10, PageID#2022.  They

do, however, admit puberty blockers likely lead to "adverse effects on bone mineralization" and "compromised fertility if the person subsequently is treated with sex hormones." *Id*. PageID#2009.

Meanwhile, WPATH now admits that it is an "advocacy organization[]," *Boe v. Marshall*, No. 2:22-cv-184-LCB, Doc.208, at 3 (M.D. Ala. Dec. 27, 2022), and has opposed efforts to discover the bases for its "standards," *id*., Doc.263. Because WPATH is an advocacy organization, not a neutral scientific body, the First and Fifth Circuits and, until recently, the U.S. Department of Health and Human Services have found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see also Kosilek v. Spencer*, 774 F.3d 63, 68-96 (1st Cir. 2014) (en banc); *Nondiscrimination in Health & Health Educ. Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160, 37198 (June 19, 2020) (warning of "rel[ying] excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding"). WPATH admits it has only "limited data" on the safety of hormonal treatments and most surgeries for minors, yet it has opted not to set *any* minimum age for treatments other than phalloplasty. WPATH, R.113-9, PageID#1801-02.

Plaintiffs failed to present evidence clearly showing that these issues are beyond the realm of medical and scientific uncertainty, let alone state police power.

The Act's approach of postponing treatment until adulthood is far better tailored than WPATH's unbounded approach. Although some European countries allow these procedures on minors in controlled research settings, the Fourteenth Amendment does not require research exceptions (and Plaintiffs don't ask for one). The General Assembly rationally decided to prohibit certain treatments and await the results of research studies underway in other States and countries. Plaintiffs have not alleged research trials are ongoing in Tennessee, and "facial attacks are not the proper procedure for challenging the lack of a" research "exception." *Preterm-Cleveland*, 994 F.3d at 529 (majority).

## II.    Plaintiffs Failed to Demonstrate Standing Sufficient to Seek a Preliminary Injunction Even for Themselves.

The Court asked the parties to brief whether Appellees have standing and whether sufficient discovery has been taken on that point. Order, Doc.45, at 2. Plaintiffs failed to demonstrate a substantial likelihood that the preliminary injunction would redress their alleged irreparable harms. Because that was their burden to establish *before* the district court granted the preliminary injunction, and because Vanderbilt confirmed Tennessee's arguments by refusing to reinitiate care when the preliminary injunction was in place, no further discovery is necessary to reverse the district court. Plaintiffs had failed to show a substantial likelihood of standing sufficient for the injunction.

"Where, as here, a party seeks a preliminary injunction on the basis of a

potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (quotation omitted). But, in "this context, the 'merits' on which [P]laintiff[s] must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction and standing." *Id.*; *see also Hearring v. Sliwowski*, 806 F.3d 864, 867-68 (6th Cir. 2015) (addressing lack of constitutional violation before addressing lack of standing sufficient to seek the injunction). A Plaintiff "who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Waskul*, 900 F.3d at 256 n.4 (quotation omitted). At a minimum, vacatur is required.[4]

As Tennessee has maintained throughout this litigation, Plaintiffs lack standing sufficient to seek a preliminary injunction even for themselves. Their theory was that the challenged provisions in the Act would cause Vanderbilt to quickly end their current treatments "beginning in July of 2023." PI Mem., R.33, PageID#424-26. But to get interim relief, Plaintiffs needed to prove both that the challenged provisions in the Act were causing Plaintiffs' purported irreparable harm and that "the requested injunctive relief will prevent or terminate that" harm. *Ohio*

---

[4] In light of the district court's rewriting of Fourteenth Amendment caselaw, and because this argument is also a merits issue at this stage, this Court should rule in Tennessee's favor for this reason while still addressing the validity of the constitutional rulings. *Hearring*, 806 F.3d at 867-68.

*v. Yellen*, 539 F. Supp. 3d 802, 821 (S.D. Ohio 2021). Plaintiffs failed to carry their burden of establishing that the preliminary injunction of Defendants' enforcement would stop Vanderbilt from exiting the market of providing hormones and puberty blockers to gender-dysphoric minors.

While the district court relied on a Vanderbilt administrator's declaration, the administrator discussed what Vanderbilt would do if "enforcement of the Act's provisions prohibiting Hormone Therapy" were enjoined. Pinson Decl.¶9, R.113-1, PageID#1067. But the Act's provisions were not *all* enjoined: Plaintiffs did not (and could not) challenge the private right of action in §105. That provision prohibiting the administration of hormones remained enforceable in state court, where federal courts' opinions are not binding. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 n.21 (1997). The district court also ignored the treating physician's declaration admitting she will not treat Plaintiffs because "many are already seeking care out of state" and because she fears "punitive consequences" from "non-medical third parties." Brady Decl.¶¶9-10, R.113-1, PageID#1070-71. Because Vanderbilt "never attributed its actions to any enforcement or threatened enforcement by the Attorney General" or other Defendants of the challenged provisions in particular, "the injury isn't traceable to the" Defendants. *A&R Engineering & Testing, Inc. v. Scott*, 2023 WL 4417252, at *3 (5th Cir. July 10). The district court was wrong to "presume either to control or to predict" the "independent choices" of Vanderbilt.

50

*Id.* (quotation omitted).

