Case No. 23-5600

**In the United States Court of Appeals for the Sixth Circuit**
_____

L.W., by and through her parents and next friends, Samantha Williams and Brian Williams; Samantha Williams; Brian Williams; John Doe, by and through his parents and next friends, Jane Doe and James Doe; Jane Doe; James Doe; Rebecca Roe; Susan N. Lacy, on behalf of herself and her patients; Ryan Roe, by and through his parent and next friend, Rebecca Roe,

*Plaintiffs-Appellees*, United States Of America,

v.

Jonathan Thomas Skrmetti, in his official capacity as the Tennessee Attorney General and Reporter, et al.,

*Defendants-Appellants*

and

United States of America,

*Intervenor-Appellee*
_____

On Appeal from the United States District Court
for the Middle District of Tennessee, Nashville Division
Case No. 3:23-cv-00376
_____

**BRIEF OF AMICI CURIAE 30 STATE FAMILY POLICY COUNCILS,
FAMILY POLICY ALLIANCE, AND THE HALE INSTITUTE
IN SUPPORT OF DEFENDANTS-APPELLEES AND REVERSAL OF THE
JUDGMENT BELOW**

David E. Fowler (TBR 014063)
Alliance for Law and Liberty
1113 Murfreesboro Road, No. 106-167
(615) 591-2090
jthomsmith@cgdfund.com

*Counsel for Amicus Curiae*

*FILED WITH CONSENT OF ALL COUNSEL OF RECORD*

## Table of Contents

TABLE OF AUTHORITIES ...................................................................................... ii

STATEMENT OF CORPORATE DISCLOSURE ..................................... iv

INTEREST OF *AMICI CURIAE* ............................................................................ 1

ARGUMENT ...................................................................................................... 3

    I.    Introduction ...................................................................... 3

    II.   The sex-assailing medical manipulation and sterilizing of children presents a sui generis category for legal analysis, not a generic instance of "medical care." ......................................................... 6

    III.  A constitutional "parental right" does not authorize harming children's sexual physiology .................................................. 12

    IV.  The substantive due process claim of Plaintiffs to authorize third parties to injure to their minor children is not deeply rooted in our history and traditions, but rather violates the common law understanding of the rights and duties persons ............................. 15

        A. The common law is the constitutional predicate for interpreting the Due Process Clause, and its provision of rights of personal security is at odds with the district court's ruling ..................... 15

        B. An historical and common-law-informed substantive due process right of parents must recognize their obligation to protect the rights of their child ............................................ 21

CONCLUSION ................................................................................ 23

APPENDIX—LIST OF AMICI ......................................................... 24

CERTIFICATE OF COMPLIANCE ................................................... 27

CERTIFICATE OF SERVICE ........................................................... 28

# Table of Authorities

***Cases*:**

*A.B. v. C.D. and E.F.*, 2019 BCSC 254 …………………………………………. 14

*Dobbs v. Jackson Women's Health Organization*,
142 S.Ct. 142 (2022) ………………………………………………………. 8, 16, 22

*Hurtado v. California*, 110 U.S. 516 (1884) …………………………………… 17

*Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) ……………………………. 20

*Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ……………………………….. 22

*Minor v. Happersett*, 88 U.S. 162 (1875) ……………………………………….. 17

*Munn v. Illinois*, 94 U.S. 113 (1877) ………………………………………… 19

*N.Y. State Rifle & Pistol Assn. v. Bruen*,
142 S.Ct. 2111 (2022) …………………………………………………… 16

*New York Central R.R. Co. v. White*, 243 US 188 (1917) ………………………. 19

*People v. Clough*, 17 Wend. 351, 352 (N.Y. Sup. Ct. 1837) ……………… ……19

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) ………………………………..19, 20

*Smith v. Alabama*, 124 U.S. 465 (1888) ……………………………………… 16

*South Carolina v. United States*, 199 U.S. 437 (1905) ……………………….....16

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ………………………....11, 12, 22

***Constitutional Provisions*:**

U.S. Const. amend V ………………………………………………………… 17

U.S. Const. amend. XIV ……………………………………………… *passim*

***Other Authorities:***

Brief of Amici Curiae American College of Obstetricians
and Gynecologists, et al. in Dobbs v. Jackson Women's Health
Organization ........................................................................................10

