Nos. 23-5600/5609

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

◆

L. W., et al., *Plaintiffs-Appellees*,

&

UNITED STATES OF AMERICA, *Plaintiff/Intervenor-Appellee*

v.

JONATHAN SKRMETTI, et al., *Defendants/Appellants*,

◆

JANE DOE 1, et al., *Plaintiffs-Appellees*,

v.

WILLIAM C. THORNBURY, JR., et al., *Defendants*

&

COMMONWEALTH OF KENTUCKY, ex rel. Attorney General Daniel Cameron,
*Defendant/Intervenor-Appellant*

On Appeals from the U.S. District Court for the Middle District of Tennessee, No. 3:23-cv-00376, and the U.S. District Court for the Western District of Kentucky, No. 3:23-cv-230-DJH

## BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS SUPPORTING APPELLEES

Jonathan B. Miller
Hilary Burke Chan
Aadika Singh
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609

Eli Savit
Victoria Burton-Harris
WASHTENAW COUNTY PROSECUTING
 ATTORNEY
P.O. Box 8645
Ann Arbor, Michigan, 48107
savite@washtenaw.org
(734) 222-6620

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

STATEMENT OF INTEREST ........................................................... 1

SUMMARY OF ARGUMENT .......................................................... 3

ARGUMENT ...................................................................................... 5

I.   SB 1 AND SB 150 VIOLATE THE DUE PROCESS
     RIGHTS OF PLAINTIFFS ............................................................ 5

     A.   The Purported Harms Articulated by the States
          Are Speculative and Unsupported......................................... 7

     B.   SB 1 and SB 150 Are Not Narrowly Tailored ...................... 9

II.  LOCAL GOVERNMENTS WILL BE FORCED TO
     SHOULDER THE HARMS THAT STEM FROM BANS
     ON GENDER-AFFIRMING CARE .......................................... 13

     A.   Categorial Denial of Gender-Affirming Care
          Will Lead to Adverse Mental-Health Outcomes ............... 15

     B.   Local Government Bears the Burden of Adverse
          Mental-Health Outcomes ................................................... 16

          1.   Suicidal Ideation and Mental Health Response ............ 17

          2.   Crimes and Victimization ............................................. 19

          3.   Housing Insecurity and Homelessness .......................... 21

          4.   Schools and Academic Achievement ........................... 24

CONCLUSION.................................................................................. 28

ADDITIONAL COUNSEL ............................................................... 29

APPENDIX A – LIST OF *AMICI* ...................................................... 31

CERTIFICATE OF COMPLIANCE ................................................. 33

CERTIFICATE OF SERVICE........................................................... 34

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Bernal v. Fainter*,
   467 U.S. 216 (1984) ........................................................................ 8

*Doe 1 v. Thornbury,*
   No. 3:23-CV-230-DJH, 2023 WL 4230481
   (W.D. Ky. June 28, 2023)................................................... 7, 8, 15

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
   927 F.3d 396 (6th Cir. 2019) ............................................... 6, 7, 10

*L.W. by & through Williams v. Skrmetti*,
   No. 3:23-CV-00376, 2023 WL 4232308
   (M.D. Tenn. June 28, 2023) ................................................*passim*

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) ................................................................ 5, 13

*Moore v. City of E. Cleveland, Ohio*,
   431 U.S. 494 (1977) ...................................................................... 12

*Parham v. J. R.*,
   442 U.S. 584 (1979) ............................................................*passim*

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925) ........................................................................ 6

*Prince v. Massachusetts,*
   321 U.S. 158 (1944) .................................................................. 7, 10

*Troxel v. Granville*,
   530 U.S. 57 (2000) ...................................................................... 10

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ................................................................ 5, 27

**STATUTES**

AR Code § 25-19-103 ........................................................................ 13

Ky. Rev. Stat. § 311.372 ...................................................................... 6

MCL § 722.27a ................................................................................... 13

Ohio Rev. Code § 3109.401 ............................................................... 13

Tenn. SB 150 §§ 4(2), (3) .................................................................... 9

Tenn. Code Ann. § 68-33-103(a)(1) ............................................... 6, 9

TX Fam Code § 153.001 ................................................................. 13

Utah Code § 80-2a-201 .................................................................. 13

**OTHER AUTHORITIES**

A.V. Stoep, et al., *What Proportion of Failure to Complete Secondary School in the U.S. Population is Attributable to Adolescent Psychiatric Disorder?* J. of Behavioral Health Servs. & Research, 30(1):119-24 (2003) .................................... 24

Alliance for Justice, *National Survey on Victims' View on Safety and Justice* (Sept. 2022), https://allianceforsafetyandjustice. org/wp-content/uploads/2022/09/Alliance-for-Safety-and-Justice-Crime-Survivors-Speak-September-2022.pdf ............ 20, 21

American Psychological Ass'n, *Poverty and High School Dropouts* (May 2013), http://rb.gy/exmi3l .................................. 26

Andres Gutierrez, *Detroit Police Offer Resources as Officers Deal with Record Number of Mental Health Calls*, CBS Detroit (July 18, 2023), https://www.cbsnews.com/detroit/news/detroit-police-offer-resources-as-officers-deal-with-record-number-of-mental-health-calls/ .................................................................................. 17

Andrew Flores, et al., *Hate crimes against LGBT people: National Crime Victimization Survey, 2017-2019*, PLOS ONE, (Dec. 21, 2022), https://doi.org/10.1371/journal.pone.0279363 ............................ 20

Anita Chabria, *Police Fear "Suicide By Cop" Cases. So They've Stopped Responding to Some Calls*, The Los Angeles Times (Aug. 10, 2019), https://www.latimes.com/california/story/2019-08-09/suicide-calls-california-cops-stopped-responding#:~:text=Some%20small%20and%20midsize%2 0law,if%20the%20situation%20turns%20violent ........................ 18

Arianna Prothero et al., *School Counselors and Psychologists Remain Scarce Even as Needs Rise, Education Week* (Mar. 1, 2022), https://www.edweek.org/leadership/school-counselors-and-psychologists-remain-scarce-even-as-needs-rise/2022/03 .............................................. 24

Catherine Stoddard, *"He Is A Hero": South Carolina Officer Dies Saving Person Having Mental Health Crisis,* Fox 5 Tampa Bay (Aug. 3, 2023), https://www.fox13news.com/news/he-is-a-hero-south-carolina-officer-dies-saving-person-having-mental-health-crisis ............................................................................... 18

Chapin Hall at the University of Chicago, *Missed Opportunities: LGBTQ Youth Homelessness in America,* https://www.chapinhall.org/wp-content/uploads/VoYC-LGBTQ-One-Pager-FINAL.pdf .................................... 22

Christine Chung, *New 988 Mental Health Crisis Hotline Sees Record Demand*, The New York Times (Jan. 19, 2023), https://www.nytimes.com/2023/01/19/us/suicide-hotline-demand.html ....................................................................... 18

Cindy Long, *Why School Nurses Are Leaving*, NEA Today (June 23, 2023), https://www.nea.org/advocating-for-change/new-from-nea/why-are-school-nurses-leaving ................ 25

