No. 23-5600

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

───────────────────────────

L.W., by and through her parents and next friends, Samantha Williams
and Brian Williams, et al., *Plaintiffs-Appellees*,

and

UNITED STATES OF AMERICA, *Intervenor-Appellee*,

v.

JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney
General and Reporter, et al., *Defendants-Appellants*.

───────────────────────────

On Appeal from the United States District Court for the
Middle District of Tennessee (No. 3:23-cv-00376) (Richardson, J.)

═══════════════════════════

**BRIEF OF PLAINTIFFS-APPELLEES**
═══════════════════════════

Joshua A. Block
Chase Strangio
James D. Esseks
ACLU Foundation
125 Broad Street
New York, NY 10004
Tel.: 212-549-2593

Tara Borelli
Lambda Legal Defense
and Education Fund, Inc.
1 West Court Square
Decatur, GA 30030
Tel.: 404-897-1880

Martine E. Cicconi
Christopher J. Gessner
David Bethea
Akin Gump
2001 K Street N.W.
Washington, DC 20006
Tel.: 202-887-4000

Stella Yarbrough
Lucas Cameron-Vaughn
ACLU of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142

Sruti J. Swaminathan
Lambda Legal Defense
and Education Fund, Inc.
120 Wall Street
New York, NY 10005
Tel.: 212-809-8585

Joseph L. Sorkin
Dean L. Chapman, Jr.
Akin Gump
One Bryant Park
New York, NY 10036
Tel.: 212-872-1000

*Counsel for Plaintiffs-Appellees*
*Additional Counsel Listed on Signature Page*

# **<u>TABLE OF CONTENTS</u>**

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................................... i

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE ISSUES ....................................................................... 4

STATEMENT OF THE CASE ........................................................................... 4

    A.    Medical Guidelines for Treating Transgender Adolescents with Gender Dysphoria ................................................................................ 4

    B.    Tennessee's Ban ................................................................................ 7

    C.    Plaintiffs' Background and Harms Imposed By the Ban. ....................... 10

    D.    Procedural History ............................................................................. 14

SUMMARY OF THE ARGUMENT .................................................................. 16

STANDARD OF REVIEW ................................................................................ 18

ARGUMENT ..................................................................................................... 19

    I.    Plaintiffs Are Likely to Prevail on Their Equal Protection Claims. ................................................................................................ 19

        A.    The Ban Triggers Heightened Scrutiny Because It Classifies Based on Sex. ................................................................ 19

            1.    The Ban Facially Classifies Based on Sex Designated at Birth. ................................................... 20

            2.    The Ban Facially Classifies Based on a Person's Failure to Identify With Their Sex Designated at Birth. ...................................................................... 25

            3.    The Ban Was Passed for the Impermissible Purpose of Enforcing Government-Mandated Gender Conformity. ................................................... 30

B.  Transgender Status Is a Quasi-Suspect Classification Requiring Heightened Scrutiny..................................................30

C.  The Ban Fails Heightened Scrutiny. ..........................................32

1.  Defendants Cannot Show an "Exceedingly Persuasive" Justification for Singling Out Gender-Affirming Care for Differential Treatment....................33

2.  There Is Not a "Close Means-End Fit" Between the Asserted Justifications and the Overbroad Ban.............42

3.  The District Court Did Not Clearly Err in Crediting Plaintiffs' Witnesses Over Defendants' and Concluding that the Ban Undermines, Rather Than Advances, Any Interest in Protecting Children. .............45

D.  The Ban Fails Rational Basis Review.......................................49

II.  Plaintiffs Are Likely to Prevail on Parental Autonomy Claims. ...........49

III.  Defendants' "Standing" Arguments Are Meritless..............................51

A.  Plaintiffs Proved That Their Injuries Would Be Redressed by an Injunction. ......................................................51

B.  Dr. Lacy Has Third-Party Standing. .........................................56

IV.  The Remaining Preliminary Injunction Factors Weigh Strongly in Plaintiffs' Favor..............................................................57

V.  A State-Wide Injunction Is Necessary to Provide Complete Relief..............................................................................57

CONCLUSION .................................................................................58

ADDENDUM ................................................................................ A-1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACLU Fund of Mich. v. Livingston Cnty.*,
796 F.3d 636 (6th Cir. 2015) ...............................................................19

*Adams by & through Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022) ..............................................................22

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985)......................................................................33, 47

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001)............................................................................49

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020).................................................................*passim*

*Brandt v. Rutledge*,
No. 21-2875, 2022 WL 16957734 (8th Cir. Nov. 16, 2022).............................28

*Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) ........................................................20, 23

*Brandt v. Rutledge*,
No. 21-cv-00450, 2023 WL 4073727 (E.D. Ark. June 20, 2023),
*appeal filed*, No. 23-2681 (8th Cir. July 21, 2023) .........................36, 44, 47, 48

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)............................................................................34

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)............................................................................49

*D.T. v. Sumner Cnty. Schs.*,
942 F.3d 324 (6th Cir. 2019) ...............................................................19

*Dobbs v. Jackson Women's Health Organization*,
142 S. Ct. 2228 (2022)..............................................................18, 24, 50

*Doe 1 v. Thornbury*,
  No. 23-cv-230, 2023 WL 4230481 (W.D. Ky. June 28, 2023),
  *appeal filed*, No. 23-5609 (6th Cir. June 30, 2023)...........................................26

*Doe v. Ladapo*,
  No. 23-cv-114, 2023 WL 3833848 (N.D. Fla. June 6, 2023),
  *appeal filed*, No. 23-12159 (11th Cir. June 27, 2023)................................*passim*

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982)......................................................................................54

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
  884 F.3d 560 (6th Cir. 2018) ........................................................................29

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972)......................................................................................49

*Eknes-Tucker v. Marshall*,
  603 F. Supp. 3d 1131 (M.D. Ala. 2022), *appeal filed*, No. 22-
  11707 (11th Cir. May 18, 2022) ...........................................................31, 43, 47

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)......................................................................................28

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)......................................................................................24

*Gonzales v. Carhart*,
  550 U.S. 124 (2007)........................................................................................3

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994).....................................................................17, 21, 22, 28

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
  No. 23-cv-00595, 2023 WL 4054086 (S.D. Ind. June 16, 2023),
  *appeal filed*, No. 23-2366 (7th Cir. July 12, 2023) ........................20, 21, 43, 44

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
  927 F.3d 396 (6th Cir. 2019) ........................................................................50

*Kentucky v. Biden*,
  57 F.4th 545 (6th Cir. 2023) .........................................................................57

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ........................................................................56

*Lyngaas v. Curaden AG*,
   992 F.3d 412 (6th Cir. 2021) ........................................................47

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ........................................................29

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982) ........................................................................24

*Nguyen v. INS*,
   533 U.S. 53 (2001) .............................................................17, 23, 24

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ..........................................................................3

*Ondo v. City of Cleveland*,
   795 F.3d 597 (6th Cir. 2015) ........................................................31

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ......................................................43

*Parham v. J.R.*,
   442 U.S. 584 (1979) ...........................................17, 49, 50, 51

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ........................................................29

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ..................................................................25, 30

*Powers v. Ohio*,
   499 U.S. 400 (1991) ........................................................................21

*Reed v. Goertz*,
   143 S. Ct. 955 (2023) ......................................................................52

*Reed v. Reed*,
   404 U.S. 71 (1971) ..........................................................................22

*Rice v. Cayetano*,
    528 U.S. 495 (2000)........................................................................32

*Romer v. Evans*,
    517 U.S. 620 (1996)........................................................................49

*S. Bay United Pentecostal Church v. Newsom*,
    141 S. Ct. 716 (2021)........................................................................3

*Santosky v. Kramer*,
    455 U.S. 745 (1982)........................................................................50

*Schall v. Martin*,
    467 U.S. 253 (1984)........................................................................50

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017)..............................................................28, 32, 42

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) .........................................................16, 25

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    Coll.*,
    143 S. Ct. 2141 (2023)....................................................................27, 28

*U.S. Student Ass'n Found. v. Land*,
    546 F.3d 373 (6th Cir. 2008) .........................................................18, 19

*United States v. Texas*,
    143 S. Ct. 1964 (2023)....................................................................57

*United States v. Virginia*,
    518 U.S. 515 (1996)...................................................................*passim*

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021) .........................................................57

**Statutes**

Tenn. Code Ann. § 68-33-101 et seq. ...........................................................1

Tenn. Code Ann. § 68-33-101 ...................................................................30

Tenn. Code Ann. § 68-33-102 ...........................................................9, 20, 26

Tenn. Code Ann. § 68-33-103 ..........................................................*passim*

Tenn. Code Ann. § 68-33-105 ...............................................................53

**Other Authorities**

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018)...........................................................................................55

Kamran Abbasi, *Caring for Young People with Gender Dysphoria*, BMJ 2023;380:p553 (Mar. 9, 2023), dx.doi.org/10.1136/bmj.p553.................44

Karena Phan, *Norway Didn't Ban Gender-Affirming Care for Minors, as Headline Falsely Claims*, Associated Press (June 8, 2023), https://apnews.com/article/fact-check-norway-not-ban-gender-affirming-care-956221436313 .........................................................44

Madison Pauly & Emma Rindlisbacher, *A Massive Leak Spotlights the Extremism of an Anti-Trans Medical Group*, Mother Jones (May 17, 2023), https://www.motherjones.com/politics/2023/05/anti-trans-american-college-pediatrics-leak-michelle-cretella-abortion/....................8

Matt Walsh (@MattWalshBlog), Twitter (Sept. 20, 2022), https://twitter.com/MattWalshBlog/status/1572313369528635392....................8

Matt Walsh, *Matt Walsh Investigates Nashville Gender Clinic*, YouTube (Sept. 20, 2022), https://www.youtube.com/watch?v=RDhshvoJnqU ...........................................8

Michael T. Morley, *Erroneous Injunctions*, 71 Emory L.J. 1137 (2022).............................................................................................................54

Phil Williams (@NC5PhilWilliams), Twitter (Aug. 7, 2023), https://twitter.com/NC5PhilWilliams/status/1688675082103566336?s=20 ...............................................................................2, 37, 42, 51

Phil Williams, *Revealed: Vanderbilt transgender clinic investigation sparked by doctor's video, Tennessee AG says*, NewsChannel 5 (Aug. 2, 2023), https://www.newschannel5.com/news/newschannel-5-investigates/revealed-vanderbilt-transgender-clinic-investigation-sparked-by-doctors-video-tennessee-ag-says .....................................................43

Socialstyrelsen, *Care of children and adolescents with gender dysphoria: Summary of national guidelines* (Dec. 2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf ................................44

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs-Appellees believe the Court would benefit from hearing oral argument.

## **INTRODUCTION**

Samantha Williams, Jane Doe, and Rebecca Roe are living a parent's "worst nightmare." Jane Doe Decl., R.25, PageID#221. Gender-affirming care has been a lifeline for their transgender adolescents, L.W., John Doe, and Ryan Roe. They did not initiate care on a whim. They did so after an extended period of careful consideration together with their mental health providers and pediatric endocrinologists, and after being fully informed of the potential risks and benefits of treatment. With the benefit of that care, L.W., John, and Ryan are now thriving. But as a result of Tennessee's new law, 2023 Tennessee Senate Bill 1 (codified in Tennessee Code Annotated § 68-33-101 et seq.) (the "Ban"), these parents face agonizing decisions about how to ensure their children do not lose the medical treatment they need.

For decades in the United States and around the world, doctors and families have worked to minimize the distress experienced by transgender adolescents with gender dysphoria like Minor Plaintiffs. Informed by a well-developed body of research and clinical experience, experts in the field developed clinical guidelines for treating gender dysphoria—sometimes referred to as "gender-affirming care." These guidelines are supported by the same types of studies and the same quality of evidence supporting a wide variety of pediatric care. While some European countries have recently issued new requirements for gender-affirming medical care under

state-run medical systems to minors who meet certain criteria, none of these countries has *banned* gender-affirming care like Tennessee.

Defendants' brief is filled with inflammatory assertions about gender-affirming care being dangerous and harmful, comparing the parents in this case to a hypothetical parent who "sign[s] off on castrating a son so that he can sing with an unnaturally high vocal range." Defs.' Br.37. But Defendants are desperate to avoid subjecting those assertions to "courtroom fact-finding." Defs.' Br.43. If the treatment is as dangerous and harmful as Tennessee claims, then Defendants should have little difficulty defending their assertions in court under heightened scrutiny. But every trial court to consider similar bans has looked at the evidence and found such assertions to be distorted, illogical, inconsistent, exaggerated, or simply false. Indeed, even Attorney General Skrmetti has publicly recognized that gender-affirming care can be appropriate treatment for some adolescents like the Minor Plaintiffs, who have a longstanding history of gender dysphoria.[1]

After making extensive factual findings, the district court concluded that Plaintiffs were likely to prevail on their equal protection and parental autonomy claims and preliminarily enjoined enforcement of the Ban to maintain the status quo.

