No. 23-5600

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

––––––––––––––––

L.W., by and through parents and next friends, Samantha Williams
and Bryan Williams, et al., *Plaintiffs-Appellees*,

and

UNITED STATES OF AMERICA, *Intervenor-Appellee*,

v.

JONATHAN THOMAS SKRMETTI, in his official capacity as the
Tennessee Attorney General and Reporter, et al., *Defendants-Appellants.*

––––––––––––––––

On Appeal from the United States District Court for the
Middle District of Tennessee (No. 3:23-cv-00376) (Richardson, J.)

### REPLY BRIEF OF DEFENDANTS-APPELLANTS

JONATHAN SKRMETTI
  Attorney General & Reporter
CLARK L. HILDABRAND
  Deputy Chief of Staff & Senior Counsel
STEVEN J. GRIFFIN
RYAN N. HENRY
BROOKE A. HUPPENTHAL
  Assistant Attorneys General
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, Tennessee 37202
(615) 253-5642
clark.hildabrand@ag.tn.gov

ADAM K. MORTARA
LAWFAIR LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

CAMERON T. NORRIS
TIFFANY H. BATES
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

# TABLE OF CONTENTS

INTRODUCTION & SUMMARY OF ARGUMENT................................................1

ARGUMENT ...........................................................................................3

I.    Plaintiffs Are Not Likely to Succeed on the Merits ...................................3

A. Parents lack a fundamental right to subject their children
to such risky treatments ....................................................................3

B. The Act equally protects minors of both sexes .........................................7

C. Transgender individuals are not a quasi-suspect class .............................12

D. The Act survives any level of review ......................................................14

II.   Plaintiffs Failed to Demonstrate Standing Sufficient to
Seek a Preliminary Injunction Even for Themselves ..............................22

III.  Tennessee Wins the Balance of Equities and Public Interest .................25

IV.   The District Court Could Not Enjoin Enforcement Statewide................26

CONCLUSION ......................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ................................................................25

*Bostock v. Clayton Cnty.*,
140 S.Ct. 1731 (2020) ............................................................ 1, 10, 11

*Breeze Smoke, LLC v. FDA*,
18 F.4th 499 (6th Cir. 2021) ...............................................................15

*Bristol Women's Ctr., P.C. v. Slatery*,
7 F.4th 478 (6th Cir. 2021) (en banc) ......................................... 12, 14

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) ............................................................................13

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985) ............................................................................12

*Coal. to Defend Affirmative Action v. Granholm*,
473 F.3d 237 (6th Cir. 2006) ...............................................................25

*Dobbs v. Jackson Women's Health Org.*,
142 S.Ct. 2228 (2022) ................................................................. *passim*

*Doe 1 v. Thornbury*,
2023 WL 4861984 (6th Cir. July 31) ..................................................25

*Doe v. Ladapo*,
   2023 WL 3833848 (N.D. Fla. June 6) ......................................................... 26, 28

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) .................................................................................23

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
   884 F.3d 560 (6th Cir. 2018) ..............................................................11

*Geduldig v. Aiello*,
   94 S.Ct. 2485 (1974) ..................................................................... 8, 9, 13

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) .................................................................................14

*J.E.B. v. Alabama*,
   511 U.S. 127 (1994) ..................................................................................9

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
   927 F.3d 396 (6th Cir. 2019) ................................................................4

*Kentucky v. Beshear*,
   981 F.3d 505 (6th Cir. 2020) ...............................................................25

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) ........................................................... 27, 28

*L.W. ex rel. Williams v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) ..................................................... *passim*

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ...............................................................10

*Ondo v. City of Cleveland*,
   795 F.3d 597 (6th Cir. 2015) ................................................................12

*Parham v. J.R.*,
   442 U.S. 584 (1979)........................................................................4, 6

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ..............................................................11

*Preterm-Cleveland v. McCloud*,
   994 F.3d 512 (6th Cir. 2021) (en banc) ...................................... 14, 21

*Prince v. Massachusetts*,
   321 U.S. 158 (1944)....................................................................... 5, 11

*Reed v. Reed*,
   404 U.S. 71 (1971)..............................................................................9

*Ricci v. DeStefano*,
   557 U.S. 557 (2009)..........................................................................10

*Santosky v. Kramer*,
   455 U.S. 745 (1982).............................................................................6

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017).........................................................................8, 9

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) .............................................................11

*United States v. Virginia*,
   518 U.S. 515 (1996)....................................................................... 9, 14

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) .................................................................3, 4

**Statutes**

Tenn. Code Ann. §1-3-105 ...............................................................13

Tenn. Code Ann. §49-6-5107 .............................................................6

Tenn. Code Ann. §62-38-211 .............................................................6

Tenn. Code Ann. §68-33-101 ......................................................... 6, 21

Tenn. Code Ann. §68-33-103 .............................................................8

**Other Authorities**

AAP Policy Statement, *Ritual Genital Cutting of Female Minors*,
  125 Pediatrics 1088 (2010) .........................................................7

Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls
  for Research Review*, N.Y. Times (Aug. 3, 2023) ……………..…………..………16

Morley, *Erroneous Injunctions*,
  71 Emory L.J. 1137 (2022) .........................................................23

## INTRODUCTION & SUMMARY OF ARGUMENT

Tennessee chose to prohibit a type of medical treatment for which there is scant scientific support.  No matter how often Plaintiffs and their friends deny it, there is an actual ongoing scientific debate, and Tennessee chose one of many constitutionally permissible responses.

The Act no more violated a fundamental right of parents than Tennessee's restrictions on abortion—or those of Mississippi, upheld in *Dobbs*—which do not violate some alleged right of parents to obtain abortions for their minor children. Plaintiffs refuse to define the right they seek at a specific enough level of abstraction because it cannot possibly meet the standard of a fundamental right if they do.

