UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EMMA KOE, et al.,

             Plaintiffs,

    v.

CAYLEE NOGGLE, et al.,

             Defendants.

CIVIL ACTION NO.

1:23-CV-2904-SEG

**O R D E R**

This case is before the Court on Plaintiffs' motion for a preliminary injunction.  (Doc. 2.)  An evidentiary hearing was held on August 10 and 11, 2023.  Having carefully considered the parties' positions and applicable law, the Court finds that Plaintiffs' motion should be granted.

## I.   Introduction

The Georgia General Assembly recently enacted Senate Bill 140 (SB 140), a law that bans certain medical procedures and therapies for minors who experience gender dysphoria.  The act took effect on July 1, 2023.  At issue in this case is SB 140's prohibition on cross-sex hormone replacement therapy for the treatment of gender dysphoria in minors.  Plaintiffs are three transgender minors, their parents, and a community-based organization that provides support to parents of transgender minors.  Defendants are state officials charged with the duty to implement the ban and to establish sanctions for its

violation.   Plaintiffs seek to enjoin Defendants from enforcing SB 140's prohibition on hormone replacement therapy, arguing that this provision of the law violates the Fourteenth Amendment's Equal Protection and Due Process clauses.[1]

## II.   Background

The following facts are derived from the declarations, expert reports, exhibits, and testimony submitted to the Court.[2]

### A. Senate Bill 140

On March 21, 2023, Georgia's General Assembly passed SB 140.  On March 23, 2023, the Governor signed the bill into law.[3]  2023 Ga. Laws 4.  SB 140 amends O.C.G.A. § 31-7-1 *et seq.*, which relate to the regulation of "hospitals and related institutions," and O.C.G.A. § 43-34-1 *et seq.*, which relate to the duties and authority of the Georgia Composite Medical Board.  *Id.* §§ 2,

---

[1] Plaintiffs do not challenge SB 140's prohibitions on sex reassignment surgeries or other surgical procedures.

[2] The Court has carefully considered the full record in this case, which includes six expert reports, ten declarations, over 40 exhibits, and live testimony from six witnesses.  The evidence cited in this order is reflective of the weight the Court has assigned to it.  Unless otherwise indicated, evidence that the Court has found to be most credible and relevant to the legal issues is cited in support of its analysis; evidence found to be less credible and/or less relevant is not.

[3] Section 2 of SB 140 is now codified at O.C.G.A. § 31-7-3.5, and Section 3 is codified at § 43-34-15.  The Court refers to the statutory provisions at issue in this case collectively as "SB 140."

3. SB 140 provides in part that none of the following "irreversible procedures or therapies" shall be performed in a licensed institution "on a minor for the treatment of gender dysphoria":

> (1) Sex reassignment surgeries, or any other surgical procedures, that are performed for the purpose of altering primary or secondary sexual characteristics; or
> (2) Hormone replacement therapies.

*Id.* § 2(a); *see also* § 3(a).

There are exceptions to SB 140's prohibitions. Relevant here, the new law does not prohibit hormone therapy for minors to treat "medical conditions other than gender dysphoria[.]" *Id.* § 3(b)(1). So, for example, a physician may still provide testosterone to a natal adolescent male to treat delayed puberty without infringing the prohibition. Additionally, minors "who [were], prior to July 1, 2023, being treated with irreversible hormone replacement therapies" may continue their treatment.[4] *Id.* § 3(b)(4).

SB 140 further provides an enforcement regime. The Georgia Department of Community Health ("DCH") is tasked with "establish[ing] sanctions, by rule and regulation," for medical institutions that violate the act—"up to and including the revocation of an institution's permit issued

---

[4] Also exempt from SB 140's prohibitions are (1) treatments for sex development disorders resulting in ambiguity regarding the individual's biological sex and (2) treatments for individuals with partial androgen insensitivity syndrome. 2023 Ga. Laws 4 § 3(b)(2)–(3).

pursuant to Code Section 31-7-3." *Id.* § 2(c).  And the Georgia Composite
Medical Board is responsible for adopting rules and regulations regarding SB
140's prohibitions for Georgia-licensed physicians.  *Id.* § 3(b).  Under the new
law, a physician who violates SB 140's prohibition "shall be held
administratively accountable to the board for such violation." *Id.* § 3(c).

In enacting SB 140, the Georgia General Assembly made the following
legislative findings:

(1) There has been a massive unexplained rise in diagnoses of gender
    dysphoria among children over the past ten years, with most of
    those experiencing this phenomenon being girls;
(2) Gender dysphoria is often comorbid with other mental health and
    developmental conditions, including autism spectrum disorder;
(3) A significant portion of children with gender dysphoria do not
    persist in their gender dysphoric conditions past early adulthood;
(4) Certain medical treatments for gender dysphoria, including
    hormone replacement therapies and surgeries, have permanent
    and irreversible effects on children;
(5) No large-scale studies have tracked people who received gender-
    related medical care as children to determine how many remained
    satisfied with their treatment as they aged and how many
    eventually regretted transitioning; on the contrary, the General
    Assembly is aware of statistics showing a rising number of such
    individuals who, as adults, have regretted undergoing such
    treatment and the permanent physical harm it caused;
(6) Under the principle of "do no harm," taking a wait-and-see
    approach to minors with gender dysphoria, providing counseling,
    and allowing the child time to mature and develop his or her own
    identity is preferable to causing the child permanent physical
    damage; and
(7) The General Assembly has an obligation to protect children, whose
    brains and executive functioning are still developing, from
    undergoing unnecessary and irreversible medical treatment.

2023 Ga. Laws 4 § 1(1)–(7).

## B. Terminology

We turn next to definitions for certain terms used in this order. The parties appear to agree on the terms' meanings, and their experts employed them consistently with one another in their declarations and testimony.

At birth, infants are generally assigned a sex—either male or female—based on the appearance of their external genitalia, their internal reproductive organs, and their chromosomal makeup. (Doc. 93, Laidlaw Decl. ¶¶ 14–15; Doc. 2-8, Shumer Decl. ¶ 24.) This is sometimes known as a person's "natal sex" or "birth sex." (Doc. 2-8, Shumer Decl. ¶¶ 27, 47.)

"Gender identity" is defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) as "a category of social identity and refers to an individual's identification as male, female, or, occasionally, some category other than male or female." (Doc. 93, Laidlaw Decl. ¶ 17.) Gender identity, in other words, is a person's internal, innate sense of belonging to a particular sex. (Doc. 2-8, Shumer Decl. ¶ 25.)

Transgender individuals are those whose gender identity does not align with their natal sex. (Doc. 2-8, Shumer Decl. ¶ 25; Doc. 91, Hruz Decl. ¶ 22.)

"Gender dysphoria" is a condition defined by the DSM-5 as an incongruence between a patient's assigned natal sex and their gender identity that is present for at least six months, and which causes clinically important

distress in the person's life.  *(*Doc. 2-8, Shumer Decl. ¶ 37; Doc. 93, Laidlaw Decl. ¶ 55; *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5 TR) (APA 2022).)

### C. Plaintiffs

Plaintiffs are three transgender children, four parents of transgender children, and an organization called TransParent.

Amy Koe is a 12-year-old transgender girl and the daughter of Emma Koe.  (Doc. 2-2, Koe Decl. ¶ 4.)  Amy and her family live in the Atlanta area, where Emma Koe was born and raised.  (*Id.* ¶ 3.)  From an early age, Amy began to express persistently that she wished that "God would have made [her] a girl."  (*Id.* ¶¶ 5, 7.)  Amy presented gender incongruencies for two to three years—preferring to wear girls' clothing, gravitating toward female friends, and stating her desire to look physically like a girl as she grew older.  (*Id.* ¶¶ 5, 10, 12.)  From ages five to seven, Amy began experiencing sleep difficulties, waking up repeatedly throughout the night, every night, and not being able to return to sleep.  (*Id.* ¶ 12.)  At age seven, Amy began mental health treatment and was diagnosed with gender dysphoria.  (*Id.* ¶ 14.)  She then began to socially transition, presenting as a girl and going by "Amy" rather than her given name.  (*Id.* ¶ 7.)  Amy's parents were "aware of the way the world treats transgender individuals," struggled to adjust to Amy's gender identity, and "mourned the loss of [their] expectations of who Amy would be."  (*Id.* ¶ 8.)  But

6

since socially transitioning, Amy has not wavered in her gender identity.  (*Id.* ¶¶ 12–13.)

Amy began to undergo puberty in 2022.  (*Id.* ¶ 16.)  With puberty came the onset of secondary sex characteristics consistent with Amy's natal sex.  (*Id.*)  To avoid developing in ways inconsistent with her gender identity, Amy's pediatrician and pediatric endocrinologist recommended that Amy begin taking puberty-blocking medication.  (*Id.*)  She has since taken two doses of this medication, which is administered every six months.  (*Id.*)  Amy's doctors "have [] recommended that she initiate hormone therapy[,]" and Amy wishes to do so.  (*Id.* ¶ 17.)  Her mother wants to decide "when [Amy] should start hormone therapy" based on her daughter's development "over the coming months."  (*Id.* ¶ 18.)  In describing the impact of SB 140 on her family, Emma Koe states:

> I have lived in Georgia all my life, and I cannot imagine uprooting my family and leaving the state but I know that we will do what we have to do to provide [Amy] the best available medical care. [] After the passage of this law, I felt defeated.  Many people seem to feel like being transgender is a choice, but my husband and I would never have chosen this for our child—we simply want our daughter to be alive and thriving. . . . I am a mother, and I am afraid of both the immediate and longstanding effects this lack of care will have on my child mentally and physically.

(*Id.* ¶¶ 19–20, 22.)

Tori Moe is a 12-year-old transgender girl and the daughter of Hailey Moe.  (Doc. 2-3, Moe Decl. ¶ 3.)  Tori and her family live in the Atlanta area.

(*Id.*)  Tori has consistently expressed her female gender identity for eight years. (*Id.* ¶¶ 4–6.)  Her mother states that Tori has always considered herself a girl, and since Tori was in fifth grade, she has represented herself as a girl to anyone who asks.  (*Id.* ¶¶ 7–9.)  Last year, Tori's therapist diagnosed her with gender dysphoria.  (*Id.* ¶ 11.)  For Tori, the thought of going through puberty as a male—to include development of a deeper voice, facial hair, and an Adam's apple—is "devastating." (*Id.* ¶ 15.)  In January 2023, Tori's doctors determined that she had begun puberty, and she was prescribed puberty-blocking medication, which she has been taking since.  (*Id.* ¶ 12.)  Tori's mother fears the emotional impact of keeping Tori on puberty-blocking medication as her peers progress into maturity.  (*Id.* ¶ 13.)  She further fears for her child's safety from self-harm in the absence of access to gender-affirming care.  (*Id.* ¶ 15.) Tori's mother wants to obtain hormone therapy for Tori "at the right time," which she describes as a "month-by-month consideration for our family, based on Tori's medical, social, and mental health and progress." (*Id.* ¶ 13.)  Hailey Moe does not want to leave Georgia, but she states she will "do what I have to do to ensure [Tori] receives the care she needs." (*Id.* ¶ 14.)

Mia Voe is an 11-year-old transgender girl and the daughter of Paul Voe.[5] (Doc. 2-4, Voe Decl. ¶ 4.) They live in Athens, Georgia. (*Id.* ¶ 5.) Mia has unwaveringly identified as a girl for more than six years. (*Id.* ¶¶ 9–11.) A psychologist diagnosed Mia with gender dysphoria in 2020, and she has received mental health support since then. (*Id.* ¶ 17.) In 2021, Mia began making annual visits to an endocrinologist, who has been monitoring Mia's hormone levels. (*Id.* ¶ 16.) According to the endocrinologist, Mia has not yet begun puberty. (*Id.*) But once Mia starts puberty, "her recommended treatment plan includes puberty blockers and hormone therapy." (*Id.*) Paul Voe states that he fears SB 140's immediate and longstanding effects on his child's wellbeing, and that he has lost sleep and gained weight from the resulting stress. (*Id.* ¶¶ 21, 18.)

Lisa Zoe is a ten-year-old girl and the daughter of Anna Zoe. (Doc. 2-5, Zoe Decl. ¶¶ 3–4.) She and her family have lived in Georgia since 2017. (*Id.* ¶ 4.) Lisa has consistently identified as a girl for more than six years. (*Id.* ¶¶ 8–10.) She experienced distress at having to dress as a boy and would only feel "normal" when she was able to express herself as a girl. (*Id.* ¶¶ 7–11.) Lisa has been receiving mental health treatment from a therapist since May 2020. (*Id.* ¶ 14.) In November 2020, a pediatric endocrinologist diagnosed Lisa

---

[5] Paul Voe is a plaintiff; Mia Voe is not.

9

with gender dysphoria.  (*Id.*)  Her primary care pediatrician diagnosed her with the same in February 2023.  (*Id.*)  At the onset of puberty, "which is imminent," Lisa's recommended treatment plan includes the administration of puberty-blocking medication.  (*Id.* ¶ 18.)  Lisa, her parents, and her medical providers consider hormone therapy to be a necessary part of Lisa's treatment plan.  (*Id.* ¶ 19.)  Anna Zoe believes that Lisa will experience significant mental distress if she cannot access hormone therapy as treatment for gender dysphoria.  (*Id.* ¶¶ 24–25.)  Anna Zoe does not want to uproot Lisa and her siblings from their friends and community, but she and her husband are considering moving the family to another state because of SB 140.  (*Id.* ¶¶ 22–23.)

TransParent is a community-based organization that provides resources and services for parents of transgender children.  (Doc. 2-7, Halla Decl. ¶ 4.)  It has local chapters across the country, including in Georgia.  (*Id.* ¶ 11.)  One of TransParent's Georgia-based members is Rita Soe.  (Doc. 2-6, Soe Decl. ¶ 2.)  Rita's son, Brent, is a 16-year-old transgender boy who has lived in Georgia for his entire life.  (*Id.* ¶¶ 4, 6.)  Brent was diagnosed with gender dysphoria by his psychologist in 2021. (*Id.* ¶¶ 9–10.)  At 14, Brent came out as a transgender boy and began to socially transition.  (*Id.* ¶ 10.)  Brent, his parents, and his medical providers have determined that Brent should soon begin hormone therapy, which they believe to be medically necessary for Brent's gender dysphoria treatment.  (*Id.* ¶¶ 15–16.)  Rita believes that Brent's mental health

will deteriorate if he cannot access gender-affirming care, including hormone therapy.  (*Id.* ¶ 23.)