The district court further erred by denying Tennessee an evidentiary hearing on what Vanderbilt planned to do and why. In this circuit, an evidentiary hearing is "required when there are disputed factual issues." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007). District courts cannot grant a preliminary injunction based solely on the "written evidence" unless "receiving further evidence would be manifestly pointless." *Farnsworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 427 (6th Cir. 2014) (quoting Wright & Miller). That tough standard is not met when, for example, material factual disputes turn on "credibility determinations." *Certified Restoration*, 511 F.3d at 553.

Tennessee repeatedly requested an evidentiary hearing. *See* PI Opp., R.112, PageID#948; Transcript, R.125, PageID#2243-44, 2248. It subpoenaed Vanderbilt's witnesses to come and testify. And the district court initially agreed to set an evidentiary hearing on whether "relevant treatment would or would not be available for Plaintiffs at Vanderbilt University Medical Center during the pendency of a preliminary injunction." Order, R.122, PageID#2206. The district court canceled the planned hearing without explanation. Order, R.148, PageID#2534.

Far from "manifestly pointless," *Farnsworth*, 569 F. App'x at 427, an evidentiary hearing would have let Tennessee test Vanderbilt's credibility and explore obvious gaps and contradictions in its employees' ambiguous declarations.

51

Plaintiffs put all their eggs in the Vanderbilt basket: They never submitted evidence about the minors obtaining care from any other provider in the State. Vanderbilt was the only in-state provider that administered them the prohibited treatments. Compl., R.1, PageID#25-31.

Refusing to admit that their speculation about Vanderbilt was wrong, Plaintiffs then told this Court on July 6 that "Defendants misleadingly assert . . . that Plaintiffs' physician might not resume treatment" after the preliminary injunction issued, even though at least one Plaintiff was in possession of information since June 30 confirming Defendants were right. Stay Resp.25-26. Vanderbilt's persistent refusal to reenter the market confirms what Tennessee argued all along: A preliminary injunction will not redress the minor Plaintiffs' purported harms because the Act's challenged provisions are not causing those harms.[5]

The district court also erred in giving Dr. Lacy the benefit of the preliminary injunction when it had not found she had standing. She lacks third-party standing to assert the equal-protection rights of her patients or prospective plaintiffs. "[P]roviders have *no* constitutional rights of their own in this setting." *Planned*

_____

[5] Whether the United States has standing to seek a preliminary injunction is irrelevant for Plaintiffs' separate preliminary-injunction motion—the only one under consideration here. Tennessee will address Intervenor's standing further if the other side argues otherwise. Moreover, the United States lacks its own cause of action. Because the intervention statute limits it to "the same relief as if it had instituted the action," 42 U.S.C. §2000h-2, Intervenor cannot independently receive any relief.

*Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 914 (6th Cir. 2019) (en banc). Even if minors had a right to the prohibited treatments, or if parents had a right to choose them, Dr. Lacy has no "constitutional right" to provide them. *Id.* So, she must prove third-party standing. Yet there is no "hindrance" to Dr. Lacy's current patients seeking a preliminary injunction to protect their own interests, as her co-Plaintiffs have done here and as minors and their parents have done around the country. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). She also lacks any "relationship" with minors who are not yet her patients, let alone a "close" one. *Id.* (concluding attorneys lacked third-party standing for potential future clients).

## III. Tennessee Wins the Balance of Equities and Public Interest.

The final preliminary injunction factors—namely, the balance of equities and the public interest—merge in this case because Defendants are government officials. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Each day the preliminary injunction is in place is another day the well-being of Tennessee children is at risk. Tennessee understands that Plaintiffs disagree about how best to treat gender-dysphoric minors. But, as this Court has observed, Tennessee's "elected representatives made these precise cost-benefit decisions" in enacting the law. Stay Op.14.

The preliminary injunction irreparably harms Tennessee every day it is in effect by preventing the State "from effectuating statutes enacted by representatives

of its people." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).  The preliminary injunction, by design, stops Defendants from "further[ing] the public-health considerations undergirding the law" and forces them to sit motionless as healthcare providers impose "irreversible health risks" on Tennessee children.  Stay Op.14.

Consistent with the General Assembly's findings, Tennessee's experts have observed that children experiencing gender dysphoria cannot comprehend the long-term risks of medical transition and that, for most, their dysphoria naturally desists by adulthood.  Hruz Decl. ¶62, R.113-4, PageID#1305-06; Levine Decl. ¶¶93,105-118, R.113-5, PageID#1430,1434-37; Nangia Decl. ¶154, R.113-8, PageID#1709.  The combination of puberty blockers and cross-sex hormones will likely sterilize children, among many other long-term risks. Cantor Decl. ¶¶205-25, R.113-3, PageID#1184-90; Hruz Decl. ¶¶88-92, R.113-4, PageID#1319-21; Levine Decl. ¶¶121, 127, 178, 189-95, R.113-5, PageID#1438, 1440-41, 1456, 1460-63; Román Decl. ¶39, R.113-6, PageID#1532; Laidlaw Decl. ¶¶19, 135-139, 152-156, R.113-7, PageID#1549, 1572-73, 1576-77.  Delayed justice through private suits cannot reverse the chemical sterilization of minors or restore their lost adolescence.

The district court's decision to authorize statewide relief was especially indefensible, as every member of the panel acknowledged.  Plaintiffs failed to submit specific evidence regarding individuals other than themselves.  Meanwhile,

Tennessee presented substantial evidence from detransitioners who regret their treatment decisions and parents concerned about providers' coercive methods to obtain consent. Decls., R.113-11–113-19, PageID#2031-78. Similarly situated minors and parents in Tennessee deserve the utmost protection their elected representatives have provided.