David Crawford, *Recognizing the Roots of Society in the Family,
Foundation of Justice*, 34 COMMUNIO 379, 401 (Fall 2007) ........................... 4

Jeff Shafer, *Supreme Incoherence: Transgender Ideology and the
End of Law* (March 28, 2017) ...............................................................14

Frank H. Easterbrook, *Substance and Due Process*,
1982 Sup. Ct. Rev. 85 (1982) ...............................................................17

Joseph Story, Commentaries on the Constitution of the
United States (1833) ...........................................................................17

Nathan S. Chapman and Michael W. McConnell, *Due Process
as Separation of Powers*, 121 Yale L.J. 1672 (2012) ...................................17

Justinian Digest ..................................................................................4

Justinian Institutes .............................................................................4

1 William Blackstone, Commentaries on the Laws of England (1765) ........ *passim*

1 J. Kent, *Commentaries on American Law* (1826-30) ...............................21

## STATEMENT OF CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29, *Amici* declare that they are not owned by any parent corporation or any publicly held corporation that owns 10% or more of its stock or states that there is no such corporation. Pursuant to Federal Rule of Appellate Procedure 29(4)(E), *Amici* declare that no counsel for a party authored this brief in whole or in part, and no person other than amici and their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

## INTEREST OF AMICI CURIAE[1]

*Amici* Family Policy Councils are thirty non-profit family policy organizations based in thirty states and an allied non-profit family policy organization with whom the state-based councils are aligned.  Collectively, these Family Policy Councils seek to educate citizens and State legislators on public policies that address most closely who we are as human beings. Grounding *Amici*'s policy advocacy is the objective givenness of human nature that has been long-recognized in our constitutional, common-law, and domestic relations traditions. These traditions defer to the society-founding and -preserving institution of the natural family based in the procreative relation and correspondence of persons male and female, a relation of momentous social-cultural consequence. *Amici* organizations are identified in the Appendix to this brief.

*Amicus* Hale Institute at New Saint Andrews College, whose name recalls the example and contributions of eminent seventeenth-century common-law jurist Sir Matthew Hale, seeks to advance public understanding of our common law heritage, American constitutionalism, and precepts of law vital to a just social order, located particularly in the rich traditions of our legal history.

---

[1] All parties have consented to the filing of this brief.

*Amici* support the Tennessee Attorney General and other State defendants in opposition to the lower court's misuse of substantive due process to deny State authority not just to recognize the objective identity of children and protect them from harms in their vulnerable minority, but to hold onto the orienting precepts central to our legal tradition itself.

# ARGUMENT

## I.    Introduction

The State of Tennessee enacted the challenged statute to protect the children within its borders who do not have the maturity to comprehend the life-altering gravity of being subjected to novel surgical and chemical interventions that irreversibly disrupt and alter their healthy bodies. Medical professionals impose these interventions upon a child for the specific purpose of overcoming the natural processes and characteristics unique to a child's physiology as male or female, and thereby exploit and perpetuate (rather than correct) the child's transient though profound confusion about who he or she is subjectively, as person, in relation his or her objective sexed identity.

The contest in this case thus raises questions as to whether there is a human nature, whether male and female are objective conditions of identity that State law may recognize, and whether the State may protect vulnerable children within its borders from the medical manipulation of persons' sexed bodies in furtherance of a denial of any given human nature. In sum, the fundamental issue for this Court is whether States may refuse the novel proposal by some in society that a child is a blank construct for self-definition and medical manipulation and may also refuse the consequences to law and society that will come once such a radical departure from an objective human nature and historic community precept is made normative.

3

It is an historic juridical baseline that the law is to countenance and address aright the persons for whom it is designed. Justinian's venerable *Corpus Juris Civilis* in the Digest offers that "since all law is made for the sake of human beings, we should speak first of the status of persons." DIG. 1.5.2. And from Justinian's Institutes: "Knowledge of law amounts to little if it overlooks the persons for whose sake law is made." J. INST. 1.2.12. Indeed, the concept of health itself vanishes from the law's apprehension of health if it can no longer recognize a pre-existing and given human nature by which conformity to or deviation from wholeness and integrity can be judged.