City of Ann Arbor, *Ann Arbor Human Rights Commission*, https://www.a2gov.org/departments/city-clerk/pages/humanrightscommission.aspx#lgbtq ............................................. 2

Dan Rosenzweig-Ziff, *Denver Mayor Wants to Buy Hotel as First Step to First Homelessness*, Washington Post (July 31, 2023), https://www.washingtonpost.com/nation/2023/07/31/denver-homelessness-mayor-johnston-hotel/ .......................................... 21

Detroit Police Department, Chief's Neighborhood Program, (2021), https://detroitmi.gov/sites/detroitmi.localhost/files/events/2021-09/CNL%20Power%20Pointrfnlsubr2.pdf .................................... 3

Diana Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, JAMA Netw Open. 5(2) (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423 ................................................................... 15

District Attorney Crime Prevention Foundation, SARB Program (2020), http://rb.gy/1bqgyt ........................................... 26

Evan Millward, *Cincinnati Police LGBTQ liaisons changing perspectives in the community and department*, WCPO Cincinnati, (Jun. 8, 2021), https://www.wcpo.com/community/pride/cincinnati-police-lgbtq-liaisons-changing-perspectives-in-the-community-and-department ................................................................. 3

Fight Crime: Invest in Kids, *School or the Streets: Crime and America's Dropout Crisis* (2008), http://rb.gy/b28sgj ................ 26

G. Slap et al., *Adoption as a Risk Factor for Attempted Suicide During Adolescence*, Pediatrics 108(2):E30 (Aug. 2001), http://www.doi.org. 10.1542/peds.108.2.e30 .................................................. 24

George Hunter, *Why Michigan Police are 'Overwhelmed' by Growing Mental Health Calls*, The Detroit News (Oct. 16, 2022), https://www.detroitnews.com/story/news/local/michigan/2022/10/17/why-michigan-police-are-overwhelmed-by-growing-mental-health-calls/69543716007/ ..................................................... 17

H. Kim et al., *Housing Instability and Mental Health Among Renters in the Michigan Recession and Recovery Study*, Public Health 209:30 (Aug. 2022), https://www.sciencedirect.com/science/article/abs/pii/S0033350622001421?via%3Dihub ...................................... 23

Hollywood Homeless Youth Partnership, *No Way Home*, at 7 (Nov. 2010), http://www.hhyp.org/downloads/HHYP_TCE_Report_11-17-10.pdf ..................................................................... 23

Hugo Westerlund et al., *Parental Academic Involvement in Adolescence as Predictor of Mental Health Trajectories Over The Life Course*, 15 BMC Public Health 653 (2015), https://doi.org/10.1186/s12889-015-1977-x ................................ 14

Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) Pediatrics (Feb. 2020), https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC7073269/ .................................................... 16, 17

James Copple, et al., *Gender, Sexuality, and 21st Century Policing: Protecting the Rights of the LGBTQ+ Community*, Community Oriented Policing Services U.S. Department of Justice, (2017), https://www.iadlest.org/Portals/0/cops% 20LGBTQ.pdf ................................................................................. 3

Kaleidoscope Youth Center, *LGBTQ+ Youth Homelessness*, (2019), https://www. kycohio.org/uploads/1/3/3/7/13374330/lgbtqia_homelessnes s_info_kyc.pdf ............................................................................... 2

Linda A. Teplin et al., *Crime Victimization in Adults with Severe Mental Illness*, 62 Arch. Gen. Psychiatry 8, 911-921 (2005) ............................................................................................ 20

Memorandum from Michigan State Superintendent Brian J. Whiston to State Board of Education at 2 (Feb. 23, 2016), https://www.michigan.gov/- /media/Project/Websites/mde/Year/2016/02/26/Item_B_SB E_Statement_and_Guidance_on_LGBTQ.pdf?rev=3484b24f a9c14f6e85a39684a5c33d94 ....................................................... 25

Monica Deza et al., *Local Access to Mental Healthcare and Crime, National Bureau of Economic Research*, J. of Urb. Econs. 103410 (May 2022) ............................................................ 19

N. Ray, *Lesbian, gay, bisexual and transgender youth: An epidemic of homelessness*, National Gay and Lesbian Task Force Policy Institute and the National Coalition for the Homeless (2007), http://www.thetaskforce.org/reports_ and_research/homeless_ youth ................................................... 22

National Ass'n of School Psychologists, *The Relationship Between Mental Health and Academic Achievement* [Research Summary] (2020), https://tinyurl.com/2p8b755y ............................................................................... 24

National Network for Youth, *LGBTQ+ Youth Homelessness*, https://nn4youth.org/lgbtq-homeless-youth/ ................................................................. 23

Nermeen E. El Nokali et al., *Parent Involvement and Children's Academic and Social Development in Elementary School,* 81 Child. Dev. 988 (2010) ............................................... 14

New York City Police Department, *Celebrating Pride, NYPD and GOAL Highlight Progress for LGBTQIA+,* (Jun. 24, 2021), https://www.nyc.gov/site/nypd/news/p0624a/celebrating-pride-nypd-goal-highlight-progress-lgbtqia-#:~:text=The%20Department%20is%20committed%20to,behavior%20towards%20the%20LGBTQIA%2B%20community ............ 2

Nicole Hensley, *Man Killed, 2 Houston Cops Stabbed During Mental Health Call,* The Houston Chronicle (Feb. 18, 2023), https://www.houstonchronicle.com/news/houston-texas/crime/article/officers-stabbed-man-killed-17792878.php ............................................................................. 18

Preston Mitchum & Aisha Moodie-Mills, *Beyond Bullying: How Hostile School Climate Perpetuates the School-to-Prison Pipeline for LGBT Youth*, Center for American Progress at 2 (Feb. 2014), http://rb.gy/uq8rut .............................. 26

Qiwei He & Scott Barkowski, *The Effect of Health Insurance on Crime: Evidence from the Affordable Care Act Medicaid Expansion*, 29 Health Econ. 261 (Jan. 2020) ............................... 19

Robert C. Whitaker et al., *Family Connection and Flourishing Among Adolescents in 26 Countries*, Pediatrics 149 (2022), https://publications.aap.org/pediatrics/article/149/6/e2021055263/188014/Family-Connection-and-Flourishing-Among ..................................................................... 14

Robert Klemko, *Police Agencies are Desperate to Hire. But They Say Few Want the Job*, The Washington Post (May 27, 2023) https://www.washingtonpost.com/national-security/2023/05/27/police-vacancies-hiring-recruiting-reform/ ....................................................................................... 17

S.R. Bondurant et al., *Substance Abuse Treatment Centers and Local Crime*, 104 Journal of Urb. Economics 124-133 (2018) ......................................................................................... 19

S.T. Russell et al., *Indicators of Victimization and Sexual Orientation Among Adolescents*, 104 J. Public Health 255-261 (2014) ................................................................................ 25

Seattle Police Foundation, *Safe Place*, https://seattlepolicefoundation.org/safe-place/ ............................. 2

Urban Institute, *Five Charts that Explain the Homelessness-Jail Cycle—and How to Break It* (Sept. 16, 2020), http://rb.gy/9n6kqa .................................................................... 22

## <u>STATEMENT OF INTEREST</u>

*Amici* are local governments and local government officials who regularly interface with youth and parents on a variety of issues, from schooling to housing to health care to the juvenile justice system.[1] We file this brief in strong support of Appellees and as a demonstration of our belief that parents are uniquely situated to make medical decisions for their children—because families, in all of their shapes, sizes, and formations, are foundational for our communities. As governmental entities and officials that work with families, we recognize that parents generally know their children better than government. Parents, doctors, and patients should thus retain the liberty to make medically indicated decisions for children, without unnecessary interference by the state.