---

[1] *See* Phil Williams (@NC5PhilWilliams), TWITTER (Aug. 7, 2023), https://twitter.com/NC5PhilWilliams/status/1688675082103566336?s=20.

On an extremely abbreviated time frame, a divided panel of this Court stayed the preliminary injunction pending appeal, reasoning that "[w]hat makes it bearable to choose between the two sides is the realization that not every choice is for judges to make." Stay Op.14. But the Court "retains an independent constitutional duty to review [legislative] factual findings," *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007), and "when the rights of persons are violated, the Constitution requires redress by the courts, notwithstanding the more general value of democratic decisionmaking." *Obergefell v. Hodges*, 576 U.S. 644, 677 (2015) (cleaned up). "Of course [judges] are not scientists, but neither may [they] abandon the field when government officials . . . infringe a constitutionally protected liberty. The whole point of [heightened] scrutiny is to test the government's assertions." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.).

Now with the benefit of full briefing, the stay should be vacated and the preliminary injunction affirmed. Binding Supreme Court precedent requires courts to apply heightened scrutiny to Tennessee's Ban, and the district court's factual findings under that standard were correct, and certainly not clearly erroneous. The district court properly concluded that Tennessee's Ban is unlikely to survive heightened scrutiny, and the court did not abuse its discretion in issuing an injunction to protect the Plaintiffs from irreparable harm.

## STATEMENT OF THE ISSUES

Whether the Ban is subject to heightened scrutiny; whether the district court's factual findings were clearly erroneous; and whether the court abused its discretion in granting a preliminary injunction.

## STATEMENT OF THE CASE

### A. Medical Guidelines for Treating Transgender Adolescents with Gender Dysphoria.

Being transgender is not itself a condition to be cured. Janssen Decl., R.31, PageID#355; Adkins Decl., R.29, PageID#250. A person's gender identity, which has biological roots, cannot be changed voluntarily, by external forces, or through medical or mental health intervention. Janssen Decl., R.31, PageID#352; Adkins Decl., R.29, PageID#249. It is common for clinically significant distress—called "gender dysphoria"—to arise from the incongruence transgender people experience between their gender identity and the sex they were designated at birth. Adkins Decl., R.29, PageID#250. Gender dysphoria is a serious medical condition that, if left untreated, can result in severe anxiety and depression, self-harm, and suicidality. *Id.*

Treatment for gender dysphoria is not new. It is provided in accordance with evidence-based clinical guidelines developed over decades by experts around the world. The Endocrine Society and the World Professional Association for Transgender Health ("WPATH") have published clinical practice guidelines (the "Guidelines") for diagnosing and treating gender dysphoria that are widely used in

the United States. Adkins Decl., R.29, PageID#251; Janssen Decl., R.31, PageID#355-56. Under these Guidelines, gender-affirming medical care is provided only when an adolescent has: (i) gender incongruence that is both marked and sustained over time; (ii) a diagnosis of gender dysphoria; (iii) sufficient emotional and cognitive maturity to provide informed consent; (iv) provided informed consent with their parents after being informed of the potential risks of treatment, including potential reproductive side effects; and (v) no mental health concerns that would interfere with diagnosis or treatment. Janssen Decl., R.31, PageID#358.

Defendants' assertion that gender-affirming care is a "virtually unmonitored on-ramp" to gender transition, Defs.' Br.3, bears no resemblance to how care is actually provided under the Guidelines. Treatment does not involve steering a minor towards medical intervention or any particular gender identity. Rather, it involves a careful assessment process to determine what diagnoses and treatments are appropriate for each individual patient. Adkins Rebuttal, R.141, PageID#2388-89; Janssen Rebuttal, R.143, PageID#2424-25. Pubertal suppression is indicated only when certain diagnostic criteria are met, including "a long-lasting and intense pattern of gender nonconformity or gender dysphoria [that has] worsened with the onset of puberty." Adkins Decl., R.29, PageID#254. If the treatment is discontinued, endogenous puberty will resume. *Id.* PageID#258. Pubertal suppression prevents worsening of gender dysphoria by pausing the development of secondary sex

characteristics that are inconsistent with the patient's gender identity. *Id.* PageID#253-54.

In some cases, it may be medically necessary for adolescent patients to be treated with gender-affirming hormone therapy. *Id.* PageID#255. These treatments—testosterone for transgender teenage boys and testosterone suppression and estrogen for transgender teenage girls—alleviate distress by facilitating physiological changes consistent with their gender identity. *Id.* Under the Guidelines, treatment is provided only after a rigorous assessment of the minor's gender dysphoria and capacity to understand the risks and benefits of treatment. *Id.* PageID#255-56; Janssen Decl., R.31, PageID#358.

While the risks and side effects of gender-affirming medical interventions are rare or easily managed, the benefits of treatment are significant. "[A] substantial body of evidence," including cross-sectional and longitudinal studies, as well as decades of clinical experience, has shown that these medical interventions greatly improve the mental health of adolescents with gender dysphoria. Turban Decl., R.32, PageID#383. The evidence supporting treatment is comparable to evidence supporting other pediatric care, which is often provided without randomized controlled trials. Antommaria Decl., R.30, PageID#293.

Providing these medical treatments in adolescence can also drastically minimize gender dysphoria later in life and may eliminate the need for surgery.

6

Adkins Decl., R.29, PageID#266. Conversely, delaying treatment can result in significant distress, including anxiety and escalating suicidality, as well physical changes from puberty that can be difficult, and sometimes impossible, to reverse. *Id.* PageID#266-67.

In recent years, some European countries have imposed new requirements on how gender-affirming medication is provided to minors through the countries' socialized medical systems. None of those countries has banned the treatments. Antommaria Decl., R.30, PageID#309-10; *see* Brief of *Amici Curiae* Stonewall Equality Limited, *et. al.*, in Support of Plaintiffs-Appellees. They continue to provide gender-affirming medication through the state medical systems for minors who meet certain criteria. *See* Antommaria Decl., R.30, PageID#309-10; Turban Rebuttal, R.144, PageID#2431.

## B. Tennessee's Ban

Tennessee's SB1 was catalyzed by social media posts by Matt Walsh, a columnist and radio host who has vowed to "wage an all-out assault on gender ideology." On September 20, 2022, Walsh posted on Twitter and YouTube purporting to expose Vanderbilt University Medical Center's ("VUMC") practice of "castrat[ing], steriliz[ing] and mutilat[ing] minors" for profit. The video clips Walsh posted were clipped, out-of-context, undated videos from various VUMC presentations on gender-affirming care, some of which focused on the treatment of

adults, not minors.[2] Walsh's posts nevertheless informed the legislative findings supporting the Ban.

The Ban was the first piece of legislation filed in the 2023 general session and was part of a series of bills introduced in Tennessee targeting transgender people. Compl., R.1, PageID#17-18. The Ban moved rapidly through both chambers and was signed into law by Governor Lee on March 2, 2023. *Id.* PageID#2. Tennessee's Ban was part of a wave of transgender healthcare bans that rapidly swept through state legislatures this year.[3]

The Ban prohibits any healthcare provider from knowingly performing or administering any "medical procedure" for the purpose of "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth]" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1)(A)-(B). The Ban exempts treatment of "a physical or chemical

---

[2] Matt Walsh (@MattWalshBlog), TWITTER (Sept. 20, 2022), https://twitter.com/MattWalshBlog/status/1572313369528635392; Matt Walsh, *Matt Walsh Investigates Nashville Gender Clinic*, YOUTUBE (Sept. 20, 2022), https://www.youtube.com/watch?v=RDhshvoJnqU.

[3] Defendants deride the Endocrine Society and WPATH as "medical interest group[s]," but ignore the special interest groups responsible for passing the legislation in the first place. *See* Madison Pauly & Emma Rindlisbacher, *A Massive Leak Spotlights the Extremism of an Anti-Trans Medical Group*, Mother Jones (May 17, 2023), https://www.motherjones.com/politics/2023/05/anti-trans-american-college-pediatrics-leak-michelle-cretella-abortion/.

abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex [designated at birth], including abnormalities caused by a medically verifiable disorder of sex development." *Id.* §§ 68-33-102(1), 68-33-103(b)(1). The General Assembly rejected amendments that would have narrowed the prohibition to cover only gender-transition surgery or banned cosmetic or nonessential surgery for all minors. *See* Pls.' Prelim. Inj. Mot., R.33, PageID#421-22.

The Ban allows treatment to continue until March 31, 2024, to phase out the medication for patients (1) who have initiated treatment before July 1, 2023, and (2) whose physicians certify in writing that "in the physician's good-faith medical judgment, . . . ending the medical procedure would be harmful to the minor." Tenn. Code Ann. §§ 68-33-103(b)(1)(B), (b)(3). In practice, because hormone therapy and puberty-delaying medications cannot be abruptly stopped, physicians must wean patients off care in anticipation of the full ban going into effect. *See* Lacy Rebuttal, R.140, PageID#2383. The temporary "continuation of care" provision does not permit a health provider to initiate any new treatments, medications, or procedures. VUMC and other providers who treated adolescents under sixteen all stopped providing care as of July 1, 2023. *See* Rebecca Roe Decl., R.27, PageID#236-37; Rebecca Roe Rebuttal, R.139, PageID#2380-81.

**C.  Plaintiffs' Background and Harms Imposed By the Ban.**

1.      L.W. is a fifteen-year-old transgender girl. S.Williams Decl., R.23, PageID#202-03. Her dysphoria made her feel like she was "trapped" and "drowning." L.W. Decl., R.22, PageID#196-97. It was "hard for [her] to focus" or "connect[] with [her] friends" because she "felt constant anxiety." *Id.* PageID#197. She would get sick from the idea of using sex separated restrooms at school. *Id.*

L.W. came out to her parents at twelve and was subsequently diagnosed with gender dysphoria. S.Williams Decl., R.23, PageID#203-04. L.W. and her parents met with a team at Vanderbilt and—after extensive assessments, discussions of potential risks and benefits, and ongoing mental health care—L.W. began treatment with puberty-delaying medications and then gender-affirming hormones. L.W. Decl., R.22, PageID#198-200; S.Williams Decl., R.23, PageID#206-08.

Since beginning gender-affirming medical treatment, L.W. is outgoing and thriving. S.Williams Decl., R.23, PageID#208. L.W. is "terrified" of the permanent changes that would happen to her without gender-affirming care. L.W. Decl., R.22, PageID#200-01. "It is painful [for L.W.] to even think about having to go back to the place [she] was in before [she] was able to . . . access [gender-affirming] care." *Id.* PageID#201.

Ryan Roe is a fifteen-year-old transgender boy. Ryan Roe Decl., R.26, PageID#225. Ryan was vocal and outgoing as a child, but when puberty started, he

became depressed, anxious, and withdrawn as a result of gender dysphoria. Rebecca Roe Decl., R.27, PageID#232. His anxiety was so bad that he would vomit every morning before school. Ryan Roe Decl., R.26, PageID#227. Ryan came out as transgender when he was in fifth grade. *Id.*

Ryan had two years of psychotherapy, but nothing was helping his gender dysphoria. *Id.* PageID#227-28; Rebecca Roe Decl., R.27, PageID#233-34. Ryan was prescribed anti-anxiety medication, which stopped the vomiting and some of the extreme anxiety around school, but his distress about his body only got worse. *See* Rebecca Roe Decl., R.27, PageID#233. He stopped talking in public because of the extreme distress he felt when he heard the sound of his voice. Ryan Roe Decl., R.26, PageID#227-28.