Tennessee's law treats both sexes equally, and Plaintiffs' only response is to continually state that any law that references biological sex is subject to heightened scrutiny.  The defiance of *Dobbs* runs deep here, as abortion statutes ordinarily call out the biological sex of the patient (female) and yet are not subject to heightened scrutiny.  Plaintiffs' only real response is to reject the common-law method of adjudication and deny that *Dobbs* has any value whatsoever to jurists deciding analogous questions.  Plaintiffs still argue (barely) that transgender persons are in a quasi-suspect class, without any sense of irony as their allies from every corridor of power bury this Court in amicus briefs.  At the same time, Plaintiffs wish to ignore this Court's care in limiting *Bostock* to Title VII, stretching that precedent to stand

for propositions it does not and that its author has already rejected.  There is no line of jurisprudential logic that can be bent as far as Plaintiffs seek without breaking. The Act would survive heightened scrutiny in any event.

No member of the stay panel thought statewide relief was appropriate, and Plaintiffs have done virtually nothing to bolster their arguments in favor of it.  They have abandoned the logic of the district court, introduced new arguments never raised even in opposing the stay, and hide now behind Dr. Lacy and the United States when the district court ruled on neither the former's standing nor the latter's motion. Perhaps worse, to meet their evidentiary burden and prove that the district court rightly denied Tennessee an evidentiary hearing, Plaintiffs have to redraft from scratch VUMC's statements suggesting it would not go back to treating Plaintiffs. And Plaintiffs' failure to inform this Court or Tennessee about VUMC's position until very recently is a serious matter, not some foot fault.

Tennessee is not in another court in some foreign circuit advocating a nationwide ban on puberty blockers and cross-sex hormones for treatment of gender dysphoria.  But Plaintiffs and their friends think the Constitution should be interpreted by reference to California's "experience" or the views of glitterati who also happen to be transgender.  Constitutional law does not work that way.  The States can disagree on matters of policy like these, and the star of *Juno* and a director

of *The Matrix* get as many votes on what happens in Tennessee as California does—none.  This Court should reverse.

## ARGUMENT

Plaintiffs identify no "mistakes" in this Court's "initial" analysis.  *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 422 (6th Cir. 2023).  They abandon whole portions of the district court's opinion.  They advance new arguments for the first time on appeal.  And they fail to satisfy any of the preliminary-injunction factors, or even try to defend the injunction's statewide scope.

## I.    Plaintiffs Are Not Likely to Succeed on the Merits.

### A.    Parents lack a fundamental right to subject their children to such risky treatments.

Plaintiffs hardly even try to argue that parents have a substantive due process right to subject their children to the risky treatments that Tennessee has prohibited.  Pltfs-Br.49-51.  They once again decline to provide "a 'careful description' of the asserted fundamental liberty" or to "show[] that a right to new medical treatments is 'deeply rooted in our history and traditions' and thus beyond the democratic process to regulate."  *L.W.*, 73 F.4th at 417 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721, 727 (1997)).  States like Tennessee have long regulated the affirmative provision of medical treatment.  TN-Br.23-26.  Plaintiffs do not dispute that parents lack a specific right to have doctors prescribe drugs off-label for the treatment of minors' gender dysphoria.  TN-Br.26-28.

Instead, Plaintiffs assert parents' broad right "to seek and follow medical advice" of any sort and for whatever purpose, even when a State chooses to prohibit such treatments for children. Pltfs-Br.49-50 (quoting *Parham v. J.R.*, 442 U.S. 584, 602 (1979)). *Parham* did not divine such a "general" substantive-due-process right. *L.W.*, 73 F.4th at 417. Rather, that case *upheld* a Georgia law allowing parents to institutionalize their children despite minor litigants' contention that Georgia's procedures did not "protect[] adequately the child's constitutional rights." 442 U.S. at 606. All Tennessee must show is that the Act is "reasonable." *Id.* at 620.

Similarly, this Court correctly rebuffed Plaintiffs' overly broad reading of *Kanuszewski v. Michigan Department of Health and Human Services*, 927 F.3d 396 (6th Cir. 2019). *See L.W.*, 73 F.4th at 418. Parents might have the right to reject the drawing and long-term storage of their newborn child's blood. *Kanuszewski*, 927 F.3d at 408, 418-20. Nevertheless, while "individuals sometimes have a constitutional right to refuse treatment, the Supreme Court has not handled affirmative requests for treatment in the same way." *L.W.*, 73 F.4th at 418. The "right to refuse unwanted medical treatment" of the sort in *Kanuszewski* cannot "be some-how transmuted into a right to" every sort of medical treatment. *Glucksberg*, 521 U.S. at 725-26. This Court's narrow ruling in *Kanuszewski* simply "does not mean that parents' control over their children is without limit" or that laws restricting such control are always subject to strict scrutiny. 927 F.3d at 419.

If Plaintiffs were right that parents possess such a broad fundamental right, then that "would logically imply a right for a parent to obtain an abortion for a pregnant 17-year-old in a state where elective abortion is prohibited, a result flatly inconsistent with *Dobbs*." TN-Br.7, 30-31. Plaintiffs make no attempt to solve this conundrum except to recite *Dobbs*' instruction that it should not "be understood to cast doubt on precedents that do not concern abortion." Pltfs-Br.50 (quoting *Dobbs*, 142 S.Ct. at 2277-78, 2280). But ruling in Tennessee's favor does not require this Court to "call[] into question *Griswold*, *Eisenstadt*, *Lawrence*,[] *Obergefell*," or any other Supreme Court precedent. *Id.* at 2280. No precedent of the Supreme Court or this Court has ever recognized a fundamental right for parents to obtain unproven and off-label treatments for gender dysphoric children despite serious risk of sterilization, bone loss, and other long-term physical and mental harm.