### D. Defendants

Defendants are state officials responsible for enforcing SB 140's prohibition on hormone therapy for minors.

Defendant Caylee Noggle, sued in her official capacity, is the former commissioner of the Georgia Department of Community Health ("DCH").[6] (Doc. 1, Compl. ¶ 16.)  DCH is responsible for establishing sanctions, by rule and regulation, for hospitals and other institutions that violate SB 140's prohibitions.  (*Id.*); 2023 Ga. Laws 4 § 2(c).

Defendant Georgia Department of Community Health's Board of Community Health ("the Community Health Board") establishes the general policy to be followed by DCH.  (Doc. 1, Compl. ¶ 17); O.C.G.A. §§ 31-2-2, 31-2-3(a).  The Community Health Board's nine members are sued in their official capacities.  (Doc. 1, Compl. ¶¶ 18–26.)

---

[6] It appears that Noggle recently stepped down from her role as commissioner of DCH.  *See* Katherine Landergan and Ariel Hart, *Georgia Commissioner Overseeing Medicaid to Step Down*, ATLANTA J.-CONST. (May 5, 2023), https://www.ajc.com/news/atlanta-news/georgia-commissioner-overseeing-medicaid-to-step-down/TQREI3BPMNEZDCMGILBHM5TQKA/.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, when a public officer who is a party in an official capacity resigns or otherwise ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party."  Defendants are DIRECTED to file a notice of substitution as to this party within 7 days of the date of this order.

11

Defendant Georgia Composite Medical Board ("the Composite Medical Board") is tasked with adopting rules and regulations regarding SB 140's prohibitions as they relate to licensed physicians. (Doc. 1, Compl. ¶ 27); 2023 Ga. Laws 4 § 3(b). The Composite Medical Board has the authority to enforce violations of rules and regulations by taking disciplinary action, including probation, suspension, and revocation of a physician's license. (Doc. 1, Compl. ¶ 27); O.C.G.A. § 43-34-8(a)–(b). The Composite Medical Board's 16 members are sued in their official capacities. (Doc. 1, Compl. ¶¶ 28–43); O.C.G.A. § 43-34-2(a). Defendant Daniel Dorsey is the executive director of the Composite Medical Board and is sued in his official capacity as such. (Doc. 1, Compl. ¶ 44.)

### E. Standards of Care for Treatment of Children and Adolescents with Gender Dysphoria

Plaintiffs and amici[7] contend that there is wide acceptance in the medical community that gender-affirming care, including hormone therapy, "is the

---

[7] The following organizations filed an amicus brief in this case in support of Plaintiffs' motion for preliminary injunctive relief: the Academic Pediatric Association, the American Academy of Child & Adolescent Psychiatry, the Association of American Medical Colleges, the American Academy of Family Physicians, the American Academy of Nursing, the American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality, the American College of Obstetricians and Gynecologists, the American College of Osteopathic Pediatricians, the American College of Physicians, the American Pediatric Society, Association of Medical School Pediatric Department Chairs, Inc., the Endocrine Society, the National Association of Pediatric Nurse Practitioners, the Pediatric Endocrine Society, the Societies for Pediatric Urology, the Society for Adolescent Health and Medicine, the Society for Pediatric Research, the Society of Pediatric

appropriate treatment for gender dysphoria and that, for some adolescents, gender-affirming medical interventions are necessary." (Doc. 105 at 19.) They further assert that the treatment protocols for gender dysphoria are set forth in established, evidence-based clinical guidelines: (1) the World Professional Association for Transgender Health ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People; and (2) the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons.[8]  (Doc. 70-1, McNamara Decl. ¶ 18; Doc. 105 at 9.)

The WPATH and Endocrine Society guidelines are in the record of this case, and they are voluminous.  A few of the guidelines' key concepts, as discussed by the experts and amici, are as follows.

When a person is diagnosed with gender dysphoria, their recommended care depends on their age and physical and mental development.  For pre-pubertal children, gender dysphoria treatment plans include therapy, support,

---

Nurses, and the World Professional Association for Transgender Health.  (Doc. 105.)

[8] WPATH is an international organization of scientists and other professionals that issues the authoritative standards of care for treating gender dysphoria. (Doc. 70-1, McNamara Decl. ¶ 18; Pl. Ex. 19.)  The Endocrine Society is an international organization of endocrinologists that issues clinical practice guidelines for the treatment of gender dysphoria.  (Doc. 70-1, McNamara Decl. ¶ 18.)

and assistance with elements of a social transition.  (Doc. 2-8, Shumer Decl. ¶ 46; Doc 105 at 11.)  A person's social transition may include adopting a new name and pronouns and dressing in clothing that comports with their gender identity.  (Doc. 2-8, Shumer Decl. ¶ 46.)  Recommended treatment plans for children younger than pubertal age do not involve medications or surgical treatments.  (*Id.* ¶ 45; Doc. 105 at 11.)

After the onset of puberty, an adolescent's recommended treatment plan may include medical intervention.  Puberty-suppressing medications may be prescribed to prevent pubertal development that is inconsistent with the patient's gender identity.  (Doc. 2-8, Shumer Decl. ¶ 47; Doc. 70-1, McNamara Decl. ¶ 17.)  But before such medications are prescribed, the standards of care require the participation of a mental health practitioner, who must confirm that "the adolescent has demonstrated a long-lasting and intense pattern of gender dysphoria, and that any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed, so that the adolescent's situation and functioning are stable enough to start treatment."  (Doc. 70-1, McNamara Decl. ¶ 32; Doc. 2-8, Shumer Decl. ¶ 69; Doc. 105 at 14– 15.)  Puberty blocking-medications may not be given without the informed assent of the adolescent and the informed consent of their parents or guardians.  (Doc. 70-1, McNamara Decl. ¶¶ 31–32.)

14

Puberty-blocking medications serve only a temporary purpose. (Doc. 2-8, Shumer Decl. ¶¶ 71, 97; Doc. 70-1, McNamara Decl. ¶ 43.) They provide for a "pause" on pubertal development that allows the adolescent and their family to confer with a mental health provider, to confirm the persistence of the young person's gender identity, and to determine the next step in treatment. (Doc. 70-1, McNamara Decl. ¶ 43; Doc. 2-8, Shumer Decl. ¶¶ 95–97.) If the adolescent's gender dysphoria persists, the recommended treatment plan may include hormone therapy—otherwise known as cross-sex hormones or hormone replacement therapy. (Doc. 70-1, McNamara Decl. ¶ 44.) Hormone therapy facilitates the development of sex-specific physical changes that are in line with a transgender adolescent's gender identity. (Doc. 2-8, Shumer Decl. ¶ 74.) For example, a transgender boy who is prescribed testosterone will develop a lower voice and facial and body hair; while a transgender girl who is prescribed estrogen will experience breast growth, female fat distribution, and softer skin. (*Id.*) Hormone therapy, however, may only be given to an adolescent if a mental health provider confirms a medical need for it, the parents give informed consent, and the adolescent assents and has the psychological maturity to understand the impacts of such treatment. (Doc. 70-1, McNamara Decl. ¶ 44; Doc. 2-8, Shumer Decl. ¶¶ 75–76.) Surgical interventions such as chest and genital surgery are generally not considered until adulthood. (Doc. 2-8, Shumer Decl. ¶ 78.)

15

## F. Risks Associated with Cross-Sex Hormone Therapy

All parties agree that hormone therapy, like all medical interventions, carries certain risks.  It can, for example, affect a young person's fertility.  (Doc. 93, Laidlaw Rep. ¶ 45; Doc. 2-8, Shumer Decl. ¶ 85.)   And hormones may increase a person's risk for blood clotting or cardiovascular disease.[9]  (Doc. 2-8, Shumer Decl. ¶ 90; Doc. 92, Laidlaw Decl. ¶¶ 20, 204, 254.)  With respect to these latter risks, Plaintiffs' experts and amici contend that such risks can be minimized with proper clinical supervision.  (Doc. 2-8, Shumer Decl. ¶ 89; Doc. 105 at 13.)  As for impairment to fertility, Plaintiffs' experts do not deny such a risk exists, but they state that the standards of care require extensive consultation regarding effects of treatment on fertility and options to preserve future fertility, such as sperm and oocyte cryopreservation.   (Doc. 70-1, McNamara Decl. ¶ 45; Doc. 2-8, Shumer Decl. ¶ 85.)  And they emphasize that risk for fertility changes and other risks should be balanced with the risk of withholding treatment.  (Doc. 2-8, Shumer Decl. ¶ 85.)

---

[9] These and other risks are stated in Appendix C to WPATH's standards of care.  (Pl. Ex. 9 at S254.)

16

### G. Expert Witness Testimony

All expert witnesses in this matter have extensive education, credentialing, and experience in their fields. The following is a brief summary of their backgrounds and testimony.

#### 1. Plaintiffs' Experts

Three experts submitted reports and testified on behalf of Plaintiffs.

Dr. Daniel Shumer is a pediatric endocrinologist, associate professor of pediatrics, clinical director of the Child and Adolescent Gender Clinic at Mott Children's Hospital at Michigan Medicine, and medical director of Michigan Medicine's Comprehensive Gender Services Program. (Doc. 2-8, Shumer Decl. ¶ 3.) Dr. Shumer has treated over 400 patients with gender dysphoria, the majority of whom were between 10 and 21 years old. (*Id.* ¶ 12.) He has also authored numerous peer-reviewed articles related to treatment of transgender youth. (*Id.* ¶ 14.) At the evidentiary hearing, Dr. Shumer testified about the standards of care applicable to the treatment of gender dysphoria, and his own experience in treating children. Specifically, Dr. Shumer discussed his opinion, which he grounded in his years of research and clinical experience, that adolescents who receive gender-affirming medical care at the onset of puberty typically are more successful in treating their gender dysphoria than those who receive such care later in life. (Tr. 27:5–18.) Dr. Shumer opined that it is "extremely uncommon" for patients to later regret receiving hormone

17

therapy when the proper standards of care and guidelines are followed. (Tr. 28:20–29:9; Doc. 2-8, Shumer Decl. ¶ 77.)

Dr. Meredithe McNamara is a pediatrician, adolescent medicine physician, and assistant professor of pediatrics at the Yale School of Medicine. (Doc. 70-1, McNamara Decl. ¶ 3.) She treats adolescent patients, including patients with gender dysphoria, and she has conducted original research in pediatrics. (*Id.* ¶¶ 3, 62, Ex. A.) Dr. McNamara testified that cross-sex hormone therapy is safe and efficacious as treatment for gender dysphoria, and that the evidence that supports its use is widely accepted as reliable in the medical community.

Dr. Ren Massey is a Georgia-based clinical psychologist who has treated over 600 children and adolescents with gender dysphoria. (Doc. 2-9, Massey Decl. ¶¶ 1, 6.) Dr. Massey testified as to his extensive clinical experience and the reliability of WPATH's standards of care. Dr. Massey described how WPATH's standards of care for hormone therapy are applied in clinical practice and discussed his observations of the benefits that result from such treatment.[10]

---

[10] Dr. Massey testified credibly as to his experience treating youth with gender dysphoria and his role in the development of certain WPATH standards of care. On cross-examination, however, he conceded that the substantive portions of his expert report were copied, nearly verbatim, from another expert's report in a different case. The Court therefore does not rely on Dr. Massey's expert report in its evaluation of Plaintiffs' claims.

## 2. Defendants' Experts

Three experts submitted reports and testified on behalf of Defendants.

Dr. Paul Hruz is an associate professor of pediatrics in the Division of Pediatric Endocrinology and Diabetes at Washington University School of Medicine. (Doc. 91, Hruz Rep. ¶ 2.) He has treated hundreds of children, including adolescents, with disorders of sexual development. (*Id.* ¶ 11.) Dr. Hruz has extensively studied the scientific literature relating to the treatment of gender dysphoria, but he has never treated or diagnosed a patient with gender dysphoria. (*Id.* ¶ 12; Tr. 139:13–21.) Dr. Hruz testified as to his concerns regarding the provision of cross-sex hormones to minors. He criticized the quality of evidence that supports WPATH's standards of care and opined that existing studies do not adequately demonstrate the benefits of cross-sex hormone therapy. (Tr. 118:8–119:8.) He also testified about the risks that are associated with cross-sex hormone therapy.[11] (*Id.* 123:19–124:15.)

---

[11] On cross-examination, counsel for Plaintiffs questioned Dr. Hruz about an amicus brief he co-authored and submitted to the United States Supreme Court in *Gloucester County School Board v. G.G.*, No. 16-273 (U.S. 2017). In that brief, Dr. Hruz wrote that "conditioning children into believing that a lifetime of impersonating someone of the opposite sex, achievable only through chemical and surgical interventions, is a form of child abuse." *Brief of Amici Curiae Dr. Paul R. McHugh, M.D., Dr. Paul Hruz, M.D., Ph.D., and Dr. Lawrence S. Mayer, Ph.D. in Support of Petitioner*, *Gloucester County School Board v. G.G.*, 2017 WL 219355, at *22 (U.S. 2017). The same brief contains other disparaging remarks, including some that associate transgender identity with "delusion" and "charade." *Id.* This kind of inflammatory rhetoric—in a

19

Dr. James Cantor is a clinical psychologist, a sexual behavior scientist, and a sex and couple's therapist based in Toronto, Canada. (Doc. 92, Cantor Decl. ¶¶ 1, 209.) His academic work focuses primarily on "atypical sexualities," and his "most impactful" research has addressed "the origins of pedophilia." (*Id.* ¶ 2.) Dr. Cantor is currently the director of the Toronto Sexuality Centre. (Doc. 92-1 at 1.) At the evidentiary hearing, Dr. Cantor testified as to the risks associated with hormone therapy and his disagreement with the American medical associations that have endorsed its use for treating minors with gender dysphoria. In particular, Dr. Cantor discussed his view, as reflected in his expert report, that studies into the safety and efficacy of hormone therapy have so far been inadequate. (Doc. 92, Cantor Decl. ¶¶ 89–104.) Dr. Cantor further testified as to his opinion that social media was contributing to increased rates of gender dysphoria among adolescent females, who are most vulnerable to "social contagion." (Tr. 188:7–14; 201:5–22.)