These treatments risk harm to Plaintiffs too, though the Act's continuing-care compromise lets them continue current treatments until March 31, 2024. Tenn. Code Ann. §68-33-103(b)(1). Plaintiffs have offered no evidence that they want different types of procedures. *Id.* §68-33-103(b)(4). No plausible reading of the Act requires Plaintiffs to "titrate down" from now until March. And the only evidence about titration was that Plaintiffs could titrate off in, at most, 8-weeks' time. Sealed Laidlaw Decl. ¶¶257, 287, 298, R.115, PageID#2155, 2161, 2163. That Vanderbilt has already ceased care and will not restart treatment even while a preliminary injunction is in place—as Plaintiffs knew during the pendency of the stay briefing— favors Tennessee, not Plaintiffs. Whatever is driving Vanderbilt's choice, it is not provisions of the Act that Defendants were preliminarily enjoined from enforcing.

Tennessee appreciates this Court staying the preliminary injunction after only a week. During that short time, at least one clinic in Tennessee—not Vanderbilt— appears to have continued offering prohibited treatments to new patients, in violation of the Act. Mot. at 21 n.2 (identifying CHOICES in Memphis, which serves minors

who are at least 16-years-old). This Court should continue to allow Defendants to enforce the democratic choices of Tennessee's General Assembly.

## IV.    The District Court Could Not Enjoin Enforcement Statewide.

Though the district court found only three minor Plaintiffs (and apparently their parents) have standing, it prohibited "Tennessee from enforcing the law against the nine challengers in this case *and* against the other seven million residents of the Volunteer State." Stay Op.5. The district court's opinion repeatedly relied on *Doe v. Ladapo*, a decision so extreme it equated Florida with "Iran or other similarly repressive regimes." 2023 WL 3833848, at *14 (N.D. Fla. June 6). (Ironically, Iran is a hub for sex-reassignment surgery. Resp. to Supplemental Authority, R.156, PageID#2603-04.) Yet even *Ladapo* granted a preliminary injunction limited to the three minor plaintiffs, their parents, and their healthcare providers. 2023 WL 3833848, at *17. The district court here disagreed because "it is far-fetched that healthcare providers in Tennessee would continue care specifically for Minor Plaintiffs when they cannot do so for any other individual"—ignoring that the Act allows treatment of gender-dysphoric *adults* to continue at Vanderbilt and elsewhere—and because the Act "is most likely unconstitutional on its face." Op., R.167, PageID#2719.

A statewide injunction is not "necessary" here, as every member of the panel agreed. Stay Op.4-6; *id.* at 17 (White, J., concurring in part and dissenting in part)

("I agree that the district court abused its discretion in granting a statewide preliminary injunction."). Plaintiffs submitted no evidence that providers will not treat Plaintiffs unless they can also treat all other minors. Such a theory rests on the district court's "pure speculation" about the economics of medicine and neglects that the minor Plaintiffs' physician still works at Vanderbilt treating adults. *Kentucky*, 57 F.4th at 557. Even by the district court's logic, the preliminary injunction was unnecessary for every other provider in the state not treating the minor patients. The injunction is "more burdensome to" Tennessee "than necessary to provide complete relief to the plaintiffs." *Id.*

That Plaintiffs brought a "facial" challenge to the Act changes nothing. Plaintiffs are not entitled to a statewide injunction if they succeed on a facial challenge. That logic gets things backwards. The district court should have rejected their facial challenge if as-applied relief would redress their injuries. *See Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 570-71 (6th Cir. 2012).

Nor can labeling something a facial challenge bypass the rule that courts' remedial powers are limited to the parties before them. Under our Constitution, a valid remedy "operate[s] with respect to specific parties," not on a law "in the abstract." *California v. Texas*, 141 S.Ct. 2104, 2115 (2021). So when a district court "order[s] the government" to "refrain from acting toward nonparties," it exceeds "the judicial power." *Arizona v. Biden*, 31 F.4th 469, 483-84 (6th Cir. 2022) (Sutton, J.,

concurring). "After all, the 'judicial Power' is the power to 'decide cases for parties, not questions for everyone.'" *United States v. Texas*, 143 S.Ct. 1964, 1980 (2023) (Gorsuch, J., concurring). District courts err when they craft injunctions that "circumvent rules governing class-wide relief." *Id.*; *see Kentucky v. Yellen*, 54 F.4th 325, 341 & n.12 (6th Cir. 2022) (To "obtain injunctive relief, Kentucky and Tennessee each had to demonstrate, with evidence, why it was suffering *particularized* continuing or imminent injuries in fact.").

In all events, the Act is not facially unconstitutional. Under *United States v. Salerno*, "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). As Tennessee argued below, the Act has many lawful applications. Even if it failed intermediate scrutiny as applied to Plaintiffs, it could survive when applied to: healthcare providers who treat minors without meeting the medical guidelines Plaintiffs cite, minors under the age of 12, minors with a parent who does not consent, minors with unfit parents, minors with severe mental disabilities, minors in state custody, and more. The Act does, in fact, apply to these scenarios. *Contra* Op. R.167, PageID#2720-21 (wrongly claiming the Act would "have no application" to minors in those situations).