The aberrant contemporary suggestion that constitutional liberty requires judges to abolish nature from jurisprudence so that the individual may self-construct, is an invitation to incoherence—conceptual, legal-political, and anthropological. Professor David Crawford observes:

> If juridical forms and civil institutions are not to be alienating and fragmenting, they need to *anticipate and support* the concrete person *as he really is*, rather than a hypothetical and denatured person. As such, the juridical forms and civil institutions embodying legal justice must presuppose in their structure, meaning, and ends, the familial person and the human justice he or she represents and aspires to. The family is the "foundation of justice" and is antecedently organic to society, in the sense that it informs the nature of the person who is or should be presupposed by those institutions.[2]

---

[2] David Crawford, *Recognizing the Roots of Society in the Family, Foundation of Justice*, 34 COMMUNIO 379, 401 (Fall 2007) (emphasis added).

Accordingly, *Amici* herein offer the Court three points of consideration. First, the central claim in Plaintiffs' case is not one that can be properly comprehended by the Court if it is confined to the narrow boundaries of a dispute about a generic "right to medical treatment." To be sure, the claim presents in a medical context, but the claim to a "medical treatment" is, at best, a proxy argument for—and more importantly, offered as a distraction from—the far more encompassing dispute over the anthropological and legal disruption implicated in transgender theory and its policy proposals. The district court's ruling implies and facilitates much more than the medical maltreatment of children; it forecloses the law's authority to acknowledge the objective physical identity of persons. Just as the Tennessee statute under consideration does something more than prohibit the disordering of children's' healthy bodies by medical professionals: it serves to instantiate, and thus reiterate and hold steady, the law's proper and vital recognition of an objective sexed human nature.

Secondly, the "parental rights" claim that Plaintiffs and the district court invoke is not merely inadequate for their legal claim (as explained in this Court's July 8, 2023 Memorandum Opinion), but more fundamentally, a supposed right in parents to renounce the objective meaning of sexed bodies for their child is antithetical to the predicate of sexed bodies upon which parentage itself rests and from which it arises. The momentousness of human persons' embodied sex is

revealed archetypally in maternity and paternity, and the law grants deference and honor to it in ways including the law's submission to "parental rights." The invocation of that right cannot reasonably serve as the grounds to forbid a State to do what this right itself depends on: acknowledging the decisiveness of persons' embodied sex and its consequence and social importance. There is thus a fundamental enmity and irreconcilability between the concept of parental rights and Plaintiffs proffered use of it.

Third, the centuries-enduring and constitutionally foundational common-law legal precepts that authorize and inform State police-power authority stand firmly opposed to the district court's findings of a parental prerogative to permanently injure their children, and a constitutional principle that would deprive all fifty States of their historic police power to protect the vulnerable from physical harm.

## II. The sex-assailing medical manipulation and sterilizing of children presents a sui generis category for legal analysis, not a generic instance of "medical care."

The medical interventions being proffered to confused children and anxious parents that the Tennessee statute forbids are not properly evaluated in terms of a parents' right to direct the "medical care" of a child. Instead, these life- and health-altering interventions affecting a child's procreative capacity stand as a *sui generis* category of endeavor for several reasons. First, instead of restoring diseased bodies to health, the prohibited conduct attacks healthy bodies to halt or destroy natural

6

physiological processes and to remove or destroy healthy tissues and organs. This sort of endeavor is "medicine" only in the sense that doctors, scalpels, and drugs are involved. Second, the startling emergence from nowhere of children claiming a cross-sex identity is patently a cultural rather than medical development. So also is the surgical and pharmaceutical industries' exploitation of it, which enrolls credulous children into the deceit of sex-change and the permanent harms attending that futility. And third, the conduct the statute forbids is a renunciation of the reality and significance of the sex binary, thus casting doubt on all human social and legal order. This is not garden-variety "medical treatment."

While the Court in its expedited review largely shaped its analysis in terms of the controversial and contested nature of the medical treatment issues (see, e.g., Mem. Op. at 9), the Court's Memorandum Opinion also evinces at points an awareness that the experimental character of pediatric hormone manipulation does not exhaust the scope of relevant concern.