We also submit this brief because state laws like Tennessee's SB 1 and Kentucky's SB 150 will have deleterious effects on our communities. The denial of gender-affirming care is strongly associated with adverse mental-health outcomes—outcomes that local units of government will ultimately need to address. By precluding young people from accessing medically indicated care, laws like SB 1

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person other than *amici* or *amici*'s counsel made a monetary contribution to the preparation or submission of this brief. A list of all *amici* is available at Appendix A.

and SB 150 will strain already stretched local government resources and impair *amici*'s efforts to include and serve all our constituents effectively.

Such laws will also undercut the work that many local units of government have done to serve an already-vulnerable community. Recognizing that transgender people suffer from discrimination, distrust of government, and other forms of marginalization, many *amici* have dedicated staff and resources to better serve them as part of their constituencies. For example, local governments provide housing support to their communities, including services that focus on assisting transgender people.[2] *Amici* jurisdictions also have implemented programs and policies to train law enforcement to identify and check personal biases about transgender people, and to encourage reporting and cooperation.[3] In addition, many *amici* have established LGBTQ+ community liaison programs. Liaison law-enforcement officers develop and nurture relationships with LGBTQ+ community organizations, endeavor to foster trust, and coordinate multi-government agency responses to the needs

---

[2] Kaleidoscope Youth Center, *LGBTQ+ Youth Homelessness*, (2019), https://www. kycohio.org/uploads/1/3/3/7/13374330/lgbtqia_homelessness_info_kyc.pdf.

[3] *See, e.g.*, New York City Police Department, *Celebrating Pride, NYPD and GOAL Highlight Progress for LGBTQIA+*, (Jun. 24, 2021), https://www.nyc.gov/site/ nypd/news/p0624a/celebrating-pride-nypd-goal-highlight-progress-lgbtqia-#:~:text =The%20Department%20is%20committed%20to,behavior%20towards%20the%2 0LGBTQIA%2B%20community; Seattle Police Foundation, *Safe Place*, https://seattlepolicefoundation.org/safe-place/; City of Ann Arbor, *Ann Arbor Human Rights Commission*, https://www.a2gov.org/departments/city-clerk/pages/ humanrightscommission.aspx#lgbtq.

articulated.[4] Through these and other programs, local governments foster connection so that transgender victims and witnesses of crime, as well as individuals in need of services, will feel comfortable coming forward.[5]

Laws like SB 1 and SB 150 undermine these established local government efforts and programs. Such laws threaten to impose significant mental-health related harms—and thus, increased vulnerability—among members of an already-vulnerable community. They will make the work of law enforcement harder, strain local government resources, and cause harm to individuals and their families. For all of these reasons and for what is set out below, *amici* strongly support Appellees' facial challenges to SB 1 and SB 150 and urge affirmance of the district courts' orders granting preliminary injunctions against enforcement of both laws.

## SUMMARY OF ARGUMENT

SB 1 and SB 150 violate the deeply rooted due process rights of parents to make medical decisions about their children. History, tradition, and common sense

---

[4] *See, e.g.*, Evan Millward, *Cincinnati Police LGBTQ liaisons changing perspectives in the community and department*, WCPO Cincinnati, (Jun. 8, 2021), https://www.wcpo.com/community/pride/cincinnati-police-lgbtq-liaisons-changing-perspectives-in-the-community-and-department; Detroit Police Department, Chief's Neighborhood Program, (2021), https://detroitmi.gov/sites/detroitmi.localhost/files/events/2021-09/CNL%20Power%20Pointrfnlsubr2.pdf.

[5] James Copple, et al., *Gender, Sexuality, and 21st Century Policing: Protecting the Rights of the LGBTQ+ Community*, Community Oriented Policing Services U.S. Department of Justice, (2017), https://www.iadlest.org/Portals/0/cops%20LGBTQ.pdf.

dictate that parents have superior knowledge to the state when it comes to their children's unique needs. Yet, through SB 1 and SB 150, state legislatures in Kentucky and Tennessee sideline parents entirely from certain medical decisions pertaining to gender-affirming care. Those laws replace parental judgment, as well as the judgment of medical providers, in all circumstances. SB 1 and SB 150 cannot meet the strict scrutiny demanded when fundamental rights protected by the Due Process Clause of the Fourteenth Amendment are implicated. Any concern of harm is speculative at best and certainly not supported by the records before the Court. Moreover, the statutes are not narrowly tailored, as SB 1 and SB 150 preclude consideration of any specific contexts or individual child's needs.

The harms associated with SB 1 and SB 150 will not be limited to children and their parents denied access to gender-affirming care. Local governments, which are situated closest to constituents and provide direct services and support to the most vulnerable, will be left to shoulder the load. The denial of care and subsequent harms laws like SB 1 and SB 150 impose have significant downstream impacts ranging from crisis response to victimization, housing security, and educational attainment. In each instance, an already vulnerable population will be negatively impacted and local government resources will be strained to support them with safety, housing, and schooling, among other governmental services.

## ARGUMENT

## I.    SB 1 AND SB 150 VIOLATE THE DUE PROCESS RIGHTS OF PLAINTIFFS

Tennessee's SB 1 and Kentucky's SB 150 violate parents' due process rights to make medical decisions for their minor children.[6] SB 1 and SB 150 provide that the Legislature—not parents, not doctors, and not minors themselves—know what is in the best interest of children. That "statist notion that governmental power should supersede parental authority in *all* cases . . . is repugnant to American tradition." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (emphasis in the original). By denying parents *any* authority to make certain individualized medical choices on the advice of doctors, both SB 1 and SB 150 run afoul of deeply rooted legal traditions and violate the Due Process Clause of the Fourteenth Amendment.

The "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Over a century of Supreme Court precedent, undergirded by the traditional presumption that parents act in the best interests of their children, zealously safeguards parental decision-making. *See Meyer v. Nebraska*, 262 U.S. 390, 400 (1923); *Parham,* 442 U.S. at 604; *Yoder*, 406 U.S. at 213; *Pierce v. Society*

---

[6] For the reasons given by Appellees and by the district courts, the laws at issue in these cases violate the Equal Protection Clause of the Fourteenth Amendment. *Amici*, however, focus this brief on the due process rights of the families our governments closely serve.

*of Sisters*, 268 U.S. 510 (1925). Of particular relevance here, parents "retain plenary authority to seek . . . care for their children, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604. In the medical context, "[p]arents possess a fundamental right to make decisions concerning the medical care of their children" under the Due Process Clause. *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019).