In the summer after seventh grade, Ryan's therapist discussed additional treatment options for gender dysphoria with Ryan and his parents, and they had a consultation with an endocrinologist at Vanderbilt. *See* Rebecca Roe Decl., R.27, PageID#234. Ryan and his parents spent the next several months discussing every possible effect, benefit, and risk of treatment, including potential impacts on fertility. *Id.* PageID#234-35. They also continued to discuss treatment with Ryan's therapist. *Id.* PageID#235. In January 2022, when Ryan was fourteen, he began receiving testosterone to treat his gender dysphoria. *Id.*

11

Since beginning treatment, Ryan's mental health has improved dramatically. Ryan Roe Decl., R.26, PageID#228-29; Rebecca Roe Decl., R.27, PageID#236. He has transformed back into the vocal, outgoing person that he was before puberty. *See* Rebecca Roe Decl., R.27, PageID#236. For years he suffered, and nothing could address the dysphoria the way gender-affirming treatment has. *Id.* Without it, Ryan doesn't think he could survive. Ryan Roe Decl., R.26, PageID#229.

John Doe is a twelve-year-old transgender boy. John Doe Decl., R.24, PageID#210-11. John knew from an early age that he was a boy and remembers getting upset when people treated him as a girl. *Id.* PageID#211; Jane Doe Decl., R.25, PageID#216. Participating in sex-separated activities with girls made him miserable. Jane Doe Decl., R.25, PageID#216. When he was four years old, John's parents discovered that John had adopted a new name for himself and had been telling all his friends that he was a boy. *Id.* PageID#216-17.

When John was nine years old and had been seeing a therapist for two years, his therapist wrote a referral letter for John and his parents to consult with a pediatric endocrinologist at Vanderbilt about treatment options for his gender dysphoria. *Id.* PageID#219. The endocrinologist told the family that John was still too young for pubertal suppression, and monitored John until he reached the first stages of puberty. *Id.* John had enormous anxiety about undergoing puberty inconsistent with his

gender. *Id.* And the slow and deliberative process with his doctors—including the detailed informed-consent discussions—was reassuring for John's parents. *Id.*

When John was finally able to start puberty-delaying medication in 2021, it was like a weight was lifted, and his relief was palpable. *Id.* The prospect of having to stop treatment and being forced to experience the physical changes caused by endogenous puberty terrifies John. Jane Doe Decl., R.25, PageID#220-21. John "cannot imagine losing control of [his] life" by going through a puberty that is wrong for him. John Doe Decl., R.24, PageID#212. He feels that he has "gone through a lot to finally get to [a] happy, healthy place," and he "desperately hope[s] that doesn't all get taken away." *Id.* PageID#213.

As a result of the Ban, L.W., Ryan, and John will no longer be able to receive gender-affirming medical care in Tennessee. Because cutting off treatment is unimaginable, their families have sought care outside of Tennessee, which imposes a great financial burden and disrupts L.W.'s, Ryan's, and John's schooling, their parents' work, and the relationships they have built with their doctors. S.Williams Rebuttal, R.137, PageID#2370-71; Rebecca Roe Decl., R.27, PageID#236-37; Rebecca Roe Rebuttal, R.139, PageID#2381; Jane Doe Decl., R.25, PageID#221-22; Jane Doe Rebuttal, R.138, PageID#2376-77.

2.    Dr. Lacy is a physician licensed to practice medicine in Tennessee. Lacy Decl., R.28, PageID#239. Her private practice in Memphis provides healthcare

services to transgender and cisgender people. *Id.* PageID#239-40. As part of her practice, Dr. Lacy treats gender dysphoria with hormone therapy for transgender patients ages sixteen and over. *Id.* PageID#241. She refers parents of adolescents under sixteen to a pediatric endocrinologist who specializes in providing that care. *Id.* Dr. Lacy currently treats 350-400 transgender patients in accordance with the Guidelines, including twenty patients under age eighteen. *Id.* PageID#242.

Under the Ban, Dr. Lacy cannot provide gender-affirming hormone therapy to her sixteen- and seventeen-year-old transgender patients. *Id*. Although she can continue treating existing patients until March 31, 2024, care would be limited to lowering their dosages in preparation for treatment being terminated. Lacy Rebuttal, R.140, PageID#2383-84. Dr. Lacy must comply with the law or risk losing her license. Lacy Decl., R.28, PageID#242.

### D. Procedural History

Plaintiffs filed their Complaint on April 20, 2023, and the next day moved to enjoin the law from going into effect on July 1, 2023.[4]

As part of pre-hearing discovery, Defendants served a 30(b)(6) deposition on VUMC with respect to, *inter alia*, VUMC's decision to cease providing gender-affirming care to minors already under its care as of July 1, 2023. In response, VUMC offered to provide a declaration in lieu of testimony. The declaration stated

---

[4] The United States filed a Motion to Intervene, which the court granted.

that "[s]hould enforcement of the Act's provisions prohibiting Hormone Therapy be deferred, delayed or enjoined, VUMC would continue to provide Hormone Therapy consistent with prevailing standards of care for persons with gender dysphoria to those minor patients of VUMC for whom such care is clinically appropriate." Pinson Decl. R.113-1, PageID#1067.[5] Defendants accepted the declaration and withdrew the subpoena.

In response to another 30(b)(6) subpoena from Plaintiffs, VUMC provided a declaration from Minor Plaintiffs' treating physician expressing concern that, if she provided care during the "wind-down" period without an injunction, she "could subsequently be deemed by non-medical third parties to violate the Act, which could expose [her] to punitive consequences." Brady Decl., R.113-1, PageID#1071.

At a status conference on May 24, 2023, the parties jointly proposed that testimony from the parties' experts "would all go in writing." Tr., R.125, PageID#2232. The court agreed with that proposal on the understanding that "the parties aren't, after the fact, [going to] jump up and down and say, well, the Court should have had live testimony to make credibility determinations." *Id.* PageID#2235. Defendants agreed and responded "[w]e will not jump up and down." *Id.* PageID#2243.

---

[5] The declaration defines "Hormone Therapy" to include both pubertal suppressants and cross-sex hormones. *Id.* PageID#1066.

On June 28, 2023, the district court granted Plaintiffs' motion for a preliminary injunction. In doing so, the court concluded that the Minor Plaintiffs and Parent Plaintiffs were likely to prevail on their equal protection and parental autonomy claims and that the remaining preliminary injunction factors all weighed in their favor.

Defendants moved the district court for a stay pending appeal later that day and filed a motion with this Court on June 30, 2023. On July 8, 2023, a divided motions panel granted a stay but emphasized that its "initial" views of the case "may be wrong" and ordered expedited consideration of the appeal "to mitigate any potential harm from that possibility." Stay Op.15.

## SUMMARY OF THE ARGUMENT

Plaintiffs are likely to prevail on their equal protection claims. The district court properly found that the Ban facially classifies on the basis of sex, which required the court to apply heightened scrutiny. The Ban explicitly imposes differential treatment based on an individual's sex designated at birth, *see United States v. Virginia ("VMI")*, 518 U.S. 515, 555 (1996), and it penalizes a person identified as male at birth for traits or actions that it tolerates in people identified as female at birth, *see Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741-42 (2020); *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004).

In granting a stay, the panel erred by ignoring the Supreme Court's instructions to apply heightened scrutiny to all sex classifications. There is no exception to heightened scrutiny for classifications that apply "equally" to both sexes, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 141-42 (1994), and no exception for classifications that reflect "physical differences" or distinctions that are not "stereotypes," *Nguyen v. INS*, 533 U.S. 53, 68, 73 (2001). Regardless of whether such classifications *survive* heightened scrutiny, they must still be *tested* under the heightened scrutiny framework. The district court also correctly held that classifications based on transgender status are quasi-suspect and independently merit heightened scrutiny.

Applying heightened scrutiny, the district court made detailed factual findings, which overwhelmingly establish that there is no close means-end fit between Tennessee's sweeping ban and the asserted justifications for it. In doing so, the court agreed with every other trial court to have evaluated similar justifications, concluding that Defendants' experts were not credible and the weight of the evidence did not support Defendants' assertions about the banned care.

The district court also properly found that Parent Plaintiffs are likely to prevail on their parental autonomy claims. In ruling to the contrary, the stay panel failed to apply *Parham v. J.R.*, 442 U.S. 584, 602-03 (1979), which recognizes the fundamental rights of parents with respect to receiving medical treatment for their

17

children, and failed to heed the Supreme Court's admonition in *Dobbs v. Jackson Women's Health Organization* that "nothing in [its] opinion should be understood to cast doubt on precedents that do not concern abortion." 142 S. Ct. 2228, 2277-78 (2022).

In light of Plaintiffs' likelihood of success on the merits, the district court did not abuse its discretion by issuing a preliminary injunction to protect Plaintiffs from "suffer[ing] actual and imminent injury in the form of emotional and psychological harm as well as unwanted physical changes." Op., R.167, PageID#2714. Defendants' assertions that a preliminary injunction will not redress Plaintiffs' injuries lack any evidentiary support and are based on the alarming theory that state officials can thwart court injunctions—whether preliminary or permanent—by threatening to retroactively punish third parties if the injunction is ultimately vacated.

Finally, the district court did not abuse its discretion in concluding that a state-wide injunction was necessary to fully redress Plaintiffs' injuries. If the injunction is narrowed, Dr. Lacy and the United States should be provided an opportunity to seek broader relief on remand.

## STANDARD OF REVIEW

This Court "review[s] de novo the legal conclusions made by the district court, and review[s] its factual findings for clear error." *U.S. Student Ass'n Found. v. Land*,

546 F.3d 373, 380 (6th Cir. 2008). The "ultimate decision regarding injunctive relief is reviewed under the 'highly deferential' abuse-of-discretion standard." *Id.*

## ARGUMENT

Courts "must balance four factors in determining whether to grant a preliminary injunction." *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015). Those factors are: "(1) whether the [Plaintiffs are] facing immediate, irreparable harm, (2) the likelihood that the [Plaintiffs] will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). The district court properly determined that all four factors weigh heavily in Plaintiffs' favor.

### I.    Plaintiffs Are Likely to Prevail on Their Equal Protection Claims.

Plaintiffs are likely to succeed on their equal protection claims. The Ban triggers heightened scrutiny because it classifies based on sex and transgender status, which are both quasi-suspect classifications. The district court's amply supported factual findings leave no question that the Ban cannot survive heightened scrutiny.

### A. The Ban Triggers Heightened Scrutiny Because It Classifies Based on Sex.

Supreme Court precedent is clear and unequivocal. "[A]ll gender-based classifications today warrant heightened scrutiny." *VMI*, 518 U.S. at 555 (quotations omitted). The Ban triggers heightened scrutiny as sex discrimination in multiple ways: it facially classifies based on sex designated at birth, it facially classifies based

on a person's failure to identify with their sex designated at birth, and it was passed (at least in part) for the purpose of enforcing gender conformity.

### 1. The Ban Facially Classifies Based on Sex Designated at Birth.

a.     As the district court recognized, the Ban draws an explicit classification based on sex designated at birth. Op., R.167, PageID#2680-83. The Ban prohibits medical care if—and only if—the care is provided in a manner "inconsistent with the minor's sex," which the Ban defines as "a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth." Tenn. Code Ann. §§ 68-33-103(a)(1)(A), 68-33-102(9). "Whether a medical procedure is banned by SB1 . . . therefore requires . . . the ascertainment of whether the minor's sex at birth is consistent with that minor's (gender) identity." Op., R.167, PageID#2681-82.

Accordingly, Tennessee's Ban "creates a sex-based classification on its face" and "imposes disparate treatment on the basis of sex." *Id*. PageID#2682; *see Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) ("Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [the law] discriminates on the basis of sex."). "[W]ithout sex-based classifications, it would be impossible for [Tennessee's ban] to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted)." *K.C. v. Individual*

*Members of Med. Licensing Bd. of Ind.,* 2023 WL 4054086, at *8 (S.D. Ind. June 16, 2023), *appeal filed*, No. 23-2366 (7th Cir. July 12, 2023).

b.    Defendants offer a variety of excuses for why the Ban's explicit facial classifications should be exempted from the Supreme Court's instructions to apply heightened scrutiny. None can be squared with well-established precedent.

i.    Defendants argue, and the stay panel agreed, that the Ban does not trigger heightened scrutiny because it equally "bans gender-affirming care for minors of both sexes." Stay Op.11; *see* Defs.' Br.31-32. But there is no exception to heightened scrutiny for sex classifications that apply equally to men as a group and women as a group. The Supreme Court squarely rejected that argument in *J.E.B.*, when it held that peremptory challenges could not be used to strike individual jurors on the basis of sex. 511 U.S. at 141-42. It made no difference that "the system as a whole [wa]s evenhanded" and that "for every man struck by the government petitioner's own lawyer struck a woman." *Id.* at 159-60 (Scalia, J., dissenting). Explicit facial classifications do not somehow become neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

Thus, when the Eleventh Circuit upheld the constitutionality of a sex-separated restroom policy, the court did not sidestep heightened scrutiny because the policy applied equally to both sexes. *Adams by & through Kasper v. School Board*

*of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc). The court recognized that "[t]his is a sex-based classification" and then analyzed whether the policy satisfied heightened scrutiny. *Id.* at 801.