Plaintiffs' contention that parents and children can somehow team up to place their interests at an "apex against state interference," Pltfs-Br.50, is also inconsistent with the Supreme Court's instruction that the "state's authority over children's activities is broader than over like actions of adults," *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) (rejecting challenge to Massachusetts law prohibiting even parents from furnishing magazines to children for them to sell). The one case that Plaintiffs cite says nothing about laws prohibiting certain medical treatments for

children and, like *Parham*, was a procedural-due-process case. *See Santosky v. Kramer*, 455 U.S. 745, 768 (1982) (requiring New York's factfinders to use the same procedural standards for "terminating the parent-child relationship as they must have to suspend a driver's license"). Just as it would make no difference under *Dobbs* if a 17-year-old agreed with her parents to ask for an elective abortion prohibited in Tennessee, a 15-year-old cannot empower her parents and doctors to ignore the Act's prohibitions. The General Assembly found that minors "lack the maturity" to make such decisions in the first place. Tenn. Code Ann. §68-33-101(h).

Tennessee routinely protects children from their parents' decisions. TN-Br.29. Children cannot make adequate benefit-risk calculations for themselves, and parents' benefit-risk calculations can be faulty. The General Assembly rationally determined that the benefits of the prohibited treatments are speculative at best or nonexistent at worst and that the risks are likely severe and lifelong. Plaintiffs fail to explain why parents possess a fundamental right to have such serious and novel treatments performed on their children when they cannot even consent to tattooing them. *See* Tenn. Code Ann. §62-38-211(a).

Nor can Plaintiffs point to any comparable procedure that courts have protected as a fundamental right. All they have to say about the comparison between these chemically sterilizing treatments and the surgically sterilizing ones banned under common law and, for over fifty years, by a separate Tennessee statute, *see*

TN-Br.29-30, is that the comparison is "outlandish," Pltfs-Br.37. What is outlandish is that, once puberty begins, WPATH sets no minimum age for surgically or chemically sterilizing a gender dysphoric minor. WPATH, R.113-9, PageID#1801-02.[1] Plaintiffs also summarily declare "outrageous" and "fast-and-loose," Pltfs-Br.51 n.12, Tennessee's observation that Dr. Antommaria—whom Plaintiffs chose as their medical-ethics expert—encouraged changing laws to allow "pediatricians to reach out to families by offering a ritual nick as a possible compromise" form of female genital mutilation, AAP Policy Statement, *Ritual Genital Cutting of Female Minors*, 125 Pediatrics 1088, 1092 (2010). Tennessee was right to protect children by once again rejecting Dr. Antommaria's off-kilter policy advice.

## B. The Act equally protects minors of both sexes.

Plaintiffs make two curious decisions in arguing that the Act discriminates based on sex. Neither works.

First, Plaintiffs continue to claim that the Act "prohibits medical care if—and only if—the care is provided in a manner 'inconsistent with the minor's sex.'" Pltfs-

---

[1] Throughout their brief, Plaintiffs read too much into General Skrmetti's interview addressing concerns about documents Plaintiffs placed into the public record and belatedly attempted to seal. Pltfs-Br.2, 37, 42-43, 51. As he explained, doctors are diagnosing far too many children with gender dysphoria, and the General Assembly appropriately exercised its police power to prohibit treatments that are more likely to harm children than help them. Psychotherapy remains as a beneficial and much less risky treatment.

Br.20 (quoting Tenn. Code Ann. §68-33-103(a)(1)(A)); *see also* Pltfs-Br.26.  But the Act also prohibits procedures to "[t]reat purported discomfort or distress from a discordance between the minor's sex and asserted identity."  Tenn. Code Ann. §68-33-103(a)(1)(B).  In other words, the Act prohibits *any* hormonal or surgical procedure used on either sex as treatment for gender dysphoria.  That prohibition is obviously sex-neutral.

Second, both Plaintiffs and the United States continue to ignore that virtually every abortion law facially references sex.  TN-Br.32.  According to Appellees, a medical regulation "using th[ose] words" should trigger heightened scrutiny as sex-based discrimination.  U.S.-Br.34.  Abortion laws do not merely "disparately impact members of one sex."  Pltfs-Br.24.  Yet *Dobbs* squarely ruled that "laws regulating or prohibiting abortion are not subject to heightened scrutiny," reaffirmed *Geduldig*'s application to medical regulations, and applied rational-basis review just as it would for "other health and safety measures."  *Dobbs*, 142 S.Ct. at 2245-46.

Laws that turn on the acknowledged biological differences between the two sexes—differences that Plaintiffs do not dispute, *see* TN-Br.34-35—are fundamentally distinct from laws that "prefer one sex to the detriment of the other," *L.W.*, 73 F.4th at 419.  The common thread in cases declaring laws or practices sex discriminatory is that the government's action turned on "overbroad generalizations about the way men and women are" and thus advantaged one sex over the other.  *Sessions*

8

*v. Morales-Santana*, 582 U.S. 47, 57 (2017); *see also United States v. Virginia*, 518 U.S. 515, 534 (1996) ("[S]uch classifications may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women."); *J.E.B. v. Alabama*, 511 U.S. 127, 142 (1994) ("Striking individual jurors on the assumption that they hold particular views simply because of their gender is practically a brand upon them, affixed by the law, an assertion of their inferiority." (quotation omitted)). Plaintiffs oddly claim that *Reed v. Reed*, 404 U.S. 71, 76 (1971), is unique in this regard or is incompatible with "fifty years of intervening precedent," Pltfs-Br.22. That would be news to the Supreme Court, which continues to cite *Reed* as a pivotal sex-discrimination precedent.  *E.g.*, *Sessions*, 582 U.S. at 58.