Dr. Michael Laidlaw is a physician and endocrinologist who treats patients with hormonal and/or gland disorders. (Doc. 93, Laidlaw Decl. ¶¶ 2, 4.) Dr. Laidlaw has written about and researched gender-affirming treatments for transgender individuals. (Doc. 93-1 at 2.) Dr. Laidlaw testified about what he believes to be inadequate data to support gender-affirming treatments for

---

brief submitted to the Supreme Court, no less—casts doubt on the objectivity of Dr. Hruz's testimony.

minors. Like Defendants' other experts, Dr. Laidlaw believes that WPATH's standards of care are not supported by sufficient research. (Doc. 93, Laidlaw Decl. ¶¶ 180–99.) He points to systematic review studies produced in or commissioned by certain European countries to support his opinion that the risks of cross-sex hormone therapy for minors outweigh the benefits. (*Id.* ¶¶ 249–55.) He contends that WPATH is an "advocacy organization" concerned with "promoting social and political activism." (*Id.* at 62.)

## H. Procedural History

On June 29, 2023, Plaintiffs filed this case, alleging that SB 140's prohibition on hormone replacement therapy for the treatment of minors with gender dysphoria violates (1) the parent plaintiffs' substantive due process right to direct the care and upbringing of their children, and (2) the minor plaintiffs' right to equal protection. (Doc. 1 at 40–44.) Plaintiffs also filed a motion for a temporary restraining order and preliminary injunction. (Doc. 2.)

The Court required expedited service of the TRO motion but declined to consider a pre-enactment injunction on a record on which Defendants had no meaningful opportunity to respond.[12] On July 7, 2023, following a scheduling conference, the parties filed a joint proposed hearing and briefing schedule,

---

[12] On July 5, Nancy Doe filed an unopposed motion to intervene as a plaintiff on behalf of herself and her minor daughter, Linda Doe. (Doc. 57.) The motion was granted. (Doc. 89.)

which was adopted by the Court.  (Doc. 67, 68.)  On August 10 and 11, the Court held a hearing on Plaintiffs' motion for preliminary injunction.

## III.  Discussion

Plaintiffs seek to enjoin SB 140 on two grounds.  They argue that SB 140 violates the Equal Protection Clause and their substantive due process rights under the Fourteenth Amendment.

### A. Standing (Individual Plaintiffs)

As a threshold matter, the Court determines whether Plaintiffs have Article III standing.  *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011).  "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'"  *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017) (quoting U.S. Const. art. III, § 2, cl. 1).  The doctrine of standing narrows "the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*  "If at least one plaintiff has standing, the suit may proceed."  *Biden v. Nebraska*, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023).

### 1. Injury in Fact

To satisfy the injury-in-fact requirement, Plaintiffs must show that their alleged injury is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). While no plaintiff has yet been prescribed hormone replacement therapy, "[t]he Supreme Court has accepted imminent harm as satisfying the injury-in-fact requirement of Article III standing." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160–61 (11th Cir. 2008) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)) (internal quotation marks omitted). The Supreme Court has described the standard of "imminence" as "somewhat elastic," and the Court of Appeals has cautioned that "applying it is not an exercise in conceptual analysis but an attempt to advance the purposes behind the case-or-controversy requirement of Article III . . . ." *Browning*, 522 F.3d at 1161 (citing *Lujan*, 504 U.S. at 564 n.2, and *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223 (11th Cir. 2004)). The relevant question is whether there is a likelihood that the Court will be left to decide "a case 'in which no injury would have occurred at all.'" *31 Foster Child. v. Bush*, 329

23

F.3d 1255, 1267 (11th Cir. 2003) (quoting *Lujan*, 504 U.S. at 564 n.2).  No such likelihood exists here.  Plaintiffs have adequately alleged both present and future injury sufficient to comply with Article III.

### a. Injury to Child/Adolescent Plaintiffs

Physicians have recommended treatment that will include hormone therapy for each of the parent plaintiffs' children, and in each case the parent plaintiff wishes to follow the providers' recommendations.  (Doc. 2-2, Koe Decl. ¶¶ 16–18; Doc. 2-3, Moe Decl. ¶¶ 12–15; Doc. 2-4, Voe Decl. ¶ 16; Doc. 2-5, Zoe Decl. ¶¶ 18–19.)  Puberty blockers and hormone replacement therapy are generally part of a single course of treatment (Doc. 70-1, McNamara Decl. ¶¶ 43–44; Doc. 2-8, Shumer Decl. ¶ 97), and both sides' experts agreed that remaining on puberty blockers until 18 would be medically inadvisable.  (Doc. 2-8, Shumer Decl. ¶ 88; Doc. 93, Laidlaw Decl. ¶¶ 105–07.)  Two of the child plaintiffs have already started puberty-blocking medication, and two imminently intend to take such medication at the onset of puberty.  (Doc. 2-2, Koe Decl. ¶¶ 16–18; Doc. 2-3, Moe Decl. ¶¶ 12–15; Doc. 2-4, Voe Decl. ¶ 16; Doc. 2-5, Zoe Decl. ¶¶ 18–19.)  In addition, the parent plaintiffs have stated that being denied access to hormone therapy will cause their children harmful physical and psychological effects.  (Doc. 2-2, Koe Decl. ¶¶ 18–21; Doc. 2-3, Moe Decl. ¶¶ 15; Doc. 2-4, Voe Decl. ¶ 19; Doc. 2-5, Zoe Decl. ¶¶ 24–25.)

24

Defendants dispute the imminence of Plaintiffs' alleged injuries, arguing that SB 140 does not prevent "them from doing anything they immediately intend to do." (Doc. 78 at 11.) But "immediacy" in the standing context "requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Browning*, 522 F.3d at 1161 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995)).

Plaintiffs have adequately shown that they will seek hormone therapy and will do so imminently. The best example is that of Amy Koe, who is 12 years old and has begun puberty.[13] (Doc. 2-2, Koe Decl. ¶ 16.) Amy has been taking puberty-blocking medication since 2022. (*Id.*) Her doctors "have [] recommended that she initiate hormone therapy" for gender dysphoria, and Amy wishes to do so. (Doc. 2-2, Koe Decl. ¶ 17.) Her mother will decide exactly "when [Amy] should start hormone therapy" based on her daughter's development "*over the coming months.*" (*Id.* ¶ 18) (emphasis added). While there is no date certain on which Emma Koe intends to obtain hormone therapy for Amy, the record shows that Amy's injury is "certainly impending."[14]

---

[13] Tori Moe has also begun puberty-suppressing medication, and her circumstances are analogous to Amy Koe's with regard to injury-in-fact. (Doc. 2-3, Moe Decl. ¶¶ 12–13.)

[14] "[A] plaintiff need not demonstrate that the injury will occur within days or even weeks to have standing." *31 Foster Child.*, 329 F.3d at 1267; *see also*

Contrary to Defendants' argument, this is not a case in which there is "at most a 'perhaps' or 'maybe' chance" that the Plaintiffs' alleged harm will occur. *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 95 (11th Cir. 2022) (quotation marks omitted). Plaintiffs seek treatment that has been recommended by their doctors, but that treatment is now banned by statute. Plaintiffs' definite statements reflecting an intention to engage in proscribed conduct in the near future are sufficient to establish an injury in fact. *See Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1280–81 (11th Cir. 2020) (finding injury where plaintiff had "every reason to believe" that its alleged injury would "occur only months from now"); *see also 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1175 (10th Cir. 2021), *rev'd on other grounds*, 143 S. Ct. 2298 (2023) (finding plaintiffs satisfied the injury-in-fact requirement when they "intended" to offer wedding website services but had not yet done so, as their intended course of conduct was arguably proscribed by statute).[15]

---

*Adarand Constructors, Inc.*, 515 U.S. at 211–12 (plaintiff who was likely to suffer injury within one-year period had standing to sue); *Indep. Party v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281 (11th Cir. 2020) ("[Plaintiff's] future injury is 'certainly impending'—it will occur only months from now.").

[15] Defendants' invocation of *City of South Miami v. Governor*, 65 F.4th 631 (11th Cir. 2023), is unpersuasive. In that case, the Eleventh Circuit considered whether organizations had standing to challenge a state law that required local law enforcement to cooperate with federal immigration officials. *Id.* at 634. The organizations argued that they had suffered an injury because the law might subject their members to racial profiling and deportation. *Id.* at 637. The court concluded that the organizations' alleged injury was not "certainly

At least one of the child/adolescent plaintiffs has adequately alleged an injury-in-fact. *Nebraska*, 143 S. Ct. at 2365.

### b. Injury to Parent Plaintiffs

Emma Koe, Hailey Moe, Paul Voe, and Anna Zoe, the parent plaintiffs, also sufficiently allege present and future injuries that are concrete and particularized. Those alleged injuries include deprivation of the asserted right to make imminent decisions about their children's medical care (*see* Doc. 2-2, Koe Decl. ¶ 22; Doc. 2-3, Moe Decl. ¶ 16; Doc. 2-4, Voe Decl. ¶ 21; Doc. 2-5, Zoe Decl. ¶ 25); impairment of the ability to access recommended care for their children in this state, such that some are considering out-of-state relocation (*see* Doc. 2-2, Koe Decl. ¶ 19; Doc. 2-3, Moe Decl. ¶ 14); and significant stress relating to the law's effects on their children and families. (Doc. 2-4, Voe Decl. ¶ 18 (stating that such stress has "taken a toll on [his] mental health" and has caused loss of sleep and weight gain); Doc. 2-2, Koe Decl. ¶¶ 19–20; Doc. 2-3, Moe Decl. ¶ 15). These are indeed injuries for purposes of the standing inquiry. *See Brandt v. Rutledge*, No. 4:21-CV-00450 JM, 2023 WL 4073727, at *30 (E.D.

---

impending" because it relied on a "highly attenuated chain of possibilities" and "speculation about the decisions of independent actors." *Id.* (citing *Clapper*, 568 U.S. at 410, 414). Here, by contrast, Plaintiffs' injuries are not contingent on decisions of independent actors or a speculative chain of possibilities. Plaintiffs' medical providers have recommended a course of treatment that is banned under the new law. It is not merely possible that SB 140 will affect their ability to obtain this treatment, it is certain.

Ark. June 20, 2023) (holding plaintiffs had standing where, *inter alia*, "the Parent Plaintiffs would have to watch their children suffer the loss of care or endure severe personal and financial hardship to access care for their children in other states"); *see also Walters v. Fast AC, LLC*, 60 F.4th 642, 648 (11th Cir. 2023) ("Our precedent recognizes . . . straightforward economic injuries, like lost money, but also more nebulous ones . . . like wasted time . . . and emotional distress.") (internal quotation marks omitted).

The Court has no trouble concluding that Plaintiffs have adequately alleged both present injury and a concrete risk of future harm sufficient to satisfy Article III's injury-in-fact requirement.

### 2. Traceability

A plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. There must, in other words, be a "causal connection" between the plaintiff's injury and the defendant's conduct. *Walters*, 60 F.4th at 650 (citing *Lujan*, 504 U.S. at 560). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). The "challenged action" in this case is the enforcement of SB 140's prohibition on hormone therapy for the treatment of gender dysphoria in minors. Defendant DCH and

DCH's Board of Community Health are responsible for establishing sanctions for violations of O.C.G.A. § 31-7-3.5.  2023 Ga. Laws 4 § 2(c).  And Defendant Georgia Composite Medical Board is tasked with adopting rules and regulations for physicians regarding SB 140's prohibitions.  *Id.* § 3(b).  The injuries Plaintiffs seek to avoid are fairly traceable to the challenged statutes and the entities and persons responsible for enforcing the statutory prohibitions.  *See, e.g., Schultz v. Alabama*, 42 F.4th 1298, 1316 (11th Cir. 2022) (arrestee plaintiff's alleged injuries were fairly traceable to defendant sheriff who had authority to enforce a challenged bail policy).  Defendants do not argue otherwise.

### 3. Redressability

A plaintiff's injury is redressable by a favorable judicial decision when "the practical consequence" of a favorable decision "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered."  *Utah v. Evans*, 536 U.S. 452, 464 (2002); *S. River Watershed All., Inc. v. Dekalb County, Georgia*, 69 F.4th 809, 820 (11th Cir. 2023).  Here, Plaintiffs have sued state officials explicitly granted authority to enforce SB 140's hormone therapy ban under both of its provisions.  *See* O.C.G.A. §§ 3-7-3.5(c), 43-34-15(b)–(c).  An injunction against those officials' enforcement of the challenged provisions would increase the

29

likelihood that Plaintiffs can access hormone therapy that would otherwise be banned, so Plaintiffs' injuries are redressable through the relief they seek.

Defendants argue in passing that a separate statute, O.C.G.A. § 31-5-8, makes it a misdemeanor to violate any provision under Title 31 of the Georgia Code, where a portion of SB 140's hormone therapy ban is codified.[16]  (Doc. 41 at 11.)  Therefore, they say, even if the Court enjoined Defendants' enforcement of the law, non-party state officials might nevertheless be free to bring prosecutions for violations of the hormone therapy ban, and this would prevent Plaintiffs' injuries from being redressed.  That argument does not alter the Court's redressability analysis for at least two reasons.

First, throughout Title 31, the Department of Community Health is the entity given authority to investigate and sanction violations of the title's provisions.[17]  If this Court declared SB 140's hormone therapy ban likely unconstitutional and enjoined the DCH official defendants from enforcing it, it

---

[16] O.C.G.A. § 31-5-8 states that "[a]ny person violating the provisions of [Title 31] shall be guilty of a misdemeanor[.]"  The ban on hormone replacement therapy for the treatment of gender dysphoria in minors is codified, in part, at O.C.G.A. § 31-7-3.5.