The district court never denied that prohibiting treatment in those situations

would be constitutional.  It claimed any lawful applications were irrelevant because *Salerno* is now "a dead-letter."  Op., R.167, PageID#2720-22.  This Court itself, however, has "many cases adhering to the *Salerno* test."  Stay Op.5 (majority) (compiling examples).  And the Supreme Court reaffirmed just last month, quoting *Salerno*, that "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid'"—meaning a statute cannot be "facially unconstitutional" when it has "lawful applications."  *United States v. Hansen*, 143 S.Ct. 1932, 1939 (2023).  Until the Supreme Court says otherwise, *Salerno* remains a limit on district courts' ability to grant relief beyond the parties.  *Warshak v. United States*, 532 F.3d 521, 529-31 (6th Cir. 2008) (en banc).  The district court abused its discretion in doing the opposite.

## CONCLUSION

Defendants respectfully request that this Court reverse the district court's preliminary injunction order.

Respectfully submitted,

JONATHAN SKRMETTI
  Attorney General & Reporter

/s/ *Clark L. Hildabrand*
CLARK L. HILDABRAND
  Deputy Chief of Staff & Senior Counsel

STEVEN J. GRIFFIN
RYAN N. HENRY
BROOKE A. HUPPENTHAL
  Assistant Attorneys General
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, Tennessee 37202
(615) 253-5642
clark.hildabrand@ag.tn.gov

ADAM K. MORTARA
LAWFAIR LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

CAMERON T. NORRIS
TIFFANY H. BATES
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

July 24, 2023

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,980 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font.

/s/ *Clark L. Hildabrand*
CLARK L. HILDABRAND
 Deputy Chief of Staff & Senior Counsel

July 24, 2023

## CERTIFICATE OF SERVICE

I, Clark Hildabrand, counsel for Defendants-Appellants and a member of the Bar of this Court, certify that, on July 24, 2023, a copy of the Brief of Defendants-Appellants was filed electronically through the appellate CM/ECF system. I further certify that all parties required to be served have been served.

/s/ *Clark L. Hildabrand*
CLARK L. HILDABRAND
Deputy Chief of Staff & Senior Counsel

# ADDENDUM

Page

Designation of Court Documents............................................................................ A-2

Statutory Provisions ............................................................................................... A-6

## DESIGNATION OF COURT DOCUMENTS

*L.W., et al. v. Jonathan Skrmetti, et al.,*
No. 3:23-cv-00376 (M.D. Tenn.)

| Docket Entry No. | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1 - 43 |
| 21 | Plaintiffs' Motion for Preliminary Injunction | 191 - 195 |
| 23 | Declaration of Samantha Williams | 202 - 209 |
| 25 | Declaration of Jane Doe | 215 - 224 |
| 27 | Declaration of Rebecca Roe | 231 - 238 |
| 28 | Declaration of Susan N. Lacy, M.D. | 239 - 245 |
| 33 | Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction | 411 - 443 |
| 33-1 | Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction Exhibit 1, Text of the Health Care Ban | 444 - 450 |
| 40 | Motion for Preliminary Injunction by United States of America | 501 - 509 |
| 74 | Defendants' Motion to Reset Briefing Schedule and Consolidate Preliminary Injunction Hearing with Trial on the Merits | 667 - 679 |
| 84 | Defendants' Reply in Support of Motion to Reset Briefing Schedule and Consolidate Preliminary Injunction Hearing with Trial on the Merits | 738 - 753 |
| 89 | Order on Defendants' Motion to Reset Briefing Schedule and Consolidate Preliminary Injunction Hearing with Trial on the Merits | 806 - 812 |
| 112 | Defendants' Response in Opposition to Plaintiffs' Motion for A Preliminary Injunction | 919 - 952 |
| 113-1A | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1A, Kruesi, K., Social media posts spark calls to investigate Tenn.'s VUMC, Associate Press, September 21, 2022, https://apnews.com/article/health-social-media-tennessee-nashville-730906b47882692645463fe9546a8695 | 961 - 962 |

A-2

| 113-1B | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1B, Brady, C., Cyperski, M., Romano, M., PATH to Affirmative Medical Care for Transgender/Gender Diverse (TGD) Youth (filed as video) | 963 |
|---|---|---|
| 113-1C | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1C, Brady, C., Cyperski, M., Romano, M., PATH to Affirmative Medical Care for Transgender/Gender Diverse (TGD) Youth | 964 - 986 |
| 113-1D | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1D, Video of Shayne Sebold Taylor, M.D., Medicine Grand Rounds lecture, 2018 (filed as video) | 987 |
| 113-1E | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1E, Video of Ellen W. Clayton, M.D. (filed as video) | 988 |
| 113-1F | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1F, Taylor, Shayne S., A *Primer for Transgender Health*, Southeast/TN AIDS Education and Training Center, January 1, 2019 | 989 - 1047 |
| 113-1G | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1G, Taylor, Shayne S., *Caring for the Transgender Patient: With little evidence; but a lot of love*. (filed as video) | 1048 |
| 113-1H | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1H, Declaration of Shayne Sebold Taylor, MD, filed in Bongo Productions, LLC et al. v. Carter Lawrence et al., No. 3:21-cv-00490 [Doc. No. 7-3] | 1049 - 1061 |
| 113-1J | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1J, Declaration of C. Wright Pinson, MBA, MD | 1064 - 1067 |
| 113-1K | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1K, Declaration of Cassandra C. Brady, MD | 1068 - 1071 |
| 113-2 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 2, Landén, et al., *A systematic review of hormone treatment for children with gender dysphoria and recommendations for research* | 1074 - 1088 |
| 113-3 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 3, Declaration of Dr. Cantor | 1089 - 1279 |