For instance, in considering the "vexing … dilemmas" faced by legislatures considering responses to gender identity and gender dysphoria, this Court included questions on "[d]rugs versus counseling," as well as "sports" and "access to bathrooms." (Mem. Op. 12., Docket No. 44) Indeed, when the "treatment" options for the diagnosed condition include "counseling," admission to cross-sex sports participation, or a person's access to bathrooms designated for the opposite sex, the

true nature of the alleged "medical" issues comes into view. It is unique to gender-identity health proposals that medical treatment and social reorganization are conflated. Counseling and rearranging social institutions are not viable treatment options applied to, for example, cancer, heart disease, blood clots, and cataracts patients. Only to transgender-identifying patients. And conversely, physically disruptive hormone and surgical interventions are not otherwise legal uses of medical powers when applied to persons with healthy bodies. Only for transgender-identifying patients. In this context, this Court understandably alluded to the association of "innovative medical options" with "evolving social norms" (Mem. Op. at 13)—a coupling inapplicable to actual medical care like suturing or dialysis. The Tennessee statute is not interfering with garden-variety medicine, and thus should not be considered in those terms.

The Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022), is instructive. There the Court did not examine a constitutional right to "medical treatment," but to the specific act of abortion. And from that point of focused examination, the Court denied that the Constitution contains a right to abort. Indeed, "abortion had long been a *crime* in every single State. At common law, abortion was criminal in at least some stages of pregnancy and was regarded as unlawful and could have very serious consequences at all stages." *Id*. at 2236. The Court also determined that abstract

appeals to "autonomy" in decision-making fails as a liberty right that would include abortion access, because "abortion is different" in view of its termination of unborn human life. *Id*. Hence the Court categorized abortion with matters of "great social significance and moral substance." *Id*. at 2284.

The Supreme Court assessed the specifics of the alleged "medical procedure" of abortion from a moral, anthropological, and historical-legal vantage.[3] Plaintiffs' claimed "right to medical decision-making" cannot exclude from judicial view the profound human and social implications of the practice under consideration. Therefore, it is a mistake to assign decisive *legal* authority to Plaintiffs' cadre of *medical* witnesses, or to defer to medical organizations with vested interests whose expertise resides only in the realm of technique—not in insight on decisive jurisprudential and juridical considerations such as human nature, Anglo-American juridical polestars, and civilizational predicates—all of which are implicated in Plaintiffs' claims.

In the *Dobbs* case, prominent medical associations lined up as *amici curiae* to urge upon the Supreme Court the proposition that "laws regulating abortion should be . . . supported by a valid medical or scientific justification" and that

---

[3] For example, "None of the other decisions cited by *Roe* and *Casey* involved the critical moral question posed by abortion." *Id*. at 2236.

"there is no medical or scientific justification for" the Mississippi abortion law.[4]

The Court clearly rejected the medical organizations' proposal that the *legal*

evaluation of Mississippi's law should be delimited by "medical or scientific

justification[s]" which would remove from consideration the fact that the "medical

procedure" at issue, which terminates a human life, had been a crime in Anglo-

American law for uninterrupted centuries until the divergence of *Roe v. Wade*.

In Tennessee's case, it does not resolve the constitutional point that, as the

district court related, "[i]t is undisputed that every major medical organization to

take a position on the issue … agrees that puberty blockers and cross-sex hormone

therapy are appropriate and medically necessary treatments for adolescents when

---

[4] BRIEF OF AMICI CURIAE American College of Obstetricians and Gynecologists, American Medical Association, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Public Health Physicians, American College of Medical Genetics and Genomics, American College of Nurse-Midwives, American College of Osteopathic Obstetricians and Gynecologists, American College of Physicians, American Gynecological and Obstetrical Society, American Medical Women's Association, American Psychiatric Association, American Society for Reproductive Medicine, Association of Women's Health, Obstetric and Neonatal Nurses, Council of University Chairs of Obstetrics and Gynecology, GLMA: Health Professionals Advancing LGBTQ Equality, North American Society for Pediatric and Adolescent Gynecology, National Medical Association, National Association of Nurse Practitioners in Women's Health, Society for Academic Specialists in General Obstetrics and Gynecology, Society of Family Planning, Society of General Internal Medicine, Society of Gynecological Oncology, and Society of OB/GYN Hospitalists, *Dobbs v. Jackson Women's Health Organization*, No. 19-1392, Supreme Court of the United States, https://www.supremecourt.gov/DocketPDF/19/19-1392/193074/20210920174518042_19-1392%20bsacACOGetal.pdf

clinically indicated." (R. 168, Dist. Ct. Mem. Op. at 52-53). These organizations

have no legitimate claim to unique insight on the implications of a constitutional

mandate nullifying State authority both to protect children from avant-garde

medical impositions and to protect the law itself from losing domestic relations

categories that have marked human social organization through all time. This is no

small matter, and is quite outside the reach of expert opinion on (for instance) a

child's endocrine system.