SB 1 and SB 150 wrest that fundamental due process right from parents. For example, SB 1 prohibits healthcare providers in Tennessee from administering certain gender-affirming "medical procedures" if that procedure is geared towards (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex, or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1). SB 1 contains no exceptions that allow parents to make a contrary decision about the appropriateness of such medical care. No matter how pronounced a minor's need for gender-affirming care—and no matter how severe the mental, physical, or emotional trauma that might result from its denial—parents are absolutely precluded under SB 1 from making certain medical decisions that are in their children's best interests. Kentucky's SB 150 similarly sidelines parents entirely, mandating an absolute prohibition of certain gender-affirming care. *See* Ky. Rev. Stat. § 311.372.

6

To be sure, a parent's "fundamental right to make decisions concerning the medical care of their children," *Kanuszewski*, 927 F.3d at 418, is not absolute. The state also has "a wide range of power for limiting parental freedom and authority in things affecting a child's welfare." *Prince v. Massachusetts,* 321 U.S. 158, 167 (1944). Nevertheless, given the importance of the fundamental interests at stake, infringements on parents' right to direct their children's medical care "are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Kanuszewski*, 927 F.3d at 419 (citing *Seal v. Morgan*, 229 F.3d 567, 574–75 (6th Cir. 2000)). Both Kentucky and Tennessee have failed to meet that burden here.

### A.    The Purported Harms Articulated by the States Are Speculative and Unsupported

Contending that the "risks outweigh the benefits" of gender-affirming medical procedures, the Tennessee and Kentucky Attorneys General assert a governmental interest in "protecting minors from the risks associated with" those procedures. *L.W. by & through Williams v. Skrmetti*, No. 3:23-CV-00376, 2023 WL 4232308, at *23 (M.D. Tenn. June 28, 2023); *see also Doe 1 v. Thornbury*, No. 3:23-CV-230-DJH, 2023 WL 4230481, at *4 (W.D. Ky. June 28, 2023) (asserted state interest in

"protecting children").[7] But an asserted state interest must be "real, as opposed to merely speculative." *Bernal v. Fainter*, 467 U.S. 216, 227 (1984). And record evidence indicates that the states' purported interests are speculative indeed. Contrary to the Attorneys General's broad assertions, the "medical evidence on the record indicates" that gender-affirming therapies (1) "are appropriate and medically necessary treatments for adolescents when clinically indicated"; and (2) "do not . . . pose serious risks to the minors receiving these treatments." *Id.* at *29 (cleaned up). "[E]very major medical organization to take a position on the issue . . . agrees that puberty blockers and cross-sex hormone therapy are appropriate and medically necessary treatments for adolescents when clinically indicated." *Id.* A state legislature may "feel strongly that the medical procedures banned . . . are harmful." *Id.* But if fundamental parental rights are to be displaced, the State must provide more than speculation that the "risks outweigh the benefits." *Id.*[8]

---

[7] The Kentucky Attorney General also asserts interests in protecting vulnerable groups from mistakes and preserving the integrity of medicine. *Thornbury*, 2023 WL 4230481, at *4-*5. Those purported interests, too, rise and fall with the science.

[8] Like the district court in *L.W.* (the Tennessee case), the district court in *Doe* dismissed Kentucky's purported interests as unsupported, because there is "no evidence" of abuse or neglect caused by gender-affirming care, the same treatments are permitted for cisgender children, and the concern for medical ethics was "unpersuasive." 2023 WL 4230481, at *4-*5; *see also id.* at *6 ("[The restrictions imposed by SB 150 are not designed to serve the stated government interests.").

### B.    SB 1 and SB 150 Are Not Narrowly Tailored

Even if the States' purported interest were non-speculative, SB 1 and SB 150 are not narrowly tailored to that interest. The laws fully bar certain "medical procedures" for minors, if those procedures are carried out for the purposes of providing gender-affirming care. Tenn. Code Ann. § 68-33-103(a)(1); Ky. Rev. Stat. § 311.372. There are no exceptions to these sweeping medical commands. Care cannot be provided if a parent, minor, and doctor all agree on a course of action. It cannot be provided if a young person's life will be endangered without the care. *See L.W.*, 2023 WL 4232308. at *28 ("[T]he weight of evidence in the record suggests . . . . that treatment for gender dysphoria lowers rates of depression, suicide, and additional mental health issues faced by transgender individuals"). Indeed, SB 1 and SB 150 flatly prohibit gender-affirming care even if two, three, or four independent medical professionals all agree that medical treatment sought by a parent and minor comports with the standard of care and is indicated. At bottom, SB 1 and SB 150 declare that the Legislature knows what appropriate medical care is in all individual cases—and that the Legislature's judgment must trump medical opinion and parental authority in all cases where care is sought.

That categorical displacement of parental rights is not "narrow tailoring"; it is no tailoring at all. Of course, states may legitimately seek to minimize risks

associated with medical treatment. But "[s]imply because the decision of a parent . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. After all, the Supreme Court has emphasized, there are risks inherent in any medical treatment or procedure, including common childhood procedures like a "tonsillectomy [or] appendectomy." *Id.* Parents, not the state, nevertheless retain primary responsibility for making "judgments concerning" their child's "need for medical care or treatment." *Id.* Accordingly, when a state seeks to undercut those parental rights, it must generally allow for case-specific determinations that give weight to parental input.[9] *See, e.g.*, *id.* at 584 (upholding a "medical factfinding processes" when parents sought to have their children committed to a mental health-care facility as "consistent with constitutional guarantees"); *accord Troxel v. Granville*, 530 U.S. 57, 70 (2000) (where a "fit parent's decision" regarding visitation rights are "subject to judicial review, the court must accord at least some special weight to the parent's own determination").

---

[9] This is not to say that a state can *never* categorically prohibit certain choices a parent might make. *See, e.g.*, *Prince*, 321 U.S. 158 (upholding uniform application of child labor laws). Even in the medical context, where "the life of the child is at stake . . . the state . . . may subordinate the interest of the child's parents to its own interest in keeping the child alive." *Kanuszewski*, 927 F.3d at 419. But where a state relies only on the possible "risks" of a medical procedures—risks that are inherent in *any* medical procedure, *Parham*, 442 U.S. at 603—it cannot simply displace all parental input, at least not without demonstrating that the procedure in practice uniformly presents an unusually high risk of harm.

10

The context here illustrates why categorically sidelining parents in the medical decision-making process is so strongly disfavored. "[M]any individuals with gender dysphoria have high rates of anxiety, depression, and suicidal ideation." *L.W.*, 2023 WL 4232308, at *28. And "[e]very major expert medical association" has concluded that "gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people." *Id.* (quoting *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021)). Given the established health benefits, parents (and doctors) are in a far better position than the Kentucky and Tennessee Legislatures to make individualized decisions for the best interests of individual children.