Defendants purport to derive an alternate standard from *Reed v. Reed*, 404 U.S. 71 (1971), a case that predates the Court's articulation of the heightened scrutiny standard. Plucking an out-of-context sentence fragment from *Reed*, Defendants assert that heightened scrutiny applies only with laws that "'giv[e] a mandatory preference to members of either sex over members of the other.'" Defs.' Br.31 (quoting *Reed*, 404 U.S. at 76). *Reed* held no such thing, and, as described above, fifty years of intervening precedent says the opposite. *See VMI*, 518 U.S. at 555; *J.E.B.*, 511 U.S. at 141-42.

ii.    Defendants also convinced the stay panel that heightened scrutiny should not apply because the sex classifications in the Ban are inherently necessary to regulate a medical procedure. Stay Op.11 ("The Act mentions the word 'sex,' true. But how could it not? That is the point of the existing hormone treatments—to help a minor transition from one gender to another."). According to the panel, these classifications do "not require skeptical scrutiny" because "the drugs' effects correspond to sex in . . . understandable ways." *Id.*

That reasoning turns the analysis on its head. The question of whether a classification exists is distinct from and antecedent to whether it is justified. The

existence of "physical differences" may be relevant to whether a law *survives* heightened scrutiny, but it does not transform an explicit sex classification into a sex-neutral one. *VMI*, 518 U.S. at 533. Courts must apply heightened scrutiny to all sex classifications, including "gender specific terms [that] take[] into account a biological difference" between sexes. *Nguyen*, 533 U.S. at 64, 73 (concluding that classification did not rest on a "stereotype" but still subjecting it to heightened scrutiny).

Defendants argue that laws regulating medical procedures do not become facial classifications simply by mentioning the words "sex," "man," or "woman." Defs.' Br.32. But the Ban does not just incidentally mention sex. Rather, it explicitly imposes differential treatment on the basis of sex: "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." *Brandt*, 47 F.4th at 669. Unlike a law prohibiting specific medical procedures for both men and women, the Ban allows particular medical treatments for people with a male sex designated at birth while prohibiting that treatment for people with a female sex designated at birth. A minor cisgender girl can even have purely cosmetic breast augmentation surgery, but a minor transgender girl cannot.

Defendants dismiss all this as merely "obsessing over the mechanics while ignoring medical and biological realities." Defs.' Br.8. But the very purpose of the heightened scrutiny test is "to assure that the validity of [a sex] classification is

determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725-26 (1982). The existence of "medical and biological realities" may be reasons why a particular classification survives heightened scrutiny, *see Nguyen*, 533 U.S. at 73, but they are not a basis for refusing to apply heightened scrutiny in the first place. "While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change." *Hogan*, 458 U.S. at 724 n.9.[6]

iii.    Defendants' reliance on *Dobbs* fares no better. Defendants argue—and the stay panel agreed—that "[i]f a law restricting a medical procedure that applies only to women" (i.e., abortion) "does not trigger heightened scrutiny . . . a law equally applicable to all minors, no matter their sex at birth, does not require such scrutiny either." Stay Op.11; *see* Defs.' Br.32. But *Dobbs* did not create new equal-protection law—it simply reiterated the holding in *Geduldig v. Aiello,* 417 U.S. 484 (1974), that facially neutral regulations of medical procedures do not always receive heightened scrutiny simply because they disparately impact members of one sex.

---

[6] That is why Defendants falter in arguing (at 36) that the Ban does not classify based on sex because "the benefit-risk calculation" is not the same when puberty-delaying medication and gender-affirming hormones are given for purposes other than gender transition. Even if that were true, the alleged risks would have no bearing on whether the Ban *classifies* based on sex. The relative risks of administering the treatment bear only on whether the Ban's sex classification can be *justified*.

Equal protection jurisprudence has long drawn a fundamental distinction between sex-neutral classifications (which trigger heightened scrutiny only when passed, at least in part, for a discriminatory purpose) and facial sex classifications (which always trigger heightened scrutiny). *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273-74 (1979). By conflating disparate impact with the facial classifications in this case, the panel ignored that fundamental distinction.

### 2. The Ban Facially Classifies Based on a Person's Failure to Identify With Their Sex Designated at Birth.

a.    In addition to facially classifying based on sex designated at birth, the Ban also constitutes sex discrimination because it discriminates based on the incongruence between a person's sex designated at birth and their gender identity. This Court held in *Smith* that sex discrimination under the Equal Protection Clause includes discrimination based on a person's gender nonconformity in "fail[ing] to act and/or identify with his or her" sex designated at birth. 378 F.3d at 575. And the Supreme Court in *Bostock* subsequently confirmed that, when the government "penalizes a person identified as male at birth for traits or actions that it tolerates in [a person] identified as female at birth," the person's "sex plays an unmistakable" role. 140 S. Ct. at 1741-42. Accordingly, under binding Supreme Court and circuit precedent, the Ban classifies based on sex (and is thus subject to heightened scrutiny) if it conditions the provision of medical care on whether or not a minor seeks to conform to their sex designated at birth.

25

That is precisely what the Ban does. Whether the use of GnRH agonists (puberty-delaying medications) and hormone therapy is prohibited depends exclusively on whether the treatment is deemed consistent or inconsistent with the minor's sex designated at birth. *See* Op., R.167, PageID#2684-90; *Doe 1 v. Thornbury*, 2023 WL 4230481, at *4 (W.D. Ky. June 28, 2023), *appeal filed*, No. 23-5609 (6th Cir. June 30, 2023); *Doe v. Ladapo*, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023), *appeal filed*, No. 23-12159 (11th Cir. June 27, 2023). In other words, the law "penalizes" a person designated male at birth for the same "action[]" of seeking feminizing medical treatment that it "tolerates" in persons designated female at birth. *Bostock*, 140 S. Ct. at 1741. By contrast, the Ban contains an explicit exception allowing for irreversible, sterilizing surgery on intersex infants with differences of sex development if the purpose of the surgery is to make the infant's body conform to their sex designated at birth. Tenn. Code Ann. §§ 68-33-102(1), 103(b)(1).

b.     Defendants assert that *Bostock* can be ignored because it was decided under Title VII, not the Equal Protection Clause. But *Bostock* did not say its "reasoning applies only to Title VII," *contra* Stay Op.13, or suggest that its assessment of sex classifications could not apply in other contexts. The Court simply said it did not "prejudge" how its analysis would apply to the "terms" of other laws. *Bostock*, 140 S. Ct. at 1753. Defendants offer no reasoned basis to elevate the

*Bostock* Court's unremarkable refusal to decide questions not before it into a rule that *Bostock*'s reasoning has no bearing on how lower courts should analyze future classifications involving non-conformity with sex designated at birth. Defendants have no answer for how a classification based on failure to identify with one's sex designated at birth could simultaneously be a facially sex-based classification under Title VII and a facially sex-neutral classification under the Equal Protection Clause.

i.      To be sure, there are significant differences between Title VII and the Equal Protection Clause, but those distinctions all concern whether sex discrimination is *permissible*—not whether a sex classification exists in the first place. Sex discrimination under Title VII is categorically prohibited, but a sex classification may still be permissible under the Equal Protection Clause if it satisfies heightened scrutiny. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. ("SFFA")*, 143 S. Ct. 2141, 2220 (2023) (Gorsuch, J., concurring) (drawing distinction between Title VI's and Title VII's categorical prohibitions on race and sex discrimination and the Equal Protection Clause's application of strict and intermediate scrutiny).

When attention is properly trained on the *classification* identified in *Bostock* rather than the ultimate question of liability, it is abundantly clear that the Supreme Court's reasoning applies in full force here.

27

iii. Defendants' argument that *Bostock* cannot apply because "the Equal Protection Clause uses different words and predates Title VII by nearly a century," is doubly flawed. Defs.' Br.33 (citing *Brandt v. Rutledge*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc)). The assertion that "their text is not similar in any way" overlooks that the text of Title VII and the Fourteenth Amendment both unambiguously focus on discrimination against individual persons, not equal treatment of groups. *Compare Bostock*, 140 S. Ct. at 1740-41 (noting Title VII's application to "any individual"), *with J.E.B.*, 511 U.S. at 152 (Kennedy J., concurring) ("The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups."). And heightened scrutiny applies to all sex classifications, regardless of whether they were commonplace at the time the Fourteenth Amendment was ratified. *See Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017); *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973) (plurality).

iii.    Defendants are similarly unaided by their case citations, none of which remotely suggests that a sex classification could be facially discriminatory under Title VII and facially neutral under the Equal Protection Clause.

As noted above, in his *SFFA* concurrence, Justice Gorsuch drew a distinction between Title VI's categorical prohibition on race discrimination (regardless of justification) and the Equal Protection Clause's application of strict scrutiny. Justice

Gorsuch did not suggest that a policy that classifies based on race under Title VI could be race-neutral for purposes of the Equal Protection Clause. *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), is inapt for the same reason: the court focused on the fact that Title VII and Title IX may differ with respect to whether certain sex classifications are *permissible*—not whether they exist at all. *Id.* at 510 n.4. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021), is even further afield, focusing on whether *Bostock*'s discussion about Title VII's causation standard overturned prior precedent holding that age must be the "determinative reason" for an employment decision to violate the ADEA.

iv.    Even if Defendants could limit *Bostock*'s reasoning regarding what constitutes a sex classification to Title VII, they cannot evade this Court's equal protection holding in *Smith*. Defendants observe that it has not been applied to medicine, Defs.' Br.34, but this Court has already rejected attempts to limit *Smith* as concerning only "sex stereotyping" with respect to clothing in employment. *See EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018) (holding that, under *Smith*, "transgender or transitioning status constitutes an inherently gender nonconforming trait"). And as explained, although "physical differences" can justify a sex classification, they cannot erase one.

### 3. The Ban Was Passed for the Impermissible Purpose of Enforcing Government-Mandated Gender Conformity.

Even if the Ban did not explicitly classify based on sex, it would still be subject to heightened scrutiny as a law passed "because of," not "in spite of," the statute's adverse effects on transgender youth's ability to live in accordance with their gender identity. *Feeney*, 442 U.S. at 279.

As courts have found when examining similar statutes, Tennessee's desire to "[d]issuad[e] a person from conforming to the person's gender identity rather than to the person's natal sex . . . was a substantial motivating factor in enactment of the challenged statute." *Ladapo*, 2023 WL 3833848, at *10. The statutory "findings" declare that Tennessee has "a legitimate, substantial, and compelling interest in encouraging minors to appreciate their sex" and in prohibiting procedures "that might encourage minors to become disdainful of their sex." Tenn. Code Ann. § 68-33-101(m). Enforcing state-mandated gender conformity was not an incidental effect of the statute—it was the declared purpose.

### B. Transgender Status Is a Quasi-Suspect Classification Requiring Heightened Scrutiny.

The Ban is subject to heightened scrutiny for an additional reason: it facially classifies based on transgender status, which is a quasi-suspect classification. As the district court recognized, "[t]he overwhelming majority of courts to consider the question"—including the Fourth and Ninth Circuits—"have found that transgender

individuals constitute a quasi-suspect class for the purposes of the Equal Protection Clause," triggering heightened scrutiny. Op., R.167, PageID#2677-78 (collecting cases explaining how transgender status satisfies all four criteria for identifying quasi-suspect classifications).[7]

Defendants' argument that the Ban does not classify on the basis of transgender status fails. By its plain terms, the Ban prohibits medical treatments based on whether they alleviate "distress from a discordance between the minor's sex [designated at birth] and asserted identity," or "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth]." Tenn. Code Ann. § 68-33-103(a)(1)(A)-(B). Because a transgender person is, by definition, someone whose sex designated at birth is different from their gender identity, and because only transgender people experience "distress from a discordance between" their sex designated at birth and their identity, the statute's prohibitions expressly and exclusively target transgender people. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022), *appeal filed*, No. 22-11707 (11th Cir. May 18, 2022) (similar law "places a special burden on transgender minors because their gender identity does not match their birth sex").

---

[7] Contrary to Defendants' contention (at 38), the district court did not "implicitly overrul[e]" *Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015). *Ondo* was about sexual orientation—not transgender status—and the question was whether any intervening Supreme Court decisions abrogated prior circuit precedent applying rational basis review to such classifications. *Id.* at 608-09.