The Act is a medical regulation that does not advantage members of one sex over members of the other.  If the abortion prohibition in *Dobbs* or the exclusion of pregnancy benefits in *Geduldig* do not constitute sex discrimination despite their clear application only to women, TN-Br.32, then neither does the Act.  The inconsistency of Plaintiffs' arguments with *Dobbs* and *Geduldig* is so acute that their amici are left arguing that the equal-protection analysis "in *Dobbs* was dictum" and that *Geduldig* "is inconsistent with subsequent case law."  GLBTQ-Advocates-Br.21-22.  The Act evenhandedly prohibits healthcare providers from treating *any* minor's gender dysphoria with puberty blockers, hormones, or surgeries.

Appellees' attempt to constitutionalize *Bostock*'s Title VII hiring-and-firing reasoning is equally unconvincing. Plaintiffs admit "there are significant differences between Title VII and the Equal Protection Clause," Pltfs-Br.27, but give no explanation why Americans in 1868 would have understood denial of "equal protection of the laws" to encompass medical regulations such as the Act. The rudimentary fact that both Title VII and the Constitution protect "individual persons" from discrimination, Pltfs-Br.28, is of little import. Sex discrimination under Title VII is commonly understood to stretch beyond the scope of the Equal Protection Clause. *See, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 595 (2009) (Scalia, J., concurring) (noting "the war between disparate impact" liability under Title VII "and equal protection" under the Fourteenth Amendment, which does not encompass disparate impact). The Act equally protects both boys and girls and thus satisfies the Equal Protection Clause.

This Court was right to heed the warnings in *Bostock* and subsequent decisions that *Bostock*'s "reasoning applies only to Title VII." *L.W.*, 73 F.4th at 420. The relevant language in *Meriwether* had nothing to do with "whether certain sex classifications are *permissible*." Pltfs-Br.29. Title IX, like Title VII, does not engage in heightened-scrutiny analysis. But this Court still observed that "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

And *Pelcha* rejected *Bostock*'s application even to another antidiscrimination statute with identical "because of" language. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). Plaintiffs say *Pelcha* is irrelevant because "prior precedent" from the Supreme Court required that outcome. Pltfs-Br.29. But that is yet further reason why, unless the Supreme Court says otherwise, *Bostock* should not be treated as the final word on every law or constitutional provision prohibiting discrimination.

As in their stay briefing, Plaintiffs retreat to *Smith v. City of Salem* and other cases about "sex stereotyping" in the workplace. 378 F.3d 566, 574-75 (6th Cir. 2004). Plaintiffs fail to explain how minors' physical attributes are stereotypes, so "*Smith* . . . does not move the needle" in Plaintiffs' favor. *L.W.*, 73 F.4th at 420. *Harris Funeral Homes* is even less relevant because that case was solely about Title VII. *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018). *Bostock* affirmed this Court's judgment but did not adopt its reasoning. 140 S.Ct. at 1754.

Plaintiffs cursorily argue that the legislature passed the Act "for the impermissible purpose of enforcing government-mandated gender conformity." Resp.30. The Fourteenth Amendment does not prohibit States from safeguarding children from medical abuses or giving them "opportunities for growth into free and independent well-developed men" and women. *Prince*, 321 U.S. at 165. "[W]hether

a law is dignifying or demeaning is a question for legislators, not judges." *Bristol Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 487 (6th Cir. 2021) (en banc).

### C.    Transgender individuals are not a quasi-suspect class.

Plaintiffs once again refuse to carry their burden of establishing the requirements for a quasi-suspect class. *See* TN-Br.38-41 (explaining why Plaintiffs cannot satisfy the four requirements in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 442-47 (1985)). Instead, Plaintiffs simply point to nonbinding decisions and say that this Court's decision in *Ondo* is irrelevant because "*Ondo* was about sexual orientation." Resp.30-31 & n.7. That barebones approach does not suffice. *See L.W.*, 73 F.4th at 420.

The United States acknowledges Plaintiffs' *Cleburne* problem but cannot remedy their shortcomings. U.S.-Br.28-32. To start, the United States agrees that *Ondo* "sets a high bar," U.S.-Br.29, but cannot explain how transgender status is "definitively ascertainable at the moment of birth," *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). Transgender status is not immutable. Many detransitioners, for example, would have once qualified as transgender but now do not.

Further, Plaintiffs had the burden to establish historical discrimination and ability to contribute to society. Because they failed to put evidence into the record on this point, the United States gestures at out-of-circuit cases ruling bathroom laws unconstitutional. U.S.-Br.30. That hardly suffices.

Relying on a pre-Biden Administration precedent from the Fourth Circuit, the United States insists that its presence in this case and similar ones around the country does not reveal that transgender individuals possess formidable political power. U.S.-Br.31-32. The stack of amicus briefs written by twenty States and numerous prominent law firms in support of Plaintiffs suggests otherwise. The United States is even so bold as to disparage as "Anti-Trans Bills," U.S.-Br.31, such commonsense legislation as defining sex via biology, *see* Tenn. Code Ann. §1-3-105(c), and protecting Tennessee schoolteachers who use biologically accurate pronouns, *see id.* §49-6-5107.

Even if transgender status were a quasi-suspect class, Plaintiffs ignore how "[n]on-transgender individuals also receive the treatments" prohibited by the Act. TN-Br.41 (providing example of a non-transgender, gender dysphoric girl who might obtain puberty blockers). Plaintiffs follow the district court's lead in hyperbolically comparing the Act to racially segregated public schools, which all agree "are inherently unequal." *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954). Postponing until adulthood risky medical procedures performed on gender dysphoric individuals—which does not include all transgender individuals but does include some non-transgender individuals—does not discriminate on any basis other than age. Simply put, there is a "lack of identity" between transgender status and the prohibited treatments. *Geduldig*, 417 U.S. at 496 n.20.