[17] So, for example, DCH is "empowered to . . . [e]nter into or upon public or private property at reasonable times for the purpose of inspecting same to determine the presence of conditions deleterious to health or to determine compliance with applicable laws and rules, regulations, and standards thereunder," O.C.G.A. § 31-2-1(6), and it has various powers that enable it to do so, such as the ability to obtain inspection warrants.  O.C.G.A. § 31-2-13.

is theoretically possible that state officials not bound by the judgment could nevertheless attempt to police compliance with O.C.G.A. § 31-7-3.5(a)(2) through misdemeanor prosecutions of doctors who worked in licensed institutions or the officials of those institutions.  But it is hard see that as anything but a sheer possibility, and an unlikely one at that.  The possibility's mere existence does not alter the conclusion that Plaintiffs' injuries are redressable.  Plaintiffs need only show that a favorable decision would lead to a "*significant increase in the likelihood* that [they] would obtain relief that directly redresses the injury suffered," *S. River Watershed All.*, 69 F.4th at 820 (emphasis added), not that relief is a certainty.  *E.g. Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1126–27 (11th Cir. 2019) ("To have Article III standing, a plaintiff need not demonstrate anything 'more than . . . a substantial likelihood' of redressability.") (quoting *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 79 (1978)).  Defendants cite *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198 (11th Cir. 2021), but there the plaintiffs sued the attorney general when it was clear that she had "no enforcement authority" with respect to the challenged law.  *See id.* at 1205.  Here, Plaintiffs have sued those officials with the most direct and explicit authority to enforce SB 140, such that a favorable decision would likely give them relief.

Second, and even more fundamentally, Section 31-7-3.5 applies, by its terms, to "institution[s] licensed pursuant to this article."  But the covered

31

"institutions" are defined by the Code in a particular way, and the term

"'institution' . . . exclude[s] all physicians' and dentists' private offices and

treatment rooms in which such physicians or dentists primarily see, consult

with, and treat patients." O.C.G.A. § 31-7-1(4); *see also* O.C.G.A. §§ 31-7-3, 31-

7-5. In other words, it seems unlikely that Section 31-7-3.5(a)(2), even if non-

parties retained the ability to enforce it via Section 31-5-8, would operate on

its own to prohibit the administration of hormone therapy by a licensed

physician in any setting.[18]  Section 43-34-15(c) applies to all "licensed

physicians," but the misdemeanor enforcement provision Defendants point to

does not apply to Title 43.

Accordingly, the Court is satisfied that "the practical consequence" of a

favorable decision "would amount to a significant increase in the likelihood

that the plaintiff would obtain relief that directly redresses the injury

suffered." *Utah*, 536 U.S. at 464.

---

[18] To be sure, some providers of hormone therapy may see patients in a licensed institution such as a hospital, which is to say "any building, facility, or place in which are provided two (2) or more [beds] and other facilities and services that are used for persons received for examination, diagnosis, treatment, surgery, or maternity care for periods continuing for twenty-four (24) hours or longer and which is classified by [DCH] as a hospital." Ga Comp. R. & Regs. 111-8-40-.02(f). But they need not necessarily do so.

## B. Standing (Organizational Plaintiff)

Plaintiff TransParent is a community-based support and resource organization that serves parents and caregivers of transgender children. (Doc. 1, Compl. ¶ 15.) It asserts its claims in this lawsuit on behalf of its members.

An organization can establish associational standing to enforce its members' rights. *Dream Defs. v. Governor of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023). Organizations have associational standing when "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [the lawsuit] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1316 (11th Cir. 2021)). "[I]t is enough for the representative entity to allege that one of its members or constituents has suffered an injury that would allow it to bring suit in its own right." *Doe v. Stincer*, 175 F.3d 879, 885 (11th Cir. 1999).

Here, TransParent has satisfied the standing test. First, TransParent has provided evidence that at least one of its members would have standing to sue in her own right. *Cf. Stincer*, 175 F.3d at 885. Rita Soe is a member of TransParent and is the mother of Brent Soe, a 16-year-old boy who is transgender. (Doc. 2-6, Soe Decl. ¶¶ 2, 6.) Brent has been diagnosed with gender dysphoria and has socially transitioned, such that he now "expresses

33

his male gender identity in all aspects of his life." (*Id.* ¶ 14.)  Rita Soe and her husband want to continue "to treat [Brent's] dysphoria by supporting his gender identity and starting hormone therapy in the foreseeable future." (*Id.* ¶ 15.)  Soe fears that Brent will experience "regression and mental decompensation" without access to the banned treatment.  (*Id.* ¶ 23.)  Despite their strong family and community ties to Georgia, the Soes are now considering a move out of state because of the ban.  (*Id.* ¶¶ 4, 22.)  For the reasons discussed in Section III(A)(1)(b) above, Rita Soe has sufficiently alleged an injury in fact that is concrete and particularized, as well as actual and imminent.  *Lujan*, 504 U.S. at 560.  She has likewise satisfied the traceability and redressability requirements for the reasons discussed in Sections III(A)(2)–(3).  Because at least one of its members has standing to sue in her own right, TransParent satisfies the first associational standing requirement.

Second, the interests this lawsuit seeks to protect are germane to TransParent's mission and purpose.  According to a declaration filed by TransParent's Board President, one of TransParent's "primary purposes" is to provide its members with educational materials about raising transgender children. (Doc. 2-7, Halla Decl. ¶ 4.)   Another "key function" of the organization is to connect parents with experts who provide gender-affirming care, including hormone therapy.  (*Id.* ¶ 12(b).)  TransParent has spent over a

decade compiling and organizing resources for its members about how to access such care. (*Id.*) Its Board President asserts that SB 140 hampers the organization's ability to connect members to treatment providers. (*Id.*) This lawsuit "furthers the organization['s] stated purposes" and is thus germane to its interests. *See Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1345 (11th Cir. 2005).

Third, "in no way must [TransParent's individual members] be made parties to this suit in order to advance the instant [claims] or to fashion the sort of prospective injunctive relief sought by" TransParent. *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003). It is well-established that an organization may seek prospective injunctive relief on behalf of its members without their individual participation. *See Greater Birmingham Ministries*, 992 F.3d at 1316 ("[W]e cannot say that the constitutional and voting rights claims asserted, or the declaratory or injunctive relief requested, require the participation of the individual members in this lawsuit."); *Sierra Club*, 430 F.3d at 1345 ("[T]here is no reason why the claim or relief requested by the Sierra Club or the Alabama Environmental Council requires the participation of Farned, Marshall, or any other member of either association."). TransParent thus satisfies all three requirements for associational standing.

35

## C. Preliminary Injunction Analysis

A party seeking a preliminary injunction must show that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc) (per curiam).  The first two factors are "the most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  A preliminary injunction is an "extraordinary and drastic remedy," and Plaintiffs bear the "'burden of persuasion' to clearly establish all four of these prerequisites."  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (citing *Siegel*, 234 F.3d at 1176).

### 1.  Substantial Likelihood of Success on the Merits

To obtain a preliminary injunction, Plaintiffs must establish that they are substantially likely to prevail on the merits of their claims.  "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success."  *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (quotation marks omitted) (emphases in original). "It is not enough," however, "that the chance of success on the merits be better than negligible."  *Nken*, 556 U.S. at 434.

36

Plaintiffs contend that portions of SB 140 violate the Fourteenth Amendment's Equal Protection and Due Process clauses. To secure a preliminary injunction, they need only establish a substantial likelihood of success on one claim. *Legendary Strikes Mobile Bowling, LLC v. Luxury Strike LLC*, No. 1:22-CV-05065-ELR, 2023 WL 4401541, at *4 (N.D. Ga. May 15, 2023) ("[A] plaintiff need only demonstrate a substantial likelihood of success on one of its claims to obtain a preliminary injunction.") (quotation marks omitted); *MasterMind Involvement Marketing, Inc. v. Art Inst. of Atlanta, LLC*, 389 F. Supp. 3d 1291, 1294 (N.D Ga. 2019). Because Plaintiffs have shown a substantial likelihood of success on the merits of their equal protection claim, the Court does not address the substantive due process claim in this order.

### a. SB 140 is Subject to Intermediate Scrutiny

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). It "was intended as a restriction on state legislative action inconsistent with elemental constitutional principles." *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

The equal protection analysis begins with the question of the appropriate level of scrutiny. "The general rule is that legislation is presumed to be valid

and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. "The general rule gives way, however," when the legislation makes an official classification based on a suspect or quasi-suspect class. *See id.* at 440–41. When a state makes an official classification based on sex, "intermediate scrutiny" applies, meaning that the "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *United States v. Virginia*, 518 U.S. 515, 531 (1996); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 57–58 (2017); *Glenn v. Brumby*, 663 F.3d 1312, 1321 (2011).

Because SB 140 draws distinctions based on both natal sex and gender nonconformity, it is subject to intermediate scrutiny. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns County*, 57 F.4th 791, 803 (11th Cir. 2022); *Glenn*, 663 F.3d at 1316. Eleventh Circuit precedent compels this conclusion, one also reached by the other Eleventh Circuit district courts that have considered challenges to similar laws. *See Doe v. Ladapo,* No. 4:23CV114-RH-MAF, 2023 WL 3833848, at *8–9 (N.D. Fla. June 6, 2023*); Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147–48 (M.D. Ala. 2022); *see also Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022) (holding that heightened scrutiny was appropriate standard of review for comparable Arkansas law); *K. C. v. Individual Members of Med. Licensing Bd.*, No. 1:23-CV-00595-JPH-KMB,

38

2023 WL 4054086, at *9 (S.D. Ind. June 16, 2023) (same, with respect to comparable Indiana law); *but see L. W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) (expressing "skeptic[ism]" that intermediate scrutiny should apply to comparable Tennessee law).

First, SB 140 triggers heightened scrutiny because it classifies on the basis of birth sex. In *Adams*, the Eleventh Circuit considered an equal protection challenge to a school board policy "under which male students must use the male bathroom and female students must use the female bathroom." *Adams*, 57 F.4th at 797. The court applied intermediate scrutiny, reasoning in part as follows:

> The School Board's bathroom policy requires "biological boys" and "biological girls"—in reference to their sex determined at birth—to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms. This is a sex-based classification. . . . [B]ecause the policy that Adams challenges classifies on the basis of biological sex, it is subject to intermediate scrutiny.

*Id.* at 801–803. Under SB 140, a minor's sex at birth determines whether that minor can receive a given form of medical treatment, just as under the policy at issue in *Adams*, a minor's sex at birth determined whether that minor could use a given bathroom. In the *Adams* bathroom policy, natal boys (for example) could not pass through the door of the girl's bathroom; under SB 140, they may not pass through the door of estrogen therapy. The details are obviously different, and so are the states' asserted justifications. But the classifications

function in the same manner, and both trigger heightened scrutiny. Most other courts to consider laws comparable to SB 140 have regarded them in the same essential way.[19] *See Brandt*, 47 F.4th at 667 ("The biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not. The Act is therefore subject to heightened scrutiny."); *K. C.*, 2023 WL 4054086, at *8 ("In short, without sex-based classifications, it would be impossible for S.E.A. 480 to define whether a puberty-blocking or hormone treatment involved transition from one's sex (prohibited) or was in accordance with one's sex (permitted)."); *Lapado*, 2023 WL 3833848, at *8 ("Consider an adolescent, perhaps age 16, that a physician wishes to treat with testosterone. Under the challenged statute, is the treatment legal or illegal? To know the answer, one must know the adolescent's sex. If the adolescent is a natal male, the treatment is legal. If the adolescent is a natal female, the treatment is illegal. This is a line drawn on the basis of sex, plain and simple.").

---

[19] Unlike some other states' analogous statutes, SB 140 avoids defining any of its key terms, such as "gender dysphoria" or—most importantly—"hormone replacement therapy." Some other courts to consider such laws have relied in part on the sex-based classifications that appear in definitions contained in the laws. *See, e.g., K.C.*, 2023 WL 4054086 at *8. Georgia's decision not to define the terms does not alter what they mean, of course, and there has been no genuine dispute about what "hormone replacement therapy" means or what "gender dysphoria" is. *See* Section II(B), *supra*. One cannot define either term without reference to a person's natal sex. No one argues otherwise.

Defendants urge a different way of looking at SB 140. They characterize it as a law that merely "bans cross-sex hormone therapy 'for minors of both sexes,'" (Doc. 78 at 7 (quoting *Skrmetti*, 73 F.4th at 419)), or in other words as a law that "simply says that a child—any child, male or female—cannot obtain hormone replacement to treat gender dysphoria" (Doc. 41 at 16). Defendants rely on the Sixth Circuit's decision in *Skrmetti*, which characterized a comparable Tennessee law as merely "ban[ning] gender-affirming care for minors of both sexes." 73 F.4th at 419. The Sixth Circuit then reasoned that the Tennessee law, so characterized, "does not prefer one sex to the detriment of the other." *Id.* (citing *Reed v. Reed*, 404 U.S. 71, 76 (1971)).

Respectfully, however, this Court is unpersuaded by this aspect of *Skrmetti*. To talk about SB 140 this way is merely to redescribe it in ostensibly neutral terms; the substance of the law is unaltered. The bathroom policy in *Adams* could just as easily have been characterized as one that "bans cross-sex bathroom use for minors of both sexes." Presumably this cosmetic change could not have saved the policy from heightened scrutiny. In addition, *Adams* suggests that the Eleventh Circuit may not read the Supreme Court's sex-based equal protection jurisprudence as *Skrmetti* does. The bathroom policy in *Adams* did not "prefer one sex to the detriment of the other," *Skrmetti*, 73 F.4th at 419; the policy merely imposed a sex-based classification by banning natal boys from the girls' bathroom and natal girls from the boys' bathroom.

41

*See Adams*, 57 F.4th at 801; *see also Corbitt v. Taylor*, 513 F. Supp. 3d 1309, 1314 (M.D. Ala. 2021) ("All state actions that classify people by sex are subject to the same intermediate scrutiny. The State need not favor or disfavor men or women to trigger such scrutiny; the classification itself is the trigger.").