| 113-4 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 4, Declaration of Dr. Hruz | 1280 - 1390 |
|---|---|---|
| 113-5 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 5, Declaration of Dr. Levine | 1391 - 1514 |
| 113-6 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 6, Declaration of Dr. Román | 1515 - 1541 |
| 113-7 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 7, Declaration of Dr. Laidlaw | 1542 - 1625 |
| 113-8 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 8, Declaration of Dr. Nangia | 1626 - 1733 |
| 113-9 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 9, WPATH Guidelines | 1734 - 1994 |
| 113-10 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 10, Endocrine Society Guidelines | 1995 - 2030 |
| 113-11 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 11, Declaration of Chloe Cole | 2031 - 2037 |
| 113-12 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 12, Declaration of Helena Kerschner | 2038 - 2042 |
| 113-13 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 13, Declaration of Prisha Mosley | 2043 - 2045 |
| 113-14 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 14, Declaration of Barbara F. | 2046 - 2050 |
| 113-15 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 15, Declaration of John Stiles | 2051 - 2056 |
| 113-16 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 16, Declaration of Kellie C. | 2057 - 2061 |
| 113-17 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 17, Declaration of Robert Roe | 2062 - 2066 |
| 113-18 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 18, Declaration of Yvonne Yoe | 2067 - 2072 |
| 113-19 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 19, Declaration of John Noakes | 2073 - 2078 |
| 113-20 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 20, Declaration of Jamie Reed | 2079 - 2091 |
| 115 | Sealed version of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 7, Declaration of Dr. Laidlaw | 2097 - 2180 |

| 122 | Order of Court Scheduling Preliminary Injunction Hearing | 2206 - 2207 |
| 125 | Transcript of Telephonic Status Conference | 2243 - 2248 |
| 135 | Defendants' Response in Opposition to Plaintiff-Intervenor's United States' Motion for A Preliminary Injunction | 2298 - 2331 |
| 139 | Reply Declaration of Rebecca Roe | 2380 - 2382 |
| 148 | Order of Court Cancelling Preliminary Injunction Hearing | 2534 |
| 156 | Defendants' Response to Notice of Supplemental Authority | 2603 - 2608 |
| 167 | Memorandum Opinion of the Court | 2656 - 2724 |
| 168 | Order on Plaintiffs' Motion for Preliminary Injunction | 2725 - 2727 |
| 169 | Defendants' Notice of Appeal | 2728 - 2732 |
| 170 | Defendants' Emergency Motion for a Stay of Preliminary Injunction Pending Appeal | 2733 - 2742 |
| 172 | Order of Court re Defendants' Emergency Motion for Stay of Preliminary Injunction Pending Appeal | 2747 - 2750 |

## STATUTORY PROVISIONS

## Tenn. Code Ann. § 68-33-101, *et seq*. ("The Act")

**68-33-101. Findings.**

(a) The legislature declares that it must take action to protect the health and welfare of minors.

(b) The legislature determines that medical procedures that alter a minor's hormonal balance, remove a minor's sex organs, or otherwise change a minor's physical appearance are harmful to a minor when these medical procedures are performed for the purpose of enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex or treating purported discomfort or distress from a discordance between the minor's sex and asserted identity. These procedures can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering from adverse and sometimes fatal psychological consequences. Moreover, the legislature finds it likely that not all harmful effects associated with these types of medical procedures when performed on a minor are yet fully known, as many of these procedures, when performed on a minor for such purposes, are experimental in nature and not supported by high-quality, long-term medical studies.

(c) The legislature determines that there is evidence that medical procedures that alter a minor's hormonal balance, remove a minor's sex organs, or otherwise change a minor's physical appearance are not consistent with professional medical standards when the medical procedures are performed for the purpose of enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex or treating purported discomfort or distress from a discordance between the minor's sex and asserted identity because a minor's discordance can be resolved by less invasive approaches that are likely to result in better outcomes for the minor.

(d) The legislature finds that medical procedures are being performed on and administered to minors in this state for such purposes, notwithstanding the risks and harms to the minors.

(e) The legislature finds that health authorities in Sweden, Finland, and the United Kingdom have recognized similar trends and, after conducting systematic reviews of the evidence, have found no evidence that the benefits of these procedures outweigh the risks and thus have placed severe restrictions on their use.

(f) The legislature finds that Dr. John Money, one of the earliest advocates for performing or administering such medical procedures on minors and a founder of the Johns Hopkins Gender Identity Clinic, abused minors entrusted to his care, resulting in the suicides of David and Brian Reimer.

(g) The legislature finds that such medical procedures are being performed on and administered to minors in this state with rapidly increasing frequency and that supposed guidelines advocating for such treatment have changed substantially in recent years.

(h) The legislature finds that minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures and that many individuals have expressed regret for medical procedures that were performed on or administered to them for such purposes when they were minors.

(i) The legislature finds that many of the same pharmaceutical companies that contributed to the opioid epidemic have sought to profit from the administration of drugs to or use of devices on minors for such purposes and have paid consulting fees to physicians who then advocate for administration of drugs or use of devices for such purposes.