Similarly instructive is the Supreme Court's decision in *Washington v.*

*Glucksberg*, 521 U.S. 702 (1997), a case brought by physicians and others who

claimed a constitutional right to "physician-assisted suicide." The Court refused to

artificially restrict its legal analysis to medical details. "We begin, as we do in all

due process cases, by examining our Nation's history, legal traditions, and

practices." *Id.* at 710. That examination revealed that "for over 700 years, the

Anglo-American common-law tradition has punished or otherwise disapproved of

both suicide and assisting suicide," and that criminal prohibitions on assisting

suicide persist in most States. *Id.* at 711. Thus, assisted suicide "is not a

fundamental liberty interest protected by the Due Process Clause." *Id.* at 728.

The Court in *Glucksberg* also recognized as "unquestionably important and

legitimate," *id.* at 735, government interests in protecting the young, persons with

mental disorders, and other vulnerable individuals from being pressured into

11

suicide; safeguarding the "integrity and ethics" of the medical profession (a

predominantly non-empirical consideration); and refusing legal standards whose

operation could compromise enforcement of values the law otherwise prizes. *Id.* at

731-33. Similarly, this Court should refuse the incredible suggestion that Science

answers the question before it, and thus removes from consideration those matters

of human nature that have ever and always informed, and inescapably been

implicated in, constitutional determinations.

### III.   A constitutional "parental right" does not authorize harming children's sexual physiology.

The court below ruled that the Fourteenth Amendment secures a "parental

right" to approve "medical treatments" that will hinder or eliminate from their

children the ability to become mothers or fathers themselves, while forbidding

States to consider and act upon the universal recognition across the earth through

time that the human person is objectively and profoundly male or female. Up to

this point in history, this understanding of persons has been deemed not only an

indubitable truth, but, as such, a cornerstone, orienting vision, and celebrated

feature of civilization itself.

The independent jurisdictional authority and autonomy of husband and wife,

parents and family, recognized by governments through time has depended on

those governments' acknowledgement of the created, natural, pre-political quality

of maternity, paternity, and family.  It is this vision and acknowledgment that is, in

principle, nullified by Plaintiffs' claim and the district court's ruling and opinion, the driving logic of which is that persons' bodies are blank material for uninhibited technical manipulation but are otherwise without consequence or worthy of public recognition.

Because the rights and duties of parents by nature and at common law emerge from the parents' procreative relation to the child,[5] it is incongruous to assign an authority to such parents to invite and direct third parties to intentionally destroy the generative powers and organs of such child. The law by that authorization would enshrine the idea that embodied sexual identity has no truth or authoritative legal significance. If that were true, "parental rights" could not be a relational category of constitutional consequence and authority. For the category of "parental rights" to exist, let alone rise to constitutional significance, the law must acknowledge the normative force in the procreative relation. It is from that relation the legal category of "parent" originates.[6] The conceptual grounding for the claimed right of a parent is precisely what the proposed exercise of that right (sex-

---

[5] See section IV, below.
[6] The law's recognition of custodial or parental roles for persons not in a procreative relation to the child—such as in the case of adoptive parents—does not diminish this point, for adoption and other custodial arrangements are the exceptions that rely on and reinforce the rule and template of the central and normative case (natural parenthood).

assailing drugs and surgeries) necessarily denies, namely, that male and female are objective and legally cognizable realities of human identity and significance.

Thus, here as elsewhere, Plaintiffs both renounce and rely on the same truth. The "parental right" Plaintiffs promote as legally consequential they then apply as a tool to renounce the reality and permitted legal recognition of embodied sex.

Of course, the physical and psychological battering children suffer from medical exploitation is reason enough to recoil from Plaintiffs' proposal that judges make this treatment of children a constitutional right. But also fateful is constitutionalizing transgender theory implies, in principle, the *de*constitutionalizing of the natural family itself with its pre-political grounding and authority.