Parents, after all, are often in the best position to know if their child is depressed or dealing with suicidal ideation. Parents may observe their child engaged in self-harm, making suicidal statements, or exhibiting other troubling behaviors. More, parents are able to know when their child's depressive (or suicidal) behaviors began—and for how long they have been occurring. They will know if behaviors are typical or atypical for their child. They will know, as well as anybody, the severity of a child's struggles. Parents are therefore uniquely situated to evaluate the need for treatment for their child. And they are thus generally in a superior position to make a determination, in consultation with medical professionals, as to whether treatment is needed, and what type.

11

\*     \*     \*

"[T]he institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503 (1977). But by eliminating even the possibility that parents can seek gender-affirming care for their minor children, SB 1 and SB 150 turn that history and tradition on its head. "The law's concept of the family rests on a presumption that *parents* possess . . . capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602 (emphasis added). "More importantly," the Supreme Court has emphasized, "historically [the law] has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Id*. (emphasis added) (citing 1 W. Blackstone, Commentaries; 2 J. Kent, Commentaries on American Law \* 190). True, "some parents may at times be acting against the interests of their children." *Id*. But that is "hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests." *Id*. at 602-603.

Both the Tennessee and Kentucky laws do just that. They take certain "medical procedures" for minors off the table entirely. They eliminate even the possibility that a parent, doctor, and minor can together make a decision that runs contrary to the State's commands. SB 1's and SB 150's categorical dictates that every medical case be treated the same means that those laws are not narrowly tailored. And by removing medically indicated care from the choices available to

parents, the Kentucky and Tennessee laws "discard wholesale" a parent's authority to "act in the child's best interest." *Parham*, 442 U.S. at 602-603. The constitutional violation is thus clear and both SB 1 and SB 150 should be invalidated.

## II.    LOCAL GOVERNMENTS WILL BE FORCED TO SHOULDER THE HARMS THAT STEM FROM BANS ON GENDER-AFFIRMING CARE

The "natural duty of the parent" to prepare an individual child for "their station in life," *Meyer*, 262 U.S. at 400, is not only deeply rooted in constitutional tradition, it is reflected in *amici*'s day-to-day work. Countless state laws provide that parental decision-making is fundamental, and that parents are presumed to safeguard "the best interests of a child."[10] *Amici* enforce and implement these laws in a diverse array of fields, such as child custody and juvenile justice.

---

[10] *See, e.g.*, MCL § 722.27a ("[I]t is presumed to be in the best interests of a child for the child to have a strong relationship with both his or her parents."); AR Code § 25-19-103 (2020) (it is "the declared public policy of this state . . . that absent evidence to the contrary, it is in a child's best interest . . . [t]o have substantial, frequent, meaningful and continuing parenting time with both parents [and] [t]o have both parents participate in decision-making about the child"); Ohio Rev. Code § 3109.401 ("the parent and child relationship is of fundamental importance to the welfare of a child"); TX Fam Code § 153.001 ("public policy of this state is to . . . assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child"); Utah Code § 80-2a-201 ("It is the public policy of this state that . . . a parent retains the fundamental right and duty to exercise primary control over the care, supervision, upbringing, and education of the parent's child").

Those laws are there for a reason. Parental involvement in a child's life is associated with "declines in problem behaviors and improvements in social skills."[11] Numerous studies have shown, moreover, that "childhood family connection is associated with flourishing in adulthood."[12] When parents are involved in a child or adolescent's life, that young person is statistically more likely to succeed academically, and statistically less likely to experience mental-health issues into adulthood.[13]

By categorically prohibiting parents from accessing medically indicated gender-affirming treatment for their children, SB 1 and SB 150 threaten to undermine young people's future life outcomes. The denial of gender-affirming care can lead to significant trauma and mental-health issues, and the resulting effects are those that *amici* will need to address. *Amici* represent the government units closest to our residents. Our schools, public safety components, and other services are on the front lines supporting and protecting all community members. From that vantage, we understand that SB 1's and SB 150's displacement of the judgment of parents

---

[11] Nermeen E. El Nokali et al., *Parent Involvement and Children's Academic and Social Development in Elementary School,* 81 Child. Dev. 988 (2010).

[12] Robert C. Whitaker et al., *Family Connection and Flourishing Among Adolescents in 26 Countries*, Pediatrics 149 (2022), https://publications.aap.org/pediatrics/article/149/6/e2021055263/188014/Family-Connection-and-Flourishing-Among.

[13] Hugo Westerlund et al., *Parental Academic Involvement in Adolescence as Predictor of Mental Health Trajectories Over The Life Course,* 15 BMC Public Health 653 (2015), https://doi.org/10.1186/s12889-015-1977-x.

and doctors will not only cause harm for individuals, it will have broader deleterious effects on our communities as well.

### A.    Categorial Denial of Gender-Affirming Care Will Lead to Adverse Mental-Health Outcomes

As both district courts noted, "*every* major medical organization to take a position on the issue . . . agrees that puberty blockers and cross-sex hormone therapy are appropriate and medically necessary treatments for adolescents when clinically indicated." *L.W.*, 2023 WL 4232308, at *29 (emphasis added); *see also Doe*, 2023 WL 4230481, at *2 ("[T]reatments barred by SB 150 are medically appropriate and necessary for some transgender children under the evidence-based standard of care accepted by all major medical organizations in the United States."). Young transgender people who seek (and receive) gender-affirming care—including puberty blockers and gender-affirming hormones—experience "60% lower odds of moderate or severe depression and 73% lower odds of suicidality" than those who were denied care.[14] And the adverse mental-health outcomes associated with the denial of indicated gender-affirming care are long-lasting. A cross-sectional study of transgender adults concluded that those who had been denied gender-affirming

---

[14] Diana Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, JAMA Netw Open. 5(2) (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423.

care as adolescents were significantly likelier to suffer from severe psychological stress and suicidal ideation than those who had received care.[15]

For these reasons, the "the AAP, American Medical Association, American Psychiatric Association, American Psychological Association, and American Academy of Child Adolescent Psychiatry" all support the availability of gender-affirming care when medically indicated. *L.W.*, 2023 WL 4232308, at *29. "[A]ll major medical organizations oppose outright bans on gender-affirming medical care for adolescents." *Id.* Such categorical bans prevent parents and doctors from making a decision that is in the best interest of an individual child. But mental-health issues that can result from the denial of care do not end with the child or their family. Rather, they radiate outwards and require local-government response.

### B.    Local Government Bears the Burden of Adverse Mental-Health Outcomes

Across nearly every sector, local units of government like *amici* will bear the burden of adverse mental-health outcomes associated with care-denying laws like SB 1 and SB 150.

---

[15] Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation,* 145(2) Pediatrics (Feb. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7073269/.

### 1. Suicidal Ideation and Mental Health Response

The most pronounced observed effect from the denial of gender-affirming care is an increase in suicidal ideation and "severe psychological stress."[16] Laws like SB 1 and SB 150 will invariably exacerbate those issues—straining local units of government and placing more people in harm's way.

Often, local units of government are asked to respond to mental-health crises, including crises involving a suicidal person. Frequently (and in record numbers)[17] those calls are routed to law enforcement, who report being "overwhelmed" by mental-health related incidents.[18] The barrage of mental-health calls has taxed local law enforcement at a time when police ranks are already stretched thin.[19] And though

---

[16] Turban et al., *supra* n.15.