Resisting this straightforward conclusion, Defendants offer the irrelevant observation that not all transgender individuals need the banned medical procedures. As the district court recognized, that is like saying a law prohibiting Black students from graduate school does not discriminate based on race because not all Black individuals wish to enroll. Op., R.167, PageID#2674; *see also Rice v. Cayetano*, 528 U.S. 495, 516-17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice to make the classification race neutral."); *VMI*, 518 U.S. at 550 (explaining that "some women, at least, would want to attend [VMI] if they had the opportunity" even if others would not).

### C. The Ban Fails Heightened Scrutiny.

To survive heightened scrutiny, Tennessee must, at a minimum, provide an "exceedingly persuasive justification" for the Ban's classifications. *VMI*, 518 U.S. at 531. There must be a "close means-end fit" that does not "classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions*, 582 U.S. at 64 n.13, 68. The "burden of justification is demanding"—not "deferential"—and it "rests entirely on the State." *VMI*, 518 U.S. at 533, 555.

To overturn the district court's findings of fact, including its credibility determinations regarding experts, Defendants must establish those findings were not only wrong, but clearly erroneous. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not

reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573-74 (1985).

The district court's findings show that Tennessee cannot establish the close means-end fit necessary to support its categorical ban because the Ban is both severely underinclusive and severely overbroad. Those findings establish that many of Defendants' claims about the harms of the banned treatments are not reliable, that the alleged harms are not unique to the prohibited care, and that the Ban undermines, rather than advances, the interest in protecting the welfare of children. Op., R.167, PageID#2696-713.

### 1. Defendants Cannot Show an "Exceedingly Persuasive" Justification for Singling Out Gender-Affirming Care for Differential Treatment.

As discussed below, Defendants' proffered critiques of the banned treatment are exaggerated or untrue, and the supporting assertions of Defendants' experts have been repeatedly discredited as inaccurate and unreliable. But even if Defendants' criticisms had any merit, those criticisms apply equally to many forms of medical care that are not covered by the Ban—including care involving the same medications for any other purpose. As the district court found, the Ban is "not proportionate to the state's interest of protecting children from allegedly dangerous medical treatments," and is "severely underinclusive in terms of the minors it protects from

the alleged medical risks of the banned procedures." Op., R.167, PageID#2712-13.

Accordingly, Tennessee cannot show an "exceedingly persuasive" justification for

this "differential treatment." *VMI*, 518 U.S. at 532-33; *cf. Church of the Lukumi*

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be

regarded as protecting an interest of the highest order when it leaves appreciable

damage to that supposedly vital interest unprohibited.") (cleaned up).

**<u>Risk of Side Effects</u>**: Defendants cite a litany of potential side effects from

gender-affirming medical intervention, Defs.' Br.11-14, but based on the

"voluminous" record before it, the district court properly concluded that

"Defendants' allegations of these harms and their prevalence is not supported." Op.,

R.167, PageID#2696, 2703. Indeed, Tennessee allows healthcare providers to use

the same allegedly risky endocrine treatments—pubertal suppression, testosterone,

estrogen, and testosterone suppression—for minors for any other medical purpose.

*Id.* PageID#2709-10. The "risks related to hormone therapy and puberty suppression

generally do not vary based on the condition they are being prescribed to treat, and

the same hormones are used for a variety of indications in addition to gender

dysphoria." Adkins Decl., R.29, PageID#263.

In support of their claims regarding side effects, Defendants "rely on the

testimony of Drs. Cantor, Hruz, Levine and Laidlaw." Op., R.167, PageID#2696.

The court determined that Cantor's and Hruz's testimony was "minimally persuasive"

as to the potential side effects of treatment. *Id.* Regarding Laidlaw's claims about potential cardiovascular side effects of hormone therapy, Defs.' Br.12, the court concluded that the "weight of the evidence . . . supports the conclusion that any increased risk of cardiovascular disease in patients receiving treatment for gender dysphoria is either speculative or, to the extent that such risk exists, it can be mitigated by the treating physician." Op., R.167, PageID#2702. The court also found that the weight of the evidence did not support claims about increased cancer risk. *Id.* PageID#2703.

The district court also was not "persuaded that puberty blockers pose a serious risk to a patient's bone density" when properly administered. *Id.* PageID#2700. The court found Dr. Levine's assertions about the potential risk to be illogical, crediting Dr. Adkins' countervailing testimony that once patients receiving puberty blockers initiate puberty—either endogenously or through hormone therapy—their bone mineralization rate is comparable to peers, and that there is no evidence of long-term fracture risk from treatment. *Id.*

All medical treatments have *some* risk. But if the mere fact of risk were enough to ban care, that would leave "several pediatric treatments targeting something other than gender dysphoria vulnerable to severe limitations on access." *Id.* PageID#2707; *see also* Antommaria Decl., R.30, PageID#303 ("[T]hat gender-

35

affirming medical care has risks does not distinguish it from other forms of treatment.").

**Alternative Treatment**: There is no evidence that psychotherapy alone is an effective treatment for gender dysphoria. Turban Decl., R.32, PageID#387-88. As one court put it: "The choice these plaintiffs face is binary: to use GnRH agonists and cross-sex hormones, or not. It is no answer to say the evidence on the yes side is weak when the evidence on the no side is weaker or nonexistent." *Ladapo*, 2023 WL 3833848, at *11.

Defendants assert that treatment with only psychotherapy provides a less risky alternative because "the vast majority of children exhibiting gender dysphoria align their gender identity with their sex by the time they reach adulthood." Defs.' Br.12. But that claim is not supported by the evidence. While so-called "desistence" has been observed in prepubertal children, "there is broad consensus in the field that once adolescents reach the early stages of puberty and experience gender dysphoria, it is very unlikely they will subsequently identify as cisgender or desist." *Brandt v. Rutledge*, 2023 WL 4073727, at *34 (E.D. Ark. June 20, 2023), *appeal filed*, No. 23-2681 (8th Cir. July 21, 2023); Turban Decl., R.32, PageID#390.

There is also no support for Defendants' assertions (at 14) that receiving puberty-delaying medication places adolescents on a "conveyor belt" making it more likely for the adolescents to continue identifying as transgender. "It is a logical

fallacy to infer that a study showing that 98% of adolescents on puberty blockers proceeding onto gender-affirming hormones is evidence that puberty blockers increase the likelihood of persistence." Turban Rebuttal, R.144, PageID#2438. Rather, "the adolescents who started pubertal suppression were those who were, through medical and mental health screening, determined, prior to starting pubertal suppression, to have a low likelihood of future desistence." *Id*.

**Evidence Base**: Tennessee's claim (at 14) that "no reliable studies" demonstrate the benefits or efficacy of treatment is unsupported by the record. In reality, uncontested testimony showed that the Guidelines are based on evidence—including both long-term research studies and clinical experience—comparable to that supporting other pediatric care.

Comparing gender-affirming care to castration, mutilation, and sterilization more than a dozen times, *see, e.g.*, Defs.' Br.29, 30, 33, 37, Defendants suggest that gender-affirming care is akin to procedures with no evidence of health benefit and significant evidence of harm. There is no record support for these outlandish assertions, and even Attorney General Skrmetti has publicly recognized that gender-affirming care can be appropriate treatment for at least some adolescents.[8] The evidence of the benefits of treatment includes multiple longitudinal and cross-sectional studies, and (even though Defendants repeatedly claim there is no "long-

---

[8] *See* Williams, Twitter, *supra*, n.1.

term" evidence) at least one study followed patients for a mean of nearly six years after initiation of treatment. Turban Decl., R.32, PageID#384-86, 388-89. By contrast, many medications used regularly by doctors are supported by evidence of efficacy for much shorter periods of time. *Id.* PageID#388-89.

Further, while Defendants complain that existing studies "lack[] control groups" and therefore constitute "low quality" evidence in scientific grading systems, Defs.' Br.14, the uncontested testimony is that "[r]ecommendations for pediatric care made by professional associations in guidelines are seldom based on well-designed and conducted randomized controlled trials due to their rarity." Antommaria Decl., R.30, PageID#293. Thus, the district court found that "to the extent [the Guidelines] rely on what is considered 'low-quality evidence,' [they] are not unique in this respect." Op., R.167, PageID#2693. And as one court explained, "the fact that research-generated evidence supporting these treatments gets classified as 'low' or 'very low' quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria." *Ladapo*, 2023 WL 3833848, at *11. Indeed, as noted above, the evidence supporting Defendants' "psychotherapy only" approach "is far weaker, not just of 'low' or 'very low' quality." *Id.*

**Fertility**: Existing evidence does not support Defendants' claim that banning gender-affirming medical care is justified based on risks to fertility. As the district

court noted, "the record overwhelmingly demonstrates that many individuals receiving puberty blockers or cross sex-hormones will remain fertile . . . and that the risk of negative impacts on fertility can be mitigated." Op., R.167, PageID#2697.

Puberty-delaying medication on its own does not affect fertility, and many patients treated with hormone therapy are able to conceive children. Adkins Decl., R.29, PageID#264. For other treatments, there are ways to make adjustments to protect fertility. *Id.* PageID#263-64. The Guidelines explicitly instruct providers to discuss the effects of treatment on fertility and explore options for fertility preservation when treating adolescents with gender dysphoria. *Id.* PageID#254-55; Janssen Decl., R.31, PageID#358.

Gender-affirming medical care is not the only type of medical care that may affect fertility, but it is the only care banned under the law. Adkins Decl., R.29, PageID#264-65. Defendants fail to explain why this, and only this, form of potential fertility-impacting treatment is banned.

**<u>Regret</u>**: To minimize potential regret, existing guidelines require providers to conduct a comprehensive psychosocial evaluation and discuss in detail the potential impact of medical interventions. Turban Decl., R.32, PageID#390-91. Although Defendants cite anecdotal experiences of individuals who regret receiving gender-affirming care, *see, e.g.*, Defs.' Br.13, research shows that rates of regret are extremely low. Antommaria Decl., R.30, PageID#307 (noting regret rates under 2%);

Turban Decl., R.32, PageID#393-94 (similar). That some individuals regret receiving treatment does not justify banning it for everyone.

Further, patient regret is an unfortunate potential risk of many medical interventions. Antommaria Decl., R.30, PageID#307-08. Yet, while Tennessee bans gender-affirming medical care for adolescents based on concern about regret, the Ban expressly permits surgical interventions on intersex infants, a procedure that has notably higher rates of regret among families. *Id.*

**Capacity to Consent**: Likewise, there is nothing unique about gender-affirming medical interventions in relation to a minor's ability to appreciate the long-term effect of treatment. As with most medical interventions for minors, it is an adolescent's parents or guardians who consent to treatment. Antommaria Decl., R.30, PageID#300. Defendants' experts cite no evidence to support their claim of insurmountable obstacles to consent in this area alone. Antommaria Rebuttal, R.142, PageID#2416-17. A fundamental part of assessment for gender-affirming care is determining whether the minor can understand and articulate the risks, benefits, and alternatives of that intervention, and whether parents can provide consent. *See* Janssen Rebuttal, R.143, PageID#2425. "The risks and benefits associated with gender-affirming care are not more difficult to understand than those associated with other mental health conditions." *Id.*

**Off-label Use**: Defendants' characterization of off-label drug use bears no resemblance to reality. "Once a drug has been approved . . . the drug can be distributed not just for the approved use but for any other use as well[, and] [t]here ordinarily is little reason to incur the burden and expense of seeking additional FDA approval." *Ladapo*, 2023 WL 3833848, at *15. Thus, that a treatment is "off label" does not, as the panel mistakenly claimed, mean that "the FDA is not prepared to put its credibility and careful testing protocols behind the use." Stay Op.9. Off-label use "says precisely nothing about whether the drugs are safe and effective" for treating gender dysphoria. Op., R.167, PageID#2711.

"Off-label" use of drugs is common in medicine, particularly in pediatrics. Turban Decl., R.32, PageID#383. Tennessee does not generally ban off-label uses of drugs, nor does it ban other off-label uses of *these particular drugs*. GnRH agonists, for example, are commonly prescribed off-label to slow the onset of puberty in minors with intellectual disabilities who are unable to tolerate puberty at the typical age, for minors with growth hormone deficiency who despite hormone therapy will have a very short adult height, and to patients with endometriosis—all treatments that remain legal in Tennessee. *See* Decl. of Daniel Shumer, M.D. ¶60, *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, No. 23-cv-00595 (S.D. Ind. Apr. 21, 2023) [ECF No. 26-2].