### D.    The Act survives any level of review.

Plaintiffs urge this Court to "second-guess" Tennessee's "medical and scientific judgments." *Bristol*, 7 F.4th at 483. But States have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty," *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007), and Tennessee's rationales are not "subject to courtroom fact-finding," *Bristol*, 7 F.4th at 483. The Act easily satisfies rational-basis review.

Even if the Act were subject to heightened scrutiny, Plaintiffs would fare no better. That standard requires only that laws serve "important governmental objectives" and employ means "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533. The Act serves governmental interests that are not just important, but compelling. And its prohibition of these unproven and risky medical interventions was "the least restrictive way to further" Tennessee's compelling interest. *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 548 (6th Cir. 2021) (en banc) (Bush, J., concurring).

The record is on the State's side. It shows that Plaintiffs' assertions regarding the purported benefits of the prohibited treatments are exaggerated or simply unfounded, and that Plaintiffs downplay or outright ignore their potential harms.

As an initial matter, Plaintiffs never even acknowledge the systematic reviews of available research recently conducted by national health authorities in Sweden,

the U.K., Finland, and Norway.  Cantor Decl. ¶¶70-87, R.113-3, PageID#1125-34. Those reviews consistently conclude that the evidence supporting the use of hormonal interventions for gender dysphoria in minors is of "very low quality" and that the risks outweigh the purported benefits.  Levine Decl. ¶¶134-37, R.113-5, PageID#1443-44.

Plaintiffs instead argue that the "very low quality" evidence on which the WPATH Standards and Endocrine Society Guidelines are based is comparable to that supporting other types of pediatric care, and that evidence deemed "very low quality" does not mean it is "not persuasive" or "the best available."  Pltfs-Br.37-38. But according to the respected GRADE criteria, "very low quality" means there is a "high likelihood that the patient *will not experience* the hypothesized benefits of the treatment."  Levine Decl. ¶136, R.113-5, PageID#1444.  To that point, randomized controlled trials are the "strongest evidence of appropriateness for public health," *Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 506 (6th Cir. 2021), as they are required to establish the causal effects of a particular treatment, Cantor ¶¶45-48, R.113-3, PageID#1116-17.  No such trials have been conducted for these treatments.  Levine Decl. ¶133, R.113-5, PageID#1443.  Every independent systematic review has deemed these treatments "experimental."  Cantor Decl. ¶¶167-71, 302, R.113-3, PageID#1168-70, 1215.

Implicitly acknowledging this gap in the evidence, AAP recently announced that it has commissioned its own systematic review of the medical research. Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review*, N.Y. Times (Aug. 3, 2023), perma.cc/VS4H-AEUM. And, of course, WPATH, Endocrine Society, and AAP have all been known to suppress voices who dissent or question their unbounded approach. *See* Ala.-Br.24-29; FRC-Br.7-26.

The assertion that the "risks related to hormone therapy and puberty suppression generally do not vary based on the condition they are being prescribed to treat" defies medical and biological reality. Pltfs-Br.34. The United States makes the same deeply flawed argument. U.S.-Br.54-55. As previously discussed, giving puberty blockers to a young child for treatment of precocious puberty has much different effects than blocking puberty in a healthy adolescent of normal pubertal age. TN-Br.11. Likewise, giving testosterone to a male to rectify a hormonal deficiency carries much different risks than giving the same drug to a physically healthy female. TN-Br.12-13. Plaintiffs do not attempt to address these marked differences in risk based on the conditions being treated.

The record is against Plaintiffs' attempts to minimize the risk of cardiovascular disease and cancer related to the use of cross-sex hormones. Pltfs-Br.35. Endocrine Society Guidelines acknowledge the "very high risk" of developing conditions

16

that cause blood clots, as well as a moderately increased risk of coronary artery disease, cerebrovascular disease, hypertriglyceridemia, and hypertension.   R.113, PageID#2013.  The Guidelines further acknowledge the increased risk of breast cancer in males and breast or uterine cancer in females related to the use of cross-sex hormones.  *Id*.  Independent systematic reviews have likewise found that these drugs cause increased risk of cardiovascular disease and cancer.  Cantor ¶¶27, 223, R.113-3, PageID#1107, 1190.

Any suggestion that puberty blockers do not pose a serious risk to patients' bone density is similarly unfounded.  Research shows that adolescents whose normally timed puberty was blocked fail to fully regain pre-treatment bone density, even after introduction of cross-sex hormones, and lower bone density can lead to greater risk of osteoporosis and fractures later in life.  Hruz ¶¶79, 91, 132-33, R.113-4, PageID#1315, 1320, 1367-72; Laidlaw ¶107, R.113-7, PageID#1566; Cantor ¶¶216-29, R.113-3, PageID#1187-88.

Risks to fertility, Pltfs-Br.38-39, are likewise understated by Plaintiffs.  If puberty is blocked in early pubertal stages when the minor's sex organs are still immature (as recommended by Endocrine Society Guidelines), the minor will remain infertile and have no option of "fertility preservation."  Laidlaw ¶¶89-91, R.113-7, PageID#1562.  It is widely accepted that cross-sex hormones impair fertility and can cause permanent sterilization.  *Id*.; *see* ES Guidelines at 3878, R.113-10,

PageID#2005; Hruz ¶89-90, R.113-4, PageID#1319.  Although there have been limited reports of pregnancy after the initiation of cross-sex hormones, those individuals all started cross-sex hormones as adults after having completed endogenous puberty. Hruz ¶90, R.113-4, PageID#1319.  And even where "fertility preservation" is an option, it is attempted less than five percent of the time.  Laidlaw ¶93, R.113-7, PageID#1562.