There is a second reason that SB 140 is subject to heightened scrutiny. This Circuit has held that "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause"; that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination"; and that "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Glenn*, 663 F.3d at 1316–17.

SB 140 places a special burden on transgender minors, like the minor plaintiffs, and it does so on the basis of their gender nonconformity.[20] By its terms, the law bans the use of cross-sex hormones only for the treatment gender dysphoria, or the persistent incongruence of gender identity and natal sex. The desired outcome of the banned treatments—as no one disputes—is to

---

[20] In this respect—its burden on transgender, *i.e.* gender non-conforming, minors—SB 140 is distinctly unlike the bathroom policy at issue in *Adams*. *Cf.* 57 F.4th at 808 ("[B]oth sides of the classification—biological males and biological females—include transgender students. To say that the bathroom policy singles out transgender students mischaracterizes how the policy operates.").

begin a physical transition so that the adolescent patient's development and appearance do not conform to those expected of the patient's birth sex, but rather to the patient's gender identity. In other words, SB 140 therefore bans the use of cross-sex hormones only for those whose gender identity and natal sex are incongruent, and only for the purpose of achieving gender-nonconforming physical characteristics. SB 140 thus "discriminat[es] against . . . transgender individual[s] because of [their] gender-nonconformity[.]" *Glenn*, 663 F.3d at 1317; *see Eknes-Tucker*, 603 F. Supp. 3d at 1147 ("The Act categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity. In this way, the Act places a special burden on transgender minors because their gender identity does not match their birth sex. The Act therefore amounts to a sex-based classification for purposes of the Equal Protection Clause.") (citing *Glenn*, 663 F.3d at 1317).

A further word on *Glenn* is necessary. Defendants argue that *Glenn* is distinguishable, but they read the case so narrowly that they all but read it out of existence. Defendants' view is that *Glenn* concerns sex stereotypes, while SB 140 has no basis in anything but biological differences. (*See* Tr. 266:17–268:1; Doc. 78 at 9.) Medical procedures and biological differences, Defendants say, have nothing to do with sex stereotypes. (*See id.*) But this argument misconstrues what *Glenn* means by stereotypes and what it does with them. Consider the facts of the case. *Glenn* concerned a plaintiff employed by the

43

Georgia General Assembly's Office of Legal Counsel, one who in 2005 "was diagnosed with [gender identity disorder]" and "began to take steps to transition from male to female under the supervision of health care providers." *Id.* at 1314. When the plaintiff's supervisor learned that the plaintiff "was ready to proceed with gender transition and would begin coming to work as a woman and was also changing her legal name," the supervisor fired her. *Id.* The plaintiff brought a claim alleging that she was discriminated against on the basis of sex.

An undivided Eleventh Circuit panel agreed. It began by discussing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). There, the Supreme Court held that plaintiff's Title VII rights were violated when she was passed over for a promotion because she acted "macho." *See id.* at 235. Six members of the Supreme Court agreed that Title VII "barred not just discrimination because of biological sex, but also gender stereotyping—failing to act and appear according to expectations defined by gender." *Glenn*, 663 F.3d at 1316 (citing *Price Waterhouse*, 490 U.S. at 250–51 (plurality op.); *id.* at 258–61 (White, J., concurring); *id.* at 272–73 (O'Connor, J., concurring)).

*Glenn* extended the *Price Waterhouse* reasoning into the domain of the Equal Protection Clause and into the "congruen[t]," but different, context of its own facts. It did so in the following critical passage:

44

> A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. . . . There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms. Accordingly, discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender.

*Glenn*, 663 F.3d at 1316–17.

In short, *Glenn* cannot be distinguished away by claiming that biological difference and sex stereotypes exist in separate realms. The point is not that *Glenn* says that the former is reducible to the latter—*Glenn* does not say that biological sex is a stereotype.[21] But *Glenn* does say that discriminating on the basis of nonconformity with the expectations defined by one's sex—a nonconformity by which transgender individuals are "defined"—is sex

---

[21] The Court emphasizes this point because part of Defendants' attempt to distinguish *Glenn* involves a passage in *Adams* stating that *Glenn* and *Price Waterhouse* "dealt with workplace discrimination involving nonconformity with sex stereotypes," and that "neither case departed from the plain meaning of 'sex,' generally, or as used within Title IX." *Adams*, 57 F.4th at 814. But *Adams* does not help Defendants on this point for two reasons. First, that portion of the *Adams* opinion concerned the Title IX claim, not the equal protection claim. Its aim was to show that *Glenn* did not support a meaning of the word "sex" in Title IX other than "a biological understanding of 'sex.'" *See Adams*, 57 F.4th at 814. That discussion has little to say about *Glenn*'s equal protection holding, and the equal protection analysis in *Adams* did not mention *Glenn*. Second, only what *Adams* calls the "plain meaning" of "sex" is required to understand *Glenn*'s holding and its application to this case. *Glenn* is not about unsettling the meaning of "sex," but about how state action that specifically burdens those who do not sufficiently play the part expected of their sex—those, like transgender people, who do not "conform"—is subject to heightened scrutiny.

discrimination.  Indeed, in the logical structure of this reasoning, *Glenn* is in accord with the Supreme Court's recent decision in *Bostock*, which "held that 'discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex.'" *Adams*, 57 F.4th at 808 (quoting *Bostock v. Clayton County,* 140 S. Ct. 1731, 1747 (2020)).

To be sure, *Glenn* concerned the employment context and it implicated adults, not minors.  But these facts play no role in the opinion's legal reasoning about why Glenn's firing was sex discrimination.  The different context here is relevant to whether SB 140 can survive heightened scrutiny, not whether it applies in the first place.

Defendants raise one additional argument pertinent to the application of intermediate scrutiny.  They suggest that *Dobbs* and *Geduldig* show that intermediate scrutiny does not apply to SB 140.  They note that *Dobbs*, in dismissing the arguments of *amici* that the equal protection clause protected the right to abortion, said that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (quoting *Geduldig v.*

46

*Aiello*, 417 U.S. 484, 496, n.20 (1974)).[22]   Here, however, the medical procedures at issue are not ones that "only one sex can undergo."  Prior to the passage of SB 140, any child could—if medically indicated—receive hormone therapy with either estrogen or testosterone.  Changing that is what the bill aims to achieve.  Secondly, neither *Dobbs* nor *Geduldig* says anything about laws that place special burdens on gender nonconformity, as SB 140 does. These cases do not compel a different conclusion than that reached here.

Accordingly, SB 140 is subject to intermediate scrutiny both because it classifies on the basis of natal sex, like the policy at issue in *Adams*, and because it places a special burden on nonconformity with sex stereotypes, like the action challenged in *Glenn*.   Seen either way, intermediate scrutiny applies.[23]

### b. SB 140 is not Substantially Related to an Important Government Interest

"Successful defense of legislation that differentiates on the basis of gender . . . requires an 'exceedingly persuasive justification.'"   *Sessions v.*

---

[22] *Geduldig*, for its part, said that "[w]hile it is true that only women can become pregnant[,] it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in [*Reed* and *Frontiero*.]" *Geduldig*, 417 U.S. at 496 n.20.

[23] Plaintiffs also argue that transgender people constitute a quasi-suspect class.  Because SB 140 discriminates on the basis of sex, the Court need not reach this argument and declines to do so at this preliminary stage.

*Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *United States v. Virginia*, 518 U.S. 515, 531 (1996)). "The burden of justification is demanding and it rests entirely on the State." *Virginia*, 518 U.S. at 533 (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). To carry this burden, "[t]he defender of legislation that differentiates on the basis of gender must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Morales-Santana*, 582 U.S. at 59 (quoting *Hogan*, 458 U.S. at 724) (alteration in original).

Defendants describe the state's interest as that in "safeguarding the physical and psychological well-being of . . . minor[s]" (Doc. 41 at 20) (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020)) and in "regulating medicine and experimental medical treatments on minors in Georgia" (*id.*). 2023 Ga. Laws 4 § 1(1)–(2). Plaintiffs, for their part, argue that hormone therapy "is a critical element of the standard of care adopted by every major professional medical and mental health association in the country" for the treatment of gender dysphoric youth, and that informed consent from parents and children and extensive multidisciplinary evaluations of patients must precede hormone therapy under that standard of care. (Doc. 70 at 10–11.) And, they say, hormone therapy administered pursuant to the standard

48

of care is effective for treating gender dysphoria because it "reduces gender dysphoria, improves psychological functioning, and reduces suicide risk." *Id.*

At a general level, the state's asserted interest in protecting children through regulation of the medical profession is, of course, an important one. *See Otto*, 981 F.3d at 868 ("[A] State's interest in safeguarding the physical and psychological well-being of a minor is compelling.") (quoting *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)); *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical profession."). Under the equal protection analysis, however, the identification of an important state interest is necessary to survive heightened scrutiny, but it is not sufficient. Once an objective has been identified, the state must provide evidence that the policy *serves* that important objective and that the policy is substantially related to its achievement. *See Craig v. Boren*, 429 U.S. 190, 199–204 (1976); *see also Plyler v. Doe*, 457 U.S. 202, 228–230 (1982) (holding that the challenged statute failed heightened scrutiny because the record contained no credible evidence that the policy advanced the state's stated objectives). For a sex-based classification to withstand heightened scrutiny, the state must demonstrate that the objective and the policy have a "close means-ends fit," *Morales Santana*, 582 U.S. at 68, although the fit need not be "perfect," *Adams*, 57 F.4th at 801.

49

Here, then, the question is whether Defendants can make this showing not in some abstract sense, but with respect to the legislative scheme the state has actually adopted—that is, a prospective ban on cross-sex hormone therapy for the treatment of gender dysphoria in minors. *See Morales-Santana*, 582 U.S. at 59, 68; *see also K.C.*, 2023 WL 4054086 at *9–*10 (finding legitimate "the proffered state interests" in protecting children and regulating the medical profession, but stating that "[e]ven so, heightened scrutiny requires more—the regulation must have an 'exceedingly persuasive justification' and a 'close means-end fit'"). The Court finds that Defendants have failed to carry this "demanding" burden. *Virginia*, 518 U.S. at 533.

Much of what is disputed at this stage, both in the paper record and in the expert testimony before the Court, has concerned (1) what the medical evidence shows about the risks and benefits of hormone therapy as a treatment for gender dysphoria; (2) the strength of that evidence, *i.e.* the Defendants' contention that hormone therapy is medically controversial and unsupported by sufficient research of sufficient strength; and (3) stray suggestions that care is pushed upon undesiring parents or unready youth. The Court addresses each in turn. In so doing, the Court considers only the record evidence before it and weighs the strength and credibility of the parties' witnesses. The Court also bears in mind the deference generally owed to legislative findings. *See Carhart*, 550 U.S. at 165. At the same time, under heightened constitutional

scrutiny, such findings are not entitled to "dispositive weight," for "[t]he Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake." *Id.*; *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500–01 (1989) (stating, in race-based equal protection case, that "[t]he factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary. . . . [b]ut when a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals.") (internal citation omitted).[24]

First, the preliminary record evidence of the medical risks and benefits of hormone therapy shows that a broad ban on the treatment is not substantially likely to serve the state's interest in protecting children. As all parties acknowledge, every medical treatment carries risks, and a clinician's decision about whether a given course of treatment is indicated depends on a balancing of risks with the benefits of the treatment. Hormone therapy is no

---

[24] Similarly, while Defendants contend that that the Court should adhere to what *Dobbs* called "the normal rule that courts defer to the judgments of legislatures in areas fraught with medical and scientific uncertainties," *Dobbs*, 142 S. Ct. at 2268, that is not the inquiry required by heightened scrutiny. Nor does *Dobbs* say otherwise. *Dobbs* expressly did not involve "heightened constitutional scrutiny" but instead "the same standard of review" that applied to "other health and safety measures." *See id.* at 2245–46; *see also K.C.*, 2023 WL 4054086, at *11 (distinguishing *Dobbs* on same basis).

51

different; the record and the testimony of both parties' experts accordingly show that the treatment carries risks. These risks include impairment of fertility, bone density issues, high blood pressure, weight gain, glucose intolerance, liver disease, thrombosis, and cardiovascular disease.[25] (Doc. 91, Hruz Decl. ¶ 82; Doc. 2-8, Shumer Decl. ¶ 90.) Some of these risks, such as the risk of venous thromboembolism associated with estrogen therapy, attend any treatment with the hormones, whether or not they are used on a cross-sex basis. (Doc. 2-8, Shumer Decl. ¶ 90.) Some of these risks are unique, or else heightened, when cross-sex hormones are used for the treatment of gender dysphoria. (Doc. 93, Laidlaw Decl. ¶¶ 127, 138, 154, 157–58.)

---

[25] Some of what Defendants' experts characterized as "risks" are not risks, at least not in the sense of "side effects." For example, to say that a natal male receiving estrogen is at "risk" for weight gain resulting from increased breast tissue, or that a natal female receiving testosterone is at "risk" for facial hair growth, is to be imprecise about the kind of risk or "medical problem" under discussion. (*E.g.*, Doc. 93, Laidlaw Decl. ¶ 139.) These physical, developmental changes driven by hormone therapy are, in fact, the desired effect of the treatment. (*E.g.,* Tr. 46:17–47:6 (Dr. Shumer testifying that voice deepening for transgender boys and breast growth for transgender girls, for example, are "[l]ess often described as a side effect [and] [m]ore often described as something that the patient is excited about.").) To the extent that the state regards itself as having an interest in preventing the desired *outcome* of hormone replacement therapy—physical characteristics concordant with gender identity when gender identity differs from birth sex—the state has not explained what this interest might be, and the Court doubts whether a legitimate one could be found. *Cf. Brandt*, 47 F.4th at 670; *Glenn*, 663 F.3d at 1320–21. Instead, what Defendants' experts really mean by calling certain effects "risks" is that patients may later regret some of these physical changes, a matter discussed below.