(j) The legislature finds that healthcare providers in this state have sought to perform such surgeries on minors because of the financial incentive associated with the surgeries, not necessarily because the surgeries are in a minor's best interest.

(k) The legislature finds that healthcare providers in this state have threatened employees for conscientiously objecting, for religious, moral, or ethical reasons, to performing or administering such medical procedures.

(l) The legislature finds that healthcare providers in this state have posted pictures of naked minors online to advertise such surgeries.

(m) The legislature declares that the integrity and public respect of the medical profession are significantly harmed by healthcare providers performing or administering such medical procedures on minors. This state has a legitimate, substantial, and compelling interest in protecting minors from physical and emotional harm. This state has a legitimate, substantial, and compelling interest in protecting the ability of minors to develop into adults who can create children of their own. This state has a legitimate, substantial, and compelling interest in promoting the dignity of minors. This state has a legitimate, substantial, and

compelling interest in encouraging minors to appreciate their sex, particularly as they undergo puberty. This state has a legitimate, substantial, and compelling interest in protecting the integrity of the medical profession, including by prohibiting medical procedures that are harmful, unethical, immoral, experimental, or unsupported by high-quality or long-term studies, or that might encourage minors to become disdainful of their sex.

(n) Therefore, it is the purpose of this chapter to prohibit medical procedures from being administered to or performed on minors when the purpose of the medical procedure is to:

(1) Enable a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

(2) Treat purported discomfort or distress from a discordance between the minor's sex and asserted identity.

**68-33-102. Definitions**.

As used in this chapter:

(1) "Congenital defect" means a physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex, including abnormalities caused by a medically verifiable disorder of sex development, but does not include gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality;

(2) "Healthcare provider" means a healthcare professional, establishment, or facility licensed, registered, certified, or permitted pursuant to this title or title 63 and under the regulatory authority of:

(A) The department of health;

(B) An agency, board, council, or committee attached to the department of health; or

(C) The health facilities commission;

(3) "Hormone" means an androgen or estrogen;

(4) "Knowing" and "knowingly" have the same meaning as the term "knowing" is defined in § 39-11-302;

(5) "Medical procedure" means:

>  (A)  Surgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being; or

>  (B)  Prescribing, administering, or dispensing any puberty blocker or hormone to a human being;

(6) "Minor" means an individual under eighteen (18) years of age;

(7) "Parent" means any biological, legal, or adoptive parent or parents of the minor or any legal guardian of the minor;

(8) "Puberty blocker" means a drug or device that suppresses the production of hormones in a minor's body to stop, delay, or suppress pubertal development; and

(9) "Sex" means a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth.

## 68-33-103. Prohibitions.

(a)(1) A healthcare provider shall not knowingly perform or offer to perform on a minor, or administer or offer to administer to a minor, a medical procedure if the performance or administration of the procedure is for the purpose of:

>  (A)  Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

>  (B)  Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

>  (2)  Subdivision (a)(1) applies to medical procedures that are:

>  >  (A)  Performed or administered in this state; or

(B)   Performed or administered on a minor located in this state, including via telehealth, as defined in § 63-1-155.

(b)(1) It is not a violation of subsection (a) if a healthcare provider knowingly performs, or offers to perform, a medical procedure on or administers, or offers to administer, a medical procedure to a minor if:

(A)   The performance or administration of the medical procedure is to treat a minor's congenital defect, precocious puberty, disease, or physical injury; or

(B)   The performance or administration of the medical procedure on the minor began prior to the effective date of this act and concludes on or before March 31, 2024.

(2) For purposes of subdivision (b)(1)(A), "disease" does not include gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality.

(3) For the exception in subdivision (b)(1)(8) to apply, the minor's treating physician must certify in writing that, in the physician's good-faith medical judgment, based upon the facts known to the physician at the time, ending the medical procedure would be harmful to the minor. The certification must include the findings supporting the certification and must be made a part of the minor's medical record.

(4) The exception in subdivision (b)(1)(8) does not allow a healthcare provider to perform or administer a medical procedure that is different from the medical procedure performed prior to the effective date of this act when the sole purpose of the subsequent medical procedure is to:

(A)   Enable the minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

(B)   Treat purported discomfort or distress from a discordance between the minor's sex and asserted identity.

(c)(1) It is not a defense to any legal liability incurred as the result of a violation of this section that the minor, or a parent of the minor, consented to the conduct that constituted the violation.

A-10

(2) This section supersedes any common law rule regarding a minor's ability to consent to a medical procedure that is performed or administered for the purpose of:

    (A) Enabling the minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

    (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

**68-33-104. Distribution of Hormones or Puberty Blockers to Minors.**

A person shall not knowingly provide a hormone or puberty blocker by any means to a minor if the provision of the hormone or puberty blocker is not in compliance with this chapter.

**68-33-105. Private Right of Action.**

(a)(1) Except as otherwise provided in subdivision (a)(2), a minor, or the parent of a minor, injured as a result of a violation of this chapter, may bring a civil cause of action to recover compensatory damages, punitive damages, and reasonable attorney's fees, court costs, and expenses, against the healthcare provider alleged to have violated § 68-33-103 or any person alleged to have violated § 68-33-104.

    (2) The parent of a minor injured as a result of a violation of this chapter shall not bring a civil cause of action against a healthcare provider or another person if the parent consented to the conduct that constituted the violation on behalf of the minor.