> Once male or female embodiment no longer legally anchors human identity, the venerable practices and policies dependent on the identity-profundity of male and female bodies only survive as fugitives, or in a tentative position of contingent government permission, ever-vulnerable to the in-fact erasure already accomplished in principle. So, for instance, draining legal meaning from body and its natural functions correspondingly drains legal weight from the body-concepts of motherhood, fatherhood, kinship and ancestry—from family itself.[7]

A helpful illustration of this outcome is found in the case *A.B. v. C.D. and E.F.*, 2019 BCSC 254 (Bowden, J.) from British Columbia, Canada, In that case, the

---

[7] Jeff Shafer, *Supreme Incoherence: Transgender Ideology and the End of Law* (March 28, 2017), www.firstthings.com/web-exclusives/2017/03/supreme-incoherence-transgender-ideology-and-the-end-of-law.

Case: 23-5600    Document: 81    Filed: 07/27/2023    Page: 20


court ruled against a father who had sought an injunction to halt doctors from injecting synthetic male hormones into his adolescent daughter. In denying the father's petition, the court also ordered him not to speak to, or about, his daughter using words that would identify her as a girl or as his daughter, and also removed from the father the authority to participate in his daughter's name change and application for male legal status. *Id.* at p. 15. Indeed, the Court designated this father's daughter as his "son," *id.* at ¶¶ 34, 43, revealing that neither daughter nor son is fixed or real relationship, but simply judicially bestowed. It follows that "father" is also a merely nominal designation emptied of authority or legal claim, as the court's ruling demonstrated.

Parental authority does not survive transgenderism, as the predicates of each are antithetical. Once the device of "parental rights" facilitates Plaintiffs' overthrow of existing legal-anthropological categories of human meaning, the category of parent itself falls victim to the achievement. The self-nullifying logic of Plaintiffs' use of "parental rights" disqualifies it from legitimate candidacy as a constitutional claim.

IV.     **The substantive due process claim of Plaintiffs to authorize third parties to injure their minor children is not deeply rooted in our history and traditions, but rather violates the common law understanding of the rights and duties of persons.**

      A. **The common law is the constitutional predicate for interpreting the Due Process Clause, and its provision of the right of personal security is at odds with the district court's ruling.**

While the United States Supreme Court has recognized a substantive due process liberty right in parents in relation to the education, upbringing, and custody of their children, the existence of such authority does not grant permission to parents do what has through time has been uniformly forbidden. "Historical inquiries are essential whenever the Court is asked to recognize a new component of the 'liberty' interest protected by the Due Process Clause," as "the term 'liberty' alone provides little guidance." *Dobbs,* 142 S.Ct. at 2235.

In terms of our history and legal tradition, it cannot seriously be maintained that a mother or father has a right to jeopardize or injure a child's procreative physiology or commission removal of healthy anatomy.

The interpretation of the Fourteenth Amendment as a constitutive part of the U.S. Constitution must be "centered on constitutional text and history." *N.Y. State Rifle & Pistol Assn. v. Bruen*, 142 S.Ct. 2111, 2128-29 (2022) (construing the Second Amendment). There is nothing new in that observation. *See Smith v. Alabama*, 124 U.S. 465, 478 (1888) ("The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history."); *South Carolina v. United States*, 199 U.S. 437, 449 (1905) ("in interpreting the Constitution we must have recourse to the common law"). Indeed, the Due Process Clause is predicated on the common law. *See* Nathan S. Chapman

and Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J.

1672 (2012); Frank H. Easterbrook, *Substance and Due Process*, 1982 Sup. Ct.

Rev. 85 (1982). In fact, common law is the conception of law upon which "[t]he

whole Structure of our present jurisprudence stands," Joseph Story, *Commentaries*

*on the Constitution of the United States* § 157 (1833), and it is the legal

"nomenclature of which the framers of the Constitution were familiar." *Minor v.*

*Happersett*, 88 U.S. 162, 167 (1875).

As the Constitution's Fifth and Fourteenth Amendment each contain a Due

Process clause, "[t]he conclusion is . . . irresistible, that when the same phrase was

employed in the Fourteenth Amendment to restrain the action of the States, it was

used in the same sense and with no greater extent" than was true of the Fifth

Amendment's restraint on the federal government. *Hurtado v. California*, 110 U.S.

516, 535 (1884). Thus, even as "[d]ue process of law" under the Fifth Amendment

is to be "interpreted according to the principles of the common law," *id.* at 535, so

also in the Fourteenth Amendment—and, likewise, the interpretation of "person" set

forth in each.