[17] *See, e.g.*, Andres Gutierrez, *Detroit Police Offer Resources as Officers Deal with Record Number of Mental Health Calls*, CBS Detroit (July 18, 2023), https://www.cbsnews.com/detroit/news/detroit-police-offer-resources-as-officers-deal-with-record-number-of-mental-health-calls/.

[18] George Hunter, *Why Michigan Police are 'Overwhelmed' by Growing Mental Health Calls*, The Detroit News (Oct. 16, 2022), https://www.detroitnews.com/story/news/local/michigan/2022/10/17/why-michigan-police-are-overwhelmed-by-growing-mental-health-calls/69543716007/.

[19] Robert Klemko, *Police Agencies are Desperate to Hire. But They Say Few Want the Job*, The Washington Post (May 27, 2023) https://www.washingtonpost.com/national-security/2023/05/27/police-vacancies-hiring-recruiting-reform/.

there is movement towards a non-law enforcement response to mental health crises, those entities, too, are overburdened and under resourced in most communities.[20]

Accordingly, even a modest increase in suicidal ideation or psychological stress will burden local government at a time when those resources are already scarce. Any such increase, moreover, will endanger both public servants and the community alike. Mental-health related calls—particularly when a person has a weapon—are often tense, fraught, and dangerous.[21] And tragedies arising from mental-health related calls are all too common.[22]

By creating and exacerbating mental-health issues, categorical denial of gender-affirming care will lead to more suicides, more attempted suicides, and more mental health crises. Each such incident, standing on its own, is of tremendous

---

[20] Christine Chung, *New 988 Mental Health Crisis Hotline Sees Record Demand*, The New York Times (Jan. 19, 2023), https://www.nytimes.com/2023/01/19/us/suicide-hotline-demand.html.

[21] *See,* Anita Chabria, *Police Fear "Suicide By Cop" Cases. So They've Stopped Responding to Some Calls*, The Los Angeles Times (Aug. 10, 2019), https://www.latimes.com/california/story/2019-08-09/suicide-calls-california-cops-stopped-responding#:~:text=Some%20small%20and%20midsize%20law,if%20 the%20situation%20turns%20violent.

[22] *See, e.g.*, Nicole Hensley, *Man Killed, 2 Houston Cops Stabbed During Mental Health Call,* The Houston Chronicle (Feb. 18, 2023), https://www.houstonchronicle. com/news/houston-texas/crime/article/officers-stabbed-man-killed-17792878.php; Catherine Stoddard, *"He Is A Hero": South Carolina Officer Dies Saving Person Having Mental Health Crisis,* Fox 5 Tampa Bay (Aug. 3, 2023), https://www. fox13news.com/news/he-is-a-hero-south-carolina-officer-dies-saving-person-having-mental-health-crisis.

concern. But these are also incidents that (like so many) will require government response, strain local resources, and place public servants in harm's way.

## 2.    Crimes and Victimization

Access to all forms of health care—particularly health care that is associated with mental-health issues—is associated with reductions in crime.[23] That data is in many ways unsurprising. After all, access to healthcare can help people address mental-health and substance-use issues that are often the root causes of criminal activity. Indeed, counties with greater access to substance-use and mental-health treatment regularly enjoy decreased crime rates.[24]

Access to care, moreover, not only makes a meaningful difference in terms of crime rates, it also reduces would-be victims' vulnerability. People who are struggling with mental-health issues are significantly more likely to be victimized by crime. Annually, more than one quarter of persons with severe mental-health issues are the victims of violent crime, "a rate more than 11 times higher than the

---

[23] Qiwei He & Scott Barkowski, *The Effect of Health Insurance on Crime: Evidence from the Affordable Care Act Medicaid Expansion*, 29 Health Econ. 261 (Jan. 2020); *see also id.* at 262 ("Medicaid expansion is associated with a 10.4% reduction in motor vehicle theft, an 8.13% reduction in homicides, and a 6.33% reduction in robbery.").

[24] S.R. Bondurant et al., *Substance Abuse Treatment Centers and Local Crime*, 104 Journal of Urb. Economics 124-133 (2018); Monica Deza et al., *Local Access to Mental Healthcare and Crime, National Bureau of Economic Research*, J. of Urb. Econs. 103410 (May 2022).

general population rates even after controlling for demographic differences."[25] Not only are people with mental-health issues more likely to be victimized by crime in the first instance, mental-health issues among victims can make it more difficult to investigate cases and prove those cases at trial. By denying care that could ameliorate mental-health issues, SB 1 and SB 150 will exacerbate the victimization of transgender people, placing greater strain on local law enforcement, prosecutors, and others who support victims of crime.

What is more, SB 1 and SB 150 impact a group that is *already* particularly vulnerable to crime. Researchers who used data from the 2017-2018 National Crime Victimization Survey concluded that transgender people are more than four times as likely to be subjected to personal violence than cisgender people.[26] On top of that, crimes against transgender individuals are generally underreported. Many of these crimes thus go unsolved or unaddressed, and these crimes can have long-term

---

[25] Linda A. Teplin et al., *Crime Victimization in Adults with Severe Mental Illness*, 62 Arch. Gen. Psychiatry 8, 911-921 (2005).

[26] Andrew Flores, et al., *Hate crimes against LGBT people: National Crime Victimization Survey, 2017-2019*, PLOS ONE, (Dec. 21, 2022), https://doi.org/10.1371/journal.pone.0279363. A 2022 nationwide survey concluded that transgender people are 2.5 times as likely to experience violent victimization than people who are not transgender. Alliance for Justice, *National Survey on Victims' View on Safety and Justice* (Sept. 2022), https://allianceforsafetyandjustice. org/wp-content/uploads/2022/09/Alliance-for-Safety-and-Justice-Crime-Survivors-Speak-September-2022.pdf.

impacts on the economic and mental well-being of victims.[27] By *further* increasing the likelihood that transgender people will be victims of crime, SB 1 and SB 150 will thus undercut community safety.

### 3.      Housing Insecurity and Homelessness

Laws like SB 1 and SB 150 also will exacerbate homelessness, as those suffering from mental-health issues are particularly likely to be unhoused. Homeless individuals, and those facing housing insecurity, have a higher share of mental-health issues than the population overall.[28] And homelessness places extraordinary demands on local governments that provide essential services. Local governments fund emergency shelters, food assistance, healthcare, mental health services, and outreach programs. As the homeless population grows, the strain on existing human and financial resources can become overwhelming. For example, Saint Paul, Minnesota, monitors and restricts encampments to protect the health, safety, and security of encampment residents and the greater community. Many cities around the country are similarly facing significant challenges around the unhoused.[29] Laws

---

[27] Alliance for Justice, *supra* n.26.

[28] National Coalition for the Homeless, *Mental Illness and Homelessness* (July 2009), https://www.nationalhomeless.org/factsheets/Mental_Illness.pdf.