## 2. There Is Not a "Close Means-End Fit" Between the Asserted Justifications and the Overbroad Ban.

The Ban is also overbroad. As discussed above, the various medical treatments prohibited by the Ban all have different risks and side effects. Rather than regulating specific treatments based on their particular risks, the Ban lumps a variety of treatments together based solely on the fact that they are performed for the purpose of "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex [designated at birth]" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code. Ann. § 68-33-103(a)(1)(A)-(B). The Ban thus "classif[ies] unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn," *Sessions*, 582 U.S. at 64 n.13, and there is not a "close means-end fit" between the categorical ban and Tennessee's asserted interests for it, *id.* at 68.

Tennessee's overbroad approach is particularly pernicious as applied to Minor Plaintiffs, all of whom fall within the category of patients even Attorney General Skrmetti acknowledges are most in need of care: "[K]ids who have showed gender dysphoria symptoms from a very early age and consistently shown them over the course of their lives."[9] Despite this acknowledgement, Skrmetti claimed that "way too many people are getting the treatments than need them and that some people are

---

[9] *See* Williams, Twitter, *supra*, n.1.

going to be harmed by that in the long run."[10] But Tennessee has provided no evidence (only speculation) that such overtreatment is actually occurring, much less at rates that would justify banning the treatment for everyone. *Cf. Eknes-Tucker*, 603 F. Supp. 3d at 1148.

To address concerns of mistreatment or overtreatment, Tennessee has a wide array of other tools available to regulate medical care, including "longstanding torts for professional malpractice or other state-law penalties for bad acts that produce actual harm." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (quotations and citations omitted); *see also* Antommaria Rebuttal, R.142, PageID#2414-15 (suggesting "credentialing, licensing, and malpractice litigation" as less restrictive means to address inadequately informed consent).

While Defendants focus extensively on recent requirements for providing gender-affirming medical care to minors imposed by some European countries, "none of these countries have gone so far as to ban hormone therapy entirely." Op., R.167, PageID#2704 n.53; *accord K.C.*, 2023 WL 4054086, at *11-12; *Ladapo*, 2023 WL 3833848, at *14. Defendants' reliance (at 4) on Dr. Román for the claim

---

[10] Phil Williams, *Revealed: Vanderbilt transgender clinic investigation sparked by doctor's video, Tennessee AG says*, NewsChannel 5 (Aug. 2, 2023), https://www.newschannel5.com/news/newschannel-5-investigates/revealed-vanderbilt-transgender-clinic-investigation-sparked-by-doctors-video-tennessee-ag-says.

that Sweden has "essentially ban[ned]" hormonal gender-affirming treatment for minors reveals the weakness of their argument. The actual document Dr. Román cites provides recommendations for allowing puberty-delaying treatment and gender-affirming hormone therapy on an individualized basis.[11] *See Brandt*, 2023 WL 4073727, at *30 (finding after trial that Sweden, Finland, and the United Kingdom all continue to provide treatments to minors); *see also* Karena Phan, *Norway Didn't Ban Gender-Affirming Care for Minors, as Headline Falsely Claims*, Associated Press (June 8, 2023), https://apnews.com/article/fact-check-norway-not-ban-gender-affirming-care-956221436313. Similarly, the same editorial from *British Medical Journal* that Defendants cite (at 4) to support their position criticizes "the draconian laws now being introduced in some US states," like Tennessee. Kamran Abbasi, *Caring for Young People with Gender Dysphoria*, BMJ 2023;380:p553 (Mar. 9, 2023), dx.doi.org/10.1136/bmj.p553. That the European countries Defendants cite "all chose less-restrictive means of regulation" proves that less restrictive alternatives are available. *K.C.*, 2023 WL 4054086, at *12.

Thus, while Defendants claim they had to make a "choice between deference to the consensus of American medical societies or the more sober evidence-based

---

[11] Socialstyrelsen, *Care of children and adolescents with gender dysphoria: Summary of national guidelines*, at 4 (Dec. 2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf.

conclusions of Western Europe," Defs.' Br.4, Tennessee enacted a categorical ban that has been rejected by the medical community on both sides of the Atlantic.

### 3. The District Court Did Not Clearly Err in Crediting Plaintiffs' Witnesses Over Defendants' and Concluding that the Ban Undermines, Rather Than Advances, Any Interest in Protecting Children.

a.    The district court accepted expert testimony through written submissions, with the parties' agreement that it could make credibility determinations based on the paper record. Tr., R.125, PageID#2232-35, 2243. After reviewing all the evidence, the district court ultimately found the treatments prohibited by the Ban to be safe and beneficial, and the court determined that, by categorically banning those treatments, Tennessee *undermines* its stated interest in protecting children. The court's findings are consistent with the findings of every other district court, well supported by record evidence, and far from clearly erroneous.

The court methodologically reviewed the record evidence and concluded that the banned care benefitted, rather than harmed, adolescents with gender dysphoria. Citing testimony from Plaintiffs' experts who have treated over a thousand adolescents with gender dysphoria across two decades, the court found that the benefits of gender-affirming therapies include "lower[] rates of depression, suicide, and additional mental health issues faced by transgender individuals." Op., R.167, PageID#2706.

The personal experiences of the Williams, Doe, and Roe families illustrate this. Gender-affirming medical care transformed L.W., Ryan, and John from voiceless, depressed, and anxious to "vocal [and] outgoing," Rebecca Roe Decl., R.27, PageID#236, allowing them to be "confident, happy," and "fully present," S.Williams Decl., R.23, PageID#208, and experience "happy and healthy" lives, Jane Doe Decl., R.25, PageID#221. These parents speak in terms any parent can understand—relief, joy, and pride at watching their children blossom as their true selves.

The clinical experience of Plaintiffs' experts and the personal experiences of the Plaintiff families are bolstered by decades of research—including published, peer-reviewed, cross-sectional, and longitudinal studies—likewise demonstrating that the banned care reduces symptoms of anxiety, depression, and suicidality and improves mental health outcomes for adolescent patients. Turban Decl., R.32, PageID#384-87; Janssen Decl., R.31, PageID#363-64. It was on this robust record that the district court properly concluded that the "benefits of the medical procedures banned by SB1 are well-established by the existing record." Op., R.167, PageID#2706.

b.    After promising not to "jump up and down" arguing that the court could not make credibility determinations without a live hearing, Defendants now complain that the court credited Plaintiffs' witnesses over Defendants'. In other

words, Defendants invite this Court to do precisely what the clear error standard disallows. *Anderson*, 470 U.S. at 573-74; *see also Lyngaas v. Curaden AG*, 992 F.3d 412, 419 (6th Cir. 2021) ("When factual findings rest upon credibility determinations, this Court affords great deference to the findings of the district court.").

The district court's credibility determinations were consistent with the credibility determinations of every other trial court to evaluate the expert testimony in cases involving similar bans on gender-affirming care. *See* Op., R.167, PageID#2691 n.40 (noting courts' skepticism of Levine and Laidlaw); *Ladapo*, 2023 WL 3833848, at *2, *5 (crediting Janssen and Antommaria; not crediting Hruz); *Brandt*, 2023 WL 4073727, at *26-27, *30 (crediting Turban, Antommaria, and Adkins; not crediting Hruz); *Eknes-Tucker*, 603 F. Supp. 3d at 1142-43 (giving "very little weight" to Cantor).

Defendants accuse the district court of wrongly discounting the testimony of Defendants' experts simply because they have not provided the treatments prohibited by the Ban. But those experts lacked experience treating minors with gender dysphoria *at all*, not just with respect to the prohibited care. By contrast, the only Defendant witness who *has* treated patients with gender dysphoria, Dr. Levine, has *recommended* gender-affirming care to adolescents in individual circumstances and does not support a complete ban. Levine Decl., R.113-5, PageID#1397. He even testified at trial in Arkansas that "the psychological impact of cutting off gender-

affirming medical care for those currently receiving it [would be] 'shocking' and 'devastating'" and that "he would expect doctors to 'find a way' to help those patients, even providing treatment in violation of the law." *Brandt*, 2023 WL 4073727, at *24; *Ladapo*, 2023 WL 3833848, at *5 (crediting Dr. Levine's testimony on these points).

Defendants fare no better complaining that two of their experts were not mentioned in the district court opinion. *See* Defs.' Br.44-45 (discussing Román and Nangia). Defendants themselves all but ignored those experts in their briefing. *See generally* PI Opp., R.112. Dr. Román is part of a Swedish advocacy group opposing gender-affirming care for minors, and his (inaccurate) discussion of gender-affirming care in Sweden was cumulative of Dr. Cantor's discussion of European policies. Dr. Nangia's declaration is based on a series of hypothetical assumptions about how other mental health practitioners are diagnosing minors with gender dysphoria and recommending treatment—without any direct experience doing so herself, and without any knowledge of how care is actually provided by others. Janssen Rebuttal, R.143, PageID#2421-28.

The district court's decision to credit practitioners with first-hand knowledge of providing gender-affirming care over Defendants' advocates who have been repeatedly found to lack credibility was not clearly erroneous.

**D. The Ban Fails Rational Basis Review.**

Although the Ban is properly subject to heightened scrutiny, it ultimately fails any level of review. There is no rational basis to conclude that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten . . . legitimate interests of [Tennessee] in a way that" allowing other types of care "would not." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people versus married people). Even under rational basis review, the justifications for the Ban "ma[k]e no sense in light of how the [statute] treat[s] other [procedures] similarly situated in relevant respects." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001). The Ban's prohibition on all types of gender-affirming medical care is "so far removed from [the asserted] justifications that . . . it [is] impossible to credit" those interests as the true motivation for the law. *Romer v. Evans*, 517 U.S. 620, 635 (1996).

## II.  Plaintiffs Are Likely to Prevail on Parental Autonomy Claims.

As the district court correctly found, Op., R.167, PageID#2665-70, controlling precedent recognizes that parents' fundamental rights under the Due Process Clause include the right "to recognize symptoms of illness and to seek and follow medical advice" for their children. *Parham*, 442 U.S. at 602; *see Kanuszewski v. Mich. Dep't*

*of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019) ("Parents possess a fundamental right to make decisions concerning the medical care of their children."). Where, as here, the parent's and child's liberty interests in pursuing a course of medical care align, the strength of those interests is at its apex against state interference. *Cf. Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982).

Critically, the Supreme Court has not "confined" the right to parental autonomy "to narrow fields, such as education and visitation rights." Stay Op.8. *Parham* expressly recognized the right "to seek and follow medical advice" and did not limit that right to refusing treatment. 442 U.S. at 602. Indeed, the parental autonomy rights at issue in *Parham* involved parents who affirmatively sought to have their children admitted to a hospital for mental health treatment. *Id.* Defendants ignore *Parham* and rely heavily on *Dobbs*, but *Dobbs* itself explicitly warned that it "should [not] be understood to cast doubt on precedents that do not concern abortion." 142 S. Ct. at 2277-78, 2280.

To be sure, in some instances, a parent and minor's joint interests may "be subordinated to the State's 'parens patriae interest in preserving and promoting the welfare of the child.'" *Schall v. Martin*, 467 U.S. 253, 265 (1984) (citations omitted). But, once again, the question of whether a governmental restriction *satisfies* strict scrutiny is distinct from the question whether the restriction is *subject to* strict scrutiny in the first place. *See Kanuszewski*, 927 F.3d at 419-20.

For the same reasons the Ban fails intermediate scrutiny under the Equal Protection Clause, it also fails strict scrutiny under the Due Process Clause. The mere existence of risk—common to nearly all medical treatment—"does not automatically transfer the power to make [healthcare] decision[s] from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603.[12]

## III.   Defendants' "Standing" Arguments Are Meritless.

### A. Plaintiffs Proved That Their Injuries Would Be Redressed by an Injunction.

Defendants argue that a preliminary injunction will not redress Plaintiffs' injuries because, as Defendants tell it, VUMC was not actually prepared to resume care if the Ban were enjoined. That argument is no stronger today than it was when the district court rejected it.