Plaintiffs further contend that minors experiencing gender dysphoria after reaching puberty are unlikely to desist. Pltfs-Br.36.  Multiple studies contradict that assertion.  Laidlaw ¶¶218-19, R.113-7, PageID#1590-91.  On the other hand, those subjected to medical interventions are more likely to persist compared to those who are not.  Hruz ¶71, R.113-4, PageID#1312.  There is no reliable method to distinguish those youth who will persist from the vast majority who won't.  Levine ¶108, R.113-5, PageID#1434.

Along with their Greek chorus, Plaintiffs say that rates of regret are extremely low.  Pltfs-Br.39.  Their experts rely on short-term studies that capture initial optimism, but ignore the fact that regret often appears eight to fifteen years after starting medical transition—when sexual dysfunction, social difficulties, the need for ongoing medical care, and the use of drugs to quell anxiety and depression become recurrent.  Levine ¶¶118, 163-64, 223, R.113-5, PageID#1437, 1452, 1475.  Recent stud-

ies and clinical observations also demonstrate the rising prevalence of gender dysphoria and increasing rates of detransition and regret, especially among gender-dysphoric adolescents, which raises questions about "the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm." Levine ¶118, PageID#1437; *see also* Román ¶¶27-28, R.113-6, PageID#1527; Nangia ¶¶36, 126, R.113-8, PageID#1646, 1683.

Their theory of benefit—*i.e.*, that medicalized transition causes "lower rates of depression, suicide, and additional mental health issues faced by transgender individuals," Pltfs-Br.45-46—is unsupported. No studies document a reduction in suicide rates as a result of the prohibited treatments. Cantor ¶147, R.113-3, PageID#1158-59. To the contrary, multiple studies show high rates of suicide even *following* medical transition, including a long-term Swedish study that found transgender adults who had completed medical transition had a suicide rate 19 times higher than the general population. *Id*. ¶¶147-48. Studies also show that puberty blockers and cross-sex hormones have no long-term benefit for mental health. *See* Levine ¶141, R.113-5, PageID#1445 (puberty blockers did not affect psychological function after up to three years of use), ¶144, PageID#1446-47 (systematic review of data representing several thousand patients found no improvement in mental health following use of cross-sex hormones). And a recent study found that rates of

suicidal ideation, suicide attempts, and non-suicidal self-harm actually *increased* after gender-dysphoric minors received hormonal treatment.  Cantor ¶151, R.113-3, PageID#1160.

Most studies cited by the proponents of hormonal intervention to treat gender dysphoric youth are unreliable due to their failure to include randomized control groups, lack of representative participants, small sample sizes, limited time periods, and failure to control for confounding variables, such as concurrent psychotherapy. *See* FRC-Br.27-31; *see also* Cantor ¶¶265, 278, 293-94, 298-99, R.113-3, PageID#1203-04, 1207-08, 1212-14.  Plaintiffs thus turn to their own anecdotal testimony and that of their retained experts regarding the purported benefits of the prohibited treatments.  Pltfs-Br.46.  Plaintiffs completely disregard, however, the testimony of detransitioners who have come forward to share the horrifying physical and psychological effects they have experienced as a result of these interventions, as well as the testimony of parents who were pressured by healthcare providers to approve such treatments.

Like the district court, Plaintiffs also ignore the testimony of Dr. Nangia and Dr. Román, who have found psychotherapy beneficial in helping their minor patients resolve feelings of gender dysphoria.  Nangia Decl. ¶¶8, 145-46, R.113-8, PageID#1632, 1698; Román Decl. ¶2, R.113-6, PageID#1517-18.  And Plaintiffs

falsely assert that Dr. Levine is the only defense expert who has treated patients with gender dysphoria, disregarding Dr. Nangia and Dr. Román.  Resp.47.

Given the risk of significant harm and the lack of quality evidence of safety and effectiveness, it is unsurprising that pharmaceutical companies have not sought FDA approval for the use of puberty blockers and cross-sex hormones for treatment of gender-dysphoric adolescents.  ADF-Br.19-21.  The companies currently reaping massive profits from the off-label use of these drugs have little incentive to do so. *Id*.  And to that point, Plaintiffs do not dispute Tennessee's well-founded concerns with the financial motivations behind the prohibited treatments.  *See* Tenn. Code Ann. §68-33-101(i)-(k).

Finally, Plaintiffs assert that none of the European countries that have restricted access to hormonal treatment for gender-dysphoric minors "have gone so far as to ban hormone therapy entirely," given that these treatments are still offered in controlled research settings.  Pltfs-Br.43-44.  But, as previously discussed, there is no evidence any such research trials are ongoing in Tennessee or that Plaintiffs have sought to enroll in them.  "[F]acial attacks are not the proper procedure for challenging the lack of" an "exception."  *Preterm-Cleveland*, 994 F.3d at 529 (majority). The prohibition of these treatments for minors was the least restrictive way to further Tennessee's compelling interest in preventing the identified harms.  *Id*. at 548 (Bush, J., concurring).

The Constitution does not require Tennessee to offer its youth as guinea pigs, rather than await the outcome of research in other countries. Tennessee acted rationally, reasonably, and compassionately. The Act survives any level of review.

## II. Plaintiffs Failed to Demonstrate Standing Sufficient to Seek a Preliminary Injunction Even for Themselves.

Plaintiffs do not deny that, to get a preliminary injunction, they had to prove causation and redressability—meaning *the Act* is causing their alleged irreparable harm and *a preliminary injunction* would redress that harm. TN-Br.49-50. In Plaintiffs' words, they cannot "obtain care in Tennessee" unless they prove that a preliminary injunction would cause a Tennessee provider to "treat them." Pltfs-Br.57. Of course, Plaintiffs are currently obtaining care "outside of Tennessee." Pltfs-Br.13. So their precise alleged harms are travel expenses and the loss of "the relationships they have built" with their prior doctors. Pltfs-Br.13.