Beyond these possible adverse effects, Defendants also suggest that banning hormone therapy is justified by the risk that physical changes spurred by hormone replacement therapy may later be regretted if gender dysphoria desists later in life. Before this Court, however, the state has presented little in the way of reliable evidence of desistance or regret in those who would qualify for hormone therapy pursuant to the applicable standard of care.[26] Indeed, the record shows the contrary: that when gender-affirming care involving hormone therapy is provided in accordance with the WPATH standards of care, rates of regret are low. (Doc. 70-1, McNamara Decl. ¶ 58; Doc. 2-8, Shumer Decl. ¶ 77 (explaining that there are "very low levels of regret" when a patient receives a comprehensive evaluation prior to receiving gender-affirming care, as is required by the WPATH standards of care).)[27]

As noted above, a clinician's decision about whether a given course of treatment is medically necessary for a given patient depends on a balancing of risks with the benefits of the treatment. (*E.g.*, Doc. 70-1, McNamara Decl. ¶

---

[26] The Court finds Dr. Laidlaw's contrary conclusions on this point to be unreliable. They are based on studies that seem to support only the uncontroverted proposition that many pre-pubertal children who experience gender issues do not go on to develop persistent gender dysphoria. (*Compare* Doc. 93, Laidlaw Decl. ¶¶ 236–39, *with* Doc. 2-8, Shumer Decl. ¶ 61.)

[27] The Court assigns Dr. Shumer and Dr. McNamara significant weight on this point because both are physicians who have significant experience treating adolescents with gender dysphoria. The same cannot be said for Defendants' experts.

34; Tr. 112:16–18.)  It is therefore significant that Defendants' characterization of hormone therapy significantly understates the benefits with which it is associated.   These principally include improved mental health outcomes caused by the relief of distress including but not limited to reduced suicidality and self-harm, reduced anxiety and depression, and improved social and psychological functioning.  (Doc. 70-1, McNamara Decl. ¶ 36.)  Such benefits are supported by research as well as the extensive clinical experience of Plaintiffs' experts.  (Doc. 70-1, McNamara Decl. ¶¶ 36–41, 51–54; Doc. 2-8, Shumer Decl. ¶ 91.)  A ban on hormone therapy would deprive patients of the possibility of these benefits.  It would, indeed, be likely to put some individuals at risk of the serious harms associated with gender dysphoria that gender-affirming care seeks to prevent.  (Doc. 2-8, Shumer Decl. ¶¶ 91, 103, 105; Doc. 70-1, McNamara Decl. ¶¶ 46–50.)

In sum, the record shows that hormone therapy, like any medical treatment, carries risks, although at this stage Defendants have not substantiated any significant risk of regret because of the desistance of gender dysphoria.  The WPATH and Endocrine Society Guidelines recommend an individualized process involving the consultation of mental health and medical experts and informed consent (by parents) and assent (by the adolescent) at each stage of treatment—including hormone therapy—to weigh these risks against the treatment's benefits in an individualized manner, to ensure that

treatment is medically necessary in each case, and to manage the risks as treatment progresses. (*E.g.*, Doc. 70-1, McNamara Decl. ¶¶ 29–34.) Defendants have not shown that the treatment's risks are not or cannot be adequately managed in this way, and nor have they shown that hormone therapy is administered other than according to the standard of care in Georgia. The evidence of the treatment's risks fails to offer "an exceedingly persuasive justification," *Morales-Santana*, 582 U.S. at 58, for SB 140's sex-based legislative scheme. In other words, Defendants have not carried their burden to show that the prohibition on hormone therapy for the treatment of gender dysphoria is "substantially related," *id.* at 59, to the state's interest in protecting children.

Second, Defendants' asserted interests also depend on their claim that hormone replacement therapy is "experimental" (*e.g.*, Doc. 78 at 12) and that the research supporting its safety and benefits is of low quality. At the evidentiary hearing, the Court heard testimony from both sides about the quality of evidence available and the feasibility of obtaining higher quality evidence.

Defendants' view is based heavily on systematic review studies produced, and subsequent policy actions taken, by the governments of a handful of European countries, such as Finland, Sweden, France, and Norway. Reviews by these government entities have generally expressed the view that,

based on the existing knowledge base regarding gender-affirming care, caution is required. (*See* Doc. 92, Cantor Decl. ¶¶ 21–34.) Some of the national healthcare systems of those countries have responded by altering, to some degree, their recommended approach to gender-affirming healthcare, including the provision of hormone therapy to adolescents. So, for example, Finland's health service has restricted puberty blockers and cross-sex hormone therapies to situations where gender dysphoria is severe and other psychiatric symptoms have ceased; the Karolinska Institute, the "leading Swedish pediatric gender clinic," has limited puberty blockers and cross-sex hormones to those sixteen and older in monitored clinical trials, although the Swedish health service has not implemented those recommendations generally and instead "recommends restraint"; the Académie Nationale de Médecine of France has advised health care providers "to extend as much as possible the psychological support phase," although "medical authorities in France have not issued any actual restriction"; finally, Norway's Healthcare Investigation Board released a report stating that "the knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient," although no policy action seems to have been taken. (Doc. 92, Cantor Decl. ¶¶ 21, 25, 28, 30, 32.) In line with these findings, Defendants' experts, and Dr. Cantor in particular, argue that the medical evidence supporting gender-

56

affirming care's benefits and safety does not support any strong conclusions about its safety or effectiveness.[28]  (*See generally* Doc. 92, Cantor Decl.)

Plaintiffs, for their part, argue that the Defendants overstate the degree to which hormone therapy is controversial.  They argue – and indeed it appears undisputed on this record – that essentially every major American professional medical and mental health association has endorsed the WPATH and Endocrine Society standards of care for the treatment of gender dysphoria in adolescents.  (Doc. 105 at 8; Doc. 2-8, Shumer Decl. ¶ 56; Doc. 70-1, McNamara Decl. ¶ 21.)  Twenty of such groups have filed an amicus brief in support of Plaintiffs, which argues that SB 140 "disregards [the] medical evidence by precluding healthcare providers from providing adolescent patients with treatments for gender dysphoria in accordance with the accepted standard of care."[29]  (Doc. 105 at 17.)  Plaintiffs' experts likewise state that hormone

---

[28] The Court credits Dr. Cantor's representations on matters like the content of the international systematic reviews, but the Court assigns Dr. Cantor's views less weight as to the medical conclusions that can reasonably be drawn from the evidence for the treatment of gender dysphoria in minors.  As noted above, Dr. Cantor is a clinical psychologist, a sexual behavior scientist, a sex and couples' therapist, and the Director of the Toronto Sexuality Centre.  (Doc. 92 ¶¶ 1-2, 209; Doc. 92-1 at 1.)  The "primary focus" of his research has been "the development of atypical sexualities" and he states that the "most impactful" of his work concerns "MRI and other biological studies of the origins of pedophilia."  (Doc. 92 ¶ 1-2.)  He is not a physician and has no experience treating gender dysphoria in youth as such.

[29] These organizations include the Academic Pediatric Association, the American Academy of Child & Adolescent Psychiatry, the Association of

therapy's inclusion in the most recently published standards of care (WPATH's Standards of Care 8) is itself the result of consensus among expert practitioners and was produced according to authoritative standards governing the creation of clinical practice guidance.  (Doc. 70-1, McNamara Decl. ¶¶ 18–20; Doc. 2-8, Shumer Decl. ¶ 49.)

At this point, it should be recalled that the question put to the Court is not what the correct course of treatment is for an adolescent with gender dysphoria.  The question is whether Georgia has shown an "exceedingly persuasive justification" for the challenged legislative scheme—a scheme that prohibits clinicians and parents from determining the correct course of treatment on an individualized basis, and which does so in a sex-based manner in that it imposes this prohibition only when it comes to "hormone replacement therapy" as a treatment for gender dysphoric youth.

---

American Medical Colleges, the American Academy of Family Physicians, the American Academy of Nursing, the American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality, the American College of Obstetricians and Gynecologists, the American College of Osteopathic Pediatricians, the American College of Physicians, the American Pediatric Society, Association of Medical School Pediatric Department Chairs, Inc., the Endocrine Society, the National Association of Pediatric Nurse Practitioners, the Pediatric Endocrine Society, the Societies for Pediatric Urology, the Society for Adolescent Health and Medicine, the Society for Pediatric Research, the Society of Pediatric Nurses, and the World Professional Association for Transgender Health.

Here again, the record does not bear out the requisite "close means-ends fit" between the state's proffered interests and this scheme. The undisputed record shows that clinical medical decision-making, including in pediatric or adolescent medicine, often is not guided by evidence that would qualify as "high quality" on the scales used by Defendants' experts.[30] (Doc. 70-1, McNamara Decl. ¶¶ 23–28; Tr. 74:11–75:1 (McNamara Testimony); Tr. 133:6–14 (Hruz Testimony).) In fact, the record shows that less than 15 percent of medical treatments are supported by "high-quality evidence," or in other words that 85 percent of evidence that guides clinical care, across all areas of medicine, would be classified as "low-quality" under the scale used by Defendants' experts. (Doc. 70-1, McNamara Decl. ¶ 25; Tr. 74:11–75:1.) Defendants do not refute Dr. McNamara's testimony on this point, and indeed they "concede" that "low-quality" evidence "can be considered."[31] (Tr. 217:16–

---

[30] Dr. Cantor and Dr. McNamara both discuss the "GRADE" system by which the strength of medical or scientific evidence is rated on a scale of "very low" to "high." (Doc. 92, Cantor Decl. ¶¶ 40–55; Doc. 70-1, McNamara Decl. ¶¶ 23–24.) "According to the GRADE Working Group, high-quality evidence is derived from randomized controlled trials and low-quality evidence is derived from observational study designs." (Doc. 701-, McNamara Decl. ¶ 24.) To the extent that the Court uses the phrases "low quality" or "high quality" evidence here, the Court refers to these terms as they are used in the expert declarations.

[31] The Court found Dr. McNamara's testimony on this point to be highly credible and assigns it great weight.

23; *see also* Doc. 92, Cantor Decl. ¶ 288.)  In this respect, then, the fact that only "low-quality" evidence is available to support hormone therapy reveals little in itself.[32] The Endocrine Society has produced clinical recommendations based on "low quality" or "very low quality" evidence in several areas, and such evidence supports other treatments that are uncontroversial.[33]  (Doc. 70-1, McNamara Decl. ¶ 26; Tr. 74:23–75:1; 82:3–21.)

In light of these facts, Defendants' position that the quality of the existing evidence supporting hormone therapy justifies a ban of that therapy is not persuasive.  There is a notable inconsistency between, on the one hand,

---

[32] The same is true of the fact that hormone therapy has not been approved by the FDA for the treatment of gender dysphoria, for the record shows that off-label uses of medication are common, including in pediatric endocrinology. (Doc. 2-8, Shumer Decl. ¶ 72; Tr. 152:22–24 (Dr. Hruz testimony that "it is common in medicine in general [and] in pediatrics in particular to prescribe medicines off label[,] always with proper assessment of relative risks versus relative benefit").  Other off-label treatments that are widely accepted within the field of endocrinology include the use of growth hormones for short stature and many medications used to control type 2 diabetes that were designed for adults but are often prescribed to pediatric patients.  (Doc. 2-8, Shumer Decl. ¶ 72.)

[33] For example, the Endocrine Society guidelines regarding treatment of "various aspects of the care of primary adrenal insufficiency, central hypopituitarism, pheochromocytoma and paragangliomia," are supported by "low-quality" or "very low-quality" evidence, and the same grade of evidence supports treatments like the use of steroids to treat a child with croup and the use of puberty blockers in female cancer patients to preserve fertility while they undergo chemotherapy. (Doc. 70-1, McNamara Decl. ¶ 26; Tr. 74:23–75:1; 82:3–21.)

Case 2:23-cv-02904-SEC Document 106 Filed 08/22/23 Page 61 of 83

Defendants' experts' insistence on a very high threshold of evidence in the context of claims about hormone therapy's safety and benefits, and on the other hand their tolerance of a much lower threshold of evidence for claims about its risks, the likelihood of desistance and/or regret, and their notions about the ideological bias of a medical establishment that largely disagrees with them. That is cause for some concern about the weight to be assigned to their views, although the Court does not doubt that those they express are genuinely held.[34]

Defendants' opinions about the sufficiency of the evidence supporting hormone therapy, and the medical conclusions that can be drawn from that evidence, are also somewhat undermined by the results of the government-led systematic reviews on which they rely. In essence, while Defendants

---

[34] The Court's credibility determinations and weighing of the evidence is based solely on the record in this case. It is nevertheless worth noting all three of Defendants' experts have testified and/or submitted expert reports in other, recent cases involving gender-affirming care for minors, and that courts to varying degrees have expressed reservations about their testimony. *See, e.g., Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2023 WL 3833848, at *2 (N.D. Fla. June 6, 2023) ("Dr. [Paul] Hruz fended and parried questions and generally testified as a deeply biased advocate, not as an expert sharing relevant evidence-based information and opinions. I do not credit his testimony."); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1142–43 (M.D. Ala. 2022) (explaining that the court gave Dr. James Cantor's "testimony regarding the treatment of gender dysphoria in minors very little weight"); *C. P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-CV-06145-RJB, 2022 WL 17092846, at *4 (W.D. Wash. Nov. 21, 2022) (noting that it was a "close question" as to whether Dr. Michael Laidlaw was qualified to testify about the medical necessity of gender-affirming care because he has treated only two patients with gender dysphoria and has done no original research on gender identity).

characterize the results of the various European systematic reviews as "dramatic reversals" in policy, this does not really seem to have been the case. Most significantly—as several other courts have observed—there have been no bans on cross-sex hormone treatment for adolescents. (Doc. 92, Cantor Decl. ¶¶ 21–34); *see K.C.*, 2023 WL 4054086 at *11–12; *Ladapo*, 2023 WL 3833848 at *14; *Eknes-Tucker*, 603 F. Supp. 3d at 1146. On the contrary, it appears that these countries continue to adhere to treatment protocols not much different from the WPATH standards of care endorsed by the American medical establishment. For example, this Court's record shows what the Eighth Circuit also observed about Finland's approach:

> In fact, the Finnish council's recommendations for treatment closely mirror the standards of care laid out by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, two organizations the State repeatedly criticizes. Like WPATH, the Finnish council concluded that puberty-suppressing hormones might be appropriate for adolescents at the onset of puberty who have exhibited persistent gender nonconformity and who are already addressing any coexisting psychological issues. Similarly, the WPATH Standards of Care and the Finnish council both recommend that cross-sex hormones be considered only where the adolescent is experiencing persistent gender dysphoria, other mental health conditions are well-managed, and the minor is able to meet the standards to consent to the treatment.