(b) The parent or next of kin of a minor may bring a wrongful death action, pursuant to title 20, chapter 5, part 1, against a healthcare provider alleged to have violated § 68-33-103, if the injured minor is deceased and:

    (1) The minor's death is the result of the physical or emotional harm inflicted upon the minor by the violation; and

    (2) The parent of the minor did not consent to the conduct that constituted the violation on behalf of the minor.

(c) If a court in any civil action brought pursuant to this section finds that a healthcare provider knowingly violated § 68-33-103, then the court shall notify the appropriate regulatory authority and the attorney general and reporter by mailing a certified copy of the court's order to the regulatory authority and the attorney general and reporter. Notification pursuant to this subsection (c) shall be made upon the judgment of the court being made final.

(d) For purposes of subsection (a), compensatory damages may include:

  (1) Reasonable economic losses caused by the emotional, mental, or physical effects of the violation, including, but not limited to:

    (A) The cost of counseling, hospitalization, and any other medical expenses connected with treating the harm caused by the violation;

    (B) Any out-of-pocket costs of the minor paid to the healthcare provider for the prohibited medical procedure; and

    (C) Loss of income caused by the violation; and

  (2) Noneconomic damages caused by the violation, including, but not limited to, psychological and emotional anguish.

(e) Notwithstanding any law to the contrary, an action commenced under this section must be brought:

    (1) Within thirty (30) years from the date the minor reaches eighteen (18) years of age; or

    (2) Within ten (10) years of the minor's death if the minor dies.

(f) This section Is declared to be remedial in nature, and this section must be liberally construed to effectuate its purposes.

## 68-33-106. Attorney General and Reporter's Right of Action.

(a) The attorney general and reporter shall establish a process by which violations of this chapter may be reported.

(b) The attorney general and reporter may bring an action against a healthcare provider or any person that knowingly violates this chapter, within twenty (20) years of the violation, to enjoin further violations, to disgorge any profits received due to the medical procedure, and to recover a civil penalty of twenty-five thousand dollars ($25,000) per violation. Each time a healthcare provider performs or administers a medical procedure in violation of § 68-33-103 constitutes a separate violation.

(c) A civil penalty collected pursuant to this section must be paid into the general fund of this state.

(d) The attorney general and reporter is entitled to reasonable attorney's fees, court costs, and expenses if the attorney general and reporter prevails in an action brought pursuant to this section.

(e) Jurisdiction for an action brought pursuant to this section is in the chancery or circuit court of Williamson County or circuit court in the county where the violation occurred.

### 68-33-107. Healthcare Provider Licensing Sanctions.

A violation of § 68-33-103 constitutes a potential threat to public health, safety, and welfare and requires emergency action by an alleged violator's appropriate regulatory authority. Upon receiving notification pursuant to § 68-33-105(c), or upon otherwise becoming aware of an alleged violation of § 68-33-103, the appropriate regulatory authority shall proceed pursuant to title 63 or this title, as applicable.

### 68-33-108. Minor Immunity.

A minor upon whom a medical procedure is performed or administered must not be held liable for violating this chapter.

### 68-33-109.  Application.

This chapter does not prohibit or restrict psychological practice regulated pursuant to title 63, chapter 11; the practice of professional counseling regulated pursuant to title 63, chapter 22; or the practice of social work regulated pursuant to title 63, chapter 23.

## Other Statutes

**18 U.S.C. § 116**

(a) Except as provided in subsection (b), whoever, in any circumstance described in subsection (d), knowingly--

(1) performs, attempts to perform, or conspires to perform female genital mutilation on another person who has not attained the age of 18 years;

(2) being the parent, guardian, or caretaker of a person who has not attained the age of 18 years facilitates or consents to the female genital mutilation of such person; or

(3) transports a person who has not attained the age of 18 years for the purpose of the performance of female genital mutilation on such person,

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) A surgical operation is not a violation of this section if the operation is--

(1) necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner; or

(2) performed on a person in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a person licensed in the place it is performed as a medical practitioner, midwife, or person in training to become such a practitioner or midwife.

(c) It shall not be a defense to a prosecution under this section that female genital mutilation is required as a matter of religion, custom, tradition, ritual, or standard practice.

(d) For the purposes of subsection (a), the circumstances described in this subsection are that--

(1) the defendant or victim traveled in interstate or foreign commerce, or traveled using a means, channel, facility, or instrumentality of interstate or foreign

commerce, in furtherance of or in connection with the conduct described in subsection (a);

(2) the defendant used a means, channel, facility, or instrumentality of interstate or foreign commerce in furtherance of or in connection with the conduct described in subsection (a);

(3) any payment of any kind was made, directly or indirectly, in furtherance of or in connection with the conduct described in subsection (a) using any means, channel, facility, or instrumentality of interstate or foreign commerce or in or affecting interstate or foreign commerce;

(4) the defendant transmitted in interstate or foreign commerce any communication relating to or in furtherance of the conduct described in subsection (a) using any means, channel, facility, or instrumentality of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means or in manner, including by computer, mail, wire, or electromagnetic transmission;

(5) any instrument, item, substance, or other object that has traveled in interstate or foreign commerce was used to perform the conduct described in subsection (a);

(6) the conduct described in subsection (a) occurred within the special maritime and territorial jurisdiction of the United States, or any territory or possession of the United States; or

(7) the conduct described in subsection (a) otherwise occurred in or affected interstate or foreign commerce.