At common law, persons were "divided by the law into either natural persons,

or artificial. Natural persons are such as the God of nature formed us; artificial are

such as are created and devised by human laws for the purposes of society and

government, which are called corporations or bodies politic." 1 Blackstone's

*Commentaries* \*123. Nothing in the text or history of the Fourteenth Amendment remotely implies that this understanding of persons and their rights and duties were abrogated, particularly as such relates to the protection of a person's limbs and body from physical injury.

The Tennessee legislature determined in the declaratory and directory part of the statute at issue "the boundaries of right and wrong," *Id.* at \*53, in a way that conforms to and is accord with the fundamental rights enjoyed by all persons prior to the U.S. Constitution's ratification, and retained by the people expressly through the Fifth, Ninth, and Fourteenth Amendments, namely, the absolute rights of "personal security, liberty, and property." *Id.* at \*129.

"The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation." *Id.* This right extends not just to "those limbs and members that may be necessary to a man in order to defend himself or annoy his enemy," but "the rest of his person or body is also entitled, by the same natural right, to security from the corporal insults of menaces, assaults, beating, and wounding; though such insults amount not to destruction of life or member." *Id.* at 134 (emphasis added). It includes "[t]he preservation of a man's health from such practices as may prejudice or annoy it." *Id.* Thus, "[t]he least touching of another's person wilfully [sic], or in anger, is a battery; for the law cannot draw the line between different degrees of violence, and

therefore totally prohibits the first and lowest stage of it; every man's person being sacred, and no other having a right to meddle with it in any the slightest manner." 2 Blackstone's *Commentaries*, *120.

In this juridical context, the Supreme Court has said that it "cannot be doubted" that the States' historic police power encompasses and authority to punish self-maiming and suicide. *New York Central R.R. Co. v. White*, 243 US 188, 207 (1917). Justice Field, dissenting in *Munn v. Illinois*, 94 U.S. 113 (1877), expounded on the word "life" in the Fourteenth Amendment by acknowledging

> something more is meant than mere animal existence. The inhibition against its deprivation extends to all those limbs and faculties by which life is enjoyed. The provision equally prohibits the mutilation of the body by the amputation of an arm or leg, or the putting out of an eye, or the destruction of any other organ of the body through which the soul communicates with the outer world. The deprivation not only of life, but of whatever God has given to everyone with life, for its growth and enjoyment, is prohibited by the provision in question, if its efficacy be not frittered away by judicial decision.

*Id*. at 142. See, e.g., *People v. Clough*, 17 Wend. 351, 352 (N.Y. Sup. Ct. 1837) (citing common law sources as to the crime of maiming and mayhem, as implicated in amputating appendages).

In the same vein is the Supreme Court's observation in *Skinner v. Oklahoma*, 316 U.S. 535, 536 (1942), of "a right which is basic to the perpetuation of a race — the right to have offspring." The Court then expounded on this right in relation both to the individual and society:

> We are dealing here with legislation which involves one of the basic
> civil rights of man. Marriage and procreation are fundamental to the
> very existence and survival of the race. The power to sterilize, if
> exercised, may have subtle, far-reaching and devastating effects. In
> evil or reckless hands it can cause races or types which are inimical to
> the dominant group to wither and disappear. There is no redemption
> for the individual whom the law touches. Any experiment which the
> State conducts is to his irreparable injury. He is forever deprived of a
> basic liberty.

*Id.* at 541. Here the Court demonstrates how awareness or discernment of truths

about human nature indelibly attends and directs legal analysis. Again, the law

must deal with persons as they actually are. Protecting healthy children from

possible sterilization by medical personnel is not prohibited by but is consistent the

protection of all that constitutes life in the Due Process Clause.

As persons have a right not to be bodily injured by third persons, physicians like

all other third persons have a *corresponding* duty in their practice not to injure the

bodies of the persons who are their patients. The jurisdiction of States to regulate the

practice of medicine to protect the health of its citizens has been recognized since

adoption of the Fourteenth Amendment. *See, e.g.*, *Jacobson v. Massachusetts*, 197

U.S. 11, 25 (1905) (acknowledging the state's authority over public health, quoting

*Ogden v. Utah*, 22 U.S. 1, 203 (1824), that "health laws of every description" were

left to the powers of the state and "[n]o direct general power over these objects is

granted to Congress; and, consequently, they remain subject to state legislation.").