[29] *See, e.g.*, Dan Rosenzweig-Ziff, *Denver Mayor Wants to Buy Hotel as First Step to First Homelessness*, Washington Post (July 31, 2023), https://www.washingtonpost.com/nation/2023/07/31/denver-homelessness-mayor-johnston-hotel/.

like SB 1 and SB 150 that cause (or exacerbate) mental-health issues will ineluctably increase housing vulnerability as well, furthering the existing strain on local governments.

And again: by increasing the likelihood that transgender people will become homeless, SB 1 and SB 150 increase vulnerability for an already-vulnerable population. In many locations, LGBTQ+ people are disproportionately likely to experience housing insecurity.[30] That vulnerability is particularly pronounced for LGBTQ+ youth, who are 2.2 times more likely to experience homelessness than their non-LGBTQ+ peers.[31]

Housing insecurity has broader impacts as well. Homelessness increases the risk that a person will be cited or jailed for low-level offenses like "camping, loitering, and public urination"—which "people wouldn't have to endure if they had a place to call home."[32] On average, people experiencing unsheltered homelessness have 21 contacts with the police every six months.[33] These effects are particularly

---

[30] N. Ray, *Lesbian, gay, bisexual and transgender youth: An epidemic of homelessness*, National Gay and Lesbian Task Force Policy Institute and the National Coalition for the Homeless (2007), http://www.thetaskforce.org/reports_and_research/homeless_ youth.

[31] Chapin Hall at the University of Chicago, *Missed Opportunities: LGBTQ Youth Homelessness in America,* https://www.chapinhall.org/wp-content/uploads/VoYC-LGBTQ-One-Pager-FINAL.pdf.

[32] Urban Institute, *Five Charts that Explain the Homelessness-Jail Cycle—and How to Break It* (Sept. 16, 2020), http://rb.gy/9n6kqa.

[33] *Id.*

pronounced among homeless youth. Sixty-nine percent of homeless youth have had "some involvement with the juvenile or criminal justice systems, including arrest, probation, and/or incarceration."[34]

For young people in particular, "[h]omelessness increases the risk of victimization."[35] According to one study, some 25% of homeless youth have been "robbed or threatened by a weapon while homeless and another thirteen percent "had been victims of sexual assault."[36] And just as mental-health issues can cause homelessness in the first place, housing insecurity contributes to worse mental health outcomes overall.[37] By categorically denying care that directly impacts an individual's mental health, laws like SB 1 and SB 150 will exacerbate that vicious feedback loop—causing more homelessness, more mental-health issues, and more vulnerability that local governments will need to address.

---

[34] Hollywood Homeless Youth Partnership, *No Way Home*, at 7 (Nov. 2010), http://www.hhyp.org/downloads/HHYP_TCE_Report_11-17-10.pdf.

[35] *Id.* at 8.

[36] *See* National Network for Youth, *LGBTQ+ Youth Homelessness*, https://nn4youth.org/lgbtq-homeless-youth/.

[37] H. Kim et al., *Housing Instability and Mental Health Among Renters in the Michigan Recession and Recovery Study*, Public Health 209:30 (Aug. 2022), https://www.sciencedirect.com/science/article/abs/pii/S0033350622001421?via%3Dihub.

### 4.    Schools and Academic Achievement

SB 1's and SB 150's denial of care also impacts the effectiveness of our schools, given the impacts of psychological distress on student participation and achievement. Multiple studies demonstrate a strong connection between mental health and academic achievement of students.[38] More than half of students who do not achieve a high school diploma have a diagnosable mental illness.[39] Unsurprisingly, high school students who show suicidal ideation achieve at lower levels and have less connection to their schools and peers.[40] Many school districts do not have psychologists or enough counselors to support students in distress.[41] As a result, students suffering from mental-health issues frequently fall behind and often drop out of school. Due to an existing nationwide shortage in nurses, schools do not

---

[38] National Ass'n of School Psychologists, *The Relationship Between Mental Health and Academic Achievement* [Research Summary] (2020), https://tinyurl.com/2p8b755y.

[39] A.V. Stoep, et al., *What Proportion of Failure to Complete Secondary School in the U.S. Population is Attributable to Adolescent Psychiatric Disorder?* J. of Behavioral Health Servs. & Research, 30(1):119-24 (2003).

[40] G. Slap et al., *Adoption as a Risk Factor for Attempted Suicide During Adolescence*, Pediatrics 108(2):E30 (Aug. 2001), http://www.doi.org.10.1542/peds.108.2.e30.

[41] Arianna Prothero et al., *School Counselors and Psychologists Remain Scarce Even as Needs Rise, Education Week* (Mar. 1, 2022), https://www.edweek.org/leadership/school-counselors-and-psychologists-remain-scarce-even-as-needs-rise/2022/03.

have the resources to meet most existing needs, let alone the increased mental-health demands laws like SB1 and SB 150 will create.[42]

And yet again, the targeted impacts of SB 1 and SB 150 will exacerbate harm to a population that is already at risk. LGBTQ+ students already face significant barriers to academic achievement.  LGBTQ+ students "are targets of physical violence and experience a hostile school environment more frequently than non-LGBTQ peers" and as a result are more than two times as likely to skip school or have prolonged absences due to fears about physical safety.[43] These missed school days can disrupt a student's educational trajectory and put them at increased risk of dropping out. Students who face bullying or who feel unsafe often encounter harsh discipline at school when they act out or confront those who are threatening them. As a result of bullying, LGBTQ+ students are more likely to be involved in physical fights while at school.[44] Such students are also "more likely to experience harsh disciplinary treatment," even though these punishments "do not correlate with higher

---

[42] Cindy Long, *Why School Nurses Are Leaving*, NEA Today (June 23, 2023), https://www.nea.org/advocating-for-change/new-from-nea/why-are-school-nurses-leaving.

[43] Memorandum from Michigan State Superintendent Brian J. Whiston to State Board of Education at 2 (Feb. 23, 2016), https://www.michigan.gov/-/media/Project/Websites/mde/Year/2016/02/26/Item_B_SBE_Statement_and_Guidance_on_LGBTQ.pdf?rev=3484b24fa9c14f6e85a39684a5c33d94.

[44] S.T. Russell et al., *Indicators of Victimization and Sexual Orientation Among Adolescents*, 104 J. Public Health 255- 261 (2014).

rates of misbehavior."[45] In addition to disrupting a student's educational trajectory, these factors cycle LGBTQ+ students into the juvenile justice system all too frequently. Unfortunately, many of those students ultimately drop out of school, increasing the risk of homelessness, poverty, and future justice involvement.

The cascading effects do not end there. Young people who fail to complete high school are 3.5 times more likely than high school graduates to be arrested and more than eight times as likely to be incarcerated.[46] High school dropouts are also "far more likely to be victims of crime" than young people who graduate from high school.[47] And more broadly, high school dropouts "face extremely bleak economic and social prospects"[48] including a variety of adverse health outcomes.

By exacerbating mental-health issues among young people, SB 1 and SB 150 will further undercut students' academic success. Once again, in turn, that will create long-term and widespread impacts affecting community safety, economic stability, and public health.