1.      Defendants' singular focus on VUMC is, and always has been, misguided. Before the Ban went into effect, VUMC was the largest provider of

---

[12] There is no comparison between gender-affirming care and "female genital mutilation" or a "tattoo." Defs.' Br.29. Those procedures are not performed for medical reasons and have no claimed medical benefit. Defendants' outrageous claim that Dr. Antommaria "encouraged doctors' participation in female genital mutilation," *id.*, is illustrative of Defendants' fast-and-loose relationship with the medical sources they cite. Indeed, Attorney General Skrmetti's recent comments show why these comparisons are wholly inapt. He recognizes that, unlike tattoos, medical treatment of minors with gender dysphoria can be medically beneficial for some patients. *See* Williams, Twitter, *supra*, n.1.

gender-affirming care to adolescents under sixteen, but it was not the only one.[13]

Whether or not VUMC resumes care, an injunction would still make it possible for

other medical providers in Tennessee to do so. [14] As such, an injunction

"significant[ly] increase[s] . . . the likelihood that [the plaintiffs] would obtain relief

that directly redresses the injury suffered." *Reed v. Goertz*, 143 S. Ct. 955, 960 (2023)

(citations omitted). No more is required.

2.    Defendants' arguments about VUMC are also meritless. Defendants

had an opportunity to test their theory that VUMC would not resume care when they

served VUMC with a 30(b)(6) deposition notice. In response VUMC provided the

following testimony by declaration: "Should enforcement of the Act's provisions

prohibiting Hormone Therapy be deferred, delayed or enjoined, VUMC would

continue to provide Hormone Therapy consistent with prevailing standards of care

for persons with gender dysphoria to those minor patients of VUMC for whom such

care is clinically appropriate." Pinson Decl., R.113-1, PageID#1067. Defendants

agreed to accept that declaration in lieu of the deposition.

The district court did not abuse its discretion in concluding that an evidentiary

hearing was unnecessary in light of VUMC's declaration. If Defendants thought

---

[13] Like VUMC, all providers treating minors under sixteen stopped providing care on July 1.

[14] Even if no providers resumed treating minors under sixteen, a preliminary injunction would also enable L.W. and Ryan Roe, both of whom will turn sixteen before March 31, 2024, to obtain care from Dr. Lacy or another provider.

VUMC's testimony was ambiguous or needed clarification, they could have proceeded with the deposition to elicit testimony to demonstrate that there was a disputed issue of material fact requiring evidentiary support. Having voluntarily withdrawn their deposition notice, Defendants cannot complain that they were prohibited from developing the record.

Nor can Defendants create a disputed question of fact through their baseless assertion that VUMC would not resume care unless a court enjoined a provision in the Ban authorizing private lawsuits. Neither one of VUMC's declarations mentions the potential for private lawsuits as a factor in whether VUMC resumes care. Defendants wrongly contend (at 50) that VUMC stated it would resume care only if *the entire Act* were blocked, but Dr. Pinson's declaration stated that VUMC would continue care if the "*provisions prohibiting Hormone Therapy*" were enjoined—not if the statute were blocked in its entirety. Defendants also wrongly contend (at 50) that Dr. Brady's declaration refers to private lawsuits when she states she is concerned she "could subsequently be deemed by non-medical third parties to violate the Act, which could expose [her] to punitive consequences." Brady Decl., R.113-1, PageID#1070-71. But those lawsuits can be brought only by the minor patient or their parents and next of kin—not by "third parties." Tenn. Code Ann. § 68-33-105(a). Dr. Brady's statement plainly refers to governmental officials like Defendants and her (reasonable) fear that they would second-guess her medical

judgment and penalize her if she provided gender-affirming care after July 1 under the "continuation of care" provisions.

Going even further, Defendants contend that a preliminary injunction would not induce VUMC to resume providing care because, if the injunction were ultimately vacated, Defendants could retroactively punish VUMC for care they provided while the injunction was in effect. That alarming contention is based on the concurrence of a single Justice, which was not—and never has been—adopted by the Court. *See Edgar v. MITE Corp.,* 457 U.S. 624, 630 (1982). *But see* Michael T. Morley, *Erroneous Injunctions*, 71 Emory L.J. 1137, 1195 (2022) (Defendants' argument is "inconsistent with the traditional equitable principles that govern injunctions").

Defendants insist that the district court should have allowed them to cross-examine a VUMC witness, presumably to threaten VUMC with the prospect of retroactive punishment—and then see if VUMC would waver from its stated intent to resume care. The district court was well within its authority not to indulge Defendants' demand. A court's Article III jurisdiction to enjoin an unconstitutional statute cannot depend on how aggressively state officials threaten to punish people if the injunction is overturned. If that were enough to defeat redressability, even a *permanent* injunction would be insufficient to redress injuries for purposes of Article III. Yet that extraordinary outcome is precisely what Defendants' argument would

require. *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 989 (2018).

3.  No "new information disclosed," Defs.' Br.19, saves Defendants' redressability argument. Defendants refer to a June 30, 2023 communication between a VUMC nurse manager and one of the Parent Plaintiffs. In its entirety, that communication consists of the Parent Plaintiff writing, "now that the injunction is in place I'm assuming we will have to switch [the prescription] back when we come back to Vandy!!!," and the nurse manager replying, "[a]t this time there are no changes to the policies and procedures of the VUMC Pediatric Transgender Clinic."

Critically, the communication was sent after Defendants had already moved to stay the injunction in district court and noticed their appeal—both steps that were taken "[w]ithin hours of the district court's preliminary injunction ruling" on July 28. Defs.' Br.19.[15] It makes perfect sense that VUMC would let the Court review Tennessee's request to stay the injunction before acting. For that reason (and others), the communication adds nothing to Defendants' fevered speculation that, despite its sworn declarations, VUMC had secretly decided not to resume care even if the stay had been denied.

---

[15] As Defendants knew when they filed their brief, Plaintiffs' counsel had no knowledge of the June 30 communication until Defendants requested supplemental discovery on July 12—*after* the Court granted Defendants' motion for a stay.

## B. Dr. Lacy Has Third-Party Standing.

Defendants' challenge to Dr. Lacy's third-party standing is also meritless. Defendants contend (at 53) that because *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004), held that lawyers did not have third-party standing to assert the rights of future clients, Dr. Lacy lacks third-party standing to assert the rights of her future patients. But *Kowalski* says the opposite. In concluding that the lawyers in that case lacked standing to preemptively vindicate future clients' right to counsel, the Court distinguished and reaffirmed earlier cases granting third-party standing to represent the interests of future customers or patients "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Id.* at 130 (citations omitted). Because the Ban will be enforced directly against Dr. Lacy, she fits within the set of litigants for whom the Supreme Court has allowed third-party standing, not the set for whom the Court has disfavored it. *See id*.

Defendants' argument also overlooks the fact that Dr. Lacy already has existing patients who will be prohibited from receiving care under the Ban. Lacy Decl., R.28, PageID#242. The injuries to Dr. Lacy's patients—both current and future—would be redressed by a preliminary injunction. *See id.* PageID#242-44.

IV.    **The Remaining Preliminary Injunction Factors Weigh Strongly in Plaintiffs' Favor.**

The district court did not clearly err in finding that Plaintiffs will suffer imminent, irreparable harm if the Ban takes effect. As the court explained, "Minor Plaintiffs likely will suffer actual and imminent injury in the form of emotional and psychological harm as well as unwanted physical changes if they are deprived access to treatment of their gender dysphoria under [the Ban]." Op., R.167, PageID#2714. These harms "are not mere conjecture but instead are supported by the medical evidence in the record." *Id.* PageID#2714-15.

The irreparable and specific harm to Plaintiffs far outweighs the harm that Tennessee will face if unable during the pendency of the litigation to enforce a law that is likely unconstitutional. *See Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). And it is always in the public interest to protect constitutional rights. *Id.*

V.    **A State-Wide Injunction Is Necessary to Provide Complete Relief**

The state-wide injunction extends no further "than necessary to provide complete relief to the plaintiffs." *Kentucky v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) (citations omitted). An injunction remedying a plaintiff's harm may "affect[] nonparties[] [if] it does so only incidentally." *United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring).

Minor Plaintiffs cannot obtain care in Tennessee if providers are unable to treat them and pharmacists are unable to fill their prescriptions. As the district court

properly recognized, "it is far-fetched that healthcare providers in Tennessee would continue care specifically for Minor Plaintiffs when they cannot do so for any other individual to whom [the Ban] applies." Op., R.167, PageID#2719. An injunction limited to Minor Plaintiffs would also force those who proceeded pseudonymously to reveal their identities in order to obtain care.

In the alternative, if this Court determines that the claims of the Minor Plaintiffs and Parent Plaintiffs do not support a state-wide injunction, the Court should affirm the injunction as it applies to Plaintiffs and VUMC and remand for the district court to determine whether Dr. Lacy or the United States as Intervenor are entitled to additional injunctive relief.

## **CONCLUSION**

The preliminary injunction order should be affirmed.

Dated: August 10, 2023                          Respectfully submitted,

s/ *Joshua A. Block*

Stella Yarbrough
Lucas Cameron-Vaughn
Jeff Preptit
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org

Joshua A. Block
Chase Strangio
James D. Esseks
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel.: 212-549-2593
jblock@aclu.org
cstrangio@aclu.org
jesseks@aclu.org

Sruti J. Swaminathan
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Tel.: 212-809-8585
sswaminathan@lambdalegal.org

Tara Borelli
Lambda Legal Defense and Education Fund, Inc.
1 West Court Square, Ste. 105
Decatur, GA 30030
Tel.: 404-897-1880
tborelli@lambdalegal.org

Joseph L. Sorkin
Dean L. Chapman, Jr.
Kristen W. Chin
Theodore James Salwen
Richard J. D'Amato
Akin Gump Strauss Hauer &
Feld LLP
One Bryant Park
New York, NY 10036
Tel.: 212-872-1000
jsorkin@akingump.com
dchapman@akingump.com

Elizabeth D. Scott
Akin Gump Strauss Hauer &
Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Tel.: 214-969-2800
edscott@akingump.com

Martine E. Cicconi
Christopher J. Gessner
David Bethea
Akin Gump Strauss Hauer &
Feld LLP
Robert S. Strauss Tower
2001 K Street N.W.
Washington, DC 20006
Tel.: 202-887-4000
mcicconi@akingump.com
cgessner@akingump.com
dbethea@akingump.com

*Attorneys for the Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,973 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font.

*/s/ Joshua A. Block*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I served the foregoing response upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

*/s Joshua A. Block*

# **ADDENDUM**

Page

Designation of Court Documents............................................................. A-2

Statutory Provisions ............................................................................. A-5

## DESIGNATION OF COURT DOCUMENTS

*L.W., et al. v. Jonathan Skrmetti, et al.,*
No. 3:23-cv-00376 (M.D. Tenn.)

| Record# | Description | PageID# |
|---|---|---|
| 1 | Complaint | 1 – 43 |
| 21 | Plaintiffs' Motion for Preliminary Injunction | 191 – 195 |
| 22 | Declaration of L.W. | 196 – 201 |
| 23 | Declaration of Samantha Williams | 202 – 209 |
| 24 | Declaration of John Doe | 210 – 214 |
| 25 | Declaration of Jane Doe | 215 – 224 |
| 26 | Declaration of Ryan Roe in Support of Plaintiffs' Motion for a Preliminary Injunction | 225 – 230 |
| 27 | Declaration of Rebecca Roe in Support of Plaintiffs' Motion for a Preliminary Injunction | 231 – 238 |
| 28 | Declaration of Susan N. Lacy, MD, FACOG | 239 – 245 |
| 29 | Expert Declaration of Deanna Adkins, MD | 246 – 284 |
| 30 | Expert Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C | 285 – 346 |
| 31 | Expert Declaration of Aron Janssen, M.D. | 347 – 378 |
| 32 | Expert Declaration of Jack Turban, M.D. | 379 – 410 |
| 33 | Memorandum of Law in Support of Motion for Preliminary Injunction | 411 – 450 |
| 79 | Plaintiffs' Response in Opposition to Defendants' Motion to Reset Briefing Schedule and Consolidate Preliminary Injunction Hearing with Trial on the Merits | 703 – 715 |

| Record# | Description | PageID# |
|---------|-------------|---------|
| 88 | Order of the Court Denying Defendants' Motion to Reset Briefing Schedule and to Consolidate Preliminary Injunction Hearing with a Trial on the Merits | 799 – 805 |
| 112 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction | 919 – 952 |
| 113-1J | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1J, Declaration of C. Wright Pinson, MBA, MD | 1064 – 1067 |
| 113-1K | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 1K, Declaration of Cassandra C. Brady, MD | 1068 – 1071 |
| 113-5 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 5, Declaration of Dr. Levine | 1391 – 1514 |
| 113-8 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction Exhibit 8, Declaration of Dr. Nangia | 1626 – 1733 |
| 125 | Transcript of Telephonic Status Conference on May 24, 2023 | 2219 – 2255 |
| 137 | Reply Declaration of Samantha Williams in Support of Plaintiffs' Motion for a Preliminary Injunction | 2369 – 2374 |
| 138 | Reply Declaration of Jane Doe in Support of Plaintiff's Motion for a Preliminary Injunction | 2375 – 2379 |
| 139 | Reply Declaration of Rebecca Roe in Support of Plaintiffs' Motion for a Preliminary Injunction | 2380 – 2382 |
| 140 | Reply Declaration of Susan N. Lacy, MD FACOG | 2383 – 2386 |
| 141 | Expert Rebuttal Declaration of Deanna Adkins, MD | 2387 – 2402 |

| Record# | Description | PageID# |
|---------|-------------|---------|
| 142 | Expert Rebuttal Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C | 2403 – 2419 |
| 143 | Expert Rebuttal Declaration of Aron Janssen, M.D. | 2420 – 2429 |
| 144 | Expert Rebuttal Declaration of Jack Turban, M.D. | 2430 – 2450 |
| 146 | Reply in Support of Motion for Preliminary Injunction | 2511 – 2530 |
| 167 | Memorandum Opinion of the Court | 2656 – 2724 |
| 169 | Defendants' Notice of Appeal | 2728 – 2732 |

# STATUTORY PROVISIONS

**Tenn. Code Ann. § 68-33-101, *et seq.***

## 68-33-101. Findings.

(a) The legislature declares that it must take action to protect the health and welfare of minors.