Per their own description of their alleged harm, Plaintiffs needed to show that VUMC—the only entity that has ever treated them—would resume their treatments under a preliminary injunction. They identified no "other medical providers in Tennessee" below. Pltfs-Br.52. And they *still* refuse to name a single provider that treated minors under age 16 relatively near where they live in Nashville. *See* Pltfs-Br.52 (asserting, with no evidence or citation, that VUMC "was not the only one"). They now suggest (for the first time, in a footnote, with no evidence) that Dr. Lacy might treat them. Pltfs-Br.52 n.14. But Dr. Lacy does not treat minors under age

16; no Plaintiff is 16 yet (and Doe is only 12); and Dr. Lacy is in Memphis—roughly 200 miles from Nashville. She does not solve Plaintiffs' stated concerns. So VUMC is crucial, which explains why it was the entire focus below.

Plaintiffs did not carry their burden with respect to VUMC. Powerful evidence suggests that VUMC would *not* resume Plaintiffs' treatment under a preliminary injunction. VUMC abruptly cut off all minors by July 2023, even though the Act let it continue existing treatments until March 2024. VUMC can also be sued for whatever treatments it provides, since Plaintiffs cannot challenge the Act's private right of action. And Tennessee can enforce the Act against VUMC too, should it provide these treatments under a preliminary injunction that is later lifted, stayed, vacated, or reversed. Plaintiffs disagree, rejecting Justice Stevens' concurrence in *Edgar v. MITE* in favor of a law-review article. Pltfs-Br.54. True, there is a debate about whether "the party that obtained" an erroneous injunction can be held liable for what it does while that injunction is in place. Morley, *Erroneous Injunctions*, 71 Emory L.J. 1137, 1146-47 (2022). But VUMC is not a party. Virtually *no one* thinks that nonparties like it are immunized by erroneous preliminary injunctions that they did not obtain. *See id.* at 1195; *Edgar v. MITE Corp.*, 457 U.S. 624, 657 n.1 (1982) (Marshall, J., dissenting).

Plaintiffs try to paper over these problems by offering their own gloss on VUMC's ambiguous declarations. *Cf.* Pltfs-Br.53-54. When Dr. Pinson discussed

"enforcement of the Act's provisions prohibiting Hormone Therapy," Plaintiffs are confident that he meant only *public* enforcement.   Pinson Decl. ¶9, R.113-1, PageID#1067.  When Dr. Brady said she feared her decisions "could subsequently be deemed by non-medical third parties to violate the Act," Plaintiffs are confident that those "non-medical third parties" do not include state-court judges in private lawsuits.  Brady Decl. ¶10, R.113-1, PageID#1071.  And when VUMC later *declined* to resume care under the preliminary injunction, Plaintiffs are confident that VUMC was just waiting to see if Tennessee got a stay.  Pltfs-Br.55.  But VUMC said none of these things.   And its actual conduct in this case contradicts Plaintiffs' rose-colored reinterpretations of its employees' statements.

Even if Plaintiffs had the *better* reading of these statements, the district court still abused its discretion by denying Tennessee an evidentiary hearing.  Plaintiffs do not deny that Tennessee disputed VUMC's intent, contest that Tennessee had a right to be heard on this factual dispute, or cite any law at all about evidentiary hearings.  *Compare* TN-Br.51-52, *with* Pltfs-Br.52-54.  Citing nothing, they suggest that Tennessee had no right to an evidentiary hearing unless it first deposed VUMC's witnesses.  Pltfs-Br.52-53.  But Tennessee didn't need to depose VUMC because it subpoenaed them to appear in court to give live testimony at the evidentiary hearing. The district court did not fault Tennessee for not taking depositions; it cancelled the hearing it previously scheduled without explanation.  It abused its discretion.

For all these reasons, this Court should alternatively hold that Plaintiffs failed to prove the standing they need to get a preliminary injunction. Plaintiffs do not dispute that, because this argument is another reason why they are unlikely to succeed on the merits, this Court can rule both on it and the underlying merits of Plaintiffs' constitutional claims. TN-Br.49 n.4; *e.g.*, *Arizona v. Biden*, 40 F.4th 375, 381-94 (6th Cir. 2022) (ruling both on standing and underlying merits). Doing so has the benefit of saving judicial resources by potentially discouraging further requests for appellate review.

## III. Tennessee Wins the Balance of Equities and Public Interest.

The equitable factors are the "same" for a preliminary injunction and a stay, *Kentucky v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020), and this Court has already held that those factors favor the State—twice. *L.W.*, 73 F.4th at 421; *Doe 1 v. Thornbury*, 2023 WL 4861984, at *1 (6th Cir. July 31). Plaintiffs do not dispute that, if Tennessee is likely to prevail on the merits, then they cannot get a preliminary injunction. *See Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006). Their arguments about "unconstitutional" laws and protecting "constitutional rights" all depend on a holding that they are likely right. Pltfs.-Br.57. And because the Act is likely constitutional, "Tennessee will suffer irreparable harm from its inability to enforce the will of its legislature." *L.W.*, 73 F.4th at 421.

Plaintiffs cannot change the equitable balance by saying they are "'deprived access'" to the covered treatments.  Pltfs.-Br.57. Plaintiffs are not deprived in an irreparable sense:  They can get similar treatments once they turn 18 and fully understand the consequences.  They are currently getting the same treatments out of state.  And the Act lets them continue their treatments in Tennessee until March 2024.  Plaintiffs do not dispute that, if Tennessee providers are ending treatment or requiring titration now, then they are *choosing* to do so; those actions are not required by the Act (and thus would not likely be undone by a preliminary injunction).  TN-Br.55.  More importantly, Tennessee has concluded that those treatments risk irreversible damage, both to Plaintiffs and countless other children.  Because Tennessee is right on the merits, *it* gets to decide how best to protect the health and safety of its citizens, not Plaintiffs or federal judges.  *L.W.*, 73 F.4th at 421.