*Brandt*, 47 F.4th at 671. "In short, these European countries all chose less-restrictive means of regulation," *K.C.*, 2023 WL 4054086 at *12, and those means have not involved serious departures from the standard of care in the

United States.  *Cf. Brandt*, 47 F.4th at 671.  This matters not because Georgia is constitutionally required to follow Finland.  It matters, rather, because it casts serious doubt on Defendants' position that the state of knowledge about hormone therapy constitutes an "exceedingly persuasive justification" for singling out the treatment for a ban.  Medical authorities, in this country and elsewhere, have not drawn that conclusion from the systematic reviews.  That suggests that there is less than a "close . . . fit" between SB 140's means and the state's ends.  *Morales-Santana*, 582 U.S. at 68; *see also K.C.*, 2023 WL 4054086 at *12 ("In Defendants' view . . . the data from the systematic reviews gives the State unfettered discretion to choose how to regulate gender transition procedures for minors—up to and including a broad prohibition.  But that does not take into account the 'close means-end fit' that heightened scrutiny requires of sex-based classifications.") (citing *Morales-Santana*, 582 U.S. at 59, 68).

In other words, there is less daylight than Defendants suggest between the prevailing consensus in the United States—namely, that when indicated under the WPATH standards of care, hormone therapy is adequately safe and effective—and the approach to the same care elsewhere.  Neither the systematic reviews from Finland, et al., nor critiques of the quality of the evidence supporting hormone therapy, offer an exceedingly persuasive justification for an outright ban on care.

That brings the Court to the final set of arguments, which have not been emphasized by the Defendants, but which are worth comment. These are arguments to the effect that hormone therapy or other gender-affirming care is being "pushed" on those for whom it is not needed with "minimal consultation." (Doc. 78 at 12; Tr. 278:17–279:3.) The record does not support this notion, however.[35]  Nor have Defendants introduced evidence that providers in Georgia are not following the standards of care described elsewhere in this order. Perhaps more to the point, it is difficult to see how these concerns—even if they could be substantiated—could justify a full ban on hormone therapy; the means-ends fit would be anything but "close." *Morales-Santana*, 582 U.S. at 68. To the extent that Defendants claim that medical providers may be failing to treat in accordance with the applicable standard of care by pushing treatments on patients or failing to secure adequate informed consent, any number of regulatory means exist to, for example, address medical malfeasance or mandate informed consent or consultation protocols. *Cf. K.C.*, 2023 WL 4054086 at *11 (noting availability of "more tailored alternatives" to ban on gender-affirming care).

---

[35] Defendants' evidence on this point consists of declarations from four non-party parents, none of which describes events that took place in Georgia, and which at times describe matters beyond the declarants' personal knowledge. (Doc. 78-1, Kellie C. Decl.; Doc. 78-2, Barbara F. Decl.; Doc. 78-3, Roe Decl; Doc. 78-4, Yoe Decl.)  Defendants also introduce a complaint filed in a court in North Carolina. (Doc. 78-5.)  The Court assigns these little weight.

64

At oral argument, Defendants pointed to the ways in which SB 140 is less expansive than it could have been and argued that the law is, in fact, sufficiently tailored. But despite the law's handful of exceptions, it remains a categorical ban on care for adolescents like Plaintiffs and other youth who have not yet begun hormone replacement therapy. 2023 Ga. Laws. 4 § 3(b). And other features of the bill described as limitations in scope are not really so. The law leaves such hormone therapy available to those over 18, but intervention during adolescence—before puberty has been completed in accordance with one's birth sex—is part of the point of the banned therapy. (Doc. 2-8, Shumer Decl. ¶ 64.) Similarly, while SB 140 does not ban puberty blockers like similar laws in other states, the law is in practice no more or less tailored for this difference. Puberty blockers and hormone replacement therapy are part of a single course of treatment, (Doc. 70-1, McNamara Decl. ¶¶ 43–44), and both sides' experts agreed that remaining on puberty blockers for a prolonged period would damage health and was inadvisable for any purpose. (Doc. 2-8, Shumer Decl. ¶ 88; Doc. 93, Laidlaw Decl. ¶¶ 105–07.) So banning hormone replacement therapy effectively forecloses the availability of the course of treatment more generally. In short, the law remains a broad ban on hormone therapy for adolescents with gender dysphoria who have not yet begun such treatment.

The Court accordingly finds that Defendants have failed to carry their "demanding" burden, *Virginia*, 518 U.S. at 533, to show that their asserted interests are substantially related to SB 140's sex-classificatory legislative scheme. While there need not be a perfect means-ends fit for a law to survive heightened scrutiny, the "means-ends fit" must be "close." *See Morales-Santana*, 582 U.S. at 68. In *United States v. Virginia*, for example, the Supreme Court regarded the state's interests in the pedagogical benefits of single-sex education and diversity among public educational institutions as legitimate, "benign" justifications; nevertheless, those justifications could not support the state's "categorical exclusions." 518 U.S. at 535–36. Here, likewise, the state's prohibition on hormone replacement therapy as a treatment for gender dysphoria has not been supported by an "exceedingly persuasive justification." In light of what the evidence has shown about (1) the risks and benefits of the treatment, (2) the strength of evidence supporting it and the state of debate over gender-affirming care, (3) and alleged instances of malfeasance in the administration of that care, there is no "close means-ends fit" between SB 140's sex-based ban and the state's asserted interests. As other courts have on similar facts, this Court finds it substantially likely that Plaintiffs can succeed in showing that SB 140 cannot survive heightened scrutiny. *See K.C.*, 2023 WL 4054086, at *11; *Ladapo*, 2023 WL 3833848 at *10; *Eknes-Tucker*, 603 F. Supp. 3d at 1148; *Brandt*, 47 F.4th at 671; *Brandt*,

2023 WL 4073727 at *32–35 (finding for plaintiffs in equal protection challenge to gender-affirming care ban after full bench trial).

Plaintiffs have, therefore, shown a substantial likelihood of success on their equal protection claim.

## 2. Irreparable Harm

Next, Plaintiffs must demonstrate that they will suffer irreparable harm should the preliminary injunction not issue. "A showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel*, 234 F.3d at 1176. Harm "is 'irreparable' only if it cannot be undone through monetary remedies." *N.E. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). To satisfy this requirement, Plaintiffs' asserted irreparable harm "must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176.

Plaintiffs have established that they will suffer irreparable harm in the absence of a preliminary injunction. Without an injunction, the middle-school-age plaintiffs will be unable to obtain in Georgia a course of treatment that has been recommended by their health care providers in light of their individual diagnoses and mental health needs.

As discussed above (*see supra* § III(A)(1)), the risk of harm is sufficiently imminent. It is also both serious and irreparable. The harm in question will be experienced by minors, ages 10 to 12, all of whom have been diagnosed with

"gender dysphoria—a clinically significant psychological distress that can lead to depressed mood and suicidality." (Doc. 70-1, McNamara Decl. ¶ 48.) The parent plaintiffs fear their children's mental health will deteriorate due to SB 140's ban. (Doc. 2-2, Koe Decl. ¶¶ 18–21; Doc. 2-3, Moe Decl. ¶ 15; Doc. 2-4, Voe Decl. ¶ 19; Doc. 2-5, Zoe Decl. ¶¶ 24–25; Doc. 2-6, Soe Decl. ¶¶ 23.) The record evidence corroborates the risk of harm associated with prohibiting treatment. (Doc. 70-1, McNamara Decl. ¶ 48; Doc. 2-8, Shumer Decl.¶¶ 99–100, 105.) Plaintiffs have therefore shown a risk of irreparable harm to the minor plaintiffs. *See Eknes-Tucker*, 603 F. Supp. 3d at 1150 (finding plaintiffs would "suffer irreparable harm absent injunctive relief" where the record showed that "without transitioning medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality"); *Ladapo*, 2023 WL 3833848 at *16; *K.C.*, 2023 WL 4054086 at *13; *Brandt*, 2023 WL 4073727 at *38.

Separately, the parent plaintiffs have shown that they will experience irreparable injury without an injunction. SB 140's ban prevents the parents "from treating their children with transitioning medications subject to medically accepted standards." *Eknes-Tucker*, 603 F. Supp. 3d at 1150. Two of the parent plaintiffs consider that SB 140's ban on hormone therapy will be so harmful to their children that they are considering moving to another state. (Doc. 2-2, Koe Decl. ¶ 19; Doc. 2-3, Moe Decl. ¶ 14.) At least one parent fears

68

for her child's safety from self-harm absent this course of treatment. (Doc. 2-3, Moe Decl. ¶ 15.)

Defendants, citing *Wreal, LLC v. Amazon.com, Inc.,* 840 F.3d 1244, 1248–49 (11th Cir. 2016), contend that Plaintiffs fail to satisfy the irreparable harm requirement because they waited until two days before SB 140's effective date to file suit. *Wreal* is distinguishable. There, the Court of Appeals found that a plaintiff who delayed in seeking a preliminary injunction for five months after filing suit could not show irreparable injury. *Id.* at 1248–49. In this case, SB 140 was signed by the Governor on March 23, and Plaintiffs filed suit on June 29. They simultaneously moved for a TRO and preliminary injunction. A three-month period between SB 140's signing and the filing of Plaintiffs' motion is not unreasonable, especially when considering the amount of preparatory work required, the heavy involvement of expert witnesses, and the sensitive matters at issue in the case. True, the lawsuit's timing made it impossible to fairly consider the issues *before* the law's effective date on July 1. But this is not a case in which Plaintiffs sat on their rights. *See Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1285-86 (N.D. Fla. 2021) (finding irreparable harm despite three-month delay between bill's effective date and the motion for preliminary injunction); *cf. Wreal,* 840 F.3d at 1248–49. Plaintiffs have satisfied the second preliminary-injunction element.

### 3. Balance of Harms and Public Interest

The third and fourth preliminary-injunction requirements—that the threatened injury to the movant outweighs any harm to the non-movant and that an injunction is not adverse to the public interest—merge when, as here, the government is the party opposing the motion. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

As for harm to the Defendants, it must be acknowledged that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.*" Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)) (internal quotation marks omitted). Having said that, "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [law]." *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020); *see also Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (holding that "the threatened injury to the plaintiff clearly outweighs whatever damage the injunction may cause the city" because

70

"the city has no legitimate interest in enforcing an unconstitutional ordinance").

Considering the record evidence as discussed at length in previous sections of this order, the Court determines that the imminent risks of irreparable harm to Plaintiffs flowing from the ban—including risks of depression, anxiety, disordered eating, self-harm, and suicidal ideation— outweigh any harm the State will experience from the injunction. For the minor plaintiffs, time is of the essence, and SB 140's prohibition may lead Plaintiffs to "suffer heightened gender dysphoria" and associated distress, as well as the unwanted onset of "endogenous puberty—a process that cannot be reversed." *Brandt*, 47 F.4th at 671. For the parents, SB 140 disrupts their carefully considered treatment plans for their children, and the Court recognizes that little is so agonizing for a parent as the prospect of their child in serious emotional distress. The injunction will pause enforcement of the challenged portions of SB 140 while this matter is adjudicated. Plaintiffs have satisfied the merged balance-of-harms and public-interest requirements of the preliminary injunction standard. *Cf. Eknes-Tucker*, 603 F. Supp. 3d at 1151; *Ladapo*, 2023 WL 3833848 at *16; *K.C.*, 2023 WL 4054086 at *13; *Brandt*, 2023 WL 4073727 at *38.

Having met their burden as to all four preliminary-injunction requirements, Plaintiffs are entitled to preliminary injunctive relief.

71

## D. Scope of the Preliminary Injunction

Plaintiffs ask the Court to enjoin enforcement SB 140's hormone-therapy ban while the lawsuit is pending.  Citing the Sixth Circuit's decision in *Skrmetti*, Defendants contend that a statewide injunction would be overbroad and exceed "the nature of the federal judicial power."  (Doc. 78 at 15 (citing 75 F.4th at 415).)  They argue that any injunction should be limited in scope to the named plaintiffs.

### 1.  Plaintiffs Bring a Facial Challenge

As a threshold matter, we consider whether Plaintiffs have brought a facial or an as-applied challenge.  "A facial challenge is an attack on a statute itself as opposed to a particular application."  *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015).  Here, Plaintiffs' complaint asks the Court to "enjoin Defendants . . . from enforcing [SB 140's hormone-therapy ban]" and to declare that the ban violates the Equal Protection and Due Process clauses.  (Doc. 1 at 44.)  The Court has already found that the ban is a "facially unequal rule" that discriminates on the basis of sex.  *See, e.g., Maxi-Taxi of Fla., Inc. v. Lee Cnty. Port Auth.*, 301 F. App'x 881, 882 (11th Cir. 2008) (considering types of equal protection claims, and distinguishing those raising facial versus as-applied challenges).  Defendants argued at the hearing that Plaintiffs' claims were as-applied challenges.  But that cannot be so, for Plaintiffs attack the validity of SB 140 itself, rather than any particular application of the law, and they seek

relief that has impact beyond the plaintiffs' particular circumstances. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, No. 4:22-CV-304-MW/MAF, 2022 WL 16985720, at *50 (N.D. Fla. Nov. 17, 2022).