(e) For purposes of this section, the term "female genital mutilation" means any procedure performed for non-medical reasons that involves partial or total removal of, or other injury to, the external female genitalia, and includes--

(1) a clitoridectomy or the partial or total removal of the clitoris or the prepuce or clitoral hood;

(2) excision or the partial or total removal (with or without excision of the clitoris) of the labia minora or the labia majora, or both;

A-15

(3) infibulation or the narrowing of the vaginal opening (with or without excision of the clitoris); or

(4) other procedures that are harmful to the external female genitalia, including pricking, incising, scraping, or cauterizing the genital area.

## 28 U.S.C. § 1292(a)(1)

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

\*\*\*

## 28 U.S.C. § 1331

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C. § 1343

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

\*\*\*

## 28 U.S.C. § 1367

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

(e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

## 42 U.S.C. §2000e-2

(a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

\*\*\*

## 42 U.S.C. §2000h-2

Whenever an action has been commenced in any court of the United States seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race, color, religion, sex or national origin, the Attorney General for or in the name of the United States may intervene in such action upon timely application if the Attorney General certifies that the case is of general

public importance. In such action the United States shall be entitled to the same relief as if it had instituted the action.

**Tenn. Code Ann. § 39-15-213**

(a)  As used in this section:

   (1) "Abortion" means the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman known to be pregnant with intent other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus;

   (2) "Fertilization" means that point in time when a male human sperm penetrates the zona pellucida of a female human ovum;

   (3) "Pregnant" means the human female reproductive condition of having a living unborn child within her body throughout the entire embryonic and fetal stages of the unborn child from fertilization until birth; and

   (4) "Unborn child" means an individual living member of the species, homo sapiens, throughout the entire embryonic and fetal stages of the unborn child from fertilization until birth.

(b)  A person who performs or attempts to perform an abortion commits the offense of criminal abortion. Criminal abortion is a Class C felony.

(c)  It is an affirmative defense to prosecution under subsection (b), which must be proven by a preponderance of the evidence, that:

   (1) The abortion was performed or attempted by a licensed physician;

   (2) The physician determined, in the physician's good faith medical judgment, based upon the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman or to prevent serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman. No abortion shall be deemed authorized under this subdivision (c)(2) if performed on the basis of a claim or a diagnosis that the woman will engage in conduct that would result in her death or substantial

A-19

and irreversible impairment of a major bodily function or for any reason relating to her mental health; and

(3) The physician performs or attempts to perform the abortion in the manner which, in the physician's good faith medical judgment, based upon the facts known to the physician at the time, provides the best opportunity for the unborn child to survive, unless in the physician's good faith medical judgment, termination of the pregnancy in that manner would pose a greater risk of the death of the pregnant woman or substantial and irreversible impairment of a major bodily function. No such greater risk shall be deemed to exist if it is based on a claim or diagnosis that the woman will engage in conduct that would result in her death or substantial and irreversible impairment of a major bodily function or for any reason relating to her mental health.

(d) Medical treatment provided to the pregnant woman by a licensed physician which results in the accidental death of or unintentional injury to or death of the unborn child shall not be a violation of this section.

(e) This section does not subject the pregnant woman upon whom an abortion is performed or attempted to criminal conviction or penalty.

## Tenn. Code Ann. § 49-6-310

(a) A student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth, as indicated on the student's original birth certificate. If a birth certificate provided by a student pursuant to this subsection (a) does not appear to be the student's original birth certificate or does not indicate the student's sex upon birth, then the student must provide other evidence indicating the student's sex at the time of birth. The student or the student's parent or guardian must pay any costs associated with providing the evidence required under this subsection (a).

\*\*\*

## Tenn. Code Ann. § 62-38-211

(a) Except as provided in subsection (c), it is a Class A misdemeanor to tattoo a person under eighteen (18) years of age.

\*\*\*

## Cal. Penal Code § 819

(a) It is the public policy of the state that an out-of-state arrest warrant for an individual based on violating another state's law against providing, receiving, or allowing their child to receive gender-affirming health care or gender-affirming mental health care is the lowest law enforcement priority.

(b) California law enforcement agencies shall not knowingly make or participate in the arrest or participate in any extradition of an individual pursuant to an out-of-state arrest warrant for violation of another state's law against providing, receiving, or allowing a child to receive gender-affirming health care and gender-affirming mental health care in this state, if that care is lawful under the laws of this state, to the fullest extent permitted by federal law.

(c) No state or local law enforcement agency shall cooperate with or provide information to any individual or out-of-state agency or department regarding the provision of lawful gender-affirming health care or gender-affirming mental health care performed in this state.

\*\*\*

## Minn. Stat. § 260.925

A law of another state that authorizes a state agency to remove a child from the child's parent or guardian because the parent or guardian allowed the child to receive gender-affirming health care, as defined in section 543.23, paragraph (b), is against the public policy of this state and must not be enforced or applied in a case pending in a court in this state. A court order for the removal of a child issued in another state because the child's parent or guardian assisted the child in receiving gender-affirming care in this state must not be enforced in this state.

## Miss. Code Ann. § 41-41-191

(3) Definitions. As used in this section:

\*\*\*

A-21

(f) "Gestational age" or "probable gestation age" means the age of an unborn human being as calculated from the first day of the last menstrual period of the pregnant woman.

\*\*\*