**B.    An historical and common-law-informed substantive due process right of parents must recognize their obligation to protect the rights of their child.**

At common law "rights of persons" are those "such as are due from every citizen" and "such as belong to him." 1 Blackstone's *Commentaries*, *123. "[R]ights as well as duties" are reciprocal "of each other." *Id*. As respects the parent-child relationship, "[t]he duty of parents to provide for the maintenance of their children is . . . an obligation, says Puffendorf, laid on them not only by nature herself, but by their own proper act, in bringing them into the world: for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them, therefore, they have entered into a voluntary obligation to endeavour, as far as in them lies, that the life which they have bestowed shall be supported and preserved." Blackstone's *Commentaries,* * 447.

Thus, the law has recognized that "[t]he power of parents over their children is derived from the former consideration, their duty." Blackstone's *Commentaries*, *452. American common-law expositor and jurist Chancellor James Kent as well explained that the rights of parents derive from their duties. 1 J. Kent, Commentaries 203.

As to parents, "protection" of their children, like maintenance, was considered "a natural duty." 1 Blackstone's *Commentaries*, * 450. And the

Supreme Court, in keeping with Blackstone and Kent, has recognized that rights of parents are in accord with their "natural duty." *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923). In other words, begetting a child gives rise to the primordial duty of parents to protect the absolute right to personal security that "would belong to their [child] merely in a state of nature." 1 Blackstone's *Commentaries* *119. Consequently, a parent's invitation to a third-party professional to injure a child's healthy and naturally developing reproductive organs violates the duty that parent owes the child in deference to the child's absolute right to personal security.

Furthermore, for a claimed right to qualify as a due process "liberty" right, it "must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs*, 142 S.Ct. at 2242 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). An alleged parental right to have a medical provider administer medical drugs that disrupt and injure the healthy reproductive processes and organs of a child, and otherwise disrupt his or her carefully balanced physiology, in pursuit of a novel and ideological project based on a renunciation of the very grounding for the existence and mutually informing and referential realities of male and female, defies and contradicts our history and tradition, not conforms to them. Historic State law relies on the embodied truths of the sex binary and its procreative meaning and consequence for the normative notions of family relation on which vast swaths of law and culture are dependent and in turn

22

submit to. Plaintiffs' discordant refusal of personal meaning is not only a contradiction of Anglo-American legal history, but of the basis of human generation and organization at all.

### CONCLUSION

For the foregoing reasons, *Amici* respectfully request this Court reverse the preliminary injunction ruling of the district court.

Dated: July 27, 2023.                    /s/*David E. Fowler (TBR 014063)*

David E. Fowler (TBR 014063)
Alliance for Law and Liberty
1113 Murfreesboro Road, No. 106-167
(615) 591-2090
jthomsmith@cgdfund.com

*Counsel for Amicus Curiae*

APPENDIX – LIST OF AMICI

<u>Family Policy Council Amici</u>

Alabama Policy Institute

Alaska Family Council

Arkansas Family Council

Christian Civic League of Maine

Delaware Family Policy Council

The Family Action Council of Tennessee

The Family Foundation (KY)

The Family Foundation of Virginia

Family Heritage Alliance (SD)

Family Leader Foundation (IA)

Family Policy Alliance

Family Policy Institute of Washington

Florida Family Policy Council

Frontline Policy Council (GA)

Hawaii Family Forum

Idaho Family Policy Center

Indiana Family Institute

Kansas Family Voice

Louisiana Family Forum

Michigan Family Forum

Minnesota Family Council

Nebraska Family Alliance

New Jersey Family Policy Center

New Yorker's Family Research Foundation

North Carolina Family Policy Council

North Dakota Family Alliance

The Palmetto Family Council (SC)

Pennsylvania Family Institute

Texas Values

Wisconsin Family Action

Wyoming Family Alliance

Other Amici

The Hale Institute

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,199 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Times New Roman 14-point type face throughout, and Times New Roman is a proportionally spaced typeface that includes serifs.

Dated: July 27, 2023                    /s/ David E. Fowler

**CERTIFICATE OF SERVICE**

I certify that on July 27, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Sixth Circuit and served through CM/ECF upon all counsel of record in this case.


/s/ David E. Fowler

David E. Fowler
*Counsel for Amicus Curiae*