---

[45] Preston Mitchum & Aisha Moodie-Mills, *Beyond Bullying: How Hostile School Climate Perpetuates the School-to-Prison Pipeline for LGBT Youth*, Center for American Progress at 2 (Feb. 2014), http://rb.gy/uq8rut.

[46] Fight Crime: Invest in Kids, *School or the Streets: Crime and America's Dropout Crisis* (2008), http://rb.gy/b28sgj.

[47] District Attorney Crime Prevention Foundation, SARB Program (2020), http://rb.gy/1bqgyt.

[48] American Psychological Ass'n, *Poverty and High School Dropouts* (May 2013), http://rb.gy/exmi3l.

\*     \*     \*

Few concepts are so deeply rooted in the American constitutional tradition as parental primacy over decisions that will impact their children's future trajectory. *See Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 232. Individualized and nuanced medical decisions—like the decision whether to seek gender-affirming care—should be left to parents, doctors, and the minors themselves. By categorically displacing parental input, and prohibiting medically indicated care, SB 1 and SB 150 violate the U.S. Constitution.

While SB 1's and SB 150's constitutional violation strikes at the heart of "[t]he law's concept of the family," *Parham*, 442 U.S. at 602, their adverse effects do not end there. Denied the ability to make personal and individualized medical decisions with their parents' guidance, many who are deprived of care under SB 1 and SB 150 will suffer lasting mental-health consequences. The rippling effects of those consequences will create additional vulnerabilities that *amici* governments will need to address.

Strong families, at bottom, are the basis for strong communities. And by undercutting parental rights, SB 1 and SB 150 not only run afoul of constitutional protections—they weaken the fabric of our communities.

27

## <u>CONCLUSION</u>

For all of the foregoing reasons and for all of the reasons stated by Appellees, the orders of the district courts should be affirmed.

<div style="margin-left: 40%;">

Respectfully submitted,
 s/ Eli Savit
Eli Savit
Victoria M. Burton-Harris
WASHTENAW COUNTY PROSECUTING
ATTORNEY
P.O. Box 8645
Ann Arbor, Michigan, 48107
(734) 222-6620
savite@washtenaw.org

Jonathan B. Miller
Hilary Burke Chan
Aadika Singh
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609

</div>

Dated: August 10, 2023

## ADDITIONAL COUNSEL

ATLEEN KAUR
City Attorney
Guy C. Larcom City Hall
301 East Huron, 3rd Floor
Ann Arbor, MI 48104
*Attorney for the City of Ann
Arbor, Michigan*

EBONY M. THOMPSON
Acting City Solicitor
Baltimore City Department of
    Law
100 N. Holliday Street
Baltimore, MD 21202
*Attorney for the City of
Baltimore, Maryland*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the
    City of Chicago
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel
SUZANNE M. LOOSE
Chief Assistant Corporation
    Counsel
121 N. LaSalle Street, Room
    600
Chicago, IL 60602
*Attorneys for the City of
Chicago, Illinois*

EMILY SMART WOERNER
 City Solicitor 801 Plum
    Street, Room 214
Cincinnati, OH 45202
*Attorney for the City of
Cincinnati, Ohio*

ZACHARY M. KLEIN
Columbus City Attorney
77 North Front Street, 4th
    Floor
Columbus, OH 43215
*Attorney for the City of
Columbus, Ohio*

DAWYN HARRISON
County Counsel
500 W. Temple Street
Los Angeles, CA 90012
*Attorney for the County of Los
Angeles, California*

MICHAEL HAAS
City Attorney
210 Martin Luther King Jr.
    Blvd., Room 401
Madison, WI 53703
*Attorney for the City of
Madison, Wisconsin*

KRISTYN ANDERSON
City Attorney
City Hall, Room 210
350 South Fifth Street
Minneapolis, Minnesota
    55415
*Attorney for the City of
Minneapolis, Minnesota*

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel
100 Church Street
New York, NY 10007
*Counsel for the City of New
York, New York*

BARBARA J. PARKER
City Attorney
One Frank H. Ogawa Plaza,
  6th Floor
Oakland, CA 94612
*Attorney for the City of
Oakland, California*

KRYSIA KUBIAK
City Solicitor and Chief Legal
  Officer
414 Grant Street
Pittsburgh, PA 15219
*Counsel for the City of
Pittsburgh, Pennsylvania*

ROBERT TAYLOR
City Attorney
1221 SW Fourth Avenue,
  Room 430
Portland, OR 97204
*Attorney for the City of
Portland, Oregon*

LYNDSEY M. OLSON
City Attorney
400 City Hall & Court House
15 West Kellogg Blvd.
Saint Paul, MN 55102
*Attorney for the City of St.
Paul, Minnesota*

DELIA GARZA
Travis County Attorney
P.O. Box 1748
Austin, TX 78701
*Counsel for Travis County,
Texas*

LAUREN LANGER
City Attorney
Best Best & Krieger LLP
300 South Grand Ave., 25th
  Floor
Los Angeles, CA 90071
*Attorney for City of West
Hollywood, California*

## APPENDIX A – LIST OF *AMICI*

Washtenaw County, Michigan Prosecuting Attorney Eli Savit

City of Ann Arbor, Michigan

Arlington County. Virginia Commonwealth's Attorney Parisa Dehghani-Tafti

Athens-Clark County, Georgia District Attorney Deborah Gonzalez

City of Baltimore, Maryland

City of Chicago, Illinois

Chittenden County, Vermont State Attorney Sarah George

City of Cincinnati, Ohio

City of Columbus, Ohio

Durham, North Carolina District Attorney Satana Deberry

Gilliam County, Oregon District Attorney Kara Davis

County of Los Angeles, California

Los Angeles, California District Attorney George Gascon

Loudoun County, Virginia Commonwealth's Attorney Buta Biberaj

City of Madison, Wisconsin

City of Minneapolis, Minnesota

Multnomah County, Oregon District Attorney Mike Schmidt

City of New York, New York

Norfolk, Virginia Commonwealth's Attorney Ramin Fatehi

City of Oakland, California

Philadelphia County, Pennsylvania District Attorney Larry Krasner

Pima County, Arizona County Attorney Laura Conover

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Saint Paul, Minnesota

Travis County, Texas

Wasco County, Oregon District Attorney Matthew Ellis

Washtenaw County Sheriff Jerry L. Clayton

City of West Hollywood, California

<u>**CERTIFICATE OF COMPLIANCE**</u>
with type-volume limitation, typeface requirements,
and type-style requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

27(d)(2) because it contains 6,190 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses

Times New Roman 14-point type face throughout, and Times New Roman is a

proportionally spaced typeface that includes serifs.


Dated: August 10, 2023                    */s/ Eli Savit*_____
                                          Eli Savit
                                          Washtenaw County Prosecuting Attorney

33

## **CERTIFICATE OF SERVICE**

I certify that on August 10, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Sixth Circuit and served through CM/ECF upon all counsel of record in this case.

Dated: August 10, 2023              */s/ Eli Savit*                         
                                    Eli Savit
                                    Washtenaw County Prosecuting Attorney