(b) The legislature determines that medical procedures that alter a minor's hormonal balance, remove a minor's sex organs, or otherwise change a minor's physical appearance are harmful to a minor when these medical procedures are performed for the purpose of enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex or treating purported discomfort or distress from a discordance between the minor's sex and asserted identity. These procedures can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering from adverse and sometimes fatal psychological consequences. Moreover, the legislature finds it likely that not all harmful effects associated with these types of medical procedures when performed on a minor are yet fully known, as many of these procedures, when performed on a minor for such purposes, are experimental in nature and not supported by high-quality, long-term medical studies.

(c) The legislature determines that there is evidence that medical procedures that alter a minor's hormonal balance, remove a minor's sex organs, or otherwise change a minor's physical appearance are not consistent with professional medical standards when the medical procedures are performed for the purpose of enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex or treating purported discomfort or distress from a discordance between the minor's sex and asserted identity because a minor's discordance can be resolved by less invasive approaches that are likely to result in better outcomes for the minor.

(d) The legislature finds that medical procedures are being performed on and administered to minors in this state for such purposes, notwithstanding the risks and harms to the minors.

(e) The legislature finds that health authorities in Sweden, Finland, and the United Kingdom have recognized similar trends and, after conducting systematic reviews

of the evidence, have found no evidence that the benefits of these procedures outweigh the risks and thus have placed severe restrictions on their use.

(f) The legislature finds that Dr. John Money, one of the earliest advocates for performing or administering such medical procedures on minors and a founder of the Johns Hopkins Gender Identity Clinic, abused minors entrusted to his care, resulting in the suicides of David and Brian Reimer.

(g) The legislature finds that such medical procedures are being performed on and administered to minors in this state with rapidly increasing frequency and that supposed guidelines advocating for such treatment have changed substantially in recent years.

(h) The legislature finds that minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures and that many individuals have expressed regret for medical procedures that were performed on or administered to them for such purposes when they were minors.

(i) The legislature finds that many of the same pharmaceutical companies that contributed to the opioid epidemic have sought to profit from the administration of drugs to or use of devices on minors for such purposes and have paid consulting fees to physicians who then advocate for administration of drugs or use of devices for such purposes.

(j) The legislature finds that healthcare providers in this state have sought to perform such surgeries on minors because of the financial incentive associated with the surgeries, not necessarily because the surgeries are in a minor's best interest.

(k) The legislature finds that healthcare providers in this state have threatened employees for conscientiously objecting, for religious, moral, or ethical reasons, to performing or administering such medical procedures.

(l) The legislature finds that healthcare providers in this state have posted pictures of naked minors online to advertise such surgeries.

(m) The legislature declares that the integrity and public respect of the medical profession are significantly harmed by healthcare providers performing or administering such medical procedures on minors. This state has a legitimate, substantial, and compelling interest in protecting minors from physical and

emotional harm. This state has a legitimate, substantial, and compelling interest in protecting the ability of minors to develop into adults who can create children of their own. This state has a legitimate, substantial, and compelling interest in promoting the dignity of minors. This state has a legitimate, substantial, and compelling interest in encouraging minors to appreciate their sex, particularly as they undergo puberty. This state has a legitimate, substantial, and compelling interest in protecting the integrity of the medical profession, including by prohibiting medical procedures that are harmful, unethical, immoral, experimental, or unsupported by high-quality or long-term studies, or that might encourage minors to become disdainful of their sex.

(n) Therefore, it is the purpose of this chapter to prohibit medical procedures from being administered to or performed on minors when the purpose of the medical procedure is to:

(1) Enable a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

(2) Treat purported discomfort or distress from a discordance between the minor's sex and asserted identity.

**68-33-102. Definitions.**

As used in this chapter:

(1) "Congenital defect" means a physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex, including abnormalities caused by a medically verifiable disorder of sex development, but does not include gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality;

(2) "Healthcare provider" means a healthcare professional, establishment, or facility licensed, registered, certified, or permitted pursuant to this title or title 63 and under the regulatory authority of:

(A) The department of health;

(B) An agency, board, council, or committee attached to the department of health; or

(C) The health facilities commission;

(3) "Hormone" means an androgen or estrogen;

(4) "Knowing" and "knowingly" have the same meaning as the term "knowing" is defined in § 39-11-302;

(5) "Medical procedure" means:

    (A) Surgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being; or

    (B) Prescribing, administering, or dispensing any puberty blocker or hormone to a human being;

(6) "Minor" means an individual under eighteen (18) years of age;

(7) "Parent" means any biological, legal, or adoptive parent or parents of the minor or any legal guardian of the minor;

(8) "Puberty blocker" means a drug or device that suppresses the production of hormones in a minor's body to stop, delay, or suppress pubertal development; and

(9) "Sex" means a person's immutable characteristics of the reproductive system that define the individual as male or female, as determined by anatomy and genetics existing at the time of birth.

**68-33-103. Prohibitions.**

(a)(1) A healthcare provider shall not knowingly perform or offer to perform on a minor, or administer or offer to administer to a minor, a medical procedure if the performance or administration of the procedure is for the purpose of:

    (A) Enabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

    (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

(2) Subdivision (a)(1) applies to medical procedures that are:

(A) Performed or administered in this state; or

(B) Performed or administered on a minor located in this state, including via telehealth, as defined in § 63-1-155.

(b)(1) It is not a violation of subsection (a) if a healthcare provider knowingly performs, or offers to perform, a medical procedure on or administers, or offers to administer, a medical procedure to a minor if:

(A) The performance or administration of the medical procedure is to treat a minor's congenital defect, precocious puberty, disease, or physical injury; or

(B) The performance or administration of the medical procedure on the minor began prior to the effective date of this act and concludes on or before March 31, 2024.

(2) For purposes of subdivision (b)(1)(A), "disease" does not include gender dysphoria, gender identity disorder, gender incongruence, or any mental condition, disorder, disability, or abnormality.

(3) For the exception in subdivision (b)(1)(8) to apply, the minor's treating physician must certify in writing that, in the physician's good-faith medical judgment, based upon the facts known to the physician at the time, ending the medical procedure would be harmful to the minor. The certification must include the findings supporting the certification and must be made a part of the minor's medical record.

(4) The exception in subdivision (b)(1)(8) does not allow a healthcare provider to perform or administer a medical procedure that is different from the medical procedure performed prior to the effective date of this act when the sole purpose of the subsequent medical procedure is to:

(A) Enable the minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

(B) Treat purported discomfort or distress from a discordance between the minor's sex and asserted identity.

(c)(1) It is not a defense to any legal liability incurred as the result of a violation of

this section that the minor, or a parent of the minor, consented to the conduct that constituted the violation.

(2) This section supersedes any common law rule regarding a minor's ability to consent to a medical procedure that is performed or administered for the purpose of:

> (A) Enabling the minor to identify with, or live as, a purported identity inconsistent with the minor's sex; or

> (B) Treating purported discomfort or distress from a discordance between the minor's sex and asserted identity.

## 68-33-104. Distribution of Hormones or Puberty Blockers to Minors.

A person shall not knowingly provide a hormone or puberty blocker by any means to a minor if the provision of the hormone or puberty blocker is not in compliance with this chapter.

## 68-33-105. Private Right of Action.

(a)(1) Except as otherwise provided in subdivision (a)(2), a minor, or the parent of a minor, injured as a result of a violation of this chapter, may bring a civil cause of action to recover compensatory damages, punitive damages, and reasonable attorney's fees, court costs, and expenses, against the healthcare provider alleged to have violated § 68-33-103 or any person alleged to have violated § 68-33-104.

(2) The parent of a minor injured as a result of a violation of this chapter shall not bring a civil cause of action against a healthcare provider or another person if the parent consented to the conduct that constituted the violation on behalf of the minor.

(b) The parent or next of kin of a minor may bring a wrongful death action, pursuant to title 20, chapter 5, part 1, against a healthcare provider alleged to have violated § 68-33-103, if the injured minor is deceased and:

> (1) The minor's death is the result of the physical or emotional harm inflicted upon the minor by the violation; and

> (2) The parent of the minor did not consent to the conduct that constituted the violation on behalf of the minor.

(c) If a court in any civil action brought pursuant to this section finds that a healthcare provider knowingly violated § 68-33-103, then the court shall notify the appropriate regulatory authority and the attorney general and reporter by mailing a certified copy of the court's order to the regulatory authority and the attorney general and reporter. Notification pursuant to this subsection (c) shall be made upon the judgment of the court being made final.

(d) For purposes of subsection (a), compensatory damages may include:

   (1) Reasonable economic losses caused by the emotional, mental, or physical effects of the violation, including, but not limited to:

      (A) The cost of counseling, hospitalization, and any other medical expenses connected with treating the harm caused by the violation;

      (B) Any out-of-pocket costs of the minor paid to the healthcare provider for the prohibited medical procedure; and

      (C) Loss of income caused by the violation; and

   (2) Noneconomic damages caused by the violation, including, but not limited to, psychological and emotional anguish.

(e) Notwithstanding any law to the contrary, an action commenced under this section must be brought:

      (1) Within thirty (30) years from the date the minor reaches eighteen (18) years of age; or

      (2) Within ten (10) years of the minor's death if the minor dies.

(f) This section is declared to be remedial in nature, and this section must be liberally construed to effectuate its purposes.

**68-33-106. Attorney General and Reporter's Right of Action.**

(a) The attorney general and reporter shall establish a process by which violations of this chapter may be reported.

(b) The attorney general and reporter may bring an action against a healthcare provider or any person that knowingly violates this chapter, within twenty (20) years of the violation, to enjoin further violations, to disgorge any profits received due to the medical procedure, and to recover a civil penalty of twenty-five thousand dollars ($25,000) per violation. Each time a healthcare provider performs or administers a medical procedure in violation of § 68-33-103 constitutes a separate violation.

(c) A civil penalty collected pursuant to this section must be paid into the general fund of this state.

(d) The attorney general and reporter is entitled to reasonable attorney's fees, court costs, and expenses if the attorney general and reporter prevails in an action brought pursuant to this section.

(e) Jurisdiction for an action brought pursuant to this section is in the chancery or circuit court of Williamson County or circuit court in the county where the violation occurred.

**68-33-107. Healthcare Provider Licensing Sanctions.**

A violation of § 68-33-103 constitutes a potential threat to public health, safety, and welfare and requires emergency action by an alleged violator's appropriate regulatory authority. Upon receiving notification pursuant to § 68-33-105(c), or upon otherwise becoming aware of an alleged violation of § 68-33-103, the appropriate regulatory authority shall proceed pursuant to title 63 or this title, as applicable.

**68-33-108. Minor Immunity.**

A minor upon whom a medical procedure is performed or administered must not be held liable for violating this chapter.

**68-33-109. Application.**

This chapter does not prohibit or restrict psychological practice regulated pursuant to title 63, chapter 11; the practice of professional counseling regulated pursuant to title 63, chapter 22; or the practice of social work regulated pursuant to title 63, chapter 23.