## IV.    The District Court Could Not Enjoin Enforcement Statewide.

Plaintiffs spend less than a page trying to defend the injunction's extension statewide—an obvious overbreadth problem, as every member of this panel recognized.  *L.W.*, 73 F.4th at 414-15; *accord id.* at 423 (White, J., concurring in part and dissenting in part) ("the district court abused its discretion in granting a statewide preliminary injunction").  So even if Plaintiffs were entitled to a preliminary injunction, that injunction must be limited to L.W., Ryan Roe, John Doe, "their parents," and their "healthcare providers."  *Doe v. Ladapo*, 2023 WL 3833848, at *17 (N.D.

Fla. June 6).  That latter category, according to Plaintiffs, should be further limited to "VUMC" alone.  Pltfs-Br.58.

Plaintiffs no longer argue that they can get statewide relief because they have a successful "facial" challenge.  As Tennessee explained, *Salerno* is still the test for facial challenges; *Salerno* requires Plaintiffs to prove that the Act has no lawful application; and the Act has many lawful applications, even if it were unconstitutional as applied to Plaintiffs.  TN-Br.57-59; *accord L.W.*, 73 F.4th at 414.  Plaintiffs offer no response whatsoever, thus forfeiting the point.  But without a successful facial challenge, Plaintiffs cannot possibly be entitled to "facial" relief.

Even if they had not given up their facial challenge, Plaintiffs could not prove that statewide relief is "necessary" to remedy their individual injuries.  *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  Plaintiffs quote, but do not defend, the district court's assertion that no provider would treat Plaintiffs unless it could treat all minors in Tennessee.  Pltfs-Br.57-58.  As Tennessee explained, that assertion is supported by nothing in the record, rests on unsupported speculation about the medical field, and is facially implausible in a world where these same treatments are given to adults and the same drugs have other uses.  *See* TN-Br.56; Lacy Decl. ¶¶16-17, R.28, PageID#241-42.  The district court "did not offer any meaningful reason" for its contrary conclusion, *L.W.*, 73 F.4th at 415, and Plaintiffs cannot solve that defect by regurgitating it without responding to counterarguments.

Nor is statewide relief "necessary" because individualized relief would "force those who proceeded pseudonymously to reveal their identities in order to obtain care." Pltfs-Br.58. This argument is new on appeal, was not part of the district court's discretionary judgment, and makes no sense. The question is whether statewide relief is "necessary to remedy the plaintiff's injury," not whether it is necessary to protect the plaintiff's identity. *Kentucky*, 57 F.4th at 556. Pseudonymity does not somehow give courts the power to issue injunctions that otherwise exceed "the 'judicial power.'" *L.W.*, 73 F.4th at 415. Regardless, only "two of the three transgender minor Plaintiffs" are proceeding pseudonymously. Memo., R.20, PageID#178. No Plaintiff could "obtain care" without revealing their identity *to their provider*. Pltfs-Br.58. And all Plaintiffs have already revealed their identities *to Defendants*—the only officials who would be subject to the injunction and who could bring public-enforcement actions against providers. Hence why *Lapado* issued individualized injunctions on behalf of pseudonymous plaintiffs. 2023 WL 3833848, at *17.

Finally, this Court should ignore Plaintiffs' suggestion that "Dr. Lacy or the United States" could get statewide relief. Pltfs-Br.58. As Tennessee has explained, Dr. Lacy lacks third-party standing to assert the rights of her patients; and the United States cannot get relief broader than Plaintiffs because it lacks both standing and a cause of action. *See, e.g.*, TN-Br.52-53 & n.5; PI Opp., R.112, PageID#939; Opp.

to U.S. PI, R.135, PageID#2323, 2326-27.  Plus, the only "specific individuals" the United States identified to support its standing were the minor Plaintiffs.  U.S.-Br.62.  The district court did not address these arguments or even rule on the United States' motion.[2]  So, as Plaintiffs seem to acknowledge, these questions are for "remand" at most.  Pltfs-Br.18, 58; U.S.-Br.60-61.  Because Plaintiffs bear the burden, they are not entitled to a statewide injunction unless and until they carry that burden below.

---

[2] Neither Dr. Lacy nor the United States cross-appealed.

## CONCLUSION

This Court should reverse the district court's grant of Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

JONATHAN SKRMETTI
  Attorney General & Reporter

/s/ *Clark L. Hildabrand*
CLARK L. HILDABRAND
  Deputy Chief of Staff & Senior Counsel

STEVEN J. GRIFFIN
RYAN N. HENRY
BROOKE A. HUPPENTHAL
  Assistant Attorneys General
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, Tennessee 37202
(615) 253-5642
clark.hildabrand@ag.tn.gov

ADAM K. MORTARA
LAWFAIR LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

CAMERON T. NORRIS
TIFFANY H. BATES
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

August 17, 2023

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,500 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font.

/s/ *Clark L. Hildabrand*
CLARK L. HILDABRAND
 Deputy Chief of Staff & Senior Counsel

August 17, 2023

## CERTIFICATE OF SERVICE

I, Clark Hildabrand, counsel for Defendants-Appellants and a member of the Bar of this Court, certify that, on August 17, 2023, a copy of the Reply Brief of Defendants-Appellants was filed electronically through the appellate CM/ECF system. I further certify that all parties required to be served have been served.

/s/ *Clark L. Hildabrand*
CLARK L. HILDABRAND
 Deputy Chief of Staff & Senior Counsel