When, as here, a plaintiff brings a facial challenge to a statute, he "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987). Noting that "'the *Salerno* rule[ ]' has been subject to a heated debate in the Supreme Court, where it has not been consistently followed," the Court of Appeals recently explained that "*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012)). "The question that *Salerno* requires us to answer is whether the statute fails the relevant constitutional test[.]"[36] *Id.*

---

[36]*Club Madonna* "makes plain what the Supreme Court and the Eleventh Circuit have long done when evaluating facial challenges: determining whether the challenged law 'fails the relevant constitutional test.'" *Henry v. Abernathy*, No. 2:21-CV-797-RAH, 2022 WL 17816945, at *6 (M.D. Ala. Dec. 19, 2022) (summarizing holdings from *Salerno*, 481 U.S. at 749 –52; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008); *Doe v. Reed*, 561 U.S. 186 (2010); *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254 (11th Cir. 2007); and *Schultz v. Alabama*, 42 F.4th 1298 (11th Cir. 2022)).

Here, the Court has determined that SB 140's hormone-therapy ban is substantially likely to violate the Equal Protection Clause, and the Court's decision in this regard does not depend on facts particular to Plaintiffs.  While this conclusion does not, on its own, dictate the scope of injunctive relief, it is essentially dispositive on *Salerno's* no-set-of-circumstances inquiry.  *See Club Madonna*, 42 F.4th at 1256.  Indeed, as the Court of Appeals has stated, "[a]n alleged violation of one individual's constitutional rights under the Equal Protection Clause would necessarily constitute a violation of the Equal Protection Clause and the Constitution at large, regardless of the individually-applied remedy."  *See Adams,* 57 F.4th at 800 n.3 (declining plaintiff's request to classify an appeal of the district court's order as an as-applied challenge to the school board's bathroom policy, limited to plaintiff's particular circumstances).

Here, then, SB 140's hormone-therapy ban "fails the relevant constitutional inquiry" because its sex-based legislative scheme does not survive intermediate scrutiny.  *Club Madonna*, 42 F.4th at 1256.  Given the Court of Appeals' recent guidance, this is sufficient for Plaintiffs' facial challenge to succeed under *Salerno*'s no-set-of-circumstances test.  *See id*.  The Eighth Circuit similarly concluded, in a case challenging a ban on "gender transition procedures" for minors, that *Salerno*'s no-set-of-circumstances test was satisfied.  *Brandt*, 47 F.4th at 672 (affirming a district court's facial

74

injunction over defendants' *Salerno*-based objection to scope of injunction); *see also Mulholland v. Marion Cnty. Elec. Bd.*, 746 F.3d 811, 819 (7th Cir. 2014) ("We have not encountered before the idea of facial unconstitutionality as applied only to a particular plaintiff. Facial unconstitutionality as to one means facial unconstitutionality as to all, regardless of the fact that the injunctive portion of the judgment directly adjudicated the dispute of only the parties before it.").[37]

## 2. A Facial Injunction is Required to Secure Complete Relief to Named Plaintiffs

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assist. Project*, 582 U.S. 571, 579 (2017) (per curiam). The Supreme Court, discussing the "principles of equity jurisprudence," has said that "injunctive relief should be

---

[37] This conclusion is also consistent with the Supreme Court's approach to challenges to legislative sex-based classifications in general, in which facial challenges to statutes have succeeded without reference to whether the legislation might be constitutionally applied to hypothetical individuals. So, for example, in *Sessions v. Morales-Santana*, after the court determined that "the Government ha[d] advanced no 'exceedingly persuasive' justification for [8 U.S.C.] § 1409(a) and (c)'s gender-specific residency and age criteria," it abrogated the statutory exception under consideration. 582 U.S. at 72, 77. The court did not separately consider whether there might be "exceedingly persuasive" justifications for maintaining the challenged provision under any conceivable set of circumstances, and its remedy was nevertheless to abrogate the challenged statute.

75

no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) ("Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties."). In other words, under *Califano*, "the scope of injunctive relief is dictated by the extent of the violation established[.]" 442 U.S. at 702; *Thomas v. Bryant*, 614 F.3d 1288, 1317–18 (11th Cir. 2010) ("[W]e must also ensure that the scope of the awarded relief does not exceed the identified harm.") (citing *Califano*, 442 U.S. at 702).

It cannot be denied that there is, as the Sixth Circuit has said, a "rising chorus" calling into question the propriety of injunctive relief that extends further than necessary to remedy the plaintiff's injury. *Skrmetti*, 73 F.4th at 415. This is particularly so in the debate over the so-called nationwide injunction.[38] Despite this chorus, however, the Supreme Court's decision in *Califano* "does not foreclose the imposition of statewide injunctive relief[.]" *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019). And the Eleventh Circuit

---

[38] *Skrmetti*, 73 F.4th at 415 (citing *Doster v. Kendall*, 54 F.4th 398, 439 (6th Cir. 2022); *Trump v. Hawaii*, —— U.S. ——, 138 S. Ct. 2392, 2424–29 (2018) (Thomas, J., concurring); *Dep't of Homeland Sec. v. New York*, —— U.S. ——, 140 S. Ct. 599, 599–601 (2020) (Mem) (Gorsuch, J., concurring)); *see also Georgia v. President of the United States*, 46 F.4th 1283, 1303–08 (11th Cir. 2022).

has permitted statewide injunctions in cases not involving class actions. *E.g.*,
*Statewide Detective Agency v. Miller*, 115 F.3d 904, 906 (11th Cir. 1997); *People
First of Ala. v. Sec'y of State for Ala.*, 815 F. App'x 505, 505 (11th Cir. 2020)
(Mem.). Other courts do the same.[39]

In *Rodgers*, the Eighth Circuit considered the appropriateness of a
statewide injunction in the context of an anti-loitering law. 942 F.3d at 955.
There, as here, the state defendants sought to limit the injunction's scope to
plaintiffs, arguing that a wider injunction would violate the principles set forth
in *Califano*. *Id.* at 457–58. The Eighth Circuit disagreed, stating:

> *Califano* supports the entirely opposite conclusion: that injunctive
> relief should extend statewide because the violation established—

---

[39] *E.g., Brandt*, 47 F.4th at 672 (affirming statewide injunction prohibiting
enforcement of Arkansas's ban on gender-affirming care for minors); *Clement
v. Calif. Dep't of Corr.*, 364 F.3d 1148, 1152 (9th Cir. 2004) ("Because the
injunction is no broader than the constitutional violation, the district court
properly entered a statewide injunction."); *Garcia v. Stillman*, No. 22-CV-
24156, 2023 WL 3478450, at *2 (S.D. Fla. May 16, 2023) (denying motion to
stay a statewide preliminary injunction of a Florida statute that was
substantially likely to violate the First Amendment); *Barnett v. Raoul*, No.
3:23-CV-00141-SPM, 2023 WL 3160285, at *12 (S.D. Ill. Apr. 28, 2023) (issuing
statewide preliminary injunction prohibiting enforcement of Illinois statute
that likely violated plaintiff's Second Amendment right to bear arms); *Berean
Baptist Church v. Cooper*, 460 F. Supp. 3d 651, 664 (E.D.N.C. 2020) (issuing
statewide preliminary injunction against COVID-19 gathering restriction that
was substantially likely to violate a church's free exercise rights); *Duncan v.
Becerra*, 265 F. Supp. 3d 1106, 1139–40 (S.D. Cal. 2017), *aff'd*, 742 F. App'x
218 (9th Cir. 2018) (facially enjoining enforcement of a California gun statute
that likely violated the Second Amendment); *Make Liberty Win v. Ziegler*, 499
F. Supp. 3d 635, 646 (W.D. Mo. 2020) ("Because the constitutional violations
in this case are not based on facts unique to Plaintiffs, a statewide permanent
injunction is warranted.").

> the plain unconstitutionality of Arkansas's anti-loitering law—
> impacts the entire state of Arkansas. Moreover, Arkansas's
> reading of *Califano* would, in effect, require every plaintiff seeking
> statewide relief from legislative overreach to file for class
> certification. That cannot be the law.

*Id.* at 458. The Court is persuaded by the Eighth Circuit's reasoning. While a court should be skeptical of injunctions premised on the need to protect nonparties, *Georgia*, 46 F.4th at 1306, the mere fact that nonparties might be affected by a facial injunction does not bar the Court from issuing one. That is, a statewide injunction is appropriate where its scope is principally measured by "the extent of the violation established," *Califano*, 442 U.S. at 702, and by that which is "necessary to protect the interests of the parties," *Keener*, 342 F.3d at 1269.

Under the circumstances of this case, the Court considers that it is not possible to provide complete relief to Plaintiffs with an injunction limited in scope to the named parties. *Cf. State v. Dep't of Health & Hum. Servs.,* 19 F.4th 1271, 1282 (11th Cir. 2021) (nationwide injunction was too broad when there were "no concerns that a non-nationwide preliminary injunction wouldn't provide the plaintiffs with complete relief"). For the reasons listed below, affording Plaintiffs complete relief without a facial injunction would be, at best, very burdensome for Plaintiffs and the Court. At worst, it might be practically unworkable. In either case, Plaintiffs would not obtain "complete relief." *Califano*, 442 U.S. at 702. This is dispositive of the scope issue in itself.

78

"In crafting an injunction, a district court may appropriately consider the 'feasibility of equitable relief' and is empowered 'to weigh the costs and benefits of injunctive relief and, in particular, to assess the practical difficulties of enforcement of an injunction—difficulties that will fall in the first instance on the district court itself.'" *Am. Coll. of Obstetricians and Gynecologists v. U.S. Food and Drug Administration*, 472 F. Supp. 3d 183, 231 (D. Md. 2020) (quoting *Lord & Taylor, LLC v. White Flint, L.P.*, 780 F.3d 211, 217 (4th Cir. 2015)). Here, practical difficulties abound.

First, under a plaintiffs-only injunction, the practical hurdles involved in securing treatment could render the injunction effectively moot. Both physicians and certain regulated medical institutions[40] face possible sanctions for non-compliance with SB 140's prohibitions. A serious chilling effect on access to care is likely to follow, for what doctor or medical institution will continue to offer such care to minors, with the threat of serious sanctions on the horizon? Given that SB 140 subjects medical providers to sanction, "[c]omplete relief will only obtain upon an injunction with a broader sweep"— one that "will mitigate the fears" of providers "and in turn alleviate the

---

[40] These include medical labs, hospitals, and other institutions on which Plaintiffs may rely for their care. O.C.G.A. § 31-7-1; O.C.G.A. § 31-7-3.5.

79

[Plaintiffs'] consequent harms." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 63 (D.D.C. 2020).

Second, both the child and parent plaintiffs are proceeding pseudonymously—something the Court has found is justified by their substantial privacy interests (Doc. 89)—and it would be administratively burdensome, if possible at all, to fashion an injunction that would allow them to secure relief without compromising their anonymity. As noted in the Court's order granting the motion to proceed pseudonymously, the child plaintiffs' privacy interests are strong given that they are minors. (*See id.*)

Third, TransParent, an organizational plaintiff, sues on behalf of its members. Fundamental to the doctrine of associational standing is that an organization may invoke the court's remedial powers on behalf of its members. *Warth v. Seldin*, 422 U.S. 490, 515 (1975). If an organization, or an "association," prevails in obtaining prospective injunctive relief, that relief "will inure to the benefit of those members of the association actually injured." *Id.*; *see also Fla. Pub. Int. Rsch. Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1085 n.16 (11th Cir. 2004) ("[T]he interests this lawsuit seeks to protect are tied to the organizational missions of these groups, and the prospective relief sought, if awarded, would inure to the benefit of their members, making individual participation unnecessary.").

In other words, the members of TransParent who require but now cannot access hormone therapy for their transgender children are entitled to relief. But such relief would be hampered by the practical difficulties that would attend any effort to enforce a plaintiffs-only injunction. A TransParent member seeking care otherwise prohibited by SB 140 would have to establish their current membership in the organization to a series of providers, and this could give rise to factual disputes. *Cf. Am. Coll.*, 472 F. Supp. 3d at 231–32. That is particularly so given that a physician or institution who made an erroneous determination about these matters would risk sanctions under SB 140.[41]

Finally, if a plaintiffs-only injunction issued, follow-on suits by similarly situated non-plaintiffs based on this Court's order could create needless and "repetitious" litigation. *See Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Am. Coll.*, 472 F. Supp. 3d at 231.

The Court finds, therefore, that a facial injunction is necessary to afford complete relief. Plaintiffs have shown that they are entitled to one, and the Court has not been persuaded that less restrictive alternatives are feasible. *See Brandt*, 47 F.4th at 672 ("Moreover, Arkansas has failed to offer a more

---

[41] The presence of an organizational plaintiff in this case distinguishes it from others that have drawn the scope of relief more narrowly. *Cf. Lapado*, 2023 WL 3833848 at *17; *Skrmetti*, 73 F.4th at 421.

narrowly tailored injunction that would remedy Plaintiffs' injuries. The district court did not abuse its discretion by granting a facial injunction.").

### E. Security

Plaintiffs ask the Court to waive Rule 65(c)'s bond requirement. Upon granting a motion for preliminary injunction, Rule 65(c) generally requires a movant to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court, however, has discretion "to require no security at all." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005). Security can be waived "when complying with the preliminary injunction raises no risk of monetary loss to the defendant." *Mama Bears of Forsyth Cnty. v. McCall*, No. 2:22-CV-142-RWS, 2022 WL 18110246, * at 14 (N.D. Ga. Nov. 16, 2022) (internal quotation marks omitted). As no such risk appears to be present here, the Court declines to require the posting of security at this time. *See Eknes-Tucker*, 603 F. Supp. 3d at 1151 (declining to order bond payment upon injunction of a similar statute). Defendants may request a bond if they so choose. (Doc. 41 at 22.)

## IV.   Conclusion

Plaintiffs' motion for a preliminary injunction is **GRANTED**.  (Doc. 2.) Plaintiffs' motion for a temporary restraining order seeking to enjoin the statute before it went into effect, is **DENIED AS MOOT**.  (*Id.*)  Defendants and all other persons identified in Fed. R. Civ. P. 65(d)(2) are **ENJOINED** from enforcing the prohibition on hormone replacement therapy for the treatment of gender dysphoria in minors, as set forth in O.C.G.A. § 31-7-3.5(a)(2) and O.C.G.A. § 43-34-15(a)(2), pending trial, or until further order of the Court.

**SO ORDERED** this 20th day of August, 2023.

SARAH E. GERAGHTY
United States District Judge